No. 23-5004

[ORAL ARGUMENT NOT YET SCHEDULED]

**UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT**

_____

ASSASSINATION ARCHIVES AND RESEARCH CENTER, INC.,

*Plaintiff-Appellant*,

v.

DEPARTMENT OF JUSTICE,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:18-cv-01868 (Trevor N. McFadden, J.)

_____

**JOINT APPENDIX**

_____

Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff-Appellant*

## <u>NOTE ON APPENDIX ORGANIZATION</u>

The Table of Contents includes references to briefs and similar arguments, but only those briefs which have independent relevance are actually included in this Appendix. The references to other briefs in the Table of Contents are solely to provide organizational context for the exhibits and related documents which are included in this Appendix.

# TABLE OF CONTENTS

**Document**                                                                    **Page**

Civil Docket.................................................................................1

Complaint (Dkt. #1, filed Aug. 8, 2018)............................................12

Standing Order for Cases Before Judge Trevor N. McFadden (Dkt. #3, filed
    Aug. 10, 2018).....................................................................19

Defendant's Answer to Plaintiff's Complaint (Dkt. #8-1, filed Oct. 4, 2018)..26

Joint Status Report, Defendant's Motion to Modify the Schedule for Status
    Reports, and Plaintiff's Motion to Set Briefing Schedule (Dkt. #17.
    Filed June 5, 2019) ..............................................................32

Joint Status Report (Dkt. #19, filed Aug. 5, 2019) ...........................38

Transcript of Status Conference, Aug. 6, 2019................................40

Plaintiff's Unopposed Motion for Enlargement of Time to File Motion for
    Partial Summary Judgment (Dkt. #21, filed Sept. 9, 2019) ..................56

Plaintiff's Unopposed Motion to Modify Briefing Schedule (Dkt. #22, filed
    Mar. 9, 2020)......................................................................58

Plaintiff's Renewed Unopposed Motion to Modify Briefing Schedule (Dkt.
    #23, filed Mar. 16, 2020) .....................................................61

Plaintiff's Notice to the Court (Dkt. #24, filed Mar. 31, 2020)......................63

    Declaration of Michael G. Seidel ..........................................67

Joint Status Report (Dkt. #25, filed Apr. 8, 2020) .........................72

Joint Status Report (Dkt. #26, filed May 18, 2020) .......................77

    Declaration of David M. Hardy...........................................81

Defendant's Status Report (Dkt. #29, filed June 10, 2020)..............................88

Joint Status Report (Dkt. #30, filed June 18, 2020).........................................90

Joint Status Report (Dkt. #33, filed Oct. 16, 2020)..........................................92

Joint Status Report (Dkt. #34, filed Jan. 14, 2021) .........................................94

Joint Status Report (Dkt. #37, filed July 13, 2021).........................................97

Joint Status Report (Dkt. #38, filed Oct. 12, 2021).........................................100

Transcript of Status Conference, Oct. 13, 2021 ..............................................104

Plaintiff's Consent Motion for Enlargement of Time Within Which to File
    Its Motion for Partial Summary Judgment and Motion to Compel
    (Dkt. #39, filed Nov. 11, 2021) .............................................................113

Plaintiff's Memorandum of Points and Authorities in Support of Its Motion
    for Partial Summary Judgment (Dkt. #40, filed Nov. 23, 2021) ...........115

    Plaintiff's Statement of Material Facts as to Which There Is No
        Genuine Dispute ..........................................................................125

    Ex. A: *NSC v. DOJ*, No. 13-556, Third Declaration of David M.
        Hardy..........................................................................................128

    Ex. B: *NSC v. CIA*, No. 11-443, Transcript of 12/16/11 Status
        Conference...................................................................................136

Plaintiff's Motion to Compel Defendant to Seek an *Open America* Stay (Dkt.
    #41, filed Nov. 23, 2021) .....................................................................160

Defendant's Motion for an Extension to File Defendant's Opposition and
    Modify Briefing Schedule (Dkt. #42, filed Dec. 20, 2021)....................168

Defendant's Amended Motion for Extension to File Defendant's Opposition
    and Modify Briefing Schedule (Dkt. #44, filed Jan. 14, 2022) ..............171

Defendant's Opposition to Plaintiff's Partial Motion for Summary Judgment and Motion to Compel Defendant to Seek an *Open America* Stay (Dkt. #45, filed Jan. 21, 2022)

    Defendants' Statement of Undisputed Material Facts............................174

    Defendant's Response to Plaintiff's Statement of Undisputed Material Facts ...........................................................................182

    Declaration of Michael G. Seidel plus exhibits (excerpts).....................186

Plaintiff's Consent Motion for Enlargement of Time Within Which to File Its Replies in Support of Its Motion for Partial Summary Judgment and Motion to Compel (Dkt. #46, filed Feb. 11, 2022) ................................270

Order (Dkt. #47, filed Feb. 14, 2022)..............................................272

Defendant's Status Report (Dkt. #48, filed Mar. 18, 2022) .............................276

Memorandum of Points and Authorities in Support of Defendant's Motion for Partial Summary Judgment (Dkt. #49, filed Apr. 18, 2022).............278

    Defendant's Statement of Undisputed Material Facts............................292

    Second Declaration of Michael G. Seidel plus exhibit ..........................297

Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment (Dkt. #50, filed May 18, 2022).............................................306

    Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ...........................................................................319

Order (Dkt. #52, filed Sept. 30, 2022)..............................................322

Defendant's Motion to Dismiss and Memorandum in Support Thereof (Dkt. #53, filed Oct. 24, 2022) ......................................................325

    Third Declaration of Michael G. Seidel ...........................................331

Order (Dkt. #54, filed Nov. 8, 2022)...............................................333

Civil Notice of Appeal (Dkt. #55, filed Jan. 7, 2023).......................................335

APPEAL,CLOSED,TYPE I-FOIA

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:18-cv-01868-TNM

| | |
|---|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER v. DEPARTMENT OF JUSTICE | Date Filed: 08/08/2018 |
| Assigned to: Judge Trevor N. McFadden | Date Terminated: 11/08/2022 |
| Case in other court: 23-05004 | Jury Demand: None |
| Cause: 05:552 Freedom of Information Act | Nature of Suit: 895 Freedom of Information Act |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**ASSASSINATION ARCHIVES AND RESEARCH CENTER**      represented by **Kelly Brian McClanahan**
NATIONAL SECURITY COUNSELORS
4702 Levada Terrace
Rockville, MD 20853
(301) 728-5908
Fax: (240) 681-2189
Email: kel@nationalsecuritylaw.org
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**US DEPT OF JUSTICE**      represented by **Alan Burch**
DOJ-USAO
Eousa
3 Constitution Square
175 N Street, NE
Washington, DC 20002
202-252-5875
Email: alan.burch@usdoj.gov
*TERMINATED: 10/09/2020*
*LEAD ATTORNEY*

**Daniel Patrick Schaefer**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252-2531
Fax: (202) 252-2599
Email: daniel.schaefer@esbrook.com
*TERMINATED: 05/01/2021*

*LEAD ATTORNEY*

**Rhonda Lisa Campbell**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252-2559
Fax: (202) 252-2599
Email: rhonda.campbell@usdoj.gov
*TERMINATED: 05/18/2020*
*LEAD ATTORNEY*

**Stephanie R. Johnson**
UNITED STATES ATTORNEY'S
OFFICE
555 Fourth Street, NW
Washington, DC 20530
(202) 252-7874
Email: Stephanie.Johnson5@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/08/2018 | 1 R | COMPLAINT against DEPARTMENT OF JUSTICE ( Filing fee $ 400 receipt number 0090-5629406) filed by ASSASSINATION ARCHIVES AND RESEARCH CENTER. (Attachments: # 1 Civil Cover Sheet, # 2 LCvR 7.1 certificate, # 3 Summons, # 4 Summons, # 5 Summons)(McClanahan, Kelly) (Entered: 08/08/2018) |
| 08/08/2018 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ASSASSINATION ARCHIVES AND RESEARCH CENTER (zsb) (Entered: 08/09/2018) |
| 08/09/2018 | | Case Assigned to Judge Trevor N. McFadden. (zsb) (Entered: 08/09/2018) |
| 08/10/2018 | 3 | STANDING ORDER establishing Procedures for Cases Before Judge Trevor N. McFadden. The parties are hereby ORDERED to read and comply with the directives in the attached standing order. Signed by Judge Trevor N. McFadden on 8/10/2018. (lctnm3) (Entered: 08/10/2018) |
| 08/10/2018 | 4 | SUMMONS (3) Issued Electronically as to DEPARTMENT OF JUSTICE, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zsb) (Entered: 08/10/2018) |
| 08/23/2018 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 8/20/2018. ( Answer due for ALL FEDERAL DEFENDANTS by 9/19/2018.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 8/20/18., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DEPARTMENT OF JUSTICE served on 8/20/2018 (McClanahan, Kelly) |

| | | (Entered: 08/23/2018) |
|---|---|---|
| 09/13/2018 | 6 | NOTICE of Appearance by Rhonda Lisa Campbell on behalf of DEPARTMENT OF JUSTICE (Campbell, Rhonda) (Entered: 09/13/2018) |
| 09/19/2018 | 7 | ANSWER to Complaint by DEPARTMENT OF JUSTICE.(Campbell, Rhonda) (Entered: 09/19/2018) |
| 09/24/2018 | | MINUTE ORDER. Before the Court are a complaint and an answer in this FOIA case. It is hereby ORDERED that the parties shall meet and confer and file a Joint Status Report proposing a schedule for proceeding in this matter. The schedule should address, among other things, the status of Plaintiff's FOIA request, the anticipated number of documents responsive to Plaintiff's FOIA request, the anticipated date(s) for release of the documents requested by Plaintiff, whether a motion for an Open America stay is likely in this case, whether a Vaughn index will be required in this case, and a briefing schedule for dispositive motions, if required. The parties shall file the schedule on or before October 19, 2018. Signed by Judge Trevor N. McFadden on 9/24/2018. (lctnm3) (Entered: 09/24/2018) |
| 09/24/2018 | | Set/Reset Deadlines: Joint Status Report due by 10/19/2018. (hmc) (Entered: 09/24/2018) |
| 10/04/2018 | 8 | ERRATA *Answer (Corrected)* by DEPARTMENT OF JUSTICE 7 Answer to Complaint filed by DEPARTMENT OF JUSTICE. (Attachments: # 1 Exhibit Answer (Corrected))(Campbell, Rhonda) (Entered: 10/04/2018) |
| 10/19/2018 | 9 | Joint STATUS REPORT by ASSASSINATION ARCHIVES AND RESEARCH CENTER. (McClanahan, Kelly) (Entered: 10/19/2018) |
| 10/22/2018 | | MINUTE ORDER: Upon consideration of the parties' 9 Joint Status Report, it is hereby ORDERED that a further update shall be filed on or before December 7, 2018. This update shall propose a schedule for further proceedings as necessary. Signed by Judge Trevor N. McFadden on 10/22/2018. (lctnm3) (Entered: 10/22/2018) |
| 10/22/2018 | | Set/Reset Deadlines: Joint Status Report due by 12/7/2018. (hmc) (Entered: 10/22/2018) |
| 12/07/2018 | 10 | Consent MOTION for Extension of Time to File *Joint Status Report* by ASSASSINATION ARCHIVES AND RESEARCH CENTER (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 12/07/2018) |
| 12/10/2018 | | MINUTE ORDER: Upon consideration of the Plaintiff's 10 Consent Motion, it is hereby ORDERED that the parties shall file a Joint Status Report on or before January 11, 2019. This update shall propose a schedule for further proceedings as necessary. Counsel is directed to strictly comply with the Court's 3 Standing Order, including its provisions governing motions for extensions of time. Signed by Judge Trevor N. McFadden on 12/10/2018. (lctnm3) (Entered: 12/10/2018) |
| 12/10/2018 | | Set/Reset Deadlines: Joint Status Report due by 1/11/2019. (tg) (Entered: 12/10/2018) |
| 01/07/2019 | 11 | Consent MOTION to Stay , MOTION for Extension of Time to *in Light of Lapse of Appropriations* by DEPARTMENT OF JUSTICE (Attachments: # 1 Text of Proposed Order)(Hudak, Brian) (Entered: 01/07/2019) |

3

| 01/08/2019 | | MINUTE ORDER: Upon considering the Defendant's 11 Motion to Stay, it is hereby ORDERED that this matter shall be stayed until Congress has restored appropriations to the Department of Justice. It is further ordered that the Defendants will notify the Court immediately upon resumption of appropriations. Signed by Judge Trevor N. McFadden on 1/8/2019. (lctnm3) (Entered: 01/08/2019) |
| --- | --- | --- |
| 01/30/2019 | 12 | NOTICE *of Restored Funding* by DEPARTMENT OF JUSTICE (Campbell, Rhonda) (Entered: 01/30/2019) |
| 01/30/2019 | | MINUTE ORDER: Upon consideration of the Defendant's 12 Notice, the Court hereby lifts the stay in this case. The parties are ORDERED to file a status report with a proposed schedule for further proceedings on or before February 6, 2019. SO ORDERED. Signed by Judge Trevor N. McFadden on 1/30/19. (lctnm3) (Entered: 01/30/2019) |
| 01/30/2019 | | Set/Reset Deadlines: Joint Status Report due by 2/6/2019. (hmc) (Entered: 01/30/2019) |
| 02/06/2019 | 13 | Joint STATUS REPORT by DEPARTMENT OF JUSTICE. (Campbell, Rhonda) (Entered: 02/06/2019) |
| 02/07/2019 | | MINUTE ORDER: Upon consideration of the parties' 13 Joint Status Report, it is hereby ORDERED that a further report shall be filed on or before March 7, 2019. This report shall propose a schedule for further proceedings as necessary. Signed by Judge Trevor N. McFadden on 2/7/2019. (lctnm3) (Entered: 02/07/2019) |
| 02/07/2019 | | Set/Reset Deadlines: Joint Status Report due by 3/7/2019. (hmc) (Entered: 02/07/2019) |
| 03/07/2019 | 14 R | Joint STATUS REPORT by DEPARTMENT OF JUSTICE. (Campbell, Rhonda) (Entered: 03/07/2019) |
| 03/11/2019 | | MINUTE ORDER: Upon consideration of the parties' 14 R Joint Status Report, it is hereby ORDERED that the parties shall file a further report on or before April 5, 2019. Beginning on April 5, 2019, the parties shall file a monthly Joint Status Report on or before the 5th of each month until the Defendant completes records production. The Joint Status Report submitted after the completion of production shall propose a schedule for further proceedings as necessary. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/11/2019. (lctnm3) (Entered: 03/11/2019) |
| 03/11/2019 | | Set/Reset Deadlines: Joint Status Report due by 4/5/2019, and every 5th of each month thereafter. (hmc) (Entered: 03/11/2019) |
| 04/05/2019 | 15 | Joint STATUS REPORT by ASSASSINATION ARCHIVES AND RESEARCH CENTER. (McClanahan, Kelly) (Entered: 04/05/2019) |
| 05/06/2019 | 16 | Joint STATUS REPORT by DEPARTMENT OF JUSTICE. (Campbell, Rhonda) (Entered: 05/06/2019) |
| 06/05/2019 | 17 | Joint STATUS REPORT *, Defendant's Motion to Modify the Schedule for Status Reports, and Plaintiff's Motion to Set Briefing Schedule* by ASSASSINATION ARCHIVES AND RESEARCH CENTER. (Attachments: # 1 Text of Proposed Order - Defendant, # 2 Text of Proposed Order - Plaintiff)(McClanahan, Kelly) (Entered: 06/05/2019) |

| 06/05/2019 | 18 | MOTION to Modify, MOTION for Briefing Schedule by ASSASSINATION ARCHIVES AND RESEARCH CENTER. (See Docket Entry 17 to view document) (tth) (Entered: 06/06/2019) |
|---|---|---|
| 06/06/2019 | | MINUTE ORDER: Upon consideration of the parties' 17 Joint Status Report and the accompanying motions, a status hearing is hereby scheduled for July 8, 2019 at 10 a.m. in Courtroom 2 before Judge Trevor N. McFadden. Signed by Judge Trevor N. McFadden on 6/6/2019. (lctnm3) (Entered: 06/06/2019) |
| 06/06/2019 | | Set/Reset Hearings: Status Conference set for 7/8/2019 at 10:00 AM in Courtroom 2 before Judge Trevor N. McFadden. (hmc) (Entered: 06/06/2019) |
| 06/07/2019 | | MINUTE ORDER: The Status Conference currently set for July 8, 2019 is hereby continued until August 6, 2019 at 10:30 a.m. in Courtroom 2 before Judge Trevor N. McFadden. Signed by Judge Trevor N. McFadden on 6/7/2019. (lctnm3) (Entered: 06/07/2019) |
| 06/07/2019 | | Set/Reset Hearings: Status Conference rescheduled to 8/6/2019 at 10:30 AM in Courtroom 2 before Judge Trevor N. McFadden. (hmc) (Entered: 06/07/2019) |
| 08/05/2019 | 19 | Joint STATUS REPORT by ASSASSINATION ARCHIVES AND RESEARCH CENTER. (McClanahan, Kelly) (Entered: 08/05/2019) |
| 08/06/2019 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Status Conference held on 8/6/2019. Plaintiff's Partial Motion for Summary Judgment due by 9/13/2019. Defendant's Opposition to Plaintiff's Motion due by 10/4/2019. Plaintiff's Reply due by 10/25/2019. Motion Hearing set for 11/6/2019 at 10:00 AM in Courtroom 2 before Judge Trevor N. McFadden. The monthly Joint Status Report requirement is lifted between 8/6/2019 and 11/6/2019. Plaintiff's oral motion to compel the Government to move for an Open America stay, heard and denied. (Court Reporter: Nancy Meyer.) (hmc) Modified on 8/6/2019 to edit Plaintiff's oral motion (hmc). (Entered: 08/06/2019) |
| 08/07/2019 | 20 | TRANSCRIPT OF PROCEEDINGS before Judge Trevor N. McFadden held on 08/06/2019; Page Numbers: 1-16. Date of Issuance: 08/07/2019. Court Reporter: Nancy J. Meyer, Telephone number (202) 354-3118, Tape Number: N/A. Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 8/28/2019. Redacted Transcript Deadline set for 9/7/2019. Release of Transcript Restriction set for 11/5/2019.(Meyer, Nancy) (Entered: 08/07/2019) |
| 09/09/2019 | 21 | Unopposed MOTION for Extension of Time to File *Motion for Partial Summary Judgment* by ASSASSINATION ARCHIVES AND RESEARCH CENTER (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: |

| | | |
|---|---|---|
| | | 09/09/2019) |
| 09/10/2019 | | MINUTE ORDER. Upon consideration of the Plaintiff's 21 Motion for Extension, it is hereby ORDERED that the case shall be stayed through March 9, 2020. Should Mr. Lesar's condition improve before March 10, 2020, the Plaintiff shall promptly inform the Court. The summary judgment briefing schedule is modified as follows: Plaintiff's Partial Motion for Summary Judgment shall be due on March 10, 2020. Defendant's Opposition shall be due by March 31, 2020. Plaintiff's Reply shall be due by April 21, 2020. Motion hearing set for May 4, 2020 at 10 a.m. in Courtroom 2 before Judge Trevor N. McFadden. SO ORDERED. Signed by Judge Trevor N. McFadden on 9/10/2019. (lctnm3) (Entered: 09/10/2019) |
| 09/10/2019 | | Case Stayed through March 9, 2020. (tg) (Entered: 09/11/2019) |
| 09/11/2019 | | Set/Reset Deadlines/Hearings: Partial Summary Judgment motion due by 3/10/2020; opposition to partial Motion for Summary Judgment due by 3/31/2020. reply due by 4/21/2020. Motion Hearing set for 5/4/2020, at 10:00 AM in Courtroom 2 before Judge Trevor N. McFadden. (tg) (Entered: 09/11/2019) |
| 03/09/2020 | 22 | Unopposed MOTION for Briefing Schedule *(Modified)* by ASSASSINATION ARCHIVES AND RESEARCH CENTER (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 03/09/2020) |
| 03/11/2020 | | MINUTE ORDER granting in part and denying in part Plaintiff's 22 Motion. The following briefing schedule is hereby ORDERED: Plaintiff's Motion for Partial Summary Judgment shall be due no later than March 31, 2020; Defendant's Opposition shall be due no later than May 15, 2020; and Plaintiff's Reply shall be due no later than June 8, 2020. It is further ORDERED that the motion hearing shall be RESCHEDULED for June 23, 2020 at 10 a.m. in Courtroom 2 before Judge Trevor N. McFadden. Further requests for extension shall be disfavored. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/11/2020. (lctnm3) (Entered: 03/11/2020) |
| 03/11/2020 | | Set/Reset Deadlines/Hearings: Plaintiff's Motion for Summary Judgment due by 3/31/2020. Defendant's Opposition due by 5/15/2020. Plaintiff's Reply due by 6/8/2020. Motion Hearing rescheduled for 6/23/2020 at 10:00 AM in Courtroom 2 before Judge Trevor N. McFadden. (hmc) (Entered: 03/11/2020) |
| 03/16/2020 | 23 | Unopposed MOTION for Briefing Schedule *(Modified)* by ASSASSINATION ARCHIVES AND RESEARCH CENTER (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 03/16/2020) |
| 03/16/2020 | | MINUTE ORDER. The Court originally ordered the summary judgment briefing schedule in August 2019 at Plaintiff's request. See Minute Entry (8/6/2019). One month later, the Court granted the Plaintiff's request to stay the case for six months, with summary judgment briefing to resume upon lifting the stay. See Minute Order (9/10/2019); Plaintiff's 21 Motion for Extension. The Court then extended the deadline further at Plaintiff's request, warning at the same time that "[f]urther requests for extension shall be disfavored." Minute Order (3/11/2020); see Plaintiff's 22 Motion for Extension. The Plaintiff has known of its summary judgment briefing deadline since August 6, 2019. Notwithstanding the national emergency surrounding the coronavirus, the Plaintiff has not shown good cause why its briefing deadline should be extended yet again. For all these reasons, it is hereby ORDERED that Plaintiff's 23 Motion for Extension is DENIED. SO ORDERED. Signed by Judge |

| | | |
|---|---|---|
| | | Trevor N. McFadden on 3/16/2020. (lctnm3) (Entered: 03/16/2020) |
| 03/31/2020 | 24 | NOTICE *to the Court* by ASSASSINATION ARCHIVES AND RESEARCH CENTER (Attachments: # 1 Exhibit - Shapiro Seidel declaration)(McClanahan, Kelly) (Entered: 04/01/2020) |
| 04/01/2020 | | MINUTE ORDER. Upon consideration of the Plaintiff's 24 Notice, the summary judgment briefing schedule and motion hearing scheduled for June 23, 2020 are hereby VACATED. The parties shall meet and confer and file a Joint Status Report by April 8, 2020, which shall provide a recommendation for a further production and reporting schedule in this matter. SO ORDERED. Signed by Judge Trevor N. McFadden on 4/1/2020. (lctnm3) (Entered: 04/01/2020) |
| 04/01/2020 | | Set/Reset Deadlines: Joint Status Report due by 4/8/2020. (hmc) (Entered: 04/01/2020) |
| 04/08/2020 | 25 | Joint STATUS REPORT by DEPARTMENT OF JUSTICE. (Campbell, Rhonda) (Entered: 04/08/2020) |
| 04/09/2020 | | MINUTE ORDER. Upon consideration of the parties' 25 Joint Status Report, it is hereby ORDERED that the parties shall file another Joint Status Report by May 18, 2020. It is further ORDERED that the Defendant shall promptly inform the Court if it sooner resumes record processing capability. Signed by Judge Trevor N. McFadden on 4/9/2020. (lctnm3) (Entered: 04/09/2020) |
| 04/09/2020 | | Set/Reset Deadlines: Joint Status Report due by 5/18/2020. (hmc) (Entered: 04/09/2020) |
| 05/18/2020 | 26 | Joint STATUS REPORT by DEPARTMENT OF JUSTICE. (Burch, Alan) (Entered: 05/18/2020) |
| 05/18/2020 | 27 | NOTICE OF SUBSTITUTION OF COUNSEL by Alan Burch on behalf of DEPARTMENT OF JUSTICE Substituting for attorney Rhonda Campbell (Burch, Alan) (Entered: 05/18/2020) |
| 05/18/2020 | 28 | ERRATA by DEPARTMENT OF JUSTICE 26 Status Report filed by DEPARTMENT OF JUSTICE. (Attachments: # 1 Exhibit Declaration of David M. Hardy)(Burch, Alan) (Entered: 05/18/2020) |
| 05/19/2020 | | MINUTE ORDER. Upon consideration of the parties' 26 Joint Status Report, it is hereby ORDERED that the parties shall file another report by June 18, 2020. The report shall provide an update regarding the Defendant's record processing capability. It is further ORDERED that the parties shall appear by telephone on June 22, 2020 at 10 a.m. for a status conference before Judge Trevor N. McFadden. Dial-in information will be emailed to counsel. SO ORDERED. Signed by Judge Trevor N. McFadden on 5/19/2020. (lctnm3) (Entered: 05/19/2020) |
| 05/19/2020 | | Set/Reset Deadlines/Hearings: Joint Status Report due by 6/18/2020. Status Conference set for 6/22/2020 at 10:00 AM before Judge Trevor N. McFadden. (hmc) (Entered: 05/19/2020) |
| 06/10/2020 | 29 | STATUS REPORT by DEPARTMENT OF JUSTICE. (Burch, Alan) (Entered: 06/10/2020) |
| 06/18/2020 | 30 | Joint STATUS REPORT by DEPARTMENT OF JUSTICE. (Burch, Alan) (Entered: 06/18/2020) |

| | | |
|---|---|---|
| 06/22/2020 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Telephonic Status Conference held on 6/22/2020. Stay LIFTED. Joint Status Report due by 7/18/2020, and every 90 days thereafter. (Court Reporter: Crystal Pilgrim.) (hmc) (Entered: 06/22/2020) |
| 07/20/2020 | 31 | Joint STATUS REPORT by DEPARTMENT OF JUSTICE. (Burch, Alan) (Entered: 07/20/2020) |
| 10/09/2020 | 32 | NOTICE OF SUBSTITUTION OF COUNSEL by Daniel Patrick Schaefer on behalf of DEPARTMENT OF JUSTICE Substituting for attorney Alan Burch (Schaefer, Daniel) (Entered: 10/09/2020) |
| 10/16/2020 | 33 | Joint STATUS REPORT by DEPARTMENT OF JUSTICE. (Schaefer, Daniel) (Entered: 10/16/2020) |
| 01/14/2021 | 34 | Joint STATUS REPORT by DEPARTMENT OF JUSTICE. (Schaefer, Daniel) (Entered: 01/14/2021) |
| 04/14/2021 | 35 | Joint STATUS REPORT by DEPARTMENT OF JUSTICE. (Schaefer, Daniel) (Entered: 04/14/2021) |
| 05/01/2021 | 36 | NOTICE OF SUBSTITUTION OF COUNSEL by Stephanie R. Johnson on behalf of DEPARTMENT OF JUSTICE Substituting for attorney Daniel Patrick Schaefer (Johnson, Stephanie) (Entered: 05/01/2021) |
| 07/13/2021 | 37 | Joint STATUS REPORT by DEPARTMENT OF JUSTICE. (Johnson, Stephanie) (Entered: 07/13/2021) |
| 07/15/2021 | | MINUTE ORDER. The parties are hereby ORDERED to appear for a Status Conference on October 13, 2021 at 10:00 a.m. in Courtroom 2, before Judge Trevor N. McFadden. Signed by Judge Trevor N. McFadden on 7/15/2021. (lctnm3) (Entered: 07/15/2021) |
| 07/16/2021 | | Set/Reset Hearings: Status Conference set for 10/13/2021 at 10:00 AM in Courtroom 2- In Person before Judge Trevor N. McFadden. (hmc) (Entered: 07/16/2021) |
| 10/12/2021 | 38 R | Joint STATUS REPORT by DEPARTMENT OF JUSTICE. (Johnson, Stephanie) (Entered: 10/12/2021) |
| 10/12/2021 | | MINUTE ORDER. Upon consideration of the 38 R Joint Status Report, the in-person status conference currently scheduled for October 13, 2021 at 10:00am is hereby rescheduled for a telephonic status conference on October 13, 2021 at 10:30am. Dial in details will be emailed to counsel. SO ORDERED. Signed by Judge Trevor N. McFadden on 10/12/2021. (lctnm3) Modified on 10/12/2021 to add year (hmc). (Entered: 10/12/2021) |
| 10/12/2021 | | Set/Reset Hearings: Telephonic Status Conference rescheduled for 10/13/2021 at 10:30 AM before Judge Trevor N. McFadden. (hmc) (Entered: 10/12/2021) |
| 10/13/2021 | | Minute Entry for proceedings held before Judge Trevor N. McFadden: Telephonic Status Conference held on 10/13/2021. Plaintiff's Motion to Compel due by 11/12/2021. Defendant's Opposition due by 12/3/2021. Plaintiff's Reply due by 12/17/2021. (Court Reporter: Lisa Bankins.) (hmc) (Entered: 10/13/2021) |
| 11/11/2021 | 39 | Consent MOTION for Extension of Time to File *Motion for Partial Summary Judgment and Motion to Compel* by ASSASSINATION ARCHIVES AND RESEARCH CENTER. (Attachments: # 1 Text of Proposed Order)(McClanahan, |

| | | Kelly) (Entered: 11/11/2021) |
|---|---|---|
| 11/12/2021 | | MINUTE ORDER granting Plaintiff's 39 Consent Motion for Enlargement of Time. Plaintiff's Motion for Partial Summary Judgment and Motion to Compel are now due November 23, 2021. Defendant's opposition is due December 23, 2021. Plaintiff's Reply is due January 6, 2022. Future extension requests will be disfavored. SO ORDERED. Signed by Judge Trevor N. McFadden on 11/12/2021. (lctnm3) (Entered: 11/12/2021) |
| 11/12/2021 | | Set/Reset Deadlines: Plaintiff's Motion for Partial Summary Judgment and Motion to Compel are now due November 23, 2021. Defendant's opposition is due December 23, 2021. Plaintiff's Reply is due January 6, 2022.(hmc) (Entered: 11/12/2021) |
| 11/23/2021 | 40 | MOTION for Partial Summary Judgment by ASSASSINATION ARCHIVES AND RESEARCH CENTER. (Attachments: # 1 Exhibit A - NSC Hardy declaration, # 2 Exhibit B - 11-443 transcript, # 3 Text of Proposed Order)(McClanahan, Kelly) (Entered: 11/23/2021) |
| 11/23/2021 | 41 | MOTION to Compel *Defendant to Seek an Open America Stay* by ASSASSINATION ARCHIVES AND RESEARCH CENTER. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 11/23/2021) |
| 12/20/2021 | 42 | MOTION for Extension of Time to *FILE DEFENDANTS OPPOSITION*, MOTION to Modify *BRIEFING SCHEDULE* by DEPARTMENT OF JUSTICE. (Johnson, Stephanie) (Entered: 12/20/2021) |
| 12/21/2021 | | MINUTE ORDER granting in part and denying part the Government's 42 Motion for Extension of Time. The Government's opposition to the 40 and 41 Motions is now due January 14, 2022. Plaintiff's Reply is now due February 4, 2022. Future extension requests will be disfavored. SO ORDERED. Signed by Judge Trevor N. McFadden on 12/21/2021. (lctnm3) (Entered: 12/21/2021) |
| 12/23/2021 | | Set/Reset Deadlines: Government's opposition due by 1/14/2022. Plaintiff's reply due by 2/4/2022. (zhmc) (Entered: 12/23/2021) |
| 01/14/2022 | 43 | MOTION for Extension of Time to *FILE DEFENDANTS OPPOSITION*, MOTION to Modify *BRIEFING SCHEDULE* by DEPARTMENT OF JUSTICE. (Johnson, Stephanie) (Entered: 01/14/2022) |
| 01/14/2022 | 44 | Amended MOTION for Extension of Time to *FILE DEFENDANTS OPPOSITION*, Amended MOTION to Modify *BRIEFING SCHEDULE* by DEPARTMENT OF JUSTICE. (Johnson, Stephanie) (Entered: 01/14/2022) |
| 01/14/2022 | | MINUTE ORDER granting in part Defendant's 44 Motion for Extension of Time. Defendant shall file its opposition to the 40 and 41 Motions on or before January 21, 2022. Plaintiff's reply is now due on or before February 11, 2022. Defendant's 43 Motion for Extension of Time is hereby declared moot. SO ORDERED. Signed by Judge Trevor N. McFadden on 1/14/2022. (lctnm3) Modified on 1/18/2022 to edit ecf number (hmc). (Entered: 01/14/2022) |
| 01/18/2022 | | Set/Reset Deadlines: Defendant's opposition due by 1/21/2022, Plaintiff's reply due by 2/11/2022. (hmc) (Entered: 01/18/2022) |
| 01/21/2022 | 45 | Memorandum in opposition to re 41 MOTION to Compel *Defendant to Seek an Open America Stay*, 40 MOTION for Partial Summary Judgment filed by DEPARTMENT OF JUSTICE. (Attachments: # 1 Declaration of Michael G. Seidel,) |

| | | (Johnson, Stephanie) (Entered: 01/21/2022) |
|---|---|---|
| 02/11/2022 | 46 | Consent MOTION for Extension of Time to File Response/Reply as to 41 MOTION to Compel *Defendant to Seek an Open America Stay*, 40 MOTION for Partial Summary Judgment by ASSASSINATION ARCHIVES AND RESEARCH CENTER. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 02/11/2022) |
| 02/14/2022 | 47 | ORDER denying Plaintiff's 40 Motion for Partial Summary Judgment, 41 Motion to Compel, and 46 Consent Motion for Extension of Time. See attached Order for details. Signed by Judge Trevor N. McFadden on 2/14/2022. (lctnm3) (Entered: 02/14/2022) |
| 02/15/2022 | | Set/Reset Deadlines: Government's Proposed Schedule due by 3/18/2022. (hmc) (Entered: 02/15/2022) |
| 03/18/2022 | 48 | STATUS REPORT by DEPARTMENT OF JUSTICE. (Johnson, Stephanie) (Entered: 03/18/2022) |
| 03/23/2022 | | MINUTE ORDER. Upon consideration of the Government's 48 Status Report, the parties shall adhere to the following briefing schedule. Defendant shall file its motion on or before April 18, 2022. Plaintiff will file its opposition on or before May 18, 2022. Defendant will file its reply on or before June 17, 2022. SO ORDERED. Signed by Judge Trevor N. McFadden on 3/23/2022. (lctnm3) (Entered: 03/23/2022) |
| 03/25/2022 | | Set/Reset Deadlines: Defendant's motion due by 4/18/2022. Plaintiff's opposition due by 5/18/2022. Defendant's reply due by 6/17/2022. (hmc) (Entered: 03/25/2022) |
| 04/18/2022 | 49 | MOTION for Partial Summary Judgment by DEPARTMENT OF JUSTICE. (Attachments: # 1 Declaration of Michael G. Seidel)(Johnson, Stephanie) (Entered: 04/18/2022) |
| 05/18/2022 | 50 R | Memorandum in opposition to re 49 MOTION for Partial Summary Judgment filed by ASSASSINATION ARCHIVES AND RESEARCH CENTER. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 05/19/2022) |
| 06/17/2022 | 51 R | REPLY to opposition to motion re 50 R Memorandum in Opposition filed by DEPARTMENT OF JUSTICE. (Johnson, Stephanie) (Entered: 06/17/2022) |
| 09/30/2022 | 52 | ORDER granting Defendants' 49 Motion for Partial Summary Judgment. See attached Order for details. Signed by Judge Trevor N. McFadden on 9/30/2022. (lctnm3) (Entered: 09/30/2022) |
| 10/24/2022 | 53 R | MOTION to Dismiss by US DEPT OF JUSTICE. (Attachments: # 1 R Declaration of Michael G. Seidel)(Johnson, Stephanie) (Entered: 10/24/2022) |
| 11/08/2022 | 54 R | ORDER granting the Government's 53 R Motion to Dismiss. See attached Order for details. The Clerk of Court shall close this case. Signed by Judge Trevor N. McFadden on 11/8/2022. (lctnm3) (Entered: 11/08/2022) |

| 01/07/2023 | 55 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 47 Order on Motion for Extension of Time to File Response/Reply, 54 R Order, Order on Motion for Briefing Schedule,,,, Status Conference,,, Set Deadlines/Hearings,, 52 Order on Motion for Partial Summary Judgment by ASSASSINATION ARCHIVES AND RESEARCH CENTER. Filing fee $ 505, receipt number CDCDC-9772861. Fee Status: Fee Paid. Parties have been notified. (McClanahan, Kelly) (Entered: 01/07/2023) |
| --- | --- | --- |
| 01/09/2023 | 56 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 55 Notice of Appeal to DC Circuit Court. (zed) (Entered: 01/09/2023) |
| 01/10/2023 | | USCA Case Number 23-5004 for 55 Notice of Appeal to DC Circuit Court, filed by ASSASSINATION ARCHIVES AND RESEARCH CENTER. (zed) (Entered: 01/11/2023) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 04/08/2023 15:03:45 | | |
| **PACER Login:** | neocount | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-01868-TNM |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | * | |
| RESEARCH CENTER, INC. | * | |
| 930 Wayne Avenue | * | |
| Unit 1111 | * | |
| Silver Spring, MD  20910 | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 1:18-cv-01868 |
| v. | * | |
| | * | |
| DEPARTMENT OF JUSTICE | * | |
| 950 Pennsylvania Avenue, NW | * | |
| Washington, DC  20530, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## COMPLAINT

Plaintiff Assassination Archives and Research Center, Inc. brings this action against Defendant Department of Justice pursuant to the Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, *as amended* ("FOIA"), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the All Writs Act, 28 U.S.C. § 1651.

## JURISDICTION

1.      This Court has both subject matter jurisdiction over this action and personal jurisdiction over Defendant pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

## VENUE

2.      Venue is appropriate under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391.

12

## PARTIES

3.      Plaintiff Assassination Archives and Research Center, Inc. ("AARC") is a non-profit tax-exempt business incorporated in the state of Maryland.

4.      Defendant Department of Justice ("DOJ") is an agency within the meaning of 5 U.S.C. § 552(e), and is in possession and/or control of the records requested by AARC which are the subject of this action.

5.      The Federal Bureau of Investigation ("FBI") and Office of Information Policy ("OIP") are DOJ components.

## FACTUAL BACKGROUND

6.      On 2 July 2009, FBI revealed that it possessed seven boxes of indices of pre-1960 electronic surveillance activities ("ELSUR indices") in a sworn declaration filed in the FOIA case *Lardner v. FBI*, No. 03-874 (D.D.C.).

7.      On 7 October 2009, AARC submitted to FBI a FOIA request for the ELSUR indices ("the 1st Request") via U.S. Postal Service Certified Mail.

8.      AARC requested that it be classified as a representative of the news media and be granted a public interest fee waiver.

9.      On 4 November 2009, FBI acknowledged receipt of the 1st Request and assigned it Request No. 1139342-000.

10.     On 5 November 2009, FBI informed AARC that it had denied its fee category and fee waiver requests.

11.     On 13 November 2009, FBI informed AARC that it had identified approximately 18,000 pages of potentially responsive records.

12.     On 9 February 2011, FBI informed AARC that approximately 5,000 pages of the identified records were dated after 1960.  FBI stated that AARC must commit to pay $540 or agree to reduce the scope of the request within thirty days or the request would be closed.

13.     AARC did not commit to pay $540 or agree to reduce the scope of the 1st Request.

14.     AARC did not file an administrative appeal of FBI's fee category and fee waiver denials with OIP.

15.     FBI did not release any records to AARC.

## FIRST CAUSE OF ACTION

## (CONSTRUCTIVE RECORDS DENIAL – UNKNOWN NO.)

16.     AARC repeats and realleges the allegations contained in all paragraphs set forth above.

17.     On 7 September 2012, AARC submitted to FBI a followup FOIA request for the ELSUR indices via U.S. Postal Service Certified Mail.

18.     AARC made reference to *Lardner* and the fact that "FBI . . . advised [it] that some of the materials in these seven boxes concern post-1960 surveillances, rather than pre-1960 surveillances."

19.     AARC requested "copies of all these indices, whether they relate to pre- or post-1960 surveillance . . . [and] all tapes, transcripts, logs and other materials related to said surveillance, including surveillance applications, affidavits, testimony, authorizations and warrants" ("the 2d Request").

20.     AARC requested that it be classified as a representative of the news media and be granted a public interest fee waiver.

21.     According to the U.S. Postal Service, FBI refused to accept delivery of the 2d Request on 10 September 2012, and it was sent to the Dead Mail Office, where it was disposed of.

22.     On 10 April 2013, AARC's counsel, having learned of FBI's refusal to accept the 2d Request, wrote to FBI: "I would like to know the identities of all members of your staff who were aware of or participated in this denial of rights, and I ask that you take disciplinary action against them.  Please place [this] request in a processing queue in accordance with the priority it would have received had you accepted delivery of it in September 2012."

23.     AARC has not received any response from FBI to this request as of this writing.

24.     AARC has a legal right under FOIA to obtain the information it seeks, and there is no legal basis for the denial by FBI of said right.

### SECOND CAUSE OF ACTION

### (CONSTRUCTIVE RECORDS DENIAL – 1386188-000)

25.     AARC repeats and realleges the allegations contained in all paragraphs set forth above.

26.     On 2 October 2017, AARC submitted to FBI a FOIA request for all information about the processing of the 1st Request.

27.     AARC stated, "Because these records should be easy to locate and should not be voluminous, we do not anticipate the assessment of any fees, but should you conclude that fees are appropriate, please inform me and we will address that issue at that time."

28.     On 12 October 2017, FBI acknowledged receipt of this request and assigned it Request No. 1386188-000.

29.     AARC has not received any substantive response from FBI to this request as of this writing.

30.     AARC has a legal right under FOIA to obtain the information it seeks, and there is no legal basis for the denial by FBI of said right.

### THIRD CAUSE OF ACTION

### (CONSTRUCTIVE RECORDS DENIAL – 1386440-000)

31.     AARC repeats and realleges the allegations contained in all paragraphs set forth above.

32.     On 2 October 2017, AARC submitted to FBI a FOIA request for information related to the 2d Request.

33.     AARC described the sequence of events surrounding the 2d Request and requested "all information about the aforementioned sequence of events and all information about any actions FBI took in response to [AARC's counsel's] 10 April 2013 letter."

34.     AARC stated, "This includes all information in the [FOIA Document Processing System] about the request itself, all emails or records not in that system discussing the request, and all records, regardless of location, discussing any disciplinary actions considered or taken by FBI regarding this sequence of events, as well as any similar records discussing this matter (such as, for example, an email or memo inquiring into the reasons for the refusal, or an email or memo stating that no response will be issued)."

35.     AARC stated, "Because these records should be easy to locate and should not be voluminous, we do not anticipate the assessment of any fees, but should you conclude that fees are appropriate, please inform me and we will address that issue at that time."

36.     On 10 October 2017, FBI acknowledged receipt of this request and assigned it Request No. 1386440-000, stating that it had been "unable to identify any main file records [in the Central Records System] responsive to [this] request."

37.     On 11 October 2017, AARC submitted an appeal to OIP, stating simply, "It is no surprise that the responsive records about what the FBI Mail Room did about a FOIA request is not in the Central Records System, and it is ludicrous for FBI to only search that system," which was assigned Appeal No. DOJ-AP-2018-000176.

38.     On 13 October 2017, FBI informed AARC that "[t]he No Record Letter previously sent to [it] was in error."

39.     On 15 November 2017, OIP informed AARC that "FBI is still currently processing [its] request" and closed the appeal.

40.     AARC has not received any substantive response from FBI to this request as of this writing.

41.     AARC has a legal right under FOIA to obtain the information it seeks, and there is no legal basis for the denial by FBI of said right.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Assassination Archives and Research Center, Inc. prays that this Court:

(1)     Order the Federal Bureau of Investigation to provide all responsive records to it;

(2)     Issue a written finding that the circumstances surrounding the failure to respond to the 2d Request raise questions whether agency personnel acted arbitrarily or capriciously;

(3)     Order preliminary and permanent injunctive and/or declaratory relief as may be appropriate;

(4)     Award reasonable costs and attorneys' fees as provided in 5 U.S.C. §

552(a)(4)(E) or any other applicable law;

(5)     Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

(6)     Grant such other relief as the Court may deem just and proper.

Date:   August 8, 2018

Respectfully submitted,


/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

## STANDING ORDER FOR CASES BEFORE JUDGE TREVOR N. MCFADDEN

In order to administer this civil action in a manner fair to the litigants and consistent with the parties' interest in completing this litigation in the shortest possible time and at the least possible cost, *see* FED. R. CIV. P. 1, it is hereby

**ORDERED** that the parties are directed to comply with each of the directives set forth in this Order.  The Court will hold the parties responsible for following these directives; failure to conform to this Order's directives **may, when appropriate, result in the imposition of sanctions**.

1.  **Local Rules**

    Parties are expected to comply with the Local Civil Rules of this Court ("LCvR").  The Rules are available online at http://www.dcd.uscourts.gov/court-info/local-rules-and-orders/local-rules.

2.  **Service of Complaint; Proof of Service (LCvR 5.3)**

    Plaintiff(s) must promptly serve the complaint on the Defendant(s) in accordance with Federal Rule of Civil Procedure 4 and file proof of service.

3.  **Removed Actions**

    Defendant(s) removing an action to this Court must re-file any answer as a supplement to the petition and re-notice any pending motion.  Defendant(s) shall also promptly ensure that all parties receive a copy of this Standing Order.

4.  **Disclosure of Corporate Affiliations and Financial Interests (LCvR 26.1)**

    To facilitate the Court's determination of the need for recusal, where a corporation is a party or intervenor, counsel of record for that party or intervenor shall file a certificate listing any parent, subsidiary, or affiliate of that party or intervenor which, to the knowledge of counsel, has any outstanding securities in the hands of the public.  Such certificate shall be filed with the party's first pleading.  **Counsel have a continuing obligation to advise the Court of any change.**

5.  **Electronic Filing (LCvR 5.4)**

    (A)  **All documents in this case are to be filed electronically**, except with the exceptions noted below per LCvR 5.4, or with prior leave of the Court upon good cause shown.  All electronically filed documents are to be in Portable Data Format (.pdf).  In order to enable the Court's efficient resolution of all matters in this case, all filings shall be submitted in text searchable PDF files, directly converted from the word-processing format into PDF so as to preserve their

searchability and readability.  The Court recognizes an exception for exhibits that must be scanned because they exist only in paper format.

(B)     Exceptions to Electronic Filing (LCvR 5.4(e))

  (i)     Every document filed under seal in a totally sealed case shall be filed in paper form accompanied by an electronic copy in a format deemed compatible by the Clerk's Office with CM/ECF filing.

  (ii)    Electronic filing procedures will be followed **by parties represented by counsel only**.  In a case involving a ***pro se* party**, the party appearing *pro se* shall continue to file documents in paper form with the Clerk's Office. Parties represented by counsel must serve documents upon *pro se* parties in paper form.

(C)     Absent specific statutory authority, a proposed sealed document in an otherwise unsealed case must be accompanied with a motion to seal in accordance with LCvR 5.1(h) and filed pursuant to the procedures established by the Clerk's Office.  Motions to seal should explain why sealing is appropriate with reference to the factors identified in *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980).  Failure to file a proper motion to seal may result in the document being placed in the public record.

(D)     CM/ECF Passwords may only be used only by the person to whom they are assigned or, in the case of an attorney, by that attorney or an authorized employee or agent of that attorney's law office or organization.  The use of a CM/ECF password to login and submit documents creates an electronic record that operates and serves as the signature of the person to whom the password is assigned for all purposes under the Federal Rules of Civil Procedure and this Court's Local Rules.

(E)     The electronic submission of any document in accordance with these procedures constitutes **filing** for all purposes under the Federal Rules of Civil Procedure and this Court's Local Rules and simultaneously creates an official **docket entry**.  A person filing by electronic means is responsible for ensuring the accuracy of the official docket entry generated by the CM/ECF software.

(F)     No **certificate of service** is required for documents filed electronically.  Service is complete upon electronic submission of an order or document and will be effected by electronic notice.  Counsel are responsible for monitoring their e-mail accounts and, upon receipt of notice of an electronic filing, for retrieving the order or document electronically.

(G)     Electronically filing a document that contains a declaration, verification, certificate, sworn statement, oath or affidavit certifies that the original signed document is in the possession of the attorney or *pro se* party responsible for the filing and that it is available for review upon request by a party or by the Court.

(H)    The Court may take into consideration technical difficulties experienced by a filer when presented a late filing.  However, parties who wait until the last minute to begin filing are warned that technical difficulties do not necessarily constitute "good cause" or "excusable neglect" justifying an extension of the applicable deadline(s).  *See* FED. R. CIV. P. 6(b).  Further, **no allowance can be made for late filing documents whose time limits are jurisdictional**.

(I)    Attorneys are to be **precise** in describing the type of document and requested relief when making electronic filings with the Court, because that description becomes the official docket entry recorded in the case.  Failure to be accurate and thorough in the description of documents electronically filed may result in action adverse to the attorney.

## 6.    Amended Pleadings

Any amended pleadings shall be accompanied by a redline comparison of the original and amended pleading.

## 7.    Communications with the Court

The parties should endeavor to keep communications with Chambers to a minimum.  *Ex parte* communications on matters other than scheduling are **strictly prohibited**; if the parties need to contact Chambers, it must be done jointly pursuant to a conference call arranged by the parties.

## 8.    Appearances at Hearings

Principal trial counsel must appear at all hearings unless excused by the Court in advance.

## 9.    Motions for Extensions of Time and Re-scheduling of Hearings

Motions for extensions of time and to re-schedule hearings are strongly discouraged; they will be granted only in truly exceptional or compelling circumstances and parties should not expect the Court to grant extensions.  The Court will not entertain or honor stipulations for extensions of time or to re-schedule hearings; parties must file a written motion in accordance with the following instructions:

(A)    Motions for extensions of time or to re-schedule a hearing **must be filed at least four business days prior** to the first affected deadline or scheduled hearing.

(B)    All motions for extensions of time or to re-schedule a hearing **must include the following** or they will not be considered:

(i)    The current deadline or date of the hearing;

(ii)    The amount of time requested for the extension; or, for re-scheduling, alternative dates that have been agreed to by all parties;

(iii)    The specific grounds for the extension or the re-scheduling of the hearing;

(iv)    The number of previous extensions or continuances, if any, granted to each party;

(v)     A statement of the impact that the requested extension or re-scheduling would have on all other previously set deadlines;

(vi)    A proposed schedule for any other affected deadlines, to be proposed only after consulting with opposing counsel; and

(vii)   A statement of whether or not opposing counsel opposes the motion in accordance with LCvR 7(m).

## 10.    Discovery Disputes

The parties are expected to fully comply with LCvR 26.2.  Moreover, counsel are required, under both Federal Rule of Civil Procedure 26(f) and LCvR 7(m), to confer in good faith in an effort to resolve any discovery dispute before bringing it to the Court's attention.  **The parties shall not file a discovery motion without prior consultation with opposing counsel**.  If, in what should be the unusual case, the parties are unable to resolve their discovery dispute, counsel shall contact Chambers jointly in order to arrange for a telephone conference with the Court.

## 11.    Depositions

Counsel must adhere to the following guidelines when taking a deposition:

(A)    Counsel for the deponent shall refrain from gratuitous comments and from directing the deponent as to times, dates, documents, testimony, and the like;

(B)    Counsel shall refrain from cuing the deponent by objecting in any manner other than stating an objection for the record followed by a word or two describing the legal basis for the objection;

(C)    Counsel shall refrain from directing the deponent not to answer any question except for reasons which conform to Federal Rule of Civil Procedure 30(c)(2);

(D)    Counsel shall refrain from engaging in dialogue on the record during the course of the deposition;

(E)    If counsel for any party or person given notice of the deposition believes that these conditions are not being adhered to, that counsel may call for suspension of the deposition and then immediately apply to the Court for a ruling and remedy.  When appropriate, the Court will impose sanctions;

(F)    All counsel are to conduct themselves in a civil, polite, and professional manner.  The Court will not countenance incivility or other behavior during the deposition

demonstrating that the examination is being conducted in bad faith or to simply annoy, embarrass, or oppress the deponent; and

(G)     In accordance with Federal Rule of Civil Procedure 30(d)(1), no deposition may last more than seven hours (exclusive of breaks), except by leave of the Court or stipulation of the parties.

## 12.     Motions Generally (LCvR 7)

Parties must comply with LCvR 7 and the following instructions:

(A)     Memoranda of points and authorities filed in support of or in opposition to any motion may not, without leave of the Court, exceed forty-five pages, and reply memoranda may not exceed twenty-five pages, with all margins set at one inch and with all text double-spaced (excepting footnotes) and in twelve-point Times New Roman (including footnotes).

(B)     **Where a party fails to file a memorandum of points and authorities in opposition to a given motion, the Court may treat the motion as conceded**. Similarly, where a party fails to respond to arguments in opposition papers, the Court may treat those specific arguments as conceded.  *See Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196, 201 (D.D.C. 2009).

(C)     A party may not file a sur-reply without first requesting leave of the Court.

(D)     **Exhibits shall be properly edited** to exclude irrelevant material and to direct the Court's attention to the pertinent portions thereof.

(E)     Each submission shall be accompanied by a table of cases and other authorities cited therein.  Counsel shall place asterisks in the margin to the left of those cases or authorities on which counsel chiefly relies.

(F)     Every pleading or paper, regardless of whether it is signed by an attorney or a *pro se* party, shall contain the name, address, telephone number, and, for an attorney, bar identification number.  *See also* LCvR 5.1(c).

## 13.     Motions to Dismiss

(A)     **In General** - The parties are reminded that a motion to dismiss under Rule 12(b)(6) or a motion for judgment on the pleadings under Rule 12(c) presenting matters outside the pleadings may be converted to a motion for summary judgment.  FED. R. CIV. P. 12(d).  If a motion to dismiss presents matters outside the pleadings, all parties must comply **fully** with the instructions set forth below regarding motions for summary judgment.

(B)     **Cases Involving Judicial Review of Administrative Agency Action** - If the Government is filing a motion to dismiss, and believes that the LCvR 7(n) requirement to "file a certified list of the contents of the administrative record . . .

simultaneously" would not be helpful to the resolution of the case, the Government must file—simultaneously with the motion to dismiss—a motion asking the Court to excuse the agency from the requirements of LCvR 7(n).

**14.**   **Motions for Summary Judgment**

(A)   **Cases Involving Judicial Review of Administrative Agency Action (LCvR 7(n))**

(i)   Each motion for summary judgment, and opposition thereto, shall include a statement of facts with references to the administrative record.  The parties must furnish **precise citations** to the portions of the administrative record on which they rely; the Court need not consider materials not specifically identified.  *See also* FED. R. CIV. P. 56(c)(1).

(ii)   The parties shall provide the Court with a joint appendix containing copies of those portions of the administrative record that are cited or otherwise relied upon in any memorandum in support of, or in opposition to, a motion for summary judgment.

(B)   **All Other Cases (LCvR 7(h))**

(i)   Each party submitting a motion for summary judgment attach a statement of material facts for which that party contends there is no genuine dispute, with specific citations to those portions of the record upon which the party relies in fashioning the statement.  The party opposing the motion must, in turn, submit a statement enumerating all material facts which the party contends are genuinely disputed and thus require trial.  The parties are strongly encouraged to carefully review *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145 (D.C. Cir. 1996).

(ii)   The parties must furnish **precise citations** to the portions of the record on which they rely; the Court need not consider materials not specifically identified.  *See also* FED. R. CIV. P. 56(c)(1).

(iii)   The moving party's statement of material facts shall be a short and concise statement, **in numbered paragraphs**, of all material facts as to which the moving party claims there is no genuine dispute.  The statement must contain **only one factual assertion in each numbered paragraph**.

(iv)   The party responding to a statement of material facts must respond to each paragraph with a **correspondingly numbered paragraph**, indicating whether that paragraph is admitted or denied.  If a paragraph is admitted only in part, the party must specifically identify which parts are admitted and which parts are denied.

(v)   The Court may assume that facts identified by the moving party in its statement of material facts are **admitted**, unless such facts are controverted in the statement filed in opposition to the motion..

(vi)   The responding party must include any information relevant to its response in its correspondingly numbered paragraph, with specific citations to the record.  However, if the responding party has additional facts that are not **directly relevant** to its response, it must identify such facts in consecutively numbered paragraphs **at the end** of its responsive statement of facts.  **If additional factual allegations are made, the opponent must file a responsive statement of its own**.

15.   **Motions for Reconsideration**

Motions for reconsideration of prior rulings are strongly discouraged.  Such motions shall be filed only when the requirements of Federal Rules of Civil Procedure 54(b), 59(e), and/or 60(b) are met.  If such a motion is filed, it **shall not exceed ten pages in length**.  Moreover, the Court will not entertain: (a) motions which simply reassert arguments previously raised and rejected by the Court; or (b) arguments which should have been previously raised, but are being raised for the first time.  Motions not in compliance with these instructions may be stricken.

16.   **Courtesy Copies**

The parties shall provide **two courtesy** copies, with ECF headers, of any submission that: (i) along with exhibits, is over one hundred pages in length; or (ii) includes any exhibits in color (to be provided in color).  Courtesy copies shall be in binders, three-hole punched, with double-sided pages.  Exhibits shall be tabbed and indexed for ease of reference.  Courtesy copies can be mailed to Chambers; or, if delivery is made by courier, to the Court Security Officer at the loading dock located at Third and C Streets (not the Clerk's Office or Chambers).  *Pro se* parties are excused from complying with this requirement.

17.   **Settlement**

The parties are expected to evaluate their respective cases for purposes of settlement.  The Court encourages the use of alternative dispute resolution—*e.g.*, mediation or neutral case evaluation.  The use of these methods is available at any time, as is a settlement conference before a magistrate judge.  If counsel are interested in pursuing these options, they may contact Chambers at any time.  If the case settles in whole or in part, counsel shall **promptly** advise the Court.

**SO ORDERED.**

_____
/s/
**TREVOR N. MCFADDEN**
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSASSINATION ARCHIVES AND<br>RESEARCH CENTER, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:18-cv-01868 |
| | ) |
| DEPARTMENT OF JUSTICE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

### DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant, the U.S. Department of Justice, ("DOJ" or "Defendant"), by and through its

undersigned counsel, hereby answers Plaintiff's Complaint as follows:

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiff is not entitled to compel the production of records protected from disclosure by

one or more of the exemptions to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, or

the Privacy Act ("PA"), 5 U.S.C. § 552a.

### DEFENDANT'S RESPONSES TO THE NUMBERED PARAGRAPHS

Defendant responds to the numbered paragraphs of Plaintiff's Complaint as set forth

below:

### JURISDICTION

1. This paragraph contains Plaintiff's allegation concerning jurisdiction, which is a

   conclusion of law to which no response is required.

## VENUE

2.    This paragraph contains Plaintiff's allegation concerning venue, which is a

conclusion of law to which no response is required.

## PARTIES

3.    Defendant lacks knowledge or information sufficient to form a belief as to the

truth of the allegations contained in this paragraph.

4.    As to the first statement in this paragraph, admit.  As to the second statement in

this paragraph, deny.

5.    Admit.

## FACTUAL BACKGROUND

6.    Admit that in a declaration dated July 2, 2009, the Federal Bureau of Investigation

("FBI") described a search in which it located seven boxes of electronic surveillance ("ELSUR")

cards.  Defendant respectfully refers the court to the cited declaration for a full and accurate

statement of its content.

7.    Admit that Defendant received a FOIA request dated October 7, 2009 from

plaintiff.  Defendant respectfully refers the Court to the request for a full and accurate statement

of its content.

8.    Admit.

9.    Admit that by letter dated November 4, 2009, the FBI acknowledged receipt of

plaintiff's request and assigned it tracking number 1139342-000. Defendant respectfully refers

the Court to the letter for a full and accurate statement of its content.

10.   Admit that by letter dated November 5, 2009, the FBI determined that Plaintiff

had not submitted sufficient information to enable the FBI to make a proper determination

regarding the request.  Defendant respectfully refers the Court to the letter for a full and accurate statement of its content.

11.      Admit. Defendant respectfully refers the Court to the request for a full and accurate statement of its content.

12.      Admit that by letter dated February 9, 2011, the FBI sought clarification from plaintiff as to the scope of his request, the potential fee involved and invited plaintiff to contact the FBI to discuss the possibility of reducing the scope of the request. Defendant respectfully refers the Court to the letter for a full and accurate statement of its content.

13.      Admit that the FBI does not have any record showing that plaintiff agreed to pay fees or agree to reduce the scope of his request.

14.      Admit that the FBI has no record of plaintiff filing an administrative appeal of the FBI's fee category and fee waiver denial with the Office of Information Policy (OIP).

15.      Admit that the FBI did not receive additional correspondence from plaintiff regarding the request and the request was administratively closed.

## FIRST CAUSE OF ACTION

### (CONSTRUCTIVE RECORDS DENIAL- UNKNOWN NO.)

16.      In response to Paragraph 16, Defendant incorporates its responses set forth above.

17.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

18.       Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph since it has no record of receiving the request September 2012 request at the time plaintiff states he mailed it.

19.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph since it has no record of receiving the request September 2012 request at the time plaintiff states he mailed it.

20.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph since it has no record of receiving the request September 2012 request at the time plaintiff states he mailed it.

21.     Deny. The FBI has no record of refusing to accept Plaintiff's FOIA request.

22.     Admit that the FBI received a letter from Plaintiff dated April 10, 2013. Defendant respectfully refers the Court to the request for a full and accurate statement of its content.

23.     Admit.

24.     This paragraph contains a legal conclusion to which no response is required.

## SECOND CAUSE OF ACTION

### (CONSTRUCTIVE RECORDS DENIAL – 1386188-000)

25.     In response to Paragraph 25, Defendant incorporates its responses set forth above.

26.     Admit that the FBI received a FOIA request from Plaintiff's attorney dated October 2, 2017. Defendant respectfully refers the Court to the request for a full and accurate statement of its content.

27.     Admit. Defendant respectfully refers the Court to the request for a full and accurate statement of its content.

28.     Admit that by letter dated October 12, 2017, the FBI acknowledged receipt of this request and assigned it tracking number 1386188-000. Defendant respectfully refers the Court to the request for a full and accurate statement of its content.

29.     Admit.

30.     This paragraph contains a legal conclusion to which no response is required.

### THIRD CAUSE OF ACTION

### (CONSTRUCTIVE RECORDS DENIAL – 1386440-000)

31.     In response to Paragraph 31, Defendant incorporates its responses set forth above.

32.     Admit that the FBI received a FOIA request from Plaintiff's attorney dated October 2, 2017. Defendant respectfully refers the Court to the request for a full and accurate statement of its content.

33.     Admit. Defendant respectfully refers the Court to the request for a full and accurate statement of its content.

34.     Admit. Defendant respectfully refers the Court to the request for a full and accurate statement of its content.

35.     Admit. Defendant respectfully refers the Court to the request for a full and accurate statement of its content.

36.     Admit that by letter dated October 10, 2017, the FBI acknowledged receipt of plaintiff's request and assigned it tracking number 1386440-000 and responded to the request. Defendant respectfully refers the Court to the letter for a full and accurate statement of its content.

37.     Admit that Plaintiff submitted an administrative appeal. Defendant respectfully refers the Court to the appeal for a full and accurate statement of its content.

38.     Admit.

39.     Admit.

40.     Admit

41.     This paragraph contains a legal conclusion to which no response is required.

## **PRAYER FOR RELIEF**

Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, Defendant asserts a general

denial as to those allegations contained in the Complaint that are not specifically admitted herein.

The remainder of the Complaint sets forth Plaintiff's prayer for relief to which no response is

required.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. BAR NUMBER 472845

DANIEL F. VAN HORN, D.C. Bar No. 924092
Chief, Civil Division

            /s/
_____
RHONDA L. CAMPBELL, D.C. Bar No. 462402
Assistant United States Attorneys
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2559
Rhonda.campbell@usdoj.gov

*Counsel for United States*

USCA Case #23-5004      Document #2003881      Filed: 06/16/2023      Page 38 of 341

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | ) | |
| RESEARCH CENTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-01868 (TNM) |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT STATUS REPORT, DEFENDANT'S MOTION TO MODIFY THE SCHEDULE FOR STATUS REPORTS, AND PLAINTIFF'S MOTION TO SET BRIEFING SCHEDULE

The parties, jointly submit this status report pursuant to the Court's Scheduling Order of March 11, 2019, as follows:

On June 3, 2019, the FBI produced another set of records to Plaintiff, and the next release will be made on or about July 1, 2019. In accordance with the Court's Order, the parties are required to file another Joint Status Report on July 5, 2019, to update the Court on the status of the processing and review of the production; however, as noted in the May 2019 status report, given the volume of the records, the FBI expects processing to take many years. Accordingly, Defendant requests that the Court's order to file monthly status reports be vacated and Defendant respectfully requests that the parties file status reports every 9 months to update the Court on the FBI's production.[1]

Because the parties disagree about the following matters, they hereby state their respective positions for the Court's consideration.

---

[1] Plaintiff argues that this request is necessarily predicated on the current processing rate being upheld by the Court, and respectfully maintains that the Court should not modify the report frequency until the FBI has properly requested and received an *Open America* stay, as described below. If the Court orders the FBI to modify its processing speed, the current report frequency may continue to be appropriate. However, Plaintiff agrees that the report frequency should be changed if the FBI is allowed to continue processing records at the current snail's pace.

*Plaintiff's Position:*

Three issues are in controversy which warrant adjudication by the Court prior to the

completion of FBI's production of responsive records, which is expected to take years at the

current rate of production:

- The FBI insists that Plaintiff pay a fee each month upon receipt of that month's

    interim release, despite the fact that the propriety of FBI's fee assessment and its

    denial of Plaintiff's request for a public interest fee waiver are in controversy in this

    litigation.  Plaintiff does not believe that it should be forced to pay fees for the next

    several years before the Court hears arguments on these fee issues.  However, the

    parties disagree on how to address these matters.  Plaintiff maintains that the FBI

    must file a motion for partial summary judgment, accompanied by a sworn

    declaration justifying the FBI's assessment of fees and its denial of Plaintiff's

    request for a public interest fee waiver.[2]  It is well established that an agency bears

    the initial burden of providing evidence (generally in the form of declarations)

    showing that it properly processed a FOIA request, which the plaintiff will then

    refute.  The FBI maintains that it falls to Plaintiff to file a motion for summary

    judgment without the benefit of any FBI declaration in the record explaining the

    agency's decisionmaking, which cannot be reconciled with the normal conduct of

    FOIA litigation, and which would place Plaintiff at the distinct disadvantage of

    having to guess at the FBI's justifications in its initial brief, while the FBI would be

---

[2] These are two distinct issues.  "The question of whether § 552(a)(4)(A)(viii) prohibits Defendant from charging Plaintiff any duplication fees is, as Plaintiff correctly told Defendant in October 2015, 'a separate issue from the public interest fee waiver issue.'"  *Stein v. DOJ*, 197 F. Supp. 3d 115, 123 (D.D.C. 2016).  Accordingly, even if the FBI were correct about the public interest fee waiver issue in its section below, that would have no bearing on its duty to prove that it properly assessed reasonable fees in the first place.  They are *different issues*.

free to tailor its declaration to the arguments made by Plaintiff.  The *Clemente*
standard cited by the FBI does not absolve the FBI of the need to offer the first
substantive evidence, any more than it would be required to seek summary judgment
first in a case where a public interest fee waiver denial was the only issue in
controversy.  The FBI's position, on the contrary, would, in that case, require a
plaintiff to seek summary judgment in order to move the case forward at all, which
runs directly counter to the purpose of summary judgment.  A plaintiff can simply
not be required to file a motion for summary judgment or else lose a case.[3]

- Similarly, the FBI refuses to process more than 500 pages per month, citing its
  internal policy.  However, in cases where an agency seeks to postpone briefing by a
  significant period, it is equally well established that the agency must seek an *Open
  America* stay justifying the delay (and, accordingly, justifying the processing speed
  causing the delay).  In such a motion, an agency must show "exceptional
  circumstances" to meet the "substantial burden [placed] on the government to justify
  to the courts any noncompliance with FOIA time limits."  *Open Am. v. Watergate
  Special Prosecution Force*, 547 F.2d 605, 617 (D.C. Cir. 1976) (Leventhal, J.,
  concurring).  An *Open America* stay may be granted "(1) when an agency is
  burdened with an unanticipated number of FOIA requests; *and* (2) when agency
  resources are inadequate to process the requests within the time limits set forth in
  the statute; *and* (3) when the agency shows that it is exercising 'due diligence' in
  processing the requests; *and* (4) the agency shows 'reasonable progress' in reducing

---

[3] To be clear, for all the FBI's protestations about the "waste of judicial resources" that a motion
for partial summary judgment would allegedly entail, it does not seriously contend that, if Plaintiff
were to file such a motion on its own, the FBI would not be required to respond to it, or that it
would not be required to offer a sworn declaration as evidence with its response.  The dispute here
is solely over which party must file the first motion.

its backlog of requests." *Elec. Frontier Found.*, 517 F. Supp. 2d 111, 120 (D.D.C. 2007) (emphasis in original) (quoting *Wilderness Soc'y v. DOI*, No. 04-650, 2005 U.S. Dist. LEXIS 20042, at *31-32 (D.D.C. Sept. 12, 2005)).  The FBI has filed no such motion, and it refuses to do so, again insisting that Plaintiff must file a motion without evidence in the record challenging the FBI's processing speed.[4]

Accordingly, Plaintiff asks this Court to order the FBI to file a motion for partial summary judgment no later than September 6, 2019, which addresses: (1) the FBI's assessment of fees for this request; and (2) the FBI's denial of Plaintiff's request for a public interest fee waiver.  Plaintiff additionally asks the Court to order the FBI to also file a motion for an *Open America* stay no later than August 16, 2019.  Should the FBI refuse to file either of these motions by the assigned date, Plaintiff asks the Court to consider the matters conceded and accordingly: (1) to order the FBI to cease assessing fees for this request and return all fees paid to date, with interest; and/or (2) to order the FBI to process responsive records at a rate of 3000 pages per month.[5]

***Defendant's Position:***

***1) Fee Waiver Issue:*** The FBI initially denied Plaintiff's request for a fee waiver by letter dated November 5, 2009 as Plaintiff failed to establish his "news media" status.  Plaintiff did not administratively appeal the FBI's denial.  Subsequently, by letter dated September 13, 2018, the

---

[4] The FBI's below citation to previous court decisions allegedly upholding its processing speed does not rob it of the responsibility for seeking an *Open America* stay, as is clearly required by well-established case law.  In brief response to these citations, Plaintiff merely points out that the cited *National Security Counselors* ruling was significantly more complex and nuanced than Judge Boasberg indicated in his *Negley* opinion, and was in part decided the way it was because the Circuit did not have access to evidence about the FBI's practice which the undersigned—who was the plaintiff's counsel—now possesses.  However, a Joint Status Report is not the proper vehicle for an extended argument on that front, which is why Plaintiff is asking the Court to require the FBI to seek an *Open America* stay as is required by the controlling case law.

[5] Plaintiff is ready to provide argument, backed by extensive case law, to justify either of these positions, but, as noted above, it will not do so here because such argument properly belongs in briefs filed in opposition to properly filed dispositive motions.

FBI again denied Plaintiff's request for a fee waiver.  In the letter the FBI explained:

> You failed to demonstrate the requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government.  *See* 28 C.F.R. Sec. 16.10(k)(i). Disclosure of the requested records would not be meaningfully informative about government operations or activities in order to be likely to contribute to an increased public understanding of those operations or activities.  *See* 28 C.F.R. Sec. 16.10(k)(2)(ii). Additionally, the public's understanding of the subject in question would not be enhanced by the disclosure to a significant extent.  *See* 28 C.F.R. Sec. 16.10(k)(2)(iv).

Here, Plaintiff, not Defendant, bears the burden of establishing it qualifies for a fee waiver.

*See Clemente v. FBI*, 741 F.Supp.2d 64, 75 (DDC 2010)("Both before the agency and before a reviewing court, the FOIA requester bears the burden of demonstrating that she meets the statutory requirement for waiver of fees." citing *Judicial Watch, Inc. v. Rossotti,* 326 F.3d 1309, 1312 (D.C. Cir. 2003)).  Moreover, it is unreasonable and a waste of judicial resources for Plaintiff to ask the Court to force summary judgment briefing before production is complete.

**2) The FBI's Processing rate:**  The FBI has been processing Plaintiff's request at a rate of 500 pages processed per month.  On June 3, 2019, the FBI issued its 5th interim release and anticipates issuing its next scheduled release on or about July 1, 2019.  The FBI estimates that there are over 20,000 pages involved in the request.

The FBI's standard processing rate of 500 pages per month has been upheld by this Circuit. "The D.C. Circuit has given its seal of approval to the Government's standard 'interim release policy' which provides for 'processing requests' in 500-page increment."  *See Negley v. DOJ*, No. 15-1004, 2018 U.S. Dist. LEXIS 56844 (D.D.C. Apr. 3, 2018) citing *Nat'l Sec. Counselors v. DOJ*, 848 F.3d 467, 471 (D.C. Cir. 2017).  The FBI is prepared to defend this processing rate as it impacts the resources of the FBI and its ability to adequately respond to a large number of requesters.

Date:   June 5, 2019

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. BAR NUMBER 472845

DANIEL F. VAN HORN, D.C. Bar No. 924092
Chief, Civil Division

/s/ *Rhonda L. Campbell*
RHONDA L. CAMPBELL
D.C. Bar No. 46240
Assistant United States Attorneys
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2559
Rhonda.campbell@usdoj.gov

*Counsel for United States*

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | ) | |
| RESEARCH CENTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-01868 (TNM) |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT STATUS REPORT

The parties, jointly submit this status report pursuant to the Court's Scheduling Order of March 11, 2019, as follows:

On August 1, 2019, the FBI produced another set of records to Plaintiff, and the next release will be made on or about September 1, 2019.  In accordance with the Court's Order, the parties will file another Joint Status Report on September 5, 2019, to update the Court on the status of the processing and review of the production, unless the Court supersedes that Order.

The parties apologize that, due to an oversight, they neglected to file a Joint Status Report on July 5, 2019.  Their respective  counsel agreed to the contents of a proposed report on July 3, 2019, but neither lawyer actually filed the report, and neither lawyer realized that it had not been filed until today, largely due to the holiday and Plaintiff's counsel's vacation.

Date:   August 5, 2019

Respectfully submitted,


JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. BAR NUMBER 472845

DANIEL F. VAN HORN, D.C. Bar No. 924092
Chief, Civil Division


/s/ *Rhonda L. Campbell*
RHONDA L. CAMPBELL
D.C. Bar No. 46240
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2559
Rhonda.campbell@usdoj.gov

*Counsel for United States*

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

1             IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA

2   _____

3   Assassination Archives and   ) Civil Action
    Research Center,          ) No. 1:18-cv-01868-TNM

4                           )

5             Plaintiff,  )
                          ) **Status Conference**

6   vs.                     )
                          )

7   Department of Justice,     ) Washington, D.C.
                          ) August 6, 2019
                Defendant.  ) Time:  10:30 a.m.

8   _____

9             Transcript of **Status Conference**
                   Held Before

10      The Honorable Trevor N. McFadden
            United States District Judge

11   _____

12             A P P E A R A N C E S

13   For the Plaintiff:     Kelly B. McClanahan (via telephone)
                      NATIONAL SECURITY COUNSELORS

14                      4702 Levada Terrace
                      Rockville, Maryland 20853

15   For the Defendant:     Rhonda L. Campbell (via telephone)

16                      U.S. ATTORNEY'S OFFICE FOR THE
                      DISTRICT OF COLUMBIA

17                      555 Fourth Street, Northwest
                      Washington, D.C. 20530

18   _____

19   Court Reporter:        Nancy J. Meyer
                      Official Court Reporter

20                      Registered Merit Reporter
                      Certified Realtime Reporter

21                      United States Courthouse, Room 6509
                      333 Constitution Avenue, Northwest

22                      Washington, D.C. 20001
                      (202) 354-3118

23

24

25

2

```
 1                    P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  Your Honor, this is Civil Case

 3    18-1868, Assassination Archives and Research Center vs.

 4    Department of Justice.  Counsel, please identify yourselves for

 5    the record.

 6              MR. McCLANAHAN:  This is Kel McClanahan.

 7              MS. CAMPBELL:  Good morning --

 8              THE COURT:  Good morning, Mr. McClanahan.

 9              MS. CAMPBELL:  Good morning.  Rhonda Campbell for the

10    United States of America.

11              THE COURT:  Good morning, Ms. Campbell.

12              All right.  I understand Ms. Campbell's child is

13    sick.  Mr. McClanahan, why aren't you here in court?

14              MR. McCLANAHAN:  Because she told me that she was

15    telling y'all that we needed to reschedule, and so I did not

16    travel to D.C.  I informed Mr. Adams of this about 20 minutes

17    ago when I got the email.

18              THE COURT:  All right.  Mr. McClanahan, my status

19    conferences are not voluntary attendance issues.  I understand

20    Ms. Campbell had an emergency, but unless and until you hear

21    from my chambers that we're rescheduling or that you're

22    permitted to call in by phone, you should be here and not just

23    make your own arrangements.  That's certainly not how things

24    work and -- in my courtroom, and, you know, I think you and I

25    may have discussed this before, sir, but if you choose to file
```

1     cases in D.C., you need to be available to be in my courtroom.

2     And if you're not available to be in my courtroom, your cases

3     will not be heard here.  Do you understand that?

4          MR. McCLANAHAN:  I do.  You and I have not ever

5     discussed anything like this.  I do apologize.  I thought that

6     it would be rescheduled because of her medical issue, and so I

7     acted on that.

8          THE COURT:  Okay.  It's not being rescheduled.  I

9     want to move forward with whatever that we can.

10          Ms. Campbell, how long do you expect the productions

11     to continue at this rate?

12          MS. CAMPBELL:  I -- I am -- I do want to state that

13     I'm not looking at a computer at this moment, and I do

14     apologize for any confusion that I've caused this morning.  I

15     do not know the exact date, but agency counsel indicated to me

16     in emails that this is going to take years.

17          THE COURT:  Okay.  But you don't have a sense of

18     whether years means a few years or a decade or what?

19          MS. CAMPBELL:  I -- I get the impression that it

20     is -- it is close to a decade.  That's how long she -- she

21     continues to send me -- and when I say "she," I'm talking about

22     agency counsel -- continues to tell me that this is a very long

23     production schedule and it's going to be -- it should have been

24     an *Open America*, in her mind, because it's going to be so long.

25          THE COURT:  Okay.  So I think on -- on that point and

1    on, you know, the question about whether there, in fact, should

2    be an *Open America* stay, you know, I'll tell you my inclination

3    is as long as there is ongoing production, an *Open America* stay

4    is -- is not necessary.  I think, you know, 500 pages a month

5    is -- is really on the top end of what I would order in a

6    monthly production, in any event, but I -- I do think it's

7    worth all of us having a conversation about how long this is

8    going to take and what -- how we're -- how we're going to get

9    this across the finish line.  So I want to come back to that.

10            The other issue that Mr. McClanahan raises is the

11   question about fees for a nonpublic interest waiver.  I'm -- I

12   have not faced this issue before.  Mr. McClanahan, do you

13   typically represent AARC?

14            MR. McCLANAHAN:  Do I -- oh, AARC?

15            THE COURT:  Yes.

16            MR. McCLANAHAN:  I do represent them in a couple

17   matters, but this is the first court case that I've represented

18   them in.

19            THE COURT:  Okay.  All right.  So you don't -- you

20   don't have much of a sense of how this has worked in other

21   cases with AARC?

22            MR. McCLANAHAN:  You mean whether or not they got a

23   waiver?

24            THE COURT:  Correct.

25            MR. McCLANAHAN:  I -- I believe that they normally

1    get a waiver, but I want to clarify one thing.  This -- there

2    are two different issues here.  One is the public interest fee

3    waiver, but the other is just the generic -- the agency has to

4    prove that it's charging reasonable fees.  And that's -- that's

5    a legally distinct issue, and we're -- we're arguing

6    that not -- even if we did not get a public fee waiver, they

7    have not justified the fees that they're charging because

8    they're not allowed to charge it because they took too long to

9    produce the records.

10              THE COURT:  Okay.  So, Ms. Campbell, it seems to me

11   that I need to resolve this issue.  Do you disagree?

12              MS. CAMPBELL:  I don't disagree, Your Honor.  Our

13   only contention when we were discussing this, as I recall, is

14   who would actually initiate briefing.  And considering that

15   this has been administratively processed, this issue, that it

16   was our position -- the FBI's position that Mr. McClanahan or

17   the plaintiff should start because he has the issue with the

18   fee waiver or whether there should be a fee waiver.  So that

19   was our real contention, and that's why it's before the Court

20   is really about who should be initiating briefing, and it's our

21   position -- or the FBI's position -- that, in fact, the

22   plaintiffs should go first.

23              THE COURT:  Okay.  And, Mr. McClanahan, do you want

24   to be heard on that?

25              MR. McCLANAHAN:  Yes, please.  That -- there are two

1    main issues with the FBI's position.  Number one is that it

2    ignores the fact there are two legal issues and not just the

3    fee waiver.  Number two is regardless of their position that we

4    should go first, Your Honor has done enough FOIA cases, the

5    plaintiff never goes first in summary judgment in FOIA cases,

6    and it just flips the system on its head to try to make us file

7    a brief based on just the skimpy information that was in the

8    administrative record; when the way it normally works is that

9    they file a declaration from David Hardy or Michael Seidel or

10   somebody who justifies everything they did and how they made

11   the fee waiver determination, how they made the fee

12   determination, and then we oppose that or we cross-move for

13   summary judgment on that, but they have to go first.

14            MS. CAMPBELL:  No.

15            THE COURT:  Okay.  So I understand your perspective,

16   and I think that's probably right as a matter of, you know, in

17   general FOIA summary judgment issues.  I think as I see it

18   here, I mean, you -- call it what you will, but this is -- this

19   is not so much a summary judgment issue as just how are we

20   going to be able to proceed.  And you're asking for documents.

21   They say we'll give you the documents but you've got to pay.

22   You say I don't want to pay.

23            I think -- I'd like the plaintiffs to file -- you can

24   call it partial motion for summary judgment, if you'd like.

25   You can call it whatever you want, but I think I'll direct the

1    plaintiffs to file first and on both issues.  I -- my

2    impression was just the question was whether or not you needed

3    to pay fees at all, although I understand your point,

4    Mr. McClanahan, that even if you're -- you're required to pay

5    fees, there's still kind of a reasonableness issue.  And so

6    I'll ask you to file something on that, and the government can

7    oppose and -- and submit a declaration, and then obviously

8    you'd have an opportunity to reply to that, but I think that's

9    the way I'd like to do it.

10         Mr. McClanahan, how long do you need to file

11   something?

12         MR. McCLANAHAN:  Can I say one thing before we get to

13   scheduling?

14         THE COURT:  Sure.

15         MR. McCLANAHAN:  So there is an easy way to avoid

16   this entire thing, and that is, we've committed that if we are

17   denied the fee waiver and the Court decides that we have to pay

18   fees, that we'll pay the fees.  The only issue right now is

19   whether we have to pay them now as opposed to after the Court

20   resolves it.  And if we can all just agree that at the end

21   of -- and I did the math.  This is not going to take a decade.

22   They have 20,000 pages according to the status reports.  Five

23   hundred pages a month, that's 3.3 years.  So in three years and

24   change, we'll be briefing whether or not the fees are owed.  If

25   you find that fees are owed, pay them then.  They're not going

8

```
 1    to be that hard up to not have $500 for the next three years.

 2              THE COURT:  Ms. Campbell, are you comfortable with

 3    that?

 4              MS. CAMPBELL:  I am not, Your Honor.  The FBI has a

 5    process for how they produce and release information, and

 6    there's no way that I can authorize plaintiff's counsel to just

 7    arbitrarily decide this is not the procedure.  They have to pay

 8    every month in order for FBI to produce.  That has been going

 9    on for years, as long as I've been doing FOIA cases.  So I'm

10    objecting to that.

11              THE COURT:  Okay.  So, Mr. McClanahan, I mean, it's

12    not an unreasonable suggestion, but I certainly don't think I

13    can just order the government to proceed on that basis with --

14    without any briefing anyway.  So I think we're back in the same

15    point; that if you want documents and you don't want to pay --

16    or at least don't want to pay now, you need to file something

17    that explains your position.  So how long do you need, sir?

18              MR. McCLANAHAN:  I'm looking at my calendar now.  If

19    I'm going to have to try and guess what their arguments are

20    going to be because they have not filed a declaration, it's

21    going to take longer.  So let's say -- I've got court then.

22    I've got oral arguments then.  How about September 13th?

23              THE COURT:  All right.  That feels on the long end,

24    but I'm willing to go with that.

25              Ms. Campbell, how long will you need to oppose?
```

```
1              MS. CAMPBELL:  Can I have three weeks, Your Honor?

2              THE COURT:  Yes.  All right.  So --

3              MS. CAMPBELL:  Thank you.

4              THE COURT:  -- the plaintiff's motion is due by

5    September 13th.  The government's opposition is due

6    October 4th, and, Mr. McClanahan, I'll give you two weeks to

7    respond.  So --

8              MR. McCLANAHAN:  Can it be three, because I have a

9    really major deadline that week of the 18th that would

10   really just jump all over this.

11             THE COURT:  So the 25th?

12             MR. McCLANAHAN:  Yeah.

13             THE COURT:  Okay.  So your reply will be due

14   October 25th.  And then what I'd like to do is set a motions

15   hearing where I'd anticipate ruling on that, but also I'd like

16   the parties to come in and -- I think, Ms. Campbell, this will

17   largely be on you -- prepared to give me a bit more information

18   about, you know -- hopefully Mr. McClanahan is right and we're

19   looking at, you know, three or so years, but I'd like to get a

20   better estimate from you at that point of how long this is

21   going to take on your proposed schedule.

22             MS. CAMPBELL:  I will do that, Your Honor, and I can

23   do that in briefing as well.

24             THE COURT:  Okay.  That's fine.  And so I take it --

25   I mean, we're not going to have any productions until then; am
```

```
 1    I correct about that?
 2              MS. CAMPBELL:  We're not going to have any what?  I'm
 3    sorry.  I didn't hear that.
 4              THE COURT:  There's not any productions going on now;
 5    is that right?
 6              MS. CAMPBELL:  No, we are producing.  I think we are.
 7    I'm sorry.  I'm not -- I'm not looking at my computer.  I think
 8    we're reviewing, but I don't remember what I've said in my
 9    JSRs, Your Honor.
10              THE COURT:  Okay.  I'm looking at that now.
11              MR. McCLANAHAN:  We get about 500 pages a month --
12              THE COURT:  Okay.
13              MR. McCLANAHAN:  -- more or less.
14              THE COURT:  So you all --
15              MS. CAMPBELL:  Thank you.
16              THE COURT:  -- are continuing with the productions,
17    but you're saying you'd like to get paid for them.  I take
18    it -- so is the FBI just planning to turn off the spigot until
19    then?
20              MS. CAMPBELL:  Well, no.  What they do is they --
21    they give out a warning.  It's just like any other billing.  So
22    you haven't paid, then they'll stop production.  So I -- I did
23    communicate with Mr. McClanahan when the FBI informed me that
24    they haven't been paid.  If it's already been produced --
25    they've already put it in gear, they generally send it out, but
```

1   if it has not been put together, they will cease, and the next

2   month they won't do anything until they get the fee.

3           It's a whole -- whole system that has absolutely

4   nothing to do with agency counsel.  It's how they handle it

5   in -- in the various sections of the FBI.  So one component

6   talks to the other, and if they haven't gotten the fee, then

7   they stop producing.  At this juncture they are producing

8   because apparently he's -- the plaintiff is paying.

9           THE COURT:  Okay.  So how about motions hearing for

10  Wednesday, November 6th at 10:00 a.m.?  That work for you,

11  Mr. McClanahan?

12          MR. McCLANAHAN:  Yeah, that works.  Is it possible to

13  do it a little bit later because the commute in is rough for

14  me.

15          THE COURT:  No.  I set my status conferences at

16  10:00 a.m.

17          MR. McCLANAHAN:  Oh, okay.

18          THE COURT:  That day doesn't work for you, I'm happy

19  to look for a different day, but they're at 10:00 a.m.

20          MR. McCLANAHAN:  No, that's --

21          THE COURT:  Okay.  And Ms. Campbell?

22          MS. CAMPBELL:  November 6th, did you say, Your Honor?

23          THE COURT:  Yes.

24          MS. CAMPBELL:  Yes, I don't have anything on that

25  day.

1          Your Honor, I have one more issue I'd like to

2     address, if we can.

3          THE COURT:  Okay.

4          MS. CAMPBELL:  It was -- I don't -- I think we've

5     said it in a couple of JSRs that it's sort of a lot to have a

6     production -- knowing that this is going to be a lengthy

7     production -- to have to produce a JSR to the Court every

8     month.  If -- if the Court is amenable, we'd like to reduce the

9     JSRs to every six months to let the Court know how much we've

10    produced -- of how much we've reviewed, how much we're

11    producing, and give the status of the case.

12         THE COURT:  Okay.  So I'm going to lift the

13    requirement for JSRs between now and November 6th.  I think,

14    you know, in light of the fee dispute, it doesn't really make

15    sense for me to order production.  And we can -- we can take

16    that up then, Ms. Campbell, about how frequently they should

17    be -- JSRs should be served.  I agree with you that monthly

18    it's probably unnecessary.  I don't know.  Six months may be a

19    little long, but I'm happy to discuss that then once we've got

20    a better sense of the total scope here and also what the

21    production rate should be going forward.

22         Okay.  Anything further from plaintiff,

23    Mr. McClanahan?

24         MR. McCLANAHAN:  Yes, sir.  A related issue.  We

25    still think that, respectfully, we should have a chance to

1   brief the 500-page-per-month rate, and so if you're not going

2   to make them file an *Open America* stay, how do you want that to

3   go procedurally?

4       THE COURT:  You're welcome to have that be -- just

5   add that into the current briefing.  I'm certainly willing to

6   consider -- or reconsider that issue if you want to wrap that

7   into the briefing.

8       MR. McCLANAHAN:  Okay.  Shall I assume that you won't

9   be trying to file it as, like, a motion to reconsider that

10  makes that burden?  We're just filing a motion to expedite

11  production or something?

12      THE COURT:  Yeah, I'm not -- you know, sitting here I

13  don't have a strong view on what -- what you'd call that.

14  Again, you know, I'm just telling you my instinct, this is not

15  an *Open America* stay situation unless -- given that there is an

16  ongoing production, but, you know, I don't think -- I wouldn't

17  think you need to meet some sort of heightened motion for

18  reconsideration burden, Mr. McClanahan.

19      I think if you want to -- as I kind of see this, this

20  is, you know, a motion for partial summary judgment on the

21  fee -- the fee issue, and if -- if you want to include briefing

22  on an appropriate schedule, you know, Ms. -- Ms. Campbell can

23  certainly in her opposition explain what -- what standard of

24  review she'd think that would -- would apply there, but I think

25  this is just -- in my mind, it is -- it's just kind of the --

1     in these FOIA cases, the courts are routinely setting

2     production schedules based on various factors, not so much kind

3     of a clear legal standard, as more just trying to supervise the

4     docket and -- and the -- the needs for certain production

5     amount change over time.  So I don't think it's a motion for

6     reconsideration situation.

7          MR. McCLANAHAN:  With that in mind, sort of

8     perfecting the -- the record, should any of this go on appeal

9     or reconsideration or something, I would like to make an oral

10    motion to have the -- compel them to file an *Open America* stay

11    that you can then formally deny so that that's on the record so

12    it preserves the issue should it come up later.

13         THE COURT:  That's just fine.  I'll -- your motion

14    is -- is heard and granted for the record -- or I'm sorry --

15    heard and denied for the record, but you can certainly make

16    that motion.

17         MR. McCLANAHAN:  All right.  Thanks very much, Your

18    Honor.

19         THE COURT:  Ms. Campbell, anything further?

20         MS. CAMPBELL:  No, Your Honor.  Thank you.  And,

21    again, I apologize to everyone for this morning.

22         THE COURT:  I hope your child feels better.  Take

23    care, folks.

24         THE COURTROOM DEPUTY:  This Honorable Court is

25    adjourned.

1            (The proceedings were concluded.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3        I, Nancy J. Meyer, Registered Professional Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                Dated this 7th day of August, 2019.

10

11                /s/ Nancy J. Meyer_____
                Nancy J. Meyer
12              Official Court Reporter
                Registered Professional Reporter
13              Certified Realtime Reporter
                333 Constitution Avenue Northwest, Room 6509
14              Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

USCA Case #23-5004      Document #2003881          Filed: 06/16/2023      Page 62 of 341

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | * | |
| RESEARCH CENTER, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No.  1:18-cv-01868 (TNM) |
| | * | |
| DEPARTMENT OF JUSTICE, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### PLAINTIFF'S UNOPPOSED MOTION FOR ENLARGEMENT OF
### TIME TO FILE MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COMES Plaintiff Assassination Archives and Research Center ("AARC") to

respectfully and apologetically request a six-month enlargement of time pursuant to Rule 6(b) of

the Federal Rules of Civil Procedure, to and including 13 March 2020, within which to file its

Motion for Partial Summary Judgment.  This motion is due 13 September 2019.

Plaintiff has good cause to request this lengthy extension.  AARC's President James

Lesar underwent complex heart surgery on 5 August 2019, and he has been under a doctor's

orders not to work for an extended period of time.  Because Mr. Lesar is the subject matter

expert with respect to the records at issue in this case, he is the person with the greatest

knowledge about the nature of these records and why they would warrant a public interest fee

waiver.  As a result, it would be extraordinarily difficult if not impossible for the undersigned to

meaningfully make the relevant arguments without being able to regularly consult with Mr.

Lesar, which Mr. Lesar's doctor has prohibited for the foreseeable future.  Plaintiff accordingly

asks for this six-month extension, with the intention that if Mr. Lesar becomes able to

meaningfully contribute before then, the undersigned will so inform this Court and discuss

alternative scheduling with Defendant's counsel.  Mr. Lesar has sought and received comparable

extensions in other cases in this Circuit in which he is a counsel of record.

This is the first extension requested for this filing.  Defendant does not oppose this

extension.  A proposed Order accompanies this Motion.

Date:   September 9, 2019

<div align="right">

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

</div>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND *
RESEARCH CENTER, *
 *
  Plaintiff, *
 *
  v. * Civil Action No. 1:18-cv-01868 (TNM)
 *
DEPARTMENT OF JUSTICE, *
 *
  Defendant. *
 *
* * * * * * * * * * * * *

### PLAINTIFF'S UNOPPOSED MOTION TO MODIFY BRIEFING SCHEDULE

NOW COMES Plaintiff to respectfully request a fifteen-week enlargement of time, until 24 June 2020, pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, within which to file its Motion for Partial Summary Judgment, and a subsequent modification of the briefing schedule to accommodate the schedules of the parties' respective counsel. This filing is due 10 March 2020.

Plaintiff has good cause to request this modification. As the Court is aware, Plaintiff's primary subject matter expert suffered from severe medical issues which restricted his ability to perform even the most minor tasks for several months. Furthermore, since the Court established this schedule at Plaintiff's request, the undersigned learned that he is expecting a new baby, who is currently due to arrive on 17 April, in the middle of the current briefing schedule. Once she arrives, the undersigned will go on paternity leave for a month, which would unnecessarily complicate this briefing and make it impossible for him to file the reply on 21 April as currently scheduled or attend the hearing scheduled for 4 May. Since rescheduling this briefing causes no

prejudice to Defendant—since it will continue to process records for months or years to come—it is in the interest of judicial economy to grant this Motion.

The undersigned is aware of the Court's disfavor for scheduling motions filed less than four days before a due date, and he apologizes for the delay. Last week his laptop suffered a catastrophic breakdown which rendered it fully inoperable and severely impacted his ability to do work. He has since ordered a replacement computer, which will not arrive until 12 March at the earliest. The undersigned delayed filing this Motion until he learned whether his computer could be repaired (it could not) and then when he could expect to receive its replacement, so that he would be able to effectively calculate the effect the downtime would have on his workload and determine the length he would need to ask the Court to extend the stay.

Defendant's counsel has requested that she be allowed 45 days from Plaintiff's dispositive motion to complete her opposition, which Plaintiff agrees is reasonable. Plaintiff accordingly asks that the Court extend the current stay and issue the attached Order establishing a new schedule. Furthermore, in keeping with the Court's expressed interest in holding a motion hearing approximately two weeks after the end of briefing, the undersigned respectfully suggests that the 4 May motion hearing be continued until sometime during the week of 21 September.

Defendant does not oppose this Motion. A proposed Order accompanies this Motion.

Date:   March 9, 2020

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | * | |
| RESEARCH CENTER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-01868 (TNM) |
| | * | |
| DEPARTMENT OF JUSTICE, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**PLAINTIFF'S RENEWED UNOPPOSED MOTION**
**TO MODIFY BRIEFING SCHEDULE**

NOW COMES Plaintiff to respectfully renew its request for an enlargement of time until

24 June 2020, pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, within which to file

its Motion for Partial Summary Judgment, and a subsequent modification of the briefing

schedule to accommodate the schedules of the parties' respective counsel. This filing is due 31

March 2020.

Plaintiff requests this modification due to extraordinary circumstances. Plaintiff is aware

that the Court previously denied this request, choosing instead to reschedule the initial filing

until 31 March, while stating that future requests would be disfavored. However, as the Court is

likely aware, since it made that ruling the Washington, DC metropolitan area has been virtually

shut down by the coronavirus outbreak, with all schools being closed for several weeks and

residents being instructed to self-isolate. As a result, the undersigned is now caring at home for

his toddler daughter because his law firm has followed the guidance of the coronavirus relief bill

which recently passed the House mandating that all employers provide two weeks paid sick leave

to employees who must care for children due to a coronavirus-related school closing. Since that

two-week period will extend to 30 March, and his second child is due to arrive between now and 16 April, it is necessary to postpone this briefing until after he returns from paternity leave.

Plaintiff accordingly asks that the Court extend the current stay and issue the attached Order establishing a new schedule. Furthermore, in keeping with the Court's expressed interest in holding a motion hearing approximately two weeks after the end of briefing, the undersigned respectfully suggests that the 4 May motion hearing be continued until sometime during the week of 21 September.

Defendant does not oppose this Motion. A proposed Order accompanies this Motion.

Date:   March 16, 2020

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-01868 (TNM) |
| | * | |
| DEPARTMENT OF JUSTICE, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### <u>PLAINTIFF'S NOTICE TO THE COURT</u>

Plaintiff hereby respectfully notifies the Court that it will not be filing a Motion for

Partial Summary Judgment at this time. Due to the coronavirus emergency, the undersigned's

law firm is not able to meet the Court's 31 March 2020 filing deadline without violating Section

5102 of the Families First Coronavirus Response Act, P.L. 116-127, or the Family and Medical

Leave Act, as modified by Second 3102 of that statute. Plaintiff files this Notice to allow the

Court to remove all deadlines and hearings pertaining to this matter from its calendar, as well as

to advise the Court of how the issues in controversy will be addressed in the future.

As the Court is aware, the proposed Motion for Partial Summary Judgment would have

addressed three distinct issues: (1) whether the Federal Bureau of Investigation ("FBI") properly

denied Plaintiff's request for a public interest fee waiver and accordingly insisted that it would

not continue to process Plaintiff's Freedom of Information Act ("FOIA") request at issue in

Count 1 unless Plaintiff continued to make monthly payments; (2) whether FBI's assessment of

fees was reasonable in the first place, even assuming *arguendo* that Plaintiff was not entitled to a

fee waiver; and (3) whether FBI's proposed processing rate of 500 pages per month was

sufficient. Plaintiff originally asked the Court to order FBI to file a dispositive motion on the first

two items, since the agency has the burden of proof to show that it properly processed a request

in a FOIA case, and an *Open America* motion on the third item. However, the Court instead

directed Plaintiff to file a dispositive motion on all three items, which led to the current briefing

schedule. (*See* Tr. of 8/6/19 Stat. Conf., Dkt. #20, at 4-11.)

<p align="center">*Items 1 and 2: Fee Issues*</p>

Because of the uncertainty surrounding the duration of the coronavirus emergency,

Plaintiff no longer intends to file a dispositive motion regarding the first two items until after FBI

has filed its dispositive motion at the end of its processing of the request at issue in Count 1. FBI

will then be required to justify to the Court that it properly processed Plaintiff's request,

including being required to demonstrate by a preponderance of the evidence that it properly

denied Plaintiff's request for a public interest fee waiver and assessed reasonable fees. After FBI

has filed that motion, Plaintiff will oppose it and—if appropriate—file a Cross-Motion on those

issues. If the Court finds at that time that FBI failed to meet its burden of proof to show that it

properly denied Plaintiff's request for a public interest fee waiver and assessed reasonable fees,

the appropriate remedy would be an order directing FBI to return the improperly assessed fees to

Plaintiff with interest.

<p align="center">*Item 3: Processing Rate*</p>

Because the coronavirus emergency has effectively shut down FBI's FOIA process for

the near future, adding an unknown amount of work to its backlog, Plaintiff has decided as an act

of good faith to forgo forcing the issue of FBI's processing rate for now. Plaintiff still maintains

that FBI was required to request an *Open America* stay before deciding to process records

responsive to Count 1 at the rate of 500 pages per month for the next several years, and it

<p align="center">2</p>

continues to maintain that FBI has a policy of deliberately imposing unnecessary restrictions on FOIA processors to slow the process to a crawl, but it also recognizes that the unexpected and extreme nature of the coronavirus emergency calls for at least a temporary cease-fire in this particular battle. Once the coronavirus emergency has passed and FBI has taken steps to cope with the surge in its backlog, Plaintiff will reassess the situation and, if necessary, move at that time to accelerate FBI's processing of responsive records.

However, Plaintiff will bring one development to the Court's attention and respectfully suggest that the Court may wish to monitor the situation or compel FBI to provide more information. As the Court is aware, FBI committed to the Court in the 6 August 2019 Status Conference that it would continue to process responsive records at a rate of approximately 500 pages per month if Plaintiff paid the monthly assessed fees. Due to factors beyond Plaintiff's control, it was unable to make payments for several months, and FBI accordingly paused its processing of responsive records. On 9 March 2020, Plaintiff paid the outstanding debt to FBI, and the undersigned informed FBI's counsel the next day of this fact and that automatic payments had been set up for at least the next nine months to cover the monthly fees. The undersigned asked FBI's counsel to confirm FBI's receipt of the payment and to confirm that FBI was restarting its processing and monthly releases, and she did not respond. The undersigned again asked FBI's counsel on 21 March and 26 March if FBI would be making monthly releases or would be asking the Court to stay its processing deadlines, as it had in other cases, and she did not respond.

While Plaintiff is sympathetic to FBI's predicament, the fact remains that unless FBI *actually asks the Court* for a stay of its processing obligations, it is bound by them. The fact that FBI has seen fit to ask several other judges in this Circuit for such a stay—each time attaching a

declaration like the one attached to this Notice—while refusing to do so in this case strongly

implies that it is attempting to obtain a litigation advantage by keeping this Court in the dark,

perhaps due to this Court's oft-stated reluctance to stay deadlines in this case. Plaintiff

respectfully suggests that the Court might want to consider directing FBI to either request a stay

in this case as it has in all the other cases or directing it to comply with its obligation to process

500 pages per month of responsive records, and that it might also consider asking FBI's counsel

to justify the failure to promptly apprise this Court of the information she saw fit to share with

multiple other judges without reservation.[1]

Date:   March 31, 2020

<div style="margin-left: 40%;">

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

</div>

---

[1] It is worth noting that the undersigned first inquired about FBI's resumption of processing on 10 March, a full week before FBI stopped processing FOIA requests due to the coronavirus emergency. The failure of FBI's counsel to respond to his inquiry at that time cannot therefore be blamed on a lack of personnel or resources due to the emergency.

USCA Case #23-5004      Document #2003881          Filed: 06/16/2023      Page 73 of 341

## DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1)     I am the Assistant Section Chief of the Record/Information Dissemination Section

(RIDS), Information Management Division (IMD), in Winchester, Virginia and, in the absence

of RIDS Section Chief, David M. Hardy, I serve as Acting Section Chief for RIDS.  I have held

this position since June 26, 2016.  I joined the FBI in September 2011, and prior to my current

position, I was the Unit Chief, RIDS Litigation Support Unit from November 2012 to June 2016;

and an Assistant General Counsel, FBI Office of General Counsel, Freedom of Information Act

("FOIA") Litigation Unit, from September 2011 to November 2012.  In those capacities, I had

management oversight or agency counsel responsibility for FBI FOIA and Privacy Act ("PA")

litigation cases nationwide.  Prior to my joining the FBI, I served as a Senior Attorney, U.S.

Drug Enforcement Administration ("DEA") from September 2006 to September 2011, where

among myriad legal responsibilities, I advised on FOIA/PA matters and served as agency

counsel representing the DEA in FOIA/PA suits nationwide.  I also served as a U.S. Army Judge

Advocate General's Corps Officer in various assignments from 1994 to September 2006

culminating in my assignment as Chief, General Litigation Branch, U.S. Army Litigation

Division where I oversaw FOIA/PA litigation for the U.S. Army.  I am an attorney registered in

the State of Ohio and the District of Columbia.

(2)     In my official capacity as the Assistant Section Chief of RIDS, I supervise

approximately 245 FBI employees, supported by approximately 72 contractors, who staff a total

of twelve (12) FBI Headquarters (FBIHQ) units and two (2) field operational service center units

whose collective mission is to effectively plan, develop, direct, and manage responses to requests

for access to FBI records and information pursuant to the FOIA as amended by the OPEN

Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13,526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives.  The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552 and the Privacy Act, 5 U.S.C. § 552a.

(4)    On January 31, 2020, Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the United States to aid the nation's healthcare community in responding to COVID-19.  On March 11, 2020, the World Health Organization publicly characterized COVID-19 as a pandemic.[1]  On March 13, 2020, the President declared a National Emergency in an effort to address the spread of COVID-19.[2]  Further, on March 16, 2020, the President announced new guidelines to slow the spread of the virus, to include avoiding groups of more than 10 people and closing schools in many communities.[3]  This

---

[1] Centers for Disease Control and Prevention. "Coronavirus Disease 2019 (COVID-19): Situation Summary." www.cdc.gov, accessed March 13, 2019.

[2] *See* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last accessed Mar. 17, 2020).

[3] *See* The President's Coronavirus Guidelines for America, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last accessed Mar. 17, 2020).

guidance follows recommendations by the Centers for Disease Control (CDC) to engage in social distancing.[4]

(5)    The United States Office of Personnel Management (OPM) has been issuing guidance to address how the Federal Government can implement measures to protect its workforce and the American public.  Specifically, on March 7, 2020, OPM recommended the "incorporation of telework and 'social distancing' in COOP [Continuity of Operations] and emergency planning [to] allow the Federal Government to continue functioning efficiently and effectively, while ensuring the health and safety of employees."[5]  Further, on March 15, 2020, both the Acting Director of the Office of Management and Budget (OMB) issued guidance to Federal agencies in the National Capital Region (NCR) to implement maximum telework flexibilities.  OMB's guidance asked agencies "to offer maximum telework flexibilities to all current telework eligible employees, consistent with operational needs of the departments and agencies as determined by their heads."[6]

(6)    The FBI is implementing these guidelines to protect its employees and their communities, and to ensure that it can continue to protect the American people during this national emergency.

---

[4] *See, e.g.*, Centers for Disease Control "Interim Guidance for Businesses and Employers" https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html (last accessed Mar. 17, 2020).

[5] United States Office of Personnel Management Memorandum "Coronavirus Disease 2019 (COVID-19); Additional Guidance" (March 7, 2020), https://www.chcoc.gov/content/coronavirus-disease-2019-covid-19-additional-guidance (last accessed Mar. 17, 2020). *See also* United States Office of Personnel Management Memorandum "Updated Guidance on Telework Flexibilities in Response to Coronavirus" (March 12, 2020), https://www.chcoc.gov/sites/default/files/M-20-13.pdf (last accessed Mar. 17, 2020).

[6] Memorandum from the Acting Director of The Office of Management and Budget to the Heads of Departments and Agencies "Updated Guidance for National Capital Region on Telework Flexibilities in Response to Coronavirus" (March 15, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/M20-15-Telework-Guidance-OMB.pdf (last accessed Mar. 17, 2020).

(7)    Telework is not available for RIDS employees.  The systems that they work on are located on FBI's SECRET-level classified enclave.  Significantly, most FOIA searches are conducted using Sentinel and documents are processed in the FOIA Document Processing System (FDPS), both of which maintain classified and other sensitive information and are located on the SECRET enclave.[7]  Furthermore, many FOIA requests involve records that must undergo classification reviews before they can be processed for FOIA exemptions.  That work necessarily must be done in the office.

(8)    RIDS employees have been designated as not mission-critical and sent home as of March 17, 2020.[8]  Only a limited number of employees are being permitted to report to the office, but no FOIA processing is occurring as of March 17, 2020.  While RIDS initially anticipated that its staff would return to work on March 30, 2020, the situation has continued to develop.  As a result, and subject to continued reassessment, RIDS now anticipates that its staff will return on a limited basis no earlier than April 13, 2020.  Until at least April 13th, no production of records pursuant to FOIA will be made, whether those productions are in relation to requests in litigation or at the administrative stage.  This includes responses to FOIA consultation requests or referrals from other agencies to the FBI.  RIDS staff members responsible for drafting *Vaughn* declarations and indexes in litigation matters continue to be designated as not mission-critical as well and remain at home.

---

[7] Moreover, in order to downgrade and move information from the SECRET enclave to an unclassified system requires running particular security protocols that can only be done on the classified enclave.

[8] A mission-critical position is one that's functions absolutely cannot be put on hold.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of March, 2020.

Michael G. Seidel
Assistant Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

71

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                                           |       |                                    |
|-------------------------------------------|-------|------------------------------------|
| ASSASSINATION ARCHIVES AND                | )     |                                    |
| RESEARCH CENTER, INC.,                     | )     |                                    |
|                                           | )     |                                    |
| Plaintiff,                                 | )     |                                    |
|                                           | )     |                                    |
| v.                                        | )     | Civil Action No. 18-1868 (TNM)     |
|                                           | )     |                                    |
| DEPARTMENT OF JUSTICE,                     | )     |                                    |
|                                           | )     |                                    |
| Defendant.                                 | )     |                                    |

## JOINT STATUS REPORT

The parties jointly submit this status report pursuant to the Court's Minute Order of April 1, 2020. The parties were unable to agree on a recommendation for a further production and reporting schedule in this matter as the Court ordered. They therefore provide their respective positions below.

***Plaintiff's Position:***

The Federal Bureau of Investigation ("FBI") refuses to provide any information to either Plaintiff or the Court beyond the fact that the FBI's FOIA office is closed. When, in a good faith effort to meet and confer, Plaintiff's counsel asked FBI's counsel to "[p]lease confirm that [FBI] received the $45 [fee payment] and will resume processing records in this case once they reopen, and specify what the processing rate will be," FBI's counsel replied by simply stating, "the RIDS office will no longer make releases or update the Court or Plaintiffs of the status of their requests," which was copied and pasted directly from the position statement she had previously sent to Plaintiff's counsel.[1] Thus, not only is FBI not interested in meeting and conferring in good faith

---

[1] This position statement was later modified to say that FBI *can* no longer provide status updates to the Court instead of *will* no longer, after Plaintiff criticized that assertion in a previous draft of this report.

to provide a recommendation for the Court, but it is openly obstructing Plaintiff's attempts to do so, despite the fact that the Court ordered the parties to propose a *production* schedule as well as a reporting schedule. Plaintiff therefore joins FBI's recommendation that the Court order the parties to file another Joint Status Report on May 18, 2020, in light of the fact that the closure of the FBI FOIA office is not unreasonable at the moment, but adds that the Court should also order FBI to immediately begin processing records responsive to Plaintiff's request upon the reopening of that office, and further order that FBI shall process those records at a rate of at least 1,000 pages per month, unless it provides a thorough explanation of its position and status supported by a sworn declaration—including an explanation for its refusal to provide the information requested by Plaintiff—within one week of the Court's Order. The Court should further order that if FBI elects to provide such evidence, it must do so in the form of a motion that Plaintiff is allowed to oppose. As this Court has repeatedly stated, Court orders, especially scheduling orders, are mandatory and not issued lightly, and a party's assertion that it does not need to propose a production schedule or even provide information about its *intended* production schedule should be soundly rejected by the Court, especially when it has seen fit to file multiple detailed declarations and motions in other cases since the office closed.[2]

***Defendant's Position:***

The FBI's Records Division ("RIDS") has suspended operational services during the

---

[2] To clarify, unlike the straw man FBI discusses below, Plaintiff has no problem with the closure of the FBI FOIA office, as stated above. Plaintiff objects only to FBI's refusal to provide even cursory information about how it intends to proceed *after it reopens*, in clear defiance of this Court's unambiguous order. While Plaintiff's counsel has repeatedly and promptly provided both FBI's counsel and the Court with any information relevant to scheduling matters, FBI instead refuses to provide even the most basic information under the guise of "not submit[ting] to Plaintiff's demands." It therefore unfortunately falls to the Court to issue such a demand, in hopes that FBI will submit to *that*. FBI's discussion of Plaintiff's requested extensions is simply an attempt to distract the Court from its recalcitrance.

Covid-19 national emergency. Consequently, the RIDS office can no longer make releases or update the Court or Plaintiffs of the status of their requests. In light of this, the FBI proposes to update Plaintiff and the Court regarding the status of RIDS by filing another joint status report on May 18, 2020.

In response to Plaintiff's other representations, it is disingenuous and improper for Plaintiff to portray Defendant as an agency that is blatantly defying this Court's orders simply because Defendant will not submit to Plaintiff's demands.   The FBI reached a considered decision, after reviewing suggestions of public health officials, to shutter RIDS's operations temporarily for the safety of its employees during this national emergency.

The FBI, however, has not requested that this case remain at a standstill while RIDS's operations are temporarily suspended.  Indeed, the temporary closure of RIDS does not prevent briefing on the fee waiver and processing rate issues that Plaintiff has raised.  Rather, it is Plaintiff who has sought to delay briefing those disputes.  Indeed, the FBI has maintained the same position throughout this litigation that on the fee waiver issue and the processing rate.  Before the current national emergency, the FBI was producing records based on a reasonable production rate (500 page processing rate). The Court held a status conference, at Plaintiff's request, to discuss these issues, and the Court allowed Plaintiff to brief its disputes on these issues.

After the Court set the briefing schedule, (a schedule that Plaintiff's counsel insisted was necessary) Plaintiff's counsel sent Defendant's counsel a series of communications requesting that briefing be delayed due to the effects on Plaintiff's counsel of the response to COVID.  Defendant did not oppose these requests, understanding that the current national emergency has impacted nearly everyone's work and personal schedules.

The above demonstrates that the FBI is not being recalcitrant or ignoring this Court's

orders.  Rather, it, like Plaintiff's counsel, is operating with limitations during this unprecedented time.   As stated above, RIDS has suspended operational services during the COVID-19 national emergency. During this suspension, RIDS is unable to make releases, to update the Court or Plaintiff as to the status of its request, or to respond as Plaintiff suggests the FBI should in the next status report.

In sum, on May 18, 2020, the Court should require the parties to update the Court regarding the status of RIDS and, to the extent practicable, make proposals as to further proceedings in this action.

Date:   April 8, 2020

Respectfully submitted,

TIMOTHY J. SHEA, D.C. Bar #437437
United States Attorney

DANIEL F. VAN HORN, D.C. Bar No. 924092
Chief, Civil Division

/s/ *Rhonda L. Campbell*
RHONDA L. CAMPBELL
D.C. Bar No. 46240
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530 (202) 252-2559
Rhonda.campbell@usdoj.gov

*Counsel for United States*

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 18-1868 (TNM) |
| DEPARTMENT OF JUSTICE, | ) ) | |
| Defendant. | ) | |

**JOINT STATUS REPORT**

The parties jointly submit this status report pursuant to the Court's Minute Order of April 9, 2020.

***Defendant's Report on Status of Processing:***

The FBI's Records Division ("RIDS") has largely suspended operational services during the Covid-19 national emergency.  RIDS resumed operations on a limited basis on April 29, 2020. See Decl. of David M. Hardy ("Hardy Decl.") ¶ 17.  A significant number of RIDS employees will be unavailable to report to work due to (1) being at higher risk for severe illness; (2) being ill; or (3) child care issues.  Hardy Decl. ¶¶ 18-19.   Consistent with social distancing rules, no more than 1/3 of RIDS employees will be permitted to work on any given day.  Each unit will be split into three teams, and each team will report to work on a rotating basis.  Therefore, because each RIDS employee available to return to work will only be able to work one or two days per week, RIDS' FOIA processing capabilities will be significantly reduced. Hardy Decl. ¶ 21.

On April 30, 2020, RIDS learned that an employee who reported to work was symptomatic for COVID-19.  In order to prevent the potential spread of infection, RIDS halted operations again at noon on April 30, 2020, so that there could be a deep cleaning of the workspace.  Later that

evening, it was determined that RIDS should remain closed for another deep cleaning on May 1, 2020, after it was discovered that another employee who reported to work had potentially been exposed to a positive COVID-19 case outside of the workplace.  Both employees subsequently self-quarantined.  These cleanings were necessary to ensure the health and safety of RIDS employees, and similar circumstances can be anticipated as the pandemic continues and as RIDS continues to bring employees back to work.

In short, while RIDS is resuming operations, it is doing so with significantly diminished staffing levels necessary to ensure the health and safety of staff who are reporting to work. Moreover, the future impacts of COVID-19 on staffing levels are unpredictable.  Considering these limitations, and in an effort to be equitable and process records in as many cases as possible, RIDS anticipates that it will be able to make a release of an undetermined number of pages in pending cases with production schedules.

In this case, FBI located the check for processing fees and it expects to make a release by the end of the month.  In light of the above, it is not able to predict what volume of information will be released.

*Plaintiff's Statement:*

As FBI noted, RIDS began slowly resuming operations at the end of April. The Court's 9 April Minute Order explicitly stated, "It is further ORDERED that the Defendant shall promptly inform the Court if it sooner resumes record processing capability." As the Court is aware, FBI did not promptly inform the Court when it resumed record processing capability almost three weeks ago. This is yet another instance of FBI choosing to inform the Court of matters regarding scheduling when *it* sees fit, even when the Court has repeatedly emphasized the importance of strict adherence to its orders regarding such matters.

To be clear, Plaintiff sympathizes with FBI's predicament, and it does not begrudge FBI the right to ease into processing slowly to protect its employees. The coronavirus emergency has forced everyone—inside and outside the government—to adjust expectations about how quickly previously routine duties can be performed and how stringent deadlines must be. Plaintiff instead takes issue with FBI's failure once again to inform the Court of what it is doing until absolutely required to, and asks that the Court consider FBI's lack of forthcomingness in the future when it decides whether FBI should be allowed to proceed on its own schedule while continuing to charge Plaintiff for each tiny drip of information it releases each month.

**Defendant's reply:**

FBI has been prompt in its reporting.  Plaintiff has suffered no prejudice for not having more frequent updates and the processing pace that will be achievable with the limited reopening remains unclear.

The parties ask the Court to set another joint status report for 30 days.

Date: May 18, 2020                    Respectfully submitted,

                                      TIMOTHY J. SHEA, D.C. Bar #437437
                                      United States Attorney

                                      DANIEL F. VAN HORN, D.C. Bar No. 924092
                                      Chief, Civil Division

                                      /s/ *Alan Burch*
                                      ALAN BURCH, D.C. Bar No. 470655
                                      Assistant United States Attorney
                                      Civil Division
                                      555 4th Street, N.W.
                                      Washington, D.C. 20530 (202) 252-2550
                                      alan.burch@usdoj.gov

                                      *Counsel for United States*


                                      /s/ *Kelly B. McClanahan*
                                      Kelly B. McClanahan, Esq.
                                      D.C. Bar #984704
                                      National Security Counselors
                                      4702 Levada Terrace
                                      Rockville, MD  20853
                                      301-728-5908
                                      240-681-2189 fax
                                      Kel@NationalSecurityLaw.org

                                      *Counsel for Plaintiff*

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), in Winchester, Virginia. I have held this position since August 1, 2002. Prior to my joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as the Section Chief of RIDS, I supervise approximately 239 FBI employees, supported by approximately 72 contractors, who staff a total of twelve (12) FBI Headquarters (FBIHQ) units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13,526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552 and the Privacy Act, 5 U.S.C. § 552a. The declaration provides an update on the status of the FBI's FOIA program, and supplements the prior Michael G. Seidel's declarations of March 19, March 27, and April 9, 2020, regarding RIDS's status during the on-going COVID-19 crisis.

(4)     The COVID-19 pandemic has no recent analogue. As of April 21, 2020, there were more than 802,000 confirmed cases of the virus in the United States and over 44,000 deaths; worldwide, there were over 2.6 million confirmed cases and more than 185,000 deaths.[1]

(5)     The Secretary of Health and Human Services declared COVID-19 as a public health emergency effective January 27, 2020.[2] The World Health Organization publicly characterized it as a pandemic on March 11, 2020,[3] and thereafter, on March 13, 2020, the President declared a National Emergency in an effort to address the spread of COVID-19.[4]

(6)     These declarations were followed by series of guidance and guidelines to slow the spread of the virus by the President and the Centers for Disease Control (CDC) for the general public; by the Office of Management and Budget (OMB) and the Office of Personnel Management (OPM) with respect to Federal agencies and the Federal workforce; and state and local governments for their communities.

---

[1] *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, last accessed Apr. 23, 2020; https://www.covidtracker.com/, Johns Hopkins University Center for Systems Science and Engineering, last accessed Apr. 23, 2020.

[2] *See* https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html, last accessed Apr. 23, 2020.

[3] Centers for Disease Control and Prevention. "Coronavirus Disease 2019 (COVID-19): Situation Summary." www.cdc.gov, accessed March 13, 2019.

[4] *See* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last accessed Mar. 17, 2020).

(7)     The CDC recommends that people engage in social distancing by keeping at least six feet from other people; not gathering in groups; and staying away from crowded places or mass gatherings.[5]  The CDC has also recommended that cloth face coverings be worn in public settings where social distancing measures are difficult to maintain (*e.g.*, grocery stores and pharmacies).[6]

(8)     By late March/early April, many states, including those where RIDS employees reside, have issued Stay at Home orders directing their residents to self-isolate except to, *inter alia*, engage in essential work/perform essential government functions.[7]  Schools were closed in these jurisdictions.

(9)     Guidance has also been issued to protect the Federal workforce, and by extension, the American people.  Following the CDC's guidance, OPM has recommended social distancing and both OPM and OMB have issued guidance for agencies to implement maximum telework flexibilities consistent with operational needs of the departments and agencies.[8]

---

[5] *See, e.g.*, Centers for Disease Control "Interim Guidance for Businesses and Employers" https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html (last accessed Mar. 17, 2020).

*See also* Centers for Disease Control "Social Distancing, Quarantine, and Isolation," https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html, last accessed Apr. 23, 2020.

[6] *See* Centers for Disease Control "Use of Cloth Face Coverings to Help Slow the Spread of COVID-19," https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html, last accessed Apr. 23, 2020.

[7] Stay at Home orders from for Maryland, Virginia, Washington D.C., West Virginia, Montana, Idaho, and Georgia. *See* https://governor.maryland.gov/2020/03/30/as-covid-19-crisis-escalates-in-capital-region-governor-hogan-issues-stay-at-home-order-effective-tonight/; https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855702- en.html; https://coronavirus.dc.gov/stayhome; https://dhhr.wv.gov/COVID-19/Pages/Governor-Issues-Stay-at-Home-Order.aspx; https://dphhs.mt.gov/aboutus/news/2020/stayathomedirective; https://www.usnews.com/news/best-states/georgia/articles/2020-04-02/georgia-infections-at-5-300-as-kemp-readies-stay-home-order; and https://coronavirus.idaho.gov/statewide-stay-home-order/, last accessed Apr. 23, 2020.

[8] OPM Memorandum "Coronavirus Disease 2019 (COVID-19); Additional Guidance" (March 7, 2020), https://www.chcoc.gov/content/coronavirus-disease-2019-covid-19-additional-guidance (last accessed Mar. 17, 2020). *See also* OPM Memorandum "Updated Guidance on Telework Flexibilities in Response to Coronavirus" (March 12, 2020), https://www.chcoc.gov/sites/default/files/M-20-13.pdf, last accessed Mar. 17, 2020.

(10)     The FBI continues to implement these guidelines to protect its employees as well as their families and communities, and to ensure that it can continue to protect the American people during this national emergency.

(11)     RIDS has never before dealt with a crisis of this magnitude that has posed similar widespread and immediate risks to the health and safety of every one of its employees, as well as their families and communities, and indeed the populace of the United States and the world.

(12)     The FBI supports the public's right to request and obtain agency records.  But in the midst of a deadly pandemic, the health and safety of FBI employees, their families, and their communities is a paramount concern of agency decision makers who must make difficult decisions about what agency functions are critical to the continuation of the FBI's mission of ensuring the safety of the American people, investigating and interdicting criminal activities, and protecting the national security.

(13)     On March 17, 2020, RIDS temporarily halted its FOIA program in response to the COVID-19 pandemic.[9]  This decision was not made lightly.  However, it was necessary and

_____

OMB Memorandum "Updated Guidance for National Capital Region on Telework Flexibilities in Response to Coronavirus" (March 15, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/M20-15-Telework-Guidance-OMB.pdf, last accessed Mar. 17, 2020.

White House and CDC Guidelines on "Opening America Up Again," https://www.whitehouse.gov/openingamerica/#criteria, last accessed Apr. 23, 2020.

OMB Memorandum "Aligning Federal Agency Operations with the National Guidelines for *Opening Up America Again*," https://www.whitehouse.gov/wp-content/uploads/2020/04/M-20-23.pdf, last accessed Apr. 23, 2020.

OPM Frequently Asked Questions Regarding the Resumption of Normal Workforce Operations, https://www.opm.gov/policy-data-oversight/covid-19/, last accessed Apr. 23, 2020.

[9]  A limited number of employees have been permitted to rotate into the office during the temporary suspension of FOIA operations to handle any emergencies or critical issues arising during the period, to operate the eFOIA portal, and to receive and route as appropriate mail and submissions to the eFOIA portal.

proper because RIDS's Government Information Specialist (GIS) positions were rightly designated as not mission-critical[10] and because they are not telework-capable positions.

(14)    Like other intelligence/national security agencies, the vast majority of FBI work is performed on classified systems.  Significantly, the record system that the FBI primarily relies upon for conducting FOIA searches – the Central Records System, which is accessed by the FBI's SENTINEL case management system – is located on the FBI's SECRET-level classified enclave, as is the FBI's FOIA Document Processing System (FDPS).  Given the volume of classified information that the FBI handles and maintains, operating in a classified enclave is both necessary and efficient; classified systems can handle both classified and unclassified materials whereas unclassified systems can only handle unclassified materials.

(15)    Moreover, putting aside a host of logistical and procedural challenges to moving unclassified records from the classified system for FOIA processing, the FBI does not currently have the technology resources necessary to process unclassified records remotely, which at a minimum would require the acquisition and configuration of laptops and remote connection technology compatible with FBI Information Technology security requirements for hundreds of employees.[11]

---

[10]  A mission-critical position is one that's functions absolutely cannot be put on hold.  RIDS management concluded that the functions of a GIS position could temporarily be put on hold without risking the FBI being unable to fulfill its primary mission as a law enforcement and national security agency.

[11]  Challenges include the identification of records potentially suitable for reviewing on unclassified systems, location of those records in FDPS, review of the records to ensure that they do not include classified or sensitive information that cannot be placed on an unclassified system, extraction of the records, and transfer of those records to an unclassified system, all of which would require employees to spend substantial hours in the office.  Moreover, once processed, the records would have to be moved back to the classified enclave to run required security scans on them before they could be produced to a requester.

(16)     These are just some of the reasons why RIDS employees are not telework capable and could not process FOIA requests remotely.  Accordingly, upon designating GIS positions as not mission-critical, RIDS had to temporarily halt FOIA processing.

(17)     Since March 17, 2020, RIDS management has continually monitored the situation.  Based on its continued assessment and evolving circumstances, RIDS believes it can safely resume FOIA operations in a limited fashion and will do so as of April 29, 2020.

(18)     To maximize social distancing, no more than 1/3 of RIDS employees will be permitted to work on any given day.[12]  Accordingly, each unit will be split into three teams – Team A, Team B, and Team C – to include supervisory GISs and unit chiefs.  Team A will return to work on April 29; Team B on April 30; and Team C on April 31.  The rotation will continue thereafter.

(19)     Not all of RIDS's workforce is available to return to work starting on April 29.  Specifically, approximately 15% of the workforce has self-identified as being higher risk for severe illness – *e.g.*, older adults or people with underlying medical conditions that increase their risk.[13]  These employees will remain on administrative leave at this time.  Furthermore, any employee who is ill must be fever and cough free for at least 24 hours before returning to work.  Finally, other employees may be unable to report to work because schools and day care facilities are closed.  RIDS is implementing available scheduling flexibilities to accommodate childcare situations, in an effort to alleviate this burden to the extent possible.

---

[12] For perspective, RIDS's workspace is a converted big box store warehouse.  It is an open floor plan with modular workstations arranged in rows, where the dividers between the workstations in each row are roughly chest high.  Within a row, neighboring workstations are less than 6 apart.  The social distancing plans being implemented will be complemented by guidance about wearing face coverings, not utilizing/accessing other employee's workstations, and cleaning workstations at the beginning and end of a workday.

[13] The 15% is not equally spread across the workforce, and RIDS anticipates that certain units/functions will be more adversely impacted.

(20)    The FBI's ability to resume FOIA operations is also expected to be impacted

based on the availability of other agency employees to assist in conducting searches and agency

subject matter experts to review records.

(21)    In sum, while RIDS will be resuming FOIA operations on April 29, it will be in a

limited fashion given the limitations necessitated by social distancing and other health and safety

measures.  RIDS management continues to monitor the situation with the goal of progressing

toward a full resumption of FOIA operations as quickly as possible while ensuring the health and

safety of RIDS employees, their families, and their communities.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this 24th day of April, 2020.

David M. Hardy
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

87

USCA Case #23-5004      Document #2003881         Filed: 06/16/2023      Page 94 of 341

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND<br>RESEARCH CENTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 18-1868 (TNM) |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S STATUS REPORT**

Defendant, the U.S. Department of Justice, respectfully files this Status Report to inform the Court that the Federal Bureau of Investigation's Records Division ("RIDS") recently resumed fully staffed operations, specifically on June 8, 2020.  Commensurate with the return of full staffing levels, RIDS will begin increasing its FOIA processing production with a goal of 300 pages reviewed for release by the end of June 2020 in litigation cases where processing is pending.  While RIDS will make its best efforts to meet increased production goals, this increased production rate may be negatively impacted by COVID-19 workplace disruptions or by Bureau operational necessity if RIDS personnel are assigned in support of FBI law enforcement efforts in response to issues arising out of or related to nationwide civil unrest. RIDS anticipates returning to its standard monthly processing rate of 500 PPM in July, subject to the referenced circumstances that may negatively impact productivity.

Counsel for Defendant conferred with counsel for Plaintiff prior to filing this Status Report and the parties will further update the Court with a Joint Status Report by June 18, 2020, per the Court's Minute Order of May 19, 2020.

88

Date: June 10, 2020                    Respectfully submitted,

                                       MICHAEL R. SHERWIN
                                       Acting United States Attorney

                                       DANIEL F. VAN HORN, D.C. Bar No. 924092
                                       Chief, Civil Division

                                       /s/ *Alan Burch*
                                       ALAN BURCH, D.C. Bar No. 470655
                                       Assistant United States Attorney
                                       Civil Division
                                       555 4th Street, N.W.
                                       Washington, D.C. 20530 (202) 252-2550
                                       alan.burch@usdoj.gov

                                       *Counsel for United States*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | ) | |
| RESEARCH CENTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 18-1868 (TNM) |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT STATUS REPORT

Defendant, the U.S. Department of Justice, and Plaintiff, the Assassination Archives and

Research Center, Inc., respectfully file this Joint Status Report pursuant to the Court's Minute

Order of May 19, 2020.  This case arises under the Freedom of Information Act ("FOIA").

Defendant does not have a further update on the processing from its Status Report filed

last week (ECF No. 29).  Defendant's status regarding its FOIA processing generally is:

The FBI's Records Division ("RIDS") resumed full staffing on June 8, 2020.
Commensurate with the return of full staffing levels, RIDS will begin increasing
its FOIA processing production with a goal of 300 pages reviewed for release by
the end of June 2020 in litigation cases where processing is pending.  While RIDS
will make its best efforts to meet increased production goals, this increased
production rate may be negatively impacted by COVID-19 workplace disruptions
or by Bureau operational necessity if RIDS personnel are assigned in support of
FBI law enforcement efforts in response to issues arising out of or related to
nationwide civil unrest.  RIDS anticipates returning to its standard monthly
processing rate of 500 PPM in July, subject to the referenced circumstances that
may negatively impact productivity.

Counsel for the parties conferred about this Joint Status Report and Plaintiff does not

intend to challenge the 500 pages per month processing rate at this time.

Date: June 18, 2020                     Respectfully submitted,

                                        MICHAEL R. SHERWIN
                                        Acting United States Attorney

                                        DANIEL F. VAN HORN, D.C. Bar No. 924092
                                        Chief, Civil Division

                                        /s/ *Alan Burch*
                                        ALAN BURCH, D.C. Bar No. 470655
                                        Assistant United States Attorney
                                        Civil Division
                                        555 4th Street, N.W.
                                        Washington, D.C. 20530 (202) 252-2550
                                        alan.burch@usdoj.gov

                                        *Counsel for United States*

                                        /s/ *Kelly B. McClanahan*
                                        Kelly B. McClanahan, Esq.
                                        D.C. Bar #984704
                                        National Security Counselors
                                        4702 Levada Terrace
                                        Rockville, MD  20853
                                        301-728-5908
                                        240-681-2189 fax
                                        Kel@NationalSecurityLaw.org

                                        *Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER, | |
| *Plaintiff,* | |
| v. | Civ. A. No. 18-1868 (TNM) |
| DEPARTMENT OF JUSTICE, | |
| *Defendant.* | |

**JOINT STATUS REPORT**

The parties respectfully file this Joint Status Report pursuant to the Court's Minute Entry of June 22, 2020.  Since the filing of the previous Joint Status Report in July, the Federal Bureau of Investigation ("FBI") issued additional interim productions to Plaintiff in July (521 pages released), August (506 pages released), and September (524 pages released).  Although it does not have a precise figure presently, the FBI estimates that it has approximately 18,000 pages left to process.  Based on these estimates, the FBI anticipates that it will take approximately three years to process the remaining records.

Given the large volume of records that remain to be processed, the parties are exchanging communications to explore possible ways to narrow the scope of the remaining records.  Plaintiff has recently submitted questions to the FBI for the purposes of narrowing the pages that are subject to further processing, which the FBI is currently reviewing.  Without making a commitment at this time about the extent of information that can or will be provided in response to Plaintiff's questions, the FBI expects to send a response to Plaintiff within the next month.

According to the Court's June 22, 2020, Minute Entry, the parties' next Joint Status Report is due on or before January 14, 2021.

92

Dated:  October 16, 2020

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN
D.C. Bar No. 924092
Chief, Civil Division

By: /s/ Daniel P. Schaefer
DANIEL P. SCHAEFER
D.C. Bar No. 996871
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2531
Daniel.Schaefer@usdoj.gov

*Counsel for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER, <br><br>    *Plaintiff*, <br><br>   v. <br><br> DEPARTMENT OF JUSTICE, <br><br>    *Defendant*. | Civ. A. No. 18-1868 (TNM) |

**JOINT STATUS REPORT**

The parties respectfully file this Joint Status Report pursuant to the Court's Minute Entry dated June 22, 2020, that directed the parties to file joint status reports every 90 days.

Since the filing of the previous Joint Status Report on October 16, 2020 (ECF No. 33), the Federal Bureau of Investigation ("FBI") issued additional interim productions to Plaintiff in October, November, December, and January.  The FBI has been processing and producing these records in accordance with a priority list provided by Plaintiff on October 30, 2020.

Beginning with the most recent production in January 2021, the FBI decreased its processing rate by 50% (from 500 pages to 250 pages).  As the FBI has reported recently in other Freedom of Information Act ("FOIA") matters before this Court, as of December 7, 2020, in response to the recent increase in COVID-19 infections, the Record/Information Dissemination Section ("RIDS") has reduced staffing by 50% at several of its operating facilities.  *See* Decl. of Michael G. Seidel, Dec. 8, 2020, *Butt v. State, et al.*, Civ. A. No. 19-155 (JEB) (D.D.C. Dec. 28, 2020) (ECF No. 49-1).  The FBI implemented this safety measure to protect its employees and their families and communities and to ensure that it can continue to protect the American people during this national emergency.  *See* Seidel Decl. ¶ 8.  This reduction in staffing means that

94

RIDS's FOIA processing capacity, in this and other cases, will be at most 50% of its normal

processing capacity (which normally is 500 pages per month in this case) until RIDS can return

to full staffing levels.  *See* Seidel Decl. ¶ 18.  The FBI continues to monitor the situation to

ensure the continuity of FOIA operations while also protecting the health and safety of

employees, their families, and their communities.

Although it does not have a precise figure presently, the FBI estimates that it has

approximately 23,000 pages left to process in this case.  The FBI has determined that a

previously cited lower page estimate was incorrect.  The FBI welcomes further guidance from

Plaintiff on narrowing criteria that can be applied to the search results reduce the volume of

records that will require further manual review for potential release.  To date, Plaintiff has

identified a priority order for the review, but this has not reduced the number of pages that still

require review.

According to the Court's, 2020, Minute Entry, the parties' next Joint Status Report is

due on or before April 13, 2021.

Dated: January 14, 2021

  */s/ Kelly B. McClanahan*
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

By: * /s/ Daniel P. Schaefer*
DANIEL P. SCHAEFER
D.C. Bar No. 996871
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2531
Daniel.Schaefer@usdoj.gov

*Counsel for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER, *Plaintiff,* v. DEPARTMENT OF JUSTICE, *Defendant*. | Civ. A. No. 18-1868 (TNM) |

**JOINT STATUS REPORT**

Pursuant to the Court's June 22, 2022 Minute Order, Plaintiff Assassination Archives and Research Center and Defendant Department of Justice ("DOJ"), by and through undersigned counsel, respectfully submit this Joint Status Report ("JSR"). The parties report as follow:

1.      Plaintiff brings this action under the Freedom of Information ("FOIA"), 5 U.S.C. § 552, seeking records relating to pre-1960 electronic surveillance activities. *See* ECF No. 1

2.      As previously reported, the Federal Bureau of Investigation ("FBI") issued additional interim productions to Plaintiff in February and March. The FBI has been processing and producing these records in accordance with a priority list provided by Plaintiff on October 30, 2020. Beginning with the most recent production in January 2021, the FBI decreased its processing rate by 50% (from 500 pages to 250 pages) due to staffing reductions implemented as part of the FBI's response to the COVID-19 pandemic. The FBI continues to monitor the situation to ensure the continuity of FOIA operations while also protecting the health and safety of employees, their families, and their communities.

3.      Due to the decrease processing rate, on April 14, 2021, Plaintiff informed Defendant that Plaintiff has not paid the FBI the processing fee since February 24, 2021 and would

97

not pay full price if the FBI continues to process at a 50% percent rate. On June 16, 2021,

Defendant provided Plaintiff with the following response via email:

> The applicable DOJ fees regulation permits the FBI to "charge the direct costs, including operator time" of producing records by computer. *See* 28 C.F.R. § 16.10(c)(2). The FBI assesses duplication fees to account for the time and expense of preparing a CD for release, including ensuring that a mandatory information-security review is conducted for each CD release. The $15 per CD the FBI typically charges for a 500-page release is less than the actual direct cost for records produced on CD. The FBI has determined that the time spent preparing a 250-page CD for release is not substantially reduced by the reduction of processed pages.

Plaintiff has not responded to this email to date. Consequently, unless the parties are able to resolve this dispute, DOJ currently anticipates that it will need to move the Court for an order requiring Plaintiff to pay applicable administrative fees for the March 2021 release as well as future releases. DOJ is amenable to resolving this issue with Plaintiff. Plaintiff reminds the Court and DOJ that the issue of the reasonableness of the FBI's fee assessment and its processing rate was discussed at length at the August 6, 2019, status conference, where the Court decided that the appropriate vehicle for resolving this controversy would be a motion for partial summary judgment.[1]

---

[1] The Court decided that Plaintiff should bear the burden of filing a dispositive motion on the issues over the objections of Plaintiff's counsel. Plaintiff originally agreed to file such a motion but notified the Court on March 31, 2020, that it would not be doing so until an unspecified point in the future due to the coronavirus emergency. In the August 2019 status conference, Plaintiff's counsel argued that requiring Plaintiff to file a motion arguing that the FBI's actions were *improper* instead of DOJ being required to file a motion arguing through admissible evidence that the FBI's actions were *proper* as is required by FOIA would be an error. Plaintiff renews this objection and asserts that if DOJ wishes to bring this matter to the Court for a resolution at this time, it should be required to do so by filing its own motion for partial summary judgment regarding its assessment of fees and its processing rate. Without commenting on Plaintiff's characterizations of the Court's decisions or any arguments, DOJ's new counsel will confer further with the FBI about this issue and file an appropriate motion if DOJ decides to allocate resources to seeking a ruling prior to completing the review and processing of records in this case.

4.      Further, as previously reported, due to the volume of records involved, the FBI does not have a precise figure but estimates that it has approximately 22,500 pages left to process in this case.  The FBI welcomes further guidance from Plaintiff on narrowing criteria that can be applied to the search results to reduce the volume of records that need to be processed.  To date, Plaintiff has identified a priority order for the review and processing, but this has not substantially reduced the number of pages that still require review and processing.

5.      Under the Court's previous scheduling order dated June 22, 2020, the parties' next joint status report is due on or before October 11, 2021.

<div align="center">***</div>

Dated: July 13, 2021

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

CHANNING D. PHILLIPS
D.C. Bar #415793
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

*/s/ Stephanie R. Johnson*
STEPHANIE R. JOHNSON
D.C. Bar # 1632338
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7874
Stephanie.Johnson5@usdoj.gov

*Counsel for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER,<br><br>     *Plaintiff*,<br><br>    v.<br><br>DEPARTMENT OF JUSTICE,<br><br>     *Defendant*. | Civil Action No. 18-1868 (TNM) |

**JOINT STATUS REPORT**

Plaintiff Assassination Archives and Research Center and Defendant Department of Justice ("DOH"), by and through undersigned counsel, respectfully submit this Joint Status Report ("JSR"). The parties report as follow:

1.    Plaintiff brings this action under the Freedom of Information ("FOIA"), 5 U.S.C. § 552, seeking records relating to pre-1960 electronic surveillance activities. *See* ECF No. 1.

2.    As previously reported, the Federal Bureau of Investigation ("FBI") issued additional interim productions to Plaintiff in February and March. The FBI has been processing and producing these records in accordance with a priority list provided by Plaintiff on October 30, 2020. Beginning with the most recent production in January 2021, the FBI decreased its processing rate by 50% (from 500 pages to 250 pages) due to staffing reductions implemented as part of the FBI's response to the COVID-19 pandemic. The FBI continues to monitor the situation to ensure the continuity of FOIA operations while also protecting the health and safety of employees, their families, and their communities.

3.    Due to the decrease processing rate, on April 14, 2021, Plaintiff informed Defendant that Plaintiff has not paid the FBI the processing fee since February 24, 2021 and would

not pay full price if the FBI continues to process at a 50% percent rate. On June 16, 2021, Defendant provided Plaintiff with the following response via email:

> The applicable DOJ fees regulation permits the FBI to "charge the direct costs, including operator time" of producing records by computer. *See* 28 C.F.R. § 16.10(c)(2). The FBI assesses duplication fees to account for the time and expense of preparing a CD for release, including ensuring that a mandatory information-security review is conducted for each CD release. The $15 per CD the FBI typically charges for a 500-page release is less than the actual direct cost for records produced on CD. The FBI has determined that the time spent preparing a 250-page CD for release is not substantially reduced by the reduction of processed pages.

Consequently, since payment had not been received since February 2021, the FBI halted the processing of records.

    4.      However, while not conceding the applicability of the assessed fees and only in this litigation, counsel for Defendant sent Plaintiff's counsel, via email on September 7, 2021, the following modified fee adjustment:

- 6/30/20--------304 pages processed----------Plaintiff paid $15

- 1/29/21--------256 pages processed----------Plaintiff paid $15

- 2/26/21--------254 pages processed----------FBI will apply a partial credit from the June payment

- 3/30/21--------252 pages processed----------FBI will apply a partial credit from the January payment

- 4/30/21--------250 pages processed----------fee of $7.50 due for this release but will combine it with the next release

- next release ----250 pages to be processed --- fee of $7.50 to be charged for this release added to the fee from April, 2021 for a total of $15.

    5.      In an attempt to cooperatively work with Plaintiff and ensure that this matter continues to proceed, recently, on October 5, 2021, the FBI released 250 pages based on a proposed modified fee adjustment. Further, the FBI is back to processing 500 pages a month and, as long

as Plaintiff pays the $15 fee, the FBI anticipates making the next release of non-exempt pages at the end of November.  Plaintiff still intends to challenge the $15/cd fee charge.

6.      Further, as previously reported, due to the volume of records involved, the FBI does not have a precise figure but estimates that it has approximately 22,500 pages left to process in this case.  The FBI welcomes further guidance from Plaintiff on narrowing criteria that can be applied to the search results to reduce the volume of records that need to be processed.  To date, Plaintiff has identified a priority order for the review and processing, but this has not reduced the number of pages that still require review and processing.

7.      In light of the above, counsel for the parties will confer and attempt to narrow or resolve any substantive issues of disagreement and/or submit a propose briefing schedule.  To that end, the parties propose that they file another Joint Status Report on or before November 15, 2021, to update the Court.  Furthermore, the parties respectfully request a continuance of the Status Conference—currently set for October 13, 2021 at 10:00 am—until November 17, 2021, or a date thereafter that is convenient to the Court.

8.      Alternatively, should the Court choose to hold the October 13, 2021, status conference as scheduled, the parties respectfully request that it be held by videoconference or conference call due to the ongoing health risks posed by the coronavirus pandemic.  *See* Standing Order 21-47 at 7 (filed Aug. 25, 2021) (recognizing "the recent worsening of the COVID-19 pandemic in this area due to the widespread circulation of the highly contagious Delta variant").

***

Dated: October 12, 2021

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

CHANNING D. PHILLIPS
D.C. Bar #415793
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

*/s/ Stephanie R. Johnson*
STEPHANIE R. JOHNSON
D.C. Bar # 1632338
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
Stephanie.Johnson5@usdoj.gov

*Counsel for Defendant*

1       UNITED STATES DISTRICT AND BANKRUPTCY COURTS
              FOR THE DISTRICT OF COLUMBIA
2

3    ASSASSINATION ARCHIVES          Civil No.  18-CV-1868
     AND RESEARCH CENTER,
4

5              Plaintiff,

6        v.                          Washington, D.C.

7    U.S. DEPARTMENT OF JUSTICE,     October 13, 2021

8              Defendant.            10:30 a.m.

9    -------------------------/

10          TRANSCRIPT OF STATUS CONFERENCE VIA ZOOM
          BEFORE THE HONORABLE TREVOR N. McFADDEN
11              UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:     National Security Counselors
                            By: KELLY B. McCLANAHAN, ESQUIRE
14                          4702 Levada Terrace
                            Rockville, Maryland  20853
15

16   For the Defendant:     United States Attorney's Office
                            By: STEPHANIE R. JOHNSON, ESQUIRE
17                          555 Fourth Street, NW
                            Washington, D.C. 20530
18

19
     Court Reporter         Lisa K. Bankins RMR FCRR RDR
20                          United States District Court
                            District of Columbia
21                          333 Constitution Avenue, NW
                            Washington, D.C. 20001
22

23

24   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.
25

104

1

```
 1                    P R O C E E D I N G S

 2          THE COURTROOM DEPUTY:  The first case is Civil

 3   Action 18-1868, Assassination Archives and Research Center

 4   versus Department of Justice.  Counsel, please identify

 5   yourselves, starting with the plaintiff.

 6          MR. MCCLANAHAN:  Good morning, Your Honor.  This

 7   is Kelly McClanahan for AARC.

 8          THE COURT:  Good morning, Mr. McClanahan.

 9          MS. JOHNSON:  Good morning, Your Honor.  This is

10   Stephanie Johnson on behalf of the Department of Justice.

11          THE COURT:  Good morning, Ms. Johnson.

12          All right.  We're here for a status conference.

13   I just wanted to see where things are and whether there's

14   anything we can do to speed this along.  Ms. Johnson, I'll

15   hear from you.

16          MS. JOHNSON:  Thank you, Your Honor.  So

17   recently, the FBI did serve additional documents and we

18   proposed a modified fee adjustment schedule.  I don't know

19   if you have in front of you the joint status report --

20          THE COURT:  I do.

21          MS. JOHNSON:  -- that we submitted yesterday.

22   So based off of that joint status report, the FBI served

23   plaintiff or processed additional records and it was 250

24   pages and they do plan on producing 500 pages by the end

25   of November.  However, if plaintiff does not pay the $15
```

105

1    fee, then they won't be releasing those 500 pages.  And

2    after discussing with plaintiff yesterday, he mentioned

3    that they do plan on proceeding with the motion to dispute

4    the $15 fee and so they wanted to brief that matter and we

5    would confer with each other and then determine a briefing

6    schedule for that.  But otherwise, the FBI is ready to

7    proceed with producing 500 pages next month.

8            THE COURT:  Okay.  So I guess I haven't had a

9    fee dispute before.  This is like a motion to compel or

10   something like that from the plaintiff.

11           MS. JOHNSON:  Your Honor, are you asking me?

12           THE COURT:  Yes.

13           MS. JOHNSON:  So my understanding, yes.

14   Plaintiff will have to move further on that.

15           THE COURT:  Okay.  And until that happens,

16   you're not turning over any documents?

17           MS. JOHNSON:  Well, I want to be paid the $15

18   fee.  The agency is willing to continue to process and

19   turn over records.  And he has been paying the fee until

20   recently.  So yes.

21           THE COURT:  So, Mr. McClanahan, is the problem

22   just that they are not doing the 500 pages now and so you

23   don't think you should be paying the full amount?

24           MR. MCCLANAHAN:  Your Honor, that was part of

25   the problem when they started going to 250 pages.  But if

106

3

1   you recall -- and it's entirely understandable if you

2   don't.  We discussed this in the status conference on

3   October 6, 2019 before the pandemic when we were arguing

4   over what my opposing counsel has just said, that we would

5   have to file a motion.  Well, we were saying that they

6   were not allowed to charge $15 per CD even for 500 pages.

7   And the argument was over who had to go first.  And there

8   was an extensive back and forth where I made the argument

9   that this is summary judgment like any other summary

10  judgment, that they have to justify their fees and then we

11  oppose.  And you said no, I believe that the plaintiff

12  should have to go first because you are actually asking

13  not to pay fees.  Respectfully, you know, I disagreed with

14  that.  But that was what was supposed to happen and then

15  COVID happened and sort of everything got thrown out of

16  whack.

17        The one thing that I will re-emphasize from that

18  hearing is that we -- this is not a fee waiver.  We're not

19  asking for a fee waiver.  We're not asking for a public

20  interest fee waiver.  We're saying that under F.O.I.A.,

21  the agency must justify that there's no issue of material

22  fact that they properly assessed fees.  And in order to do

23  that, they have to meet their burden of proof, not us.

24        Now the procedural thing, I'm going to treat it

25  as the law of the case unless you change it is that we

107

1   have to file a motion which basically we speculate about

2   the evidence they might offer about how they calculated

3   their fees.  But bottom line, this is not a fee waiver.

4   This is them being required to justify the $15 per CD is a

5   reasonable fee that it's not exceeding the actual cost

6   that are reasonable costs that are required by FOIA.

7              THE COURT:  Okay.  Thanks for reminding me, Mr.

8   McClanahan.  That does sound familiar now.  Yeah, I think

9   I would like you to go first.  I realize that you may have

10  limited information in your initial briefs and obviously,

11  you can respond to the government's arguments in its

12  opposition.  You can respond and reply and perhaps give

13  more explanation.

14             Yeah, I guess -- I'm still a little confused why

15  this is an issue now.  It seems like you have been getting

16  documents now for the last couple of years and I guess

17  been paying now.

18             MR. McCLANAHAN:  Yes.

19             THE COURT:  You kind of reached a resolution,

20  but you're no longer comfortable with how this was going.

21             MR. McCLANAHAN:  No, Your Honor.  This was

22  something that -- we were originally supposed to brief

23  this in March of last year.  In fact, a couple of weeks

24  after the world just went to pot.  And we had -- when I

25  filed a notice I believe -- I forget what I filed last

1    March that said, look, we have decided that because of

2    COVID and because of everything, the insanity that's going

3    on with COVID, that we're going to just agree to pay while

4    reserving this issue for later because our motion was not

5    just over the fees.  It was over the rate of processing

6    because we were going to file what you had called

7    basically a motion to compel them to justify an Open

8    America stay.  And you had said that I'm not going to make

9    them file Open America on my own.  Plaintiff, if you want

10   to argue that they should have to justify an Open America

11   stay, then include that in your motion.  And because of

12   COVID, arguing over the rate processing would have been

13   insane because the agency was shutting down.

14            THE COURT:  Yeah.

15            MR. MCCLANAHAN:  You know, and so we just sort

16   of put a pin in that and said, okay, well, we'll pay it

17   for the next year, try to wait out COVID.  Well, now we

18   have and COVID hasn't gone away, but they are now back up

19   to somewhat normal pace.  I don't think that it's

20   necessarily the perfect time to file a motion saying they

21   need to justify their fee because they are going to say,

22   you know, because of COVID.  But for the interest of

23   judicial economy, I'm happy to do that with the idea being

24   COVID is going to be over eventually and their fee of 500

25   pages per month was set before anyone in the world had

```
 1    COVID.
 2              And so we would basically ask you when accepting
 3    their justification for their processing fee, consider it
 4    in the fact -- in the context of this isn't a COVID
 5    problem.  This is an FBI internal calculation problem.
 6    But we are going to brief that at the same time that we
 7    brief this.  We're not moving to expedite.  We're just
 8    saying, you know, much like you said yourself, how do we
 9    speed this up?  Our position is if they are going to be
10    waiting multiple more years to finish production, they
11    need to justify under Open America, not just we're doing
12    it, Your Honor; keep letting us do it.
13              THE COURT:  Okay.  All right.  So I'm happy to
14    review the parties' briefings on that.
15              Mr. McClanahan, how long do you think you all
16    need to -- I guess -- why don't we just go ahead and try
17    to schedule that?
18              MR. McCLANAHAN:  Right.
19              THE COURT:  How long do you want to to file the
20    motion, sir?
21              MR. McCLANAHAN:  I am honestly slammed for the
22    next couple of weeks.  So let's say -- luckily, I don't
23    have that trial anymore.  So how about November 12th for
24    mine, for my motion?
25              THE COURT:  That's fine.  I'll ask the
```

1    plaintiffs to file first by November 12th.  Ms. Johnson,

2    can you all oppose by December 3rd?  I'm sorry.  Yes.

3    Yes.  December 3rd.

4            MS. JOHNSON:  I believe that's feasible.  Yes,

5    Your Honor.

6            THE COURT:  Okay.  And then I'll ask for a reply

7    from the plaintiff to be filed by December 17th.

8            MR. MCCLANAHAN:  That works for me, Your Honor.

9            THE COURT:  All right.  Anything else we should

10   be discussing today, Mr. McClanahan?

11           MR. MCCLANAHAN:  No, Your Honor.  That's it.

12           THE COURT:  Okay.  And Ms. Johnson?

13           MS. JOHNSON:  Nothing else, Your Honor.

14           THE COURT:  Thanks, folks.

15           (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25

1                       <u>CERTIFICATE OF REPORTER</u>

2

3           I, Lisa K. Bankins, an Official Court Reporter

4     for the United States District Court for the District of

5     Columbia, do hereby certify that I reported, by machine

6     shorthand, in my official capacity, the proceedings had

7     and testimony adduced upon the status conference in the

8     case of the Assassination Archives and Research Center

9     versus The Department of Justice, Civil Number 18-1868, in

10    said court on the 13th day of October, 2021.

11

12          I further certify that the foregoing 8 pages

13    constitute the official transcript of said proceedings, as

14    taken from my machine shorthand notes, together with the

15    backup tape of said proceedings to the best of my ability.

16

17          In witness whereof, I have hereto subscribed my

18    name, this 9th day of June, 2023.

19

20

21                              *Lisa K. Bankins*

22                              Lisa K. Bankins
                                Official Court Reporter
23

24

25

112

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | * | |
| RESEARCH CENTER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-01868 (TNM) |
| | * | |
| DEPARTMENT OF JUSTICE, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFF'S CONSENT MOTION FOR ENLARGEMENT**
**OF TIME WITHIN WHICH TO FILE ITS MOTION FOR**
**PARTIAL SUMMARY JUDGMENT AND MOTION TO COMPEL**

NOW COMES Plaintiff to respectfully request an eleven-day enlargement of time until

23 November 2021, pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, within which

to file its Motion for Partial Summary Judgment and Motion to Compel, and a subsequent

modification of the briefing schedule to accommodate the schedules of the parties' respective

counsel. This filing is due 12 November 2021.

Plaintiff has good cause to request this extension. Since the Court established the current

briefing schedule in the 13 October Status Conference, the undersigned become involved in the

case *Trump v. Thompson*, No. 21-2769 (D.D.C.), filed on 18 October, in which he filed an *amici*

*curiae* brief on behalf of a group of legal scholars on a thorny question of first impression of

constitutional law on an extremely accelerated schedule imposed by Judge Chutkan due to the

plaintiff's motion for a preliminary injunction. That filing required a significant amount of the

undersigned's time and resources until 31 October, and much of the subsequent time has been

taken up by the work the undersigned had to postpone, as well as an urgent concern requiring

meetings with numerous Congressional offices this past week. Accordingly, the undersigned

asks for this extension, and he requests eleven days due to another recently established briefing

deadline on 16 November. The undersigned apologizes for the tardiness of this Motion, but he

was attempting to meet the Court's original deadline and only just determined that it would not

be possible to do so.

Defendant consents to this Motion and requests that its Opposition be due on 23

December, to which Plaintiff consents and further asks that its Reply be due on 6 January 2022.

A proposed Order accompanies this Motion.

Date:   November 11, 2021

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | * | |
| RESEARCH CENTER, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-01868 (TNM) |
| | * | |
| DEPARTMENT OF JUSTICE, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Assassination Archives and Research Center, Inc. ("AARC") commenced this

litigation against Defendant Federal Bureau of Investigation ("FBI")[1] in 2018 in part to obtain

copies of historical indices of electronic surveillance activities—the majority of which are over

sixty years old—that AARC had requested in 2012. (Compl., Dkt. #1, ¶¶ 17-19 (filed Aug. 8,

2018).) After AARC commenced this litigation, FBI began processing responsive records and

began releasing records at a rate of approximately 500 pages/month, which it released by mailing

a CD containing responsive records to AARC each month. (J. Stat. Rep., Def.'s Mot. Modify

Sched. for Stat. Reps., & Pl.'s Mot. Set Briefing Sched., Dkt. #17, at 3 (filed June 5, 2019).) FBI

insisted that AARC was required to pay $15 per CD for these releases and that it would stop

processing records if AARC ceased payment. (*Id.* at 2.) At a 6 August 2019 Status Conference,

---

[1] FBI is treated herein as the "Defendant" to avoid confusion because the case is limited to
questions about FBI's processing of AARC's Freedom of Information Act ("FOIA") request,
even though the Department of Justice is the proper party Defendant as a matter of law.

the Court directed AARC—over AARC's objection[2]—to file a motion for partial summary

judgment alleging that FBI was charging unreasonable fees to process this request.

Due to various intervening factors, including the coronavirus pandemic, AARC opted to

pay the fees FBI had assessed, with the understanding that it would revisit the issue and request a

refund once FBI completed its processing of responsive records. (Pl.'s Not. to Court, Dkt. #24, at

2 (filed Mar. 31, 2020).) However, due to the coronavirus pandemic lasting significantly longer

than AARC anticipated, AARC is now formally seeking the relief it originally requested in June

2019. For the reasons stated herein, the Court should find that the duplication fees charged by

FBI have not been "limited to reasonable standard charges for document . . . duplication," 5

U.S.C. § 552(a)(4)(A)(ii)(III),[3] order FBI to return all fees paid to it by AARC thus far with

interest, and enjoin FBI from charging any more fees to AARC for the processing of this

request.[4]

---

[2] AARC maintained that because FBI legally bears the burden of proving that its fees are
reasonable, it should be required to file a dispositive motion supported by admissible evidence
on that issue first, which AARC could then oppose. AARC renews this objection, since the
Court's Order requires it to speculate about what evidence FBI *might* offer and impermissibly
shifts a burden to a plaintiff which the FOIA statute and controlling case law properly place on
the defendant.

[3] For the purposes of this Motion, AARC is citing the provision which would apply if it were
classified as an "all other" non-commercial requester, even though it demonstrated at the
administrative stage that it was properly classified as a representative of the news media.
However, since FBI did not charge any search fees, the distinction is legally irrelevant to this
Motion, although, if this Motion is denied, FBI will eventually have to prove through admissible
evidence that it properly denied AARC's fee category request. That controversy is beyond the
scope of this Motion because it does not affect the outcome.

[4] To be clear, this Motion is *not* about AARC's request for a public interest fee waiver; it is *just*
about whether FBI has charged reasonable fees *assuming that AARC was not entitled to a fee
waiver*. The two issues are separate and distinct. *Accord Stein v. DOJ*, 197 F. Supp. 3d 115, 123
(D.D.C. 2016) ("The question of whether [a separate statutory fee provision] prohibits Defendant
from charging Plaintiff any duplication fees is, as Plaintiff correctly told Defendant in October
2015, 'a separate issue from the public interest fee waiver issue.'"). AARC's entitlement to a fee
waiver—or lack thereof—has no bearing on FBI's duty to only assess reasonable fees in the first

Because of the lack of evidence in the record about FBI's assessment of fees for AARC's request, this Motion will rely on the sworn 2017 testimony of an FBI declarant in a different case, in which the declarant justified the $15/CD policy being applied in this case by describing the Goldbergian duplication process FBI engineered for producing CDs in response to FOIA requests. That declaration asserted that $15/CD was a reasonable fee because it did not exceed the "direct labor costs" incurred by forcing a GS-11 to GS-13 employee to be "active through a majority of the process" 3d Hardy Decl., Dkt. #34-2, ¶ 13 (filed June 9, 2017), *Nat'l Sec. Counselors v. DOJ*, No. 13-556 (D.D.C.) [hereinafter *NSC* Hardy Decl.], attached as Ex. A.[5]

Simply put, even though FBI will likely offer evidence which demonstrates that the direct costs of releasing a CD containing 500 pages exceed $15, that is not the end of the matter. The "reasonable standard charges" restriction, *id.* § 552(a)(4)(A)(ii)(III), and the "direct costs" restriction, *id.* § 5 U.S.C. § 552(a)(4)(A)(iv), on an agency's ability to assess duplication fees are

---

place. Like the news media issue identified above, FBI must justify through admissible evidence that it properly determined that AARC was not entitled to a public interest fee waiver when it seeks summary judgment *on its own* at some future point in the case (although, if the Court grants this Motion, that issue would arguably become moot). Any attempt by FBI to allege that either its fee category or fee waiver determinations are relevant to this Motion is simply an attempt to muddy the waters and distract the Court from a very narrow, very clear question: are FBI's assessed duplication fees reasonable?

[5] Judge Chutkan granted summary judgment to FBI in that case over the plaintiffs' objection because she interpreted the remand order from the D.C. Circuit to be limited to the question of whether the $15/CD charge exceeded FBI's direct costs, not whether those direct costs were reasonable. *Nat'l Sec. Counselors v. DOJ*, 305 F. Supp. 3d 176, 180 (D.D.C. 2018), *aff'd* No. 18-5171, 2018 U.S. App. LEXIS 31112 (D.C. Cir. Nov. 1, 2018). Accordingly, the instant case is the first time that any court has had the opportunity to fully adjudicate the reasonableness of FBI's $15/CD duplication fee in light of the *NSC* Hardy Declaration; the D.C. Circuit's previous consideration of this fee rate predated—and was responsible for—the public disclosure of this information, and Judge Chutkan's brief observations regarding the fee rate, *id.*, are simply *dicta* which this Court should respectfully decline to follow because they impermissibly shifted the burden to the plaintiffs to prove that the fees were unreasonable instead of forcing FBI to prove that they were reasonable.

3

not two distinct provisions which can be treated independently of one another. FOIA itself

originally treated these two requirements *together* stating that "fees shall be limited to reasonable

standard charges for document search and duplication and provide for recovery of only the direct

costs of such search and duplication." 5 U.S.C. § 552(a)(4)(A) (1974). This understanding was

implicit in the relevant court decisions of the time, which always treated the two provisions

together and which remain controlling precedent. *See*, *e.g.*, *Better Gov't Ass'n v. Dep't of State*,

780 F.2d 86, 88-89 (D.C. Cir. 1986) ("FOIA permits agencies to impose 'reasonable standard

charges for document search and duplication' to recover the direct costs of such services.").

When Congress replaced this quoted language with the current multi-paragraph version

of 5 U.S.C. § 552(a)(4)(A) as part of the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, §

1803, it gave absolutely no indication in the legislative history that it intended to separate these

two considerations. The FOIA amendments were absent from the congressional reports on this

large omnibus act, and the only mentions of the fee amendments in floor statements focused on

how the intent was to give greater guidance to agencies and make it easier for agencies to make

fee determinations and for certain types of requesters to obtain preferential fee treatment, *not* to

separate the "direct costs" requirement from the "reasonable standard charges" requirement. *See*,

*e.g.*, 132 Cong. Rec. S14297-14299 (Sept. 30, 1986) (statement of Sen. Leahy). This

understanding has been adopted by courts since that amendment as well, undermining any

argument that decisions like *Better Government Association* are no longer good law. *See Pollack*

*v. DOJ*, 49 F.3d 115, 119 (4th Cir. 1995) ("[T]he Act specifically requires the government to

publish a uniform schedule of fees, authorizing each agency to charge a 'reasonable' amount for

the direct costs of document search, duplication, and review."); *Goulding v. IRS*, No. 97-5628,

1998 U.S. Dist. LEXIS 9143, at *26 (N.D. Ill. June 2, 1998) ("[FOIA authorizes] each agency to charge a 'reasonable' amount for the direct costs of document search, duplication, and review.").

As the *Pollock* opinion shows, it is clearly appropriate for a court to consider whether the direct costs are reasonable, and a contrary holding would run counter to the general rule of FOIA that agencies must only assess "reasonable standard charges" for duplication. If an agency could simply utilize a patently unreasonable duplication method and then hide behind the fact that it is only charging the "direct costs" it incurred using that patently unreasonable duplication method, the "reasonable standard charges" limitation would be effectively *subordinate* to the "direct costs" limitation, instead of being the co-equal factor intended by Congress.[6]

The next legal question is whether or not an agency can ignore the statutory restrictions placed on it by FOIA by implementing an unnecessarily complex and redundant "security review process," but this question has already been addressed by another court in this Circuit. In the case *National Security Counselors v. CIA*, Judge Howell addressed an analogous controversy, in which the Central Intelligence Agency and Department of State were accused of using overcomplicated processes for duplicating records in electronic format as a justification for categorically determining that no records were readily reproducible in electronic format. 960 F. Supp. 2d 101, 202-07 (D.D.C. 2013). In that case, as in this case, the underlying explanation for the agencies' processes was that the FOIA processing system was on each agency's classified network, and so extra steps were required to move records from the classified network to the unclassified network. Judge Howell stated that she was "somewhat skeptical regarding the State Department's explanation of the labyrinthine steps that are necessary to move a document from

---

[6] A similar legal question would arise if an agency deliberately searched for records using the most time-consuming process when it was able to conduct a much shorter search, such as reviewing every entry in a database one at a time for 100 hours instead of using the database's

the classified system to an unclassified piece of electronic media," *id.* at 205, and separately

opined, "I can't imagine a more cumbersome process to have been created to do FOIA

processing, I really can't. It boggles the mind that the CIA takes unclassified documents, puts

them on a classified computer system, which can only print for obvious reasons in order to

process what might otherwise be a fairly simple FOIA request for unclassified documents." Tr.

of 12/16/11 Status Conf. at 7:18-23, *Nat'l Sec. Counselors v. CIA*, No. 11-443 (D.D.C.), attached

as Ex. B. Despite these judicial warnings in 2013 and 2011, respectively, involving two separate

agencies, FBI has implemented the next evolution of these processes. In light of the fact that at

least one court has held that an agency cannot refuse to provide CDs *at all* based solely on its

insistence on using "labyrinthine steps" to create a CD, FBI has instead decided to argue that it

may use the *cost* of that process to justify charging more fees to requesters than it otherwise

would be able to. This Court should solidly decline this invitation to allow an agency to use a

process that is deliberately and unnecessarily complicated and redundant to justify higher fees

than FOIA would allow if it used a reasonable process.

  With this in mind, it is appropriate to demonstrate the unreasonableness of the process

FBI has described in the *NSC* Hardy Declaration by removing all the conclusory editorial text

about security and focusing solely on the actual script a FOIA employee must follow to produce

a single CD containing 500 pages of unclassified records:

1. First, all records responsive to a request must be placed in the FOIA Document

  Processing System ("FDPS"), which is on a classified network, regardless of

  whether or not the records are classified. *NSC* Hardy Decl. ¶ 6.

---

search function for 10 minutes, and then insisted that every requester must pay for the direct
costs of the longer process.

2.      Then, once a record has been processed for release in the FDPS, an employee

must export each section of a document[7] as a multi-page TIF file to his local

computer drive. *Id.*

3.      Then the employee must manually rename each TIF file and save it to a common

shared drive. *Id.*

4.      Then the employee must convert each multi-page TIF file into a series of single-

page text files because Integrity—the FBI security system being described—

cannot read TIF files. *Id.*

5.      The employee cannot convert TIF files to text files on his computer and must

walk to a separate computer to do the conversion. *Id.*

6.      The employee must then copy the newly created text files from the shared drive to

his local computer drive. *Id.*

7.      Then the employee must "reflect[] upon the processed records" and create

keywords for the Integrity system to search for. *Id.* ¶ 8.

8.      Then the employee runs the Integrity scan using the custom keywords he created

against each single-page text document. This scan takes an unspecified amount of

time. *Id.* ¶ 9.

9.      Then the employee must manually review the automated scan results. *Id.*

10.     Then the employee must run a second Integrity scan using general keywords

against each single-page text document because Integrity apparently cannot

search for these general keywords at the same time as the custom keywords he

inputted previously. *Id.*

---

[7] Hardy did not define what constitutes a "section" other than to say, "A release can include multiple sections." *Id.* ¶ 7.

11.     Then the employee must determine if each keyword located by an Integrity scan is actually an entire word (e.g. "DEA" and not "death") and decide if it should be redacted because the Integrity system lacks the common search option of limiting results to whole words. *Id.* ¶ 10.

12.     Then, if the employee determines that a word must be redacted, he restarts the Integrity scan from the beginning again, even though it would already have identified any other unredacted keywords located in the document. *Id.*

13.     Then the employee returns to the FDPS and exports the sections directly to an unclassified computer as PDF files, which are then burned to a CD. *Id.* ¶ 11.

14.     Only GS-11 through GS-13 employees can perform *any* of the above-described work. *Id.* ¶ 14.

15.     Each employee must personally be actively involved with the above-described process for 50 minutes per 500 pages. *Id.* ¶ 13.

16.     As a result, for every 4800 pages released to *anyone*, a GS-11 or higher-level employee must spend an *entire 8-hour work day* doing nothing but going back and forth between computers, reviewing records which have already been through a line-by-line FOIA review, and re-running redundant automated scans, instead of searching for or reviewing records in response to FOIA requests.

From the above description, which is drawn *directly* from Hardy's testimony, it is clear that this process serves very little actual purpose beyond allowing FBI to claim that it is protecting classified information even though the bulk of records put through it were unclassified from the outset and were only placed on the classified system in the first place because the agency decided to locate the FDPS system there. Moreover, even the assertion that the FDPS

8

system has to be located on the classified system is undermined by Hardy's testimony that after all the Integrity scans have been run, the employee *returns to the FDPS system*, which is presumably still located on the classified network, and *directly "export[s] all sections from FDPS into an unclassified PDF format outside FDPS." Id.* ¶ 11. This "external FDPS location" appears not to be located on the classified network, begging the question of why it was not used the entire time instead of putting unclassified records on a classified network. However, even setting that odd inconsistency aside, there is no rational reason for the unnecessarily labyrinthine processes described by Hardy, such as converting files from one format to another format, then to a third format, then back to the first format, all on different computers unable to read the other formats, or re-running an entire scan because a single word was redacted, as though that will change whether or not other prohibited words are located, after which a simple export process can be run from the first system to the CD-creation program without any complications.

With all this in mind, however, whether or not FBI is allowed to use this process is beyond the scope of this Motion. No matter how unnecessarily convoluted or cumbersome this process may be, this Motion is not about whether or not FBI can *use* it.[8] This Motion is about whether or not FBI can *charge requesters* for the time spent using this bizarre process, and the answer to that question is decidedly in the negative because the direct costs incurred as a result of this process are not "a 'reasonable' amount for the direct costs of document . . . duplication." *Pollack*, 49 F.3d at 119. Accordingly, if the agency would not be allowed under FOIA to charge the direct costs of using this process, then it cannot use the direct costs of using this process as a

---

[8] This is not to say that that a requester could never challenge the use of this system. For instance, if the Court grants Plaintiff's motion to compel FBI to request and justify an *Open America* stay being filed contemporaneously with this Motion, and this system were being cited as a reason for a delay, the Court could easily adjudicate this issue. However, that question is not the subject of *this* Motion.

metric against which other arbitrary fees are measured. As a result, the simple fact that $15/CD is

less than the direct costs of using this process does not demonstrate that $15/CD is a reasonable

fee. For this reason, the Court should find that FBI has been assessing unreasonable duplication

costs to AARC and accordingly grant partial summary judgment on this issue to AARC.[9]

Date:   November 23, 2021

<div style="margin-left:40%">

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

</div>

---

[9] To be clear, there may be *a* reasonable "per CD" fee that could properly be assessed, but that is not the question before the Court. If FBI wishes to propose a lower fee—perhaps excluding the labor costs associated with Integrity—and justify it to the Court, it may do so. That will not change whether the fees assessed thus far—which FBI continues to defend, even when only producing 250 pages/CD—are reasonable.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | * | |
| RESEARCH CENTER, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-01868 (TNM) |
| | * | |
| DEPARTMENT OF JUSTICE, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFF'S  STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Local Rule 7(h), Plaintiff Assassination Archives and Research Center, Inc. ("AARC") submits this Statement of Material Facts as to Which There Is No Genuine Dispute.

1.      On 7 September 2012, AARC submitted to the Federal Bureau of Investigation ("FBI") a Freedom of Information Act ("FOIA") request for copies of historical indices of electronic surveillance activities. (Compl., Dkt. #1, ¶¶ 17-19 (filed  Aug. 8, 2018).)

2.      After AARC commenced this litigation, FBI began processing responsive records and began releasing records at a rate of approximately 500 pages/month, which it releases by mailing a CD containing responsive records to AARC each month. (J. Stat. Rep., Def.'s Mot. Modify Sched. for Stat. Reps., & Pl.'s Mot. Set Briefing Sched., Dkt. #17, at 3 (filed  June 5, 2019).)

3.      FBI insisted that AARC was required to pay $15 per CD for these releases and that it would stop processing records if AARC ceased payment. (*Id.* at 2.)

4.     On 9 June 2017, David Hardy authored and signed a sworn declaration describing the Integrity system used by FBI. 3d Hardy Decl., Dkt. #34-2, ¶ 13 (filed June 9, 2017), *Nat'l Sec. Counselors v. DOJ*, No. 13-556 (D.D.C.).

5.     All records responsive to a request must be placed in the FOIA Document Processing System ("FDPS"), which is on a classified network, regardless of whether or not the records are classified. *Id*.

6.     Then, once a record has been processed for release in the FDPS, an employee must export each section of a document as a multi-page TIF file to his local computer drive. *Id*.

7.     Then the employee must manually rename each TIF file and save it to a common shared drive. *Id*.

8.     Then the employee must convert each multi-page TIF file into a series of single-page text files because Integrity cannot read TIF files. *Id*.

9.     The employee cannot convert TIF files to text files on his computer and must walk to a separate computer to do the conversion. *Id*.

10.     The employee must then copy the newly created text files from the shared drive to his local computer drive. *Id*.

11.     Then the employee must "reflect[] upon the processed records" and create keywords for the Integrity system to search for. *Id*. ¶ 8.

12.     Then the employee runs the Integrity scan using the custom keywords he created against each single-page text document. *Id*. ¶ 9.

13.     Then the employee must manually review the automated scan results. *Id*.

14.     Then the employee must run a second Integrity scan using general keywords against each single-page text document. *Id*.

15.    Then the employee must determine if each keyword located by an Integrity scan is actually an entire word (e.g. "DEA" and not "death") and decide if it should be redacted. *Id.* ¶ 10.

16.    Then, if the employee determines that a word must be redacted, he restarts the Integrity scan from the beginning again. *Id.*

17.    Then the employee returns to the FDPS and exports the sections directly to an unclassified computer as PDF files, which are then burned to a CD. *Id.* ¶ 11.

18.    Only GS-11 through GS-13 employees can perform any of the above-described work. *Id.* ¶ 14.

19.    Each employee must personally be actively involved with the above-described process for 50 minutes per 500 pages. *Id.* ¶ 13.

Date:   November 23, 2021

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY COUNSELORS, *et al.*, )
              )
   Plaintiffs,        )
              )   Civ. A. No. 1:13-cv-00556-RC
   v.           )
              )
U.S. DEPARTMENT OF JUSTICE,   )
              )
   Defendant.       )
              )

## THIRD DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)   I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), in Winchester, Virginia. I have held this position since August 1, 2002. Prior to my joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)   In my official capacity as Section Chief of RIDS, I supervise approximately 248 employees who staff a total of ten (10) Federal Bureau of Investigation Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007 and the OPEN FOIA

1

         Ex. A

Act of 2009; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)  Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to Plaintiff's request for information pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the treatment that has been afforded National Security Counselor's FOIA request for the Manual of Administrative Operations and Procedures ("MAOP"), as well as RIDS' decisions about fees with respect to all three FOIA requests at issue in this lawsuit. I am also aware of the protocol adopted and followed by RIDS for assessing and charging fees associated with processing FOIA requests and issuing releases on compact discs ("CD").

(4)  The FBI submits this declaration in response to the United States Court of Appeals' ("USCA") remand on the issue of fee assessment. More specifically, it addresses whether the $15.00 assessed fee exceeds direct costs. The Court "require[s] only that the agency provide a sufficient factual basis upon which the district court can make the determination that the fees assessed under the interim release policy do not exceed direct costs." *See* USCA's Opinion dated February 14, 2017, p. 10. First, I will describe the Integrity process in greater detail, as well as the steps for preparing a release on CD. Second, I will explain the direct costs associated with a CD release and how those costs exceed the $15 assessed fee. This is my third declaration and the FBI's fourth overall declaration in this case. It incorporates all previous declarations

2

dated September 17, 2013 (hereinafter "First Hardy Declaration"), December 3, 2013 (hereinafter

"Second Hardy Declaration"), and March 14, 2014 (hereinafter "First Argall Declaration").

## I. INTEGRITY PROGRAM AND EMPLOYEE ENGAGEMENT

### A. Integrity Program

(5)     The Court states "the Hardy Declaration's explanation of the Integrity program

lacks adequate specificity to determine whether, and to what extent, the 50-minute period for

running the program involves employee engagement rather than idle time." *Id* at 9.   In response,

the FBI provides greater detail herein regarding the Integrity program and the employee

involvement required in preparing and conducting a security scan.

(6)     As stated in the First Hardy Declaration, the process by which the FBI produces a

CD to a requester involves running a security protocol utilizing the Integrity program in which the

FBI moves records from its FOIA Document Processing System ("FDPS"), which is a classified

computer network on which records responsive to FOIA requests are processed, to a non-

classified computer network from which a CD can be prepared for release.   As stated in the First

Hardy Declaration, RIDS personnel expends approximately 50 minutes to conduct a security scan

through the Integrity program.   *See* First Hardy Decl. ¶ 33(d) n. 18.   This is a good-faith

estimate of the entire Integrity process from preparing the text documents to resolving issues

noted in the reports.   The Integrity process entails the following major steps which require

individual action, review and analysis:   (1) document conversion, (2) Integrity scan, and (3)

resolution of issues.

3

### i.     Document Conversion

(7)     First, the Government Information Specialist ("GIS") must export each section of the release from FDPS to their local computer drive.   A release can include multiple sections. The GIS must export each section as a multi-page TIF[1] file.   The GIS renames each section and saves them to the common shared drive.   Integrity is unable to read TIF files so each page must be converted into single-page text documents. The GIS' computer is unable to convert the files; therefore, this part of the conversion is performed on designated computers.   The GIS retrieves the sections and saves each page as a single-page text document onto the shared drive.   This completes the conversion process.   The GIS then retrieves the text documents from the shared drive and saves them to their local drive in preparation of the Integrity scan.

### ii.    Integrity Scan

(8)     Second, the GIS prepares for the Integrity scan.   As previously stated, the Integrity program uses two policies when conducting a scan – a general security policy and a custom policy.   *See* First Hardy Decl. ¶ 33(c).   The general security policy is comprised of standard code words used in every scan; however, the custom policy is created by the GIS and unique to each specific FOIA request.   The custom policy requires analysis and an independent assessment by the GIS based on the GIS' knowledge of the case and relevant context. The GIS must identify, develop, and implement case specific key words which includes a variety of exempt words, names, confidential sources, symbol source numbers, classified techniques, and any other terms deemed sensitive or classified.   The GIS reflects upon the processed records, notes all sensitive or classified terms, and includes them in creating the custom policy.

---

[1] TIF or TIFF stands for "Tagged Image Format File."   TIF is an image format file for high-quality graphics.

4

(9)     The GIS imports the custom policy into the Integrity program, and scans it against each text document.   After the scan is finished, the GIS must conduct a manual review of the results.   Specifically, the scan produces an Integrity report indicating a pass or fail result.   If Integrity produces a pass report, then the GIS can proceed with preparing the release package; however, a fail requires the GIS to review and resolve each issue.   Both the automated scan and manual review are necessary to ensure information is ready to be outputted from the classified FDPS environment to an unclassified information environment suitable for public dissemination and to prevent the inadvertent release of sensitive or classified information.[2]   The GIS follows the same process in conducting a scan of the general security policy against each single-page text document, which produces a second report.   The GIS must run the two scans (the scan using the custom policy and the scan using the general security policy) separately, review each report, and resolve any issues or "fails" identified in the reports.

iii.     **Issue Resolution**

(10)     Third, the GIS must resolve all issues or "fails."   The reports list every instance in which a word, from the custom or general policy, is detected as un-redacted within the text documents.   The reports generate a significant number of "false" fails that are random and incomplete references to unrelated individuals or subjects.   For example, if the general or custom policies list the term "DEA" for Drug Enforcement Administration, then every instance of this letter sequence; i.e., "**dea**f," "**dea**th," "**dea**d," "**dea**n," "**dea**l," "**dea**r," will result in a fail.   The reports can produce numerous fails resulting in considerable work because the GIS must review each fail, comparing it to the corresponding page in FDPS, and determine whether it is a true or

---

[2] An inadvertent release is an accidental or unintended release of exempt information.

5

false fail. The GIS must ensure each release of the word is correct and not inadvertent.[3]    Finally,

if the GIS determines the fail is, in fact, an inadvertent release, then the identified error must be

corrected on the relevant pages in FDPS and the entire Integrity process starts over.

### B.    Burning a CD and Preparing the Release Package

(11)    After resolving issues, the GIS proceeds with preparing the release package by

exporting all sections from FDPS into an unclassified PDF format outside FDPS.    Each section is

then transferred from the external FDPS location to a software program used for authoring CDs.

After the CD is burned, the GIS prepares the physical release package.

## II. DIRECT COSTS EXCEED ASSESSED FEE

(12)    The Court states "[w]e require only that the agency provide a sufficient factual

basis upon which the district court can make the determination that the fees assessed under the

interim release policy do not exceed direct costs."    *See* USCA's Opinion dated February 14,

2017, p. 9.    As such, the FBI explains the direct costs associated with preparing and conducting

the Integrity protocol.

(13)    Integrity protects the transfer of information from a classified network to an

unclassified format.    It is a multi-step information security review which requires considerable

employee engagement.    As described above, the GIS is active through a majority of the process.

Again, the FBI provided an estimate of 50 minutes to perform the Integrity scan.    *See* First Hardy

Decl. at ¶ 33(d) n. 18.    This is a good-faith estimate based on experience, the number of

necessary steps, and the amount of work required by the GIS to complete each step.    Each step

must be performed by the GIS despite the size of the release.    It is the level of GIS engagement;

---

[3] Words can be released in certain instances and not in others depending on context, segregability, and foreseeable harm to an interest protected by an exemption.

i.e., the direct labor costs, which underpin the $15 assessed fee.

(14)     The direct labor costs associated with running Integrity exceed $15.00.   As stated in the First Hardy Declaration, the average GIS responsible for preparing and running Integrity range in grade from GS-11 to GS-13.   *Id.*   Based on the 2013 Salary Table issued by the Office of Personnel Management for the Washington, D.C. locality, the minimum hourly salary is $29.93 per hour (GS-11, Step 1) and the maximum is $55.46 (GS-13, Step 10).   *Id.*   Thus, the average direct labor cost associated with a 50-minute Integrity scan for a GS-11, Step 1 is $24.50 and a GS-13, Step 10 is $46.00.   These figures do not include labor costs for burning the CD or preparing the physical release package, as well as other direct costs such as CDs, postage, envelope, etc.   These totals are based on 2013 salary rates and, though the $15 CD fee has not changed since 2013, the government employees' yearly salary has increased.   Despite the increase in labor costs, the FBI has maintained its policy of $15 per CD.   Thus, the direct costs associated with a CD release exceeds the assessed fee.

## CONCLUSION

(15)     The purpose and function of the Integrity program is to ensure information is ready to be transferred from a classified FDPS environment to an unclassified information environment suitable for public dissemination, and to prevent the inadvertent release of sensitive or classified information.   As explained above, the Integrity process is a multi-step security review which requires considerable employee engagement.   It is the level of GIS engagement which underpins the $15 assessed fee.   The Court requested the FBI to "provide a sufficient factual basis upon which the district court can make the determination that the fees assessed under the interim release policy do not exceed direct costs."   *See* USCA's Opinion dated February 14,

2017, p. 10.   In response, the FBI provided an in-depth description of the Integrity process and

the high level of required employee engagement, as well as explained how the direct costs

associated with a CD release exceed the $15 assessed fee.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this ___7th___ day of __June 2017__.


DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia

8

135

```
                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA


NATIONAL SECURITY              :
COUNSELORS,                    :          Docket No. CA 11-443
                               :
              Plaintiff,       :          Washington, D.C.
         vs.                   :       Friday, December 16, 2011
                               :            10:10 a.m.
CENTRAL INTELLIGENCE           :
AGENCY,                        :
                               :
              Defendant.       :
----------------------------x



              TRANSCRIPT OF STATUS CONFERENCE
          BEFORE THE HONORABLE BERYL A. HOWELL
                UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Plaintiff:        KELLY BRIAN MCCLANAHAN, Esquire
                          National Security Counselors
                          1200 S. Courthouse Road
                          Suite 124
                          Arlington, VA 22204


For the Defendant:        RYAN BRADLEY PARKER, Esquire
                          U.S. Department of Justice
                          Civil Division
                          20 Massachusetts Avenue, NW
                          Suite 400
                          Washington, DC  20001

Court Reporter:           CRYSTAL M. PILGRIM, RPR
                          Official Court Reporter
                          United States District Court
                          District of Columbia
                          333 Constitution Avenue, NW
                          Washington, DC  20001


Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.
```

Ex. B

USCA Case #23-5004      Document #2003801           Filed: 06/16/2023      Page 143 of 341

1             THE COURT:  Could you say your name again?

2             MR. MCCLANAHAN:  Kel McClanahan.

3             THE COURT:  McClanahan.  Okay.

4             MR. PARKER:  Ryan Parker from the Department of

5    Justice representing the Central Intelligence Agency.

6             THE COURT:  Okay, thank you.

7         Mr. McClanahan, we're here on your request for a status

8    conference so I'll let you proceed.

9             MR. MCCLANAHAN:  Thank you, Your Honor.

10        As we see it this issue is really very simple.  We have

11   asked the agency in this and other cases, but only today we're

12   just going to talk about this one, for electronic records, and

13   they have not provided them.  And when I asked why aren't you

14   providing them, they said because we don't ever provide

15   electronic records.

16        This is something that should be fairly simple, I would

17   think, to resolve without having to go into a motion to compel

18   or motion for summary judgment, motion for PI or anything

19   procedural like that.

20            THE COURT:  And I agree with you on that.

21        I'm not, but I'm not sure that the resolution is

22   necessarily in your favor given the affidavit's support that

23   they provided and the legal standard that the Court has to

24   apply in this case.

25        But on that point, I do agree with you which is why we

1  scheduled a status conference.

2          MR. MCCLANAHAN:  Well, in reference to the affidavit

3  and the legal standard I think that first of all there's not a

4  whole lot of case law on this.  There's a few cases that are

5  related to it and then there's the sample case and the T P S

6  case that are the only ones who have really addressed the

7  issue.

8          THE COURT:  Can I just ask a couple of basic

9  questions?

10         MR. MCCLANAHAN:  Yes.

11         THE COURT:  When you asked for the documents in

12  electronic form, are you providing specific format or are you

13  just requesting for documents to be reduced in whatever

14  electronic form they're originally stored?

15         Are you asking for Word format, PDF format?

16         MR. MCCLANAHAN:  It doesn't matter.  What we did in

17  the initial request was a, the forms that off the top of our

18  heads qualify are Word, PDF, TIF, GIF, what have you.  Because

19  we are unfamiliar with the way the system work, they may store

20  their records in .CIA secret form.

21         So an electronic form that would be accessible to

22  someone else.  PDF generally works.  PDF, Word is what I have

23  always generally gotten from other agencies.  Sometimes I get a

24  doc form but generally PDF is sort of one of the industry

25  standard for this.

1          THE COURT:  When you reviewed Ms. Viscuso's

2  declaration was this the first time that you understood exactly

3  how the CIA produces, does its FOIA processing?

4          MR. MCCLANAHAN:  To that degree of detail yes.

5          THE COURT:  I found it very illuminating.

6          MR. MCCLANAHAN:  I found it very interesting.  That

7  in and of itself was information that we didn't have.

8      It says, I think it says more in support of our case

9  than it does in support of their case.

10          THE COURT:  How is that?  Because I'll be honest with

11  you, when I look at 5 U.S.C. 552(a)(4(B) that says I'm suppose

12  to give the CIA's assessment of whether a document is readily

13  producible electronically substantial weight in combination

14  with the quite detailed declaration of Ms. Viscuso, you know, I

15  find it difficult to overcome that legal requirement to direct

16  the CIA at least with respect to unclassified documents which

17  they appear to be taking and uploading into a classified

18  computer system to do the FOIA processing which one can puzzle

19  over that step, but since that is the step they're taking and

20  creating other burdens it, you know, it's, I find it difficult

21  to make the direction that they produce the documents

22  electronically.

23      And so I'm curious to hear from you how based on this

24  declaration and the substantial weight standard that the Court

25  must apply that you think that the Court has room to make that

1  direction?

2        MR. MCCLANAHAN:  Well, with regard to the substantial

3  weight I found a quote that I've used in many other briefs

4  including cases before you from the D.C. Circuit Campbell case.

5  That in the context of B (1), you also give substantial weight

6  to agency declarations and the Circuit came down and said

7  deference is not equivalent to acquiescence that substantial

8  weight does not mean that whatever they say however weird or

9  unusual has to be granted, that sort of robs the judiciary of

10  any authority.

11        And when it comes to this declaration I think there's

12  two main points that point to why this doesn't square with sort

13  of any kind of reasonability standard.

14        The first is and you've sort of touched on it in your

15  observation, it's a self-inflicted wound.  They by their own

16  practices take a document from an unclassified system and put

17  it on a classified system and even if they decide to release

18  that in its entirety, they say we can't do it because we can't

19  get it off of the classified system.

20        They could take the original off of the unclassified

21  system and give it to us, but they don't because they have put

22  it on a classified system.  That's the first thing.

23        The second thing is I don't know how long this system

24  has been in place, but I know how long the amendments have been

25  in place.  In 1996 this rule was set down.  In my former life I

1  was an IT guy.  Most of the systems that they're describing

2  were not in existence in 1996.

3       I would posit there's a very good chance that they have

4  created this system since 1996.  And I would argue that

5  deliberately creating a system that does not allow you to

6  readily reproduce something knowing that you have to readily

7  reproduce something does not allow you to say that I cannot

8  readily produce something because of the system I created.

9       THE COURT:  So Mr. McClanahan, what you are saying is

10  that even though the law obliges each agency to make reasonable

11  efforts to maintain its record in forms or formats that are

12  reproducible for purposes of this section, I'm reading from 5

13  U.S.C. 552 (A)(3)(B) that the CIA's process is not fulfilling

14  that legal obligation?

15       Is that your argument?

16       MR. MCCLANAHAN:  That is my argument and I will

17  support it by their arguments that we have all these secrets,

18  when you have all of these threats that are trying to get our

19  secrets, I deal with lots of agencies.  I deal with lots of

20  intelligence agencies.

21       The Director of National Intelligence gives PDFs.  The

22  NSA gives PDFs.  The NGA gives PDFs.  The NRO gives PDFs.  The

23  only agency that does not give PDF, until very recently State

24  has decided not to do it too and that's a different issue in a

25  different case, is the CIA.

USCA Case #23-5004      Document #2003801         Filed: 06/16/2023      Page 148 of 341

1        Of all the intelligence community, the only agency

2   including INSCOM from Army, including the Navy, including every

3   agency you can think of that we filed a request with we have

4   gotten PDFs.  All of these agencies found a way between '96 and

5   2011 to comply with the law.  And the CIA found a way to make

6   it so that it was impossible by their own action to comply with

7   the law and I don't think they should be allowed to do that.

8            THE COURT:  Yes, just remind me of your name again.

9            MR. PARKER:  Ryan Parker, Your Honor.

10           THE COURT:  Mr. Parker, so thank you for your quick

11  turn around.  I know I did not give you that much time, but

12  thank you for your quick turn around of the Viscuso declaration

13  and your papers.

14       I did as I mentioned I found this process illuminating.

15  The CIA does have a huge FOIA backlog and I think for the first

16  time I understood possibly why.

17           MR. PARKER:  Right.

18           THE COURT:  I can't imagine a more cumbersome process

19  to have been created to do FOIA processing, I really can't.  It

20  boggles the mind that the CIA takes unclassified documents,

21  puts them on a classified computer system, which can only print

22  for obvious reasons in order to process what might otherwise be

23  a fairly simple FOIA request for unclassified documents.

24       Let me pause for a second because I also wanted to,

25  perhaps I should have asked Mr. McClanahan this.  The request

1   for the tables of contents for this inhouse journal, are those

2   unclassified?

3           MR. PARKER:  Actually, there's information in the

4   tables that is classified and has been redacted in the paper

5   version of the documents that have been produced to

6   Mr. McClanahan.

7           So as Your Honor may well know, a large percentage of

8   the documents that the CIA holds contain classified

9   information.  So often, I don't think it's often the case that

10  they take documents that have no classified information and

11  upload them to the system.  I'm sure that it happens on

12  occasion, but a very large percentage of the documents that the

13  CIA has contain classified information because of the very

14  nature of the work that the CIA does.

15          THE COURT:  Oh, well then perhaps I'm overreading the

16  Viscuso declaration because I had understood from the

17  declaration that all FOIA processing and review happens on a

18  classified computer system without regard to whether the

19  documents were classified or unclassified.  I think she said

20  that in one of her statements.

21          MR. PARKER:  Your Honor is correct and I'm sorry if I

22  misled Your Honor.

23          What I was trying to say is that many of the documents

24  that are requested in FOIA requests contain classified

25  information.

1          And so as Mr. McClanahan said why would they take

2    documents that are unclassified and put them on a classified

3    system, I don't think that that's entirely accurate and it's

4    not accurate in this case because the documents that were

5    ultimately produced contain classified information which was

6    ultimately redacted from the documents that were provided to

7    Mr. McClanahan.

8          So in many cases the documents that are uploaded onto

9    the classified system contain classified information.  That's

10   the only point I was trying to make, Your Honor.  I wasn't

11   trying to say anything different than the declaration.

12          THE COURT:  I see.  I was under the impression that

13   these tables of contents were not classified.  So that, that's

14   an interesting point.

15          Why don't you answer the question that was raised in my

16   discussion with Mr. McClanahan of how does this process comply

17   with the CIA's obligation under the law to make reasonable

18   efforts to maintain its records in forms or format that are

19   reproducible for purposes of this section?  How does it comply

20   with that requirement?

21          MR. PARKER:  Yes, Your Honor.  Agencies in the

22   federal Government all have different missions and the CIA's

23   mission is particular in that they deal with sensitive

24   information often gathered about foreign countries and the

25   nature of their information is somewhat different than the

USCA Case #23-5004      Document #2003001           Filed: 06/16/2023      Page 151 of 341

1  information that is stored by other agencies.

2       And so the CIA is very mindful of FOIA.  They received

3  3,094 FOIA requests last year.  They dedicated a substantial

4  amount of resource and people to working on FOIA requests, but

5  the protection of classified information is really of the

6  utmost importance for the CIA.

7       And these processes are in place because of the threat

8  of the release of classified information and the importance of

9  protecting that information.  So I believe that the CIA does

10  everything in their power to comply with the FOIA in an

11  atmosphere that requires them to be very protective of the

12  information that they have.

13       So I would say that although this appears to be a very

14  cumbersome process, I think it is a very cumbersome process.

15  These protections are in place for a reason to protect very

16  sensitive classified information and I think in that regard the

17  CIA's hands are somewhat tied and that those protections are

18  essential and necessary.

19       So I would say that the agency is doing all that it can

20  to process these requests in the ways that, as required by the

21  statute, while at the same time protecting the classified

22  information the agency houses.

23       THE COURT:  Well, among the issues that make it

24  cumbersome as I read this declaration even for unclassified

25  documents is that there's redaction software only on the

1   classified system and not on the unclassified system.

2          So even if there were a purely unclassified document

3   which I thought the tables of the TOCs were but I guess they're

4   not, but say there was a totally unclassified document, the

5   FOIA officers of the CIA would be unable to review that

6   unclassified document, make any appropriate redactions and

7   release it electronically because their unclassified computer

8   systems don't have the redaction software.

9          That seems to me to be a fairly simple step to get the

10  redaction software on an unclassified system so that at a

11  minimum requests for unclassified documents could be reviewed

12  and redacted appropriately on an unclassified system and

13  produced electronically as opposed to the uploading of

14  unclassified documents on a classified system solely to make

15  use of the redaction software that's only on that system.  So

16  that doesn't seem like a reasonable process to me.

17          MR. PARKER:  You're correct, Your Honor, that all

18  documents in your hypothetical situation if we had a document

19  that did not contain any classified information, my

20  understanding is that would have to be uploaded to the

21  classified system because that is the system that has the

22  redaction software.

23          I think that's a choice that has been made by the CIA

24  based on its needs to protect classified information.  I would

25  agree that it does not seem to be, it is a cumbersome process.

1  But I know that the CIA tries to allocate their resources in a

2  way that makes sense for them as far as protecting the

3  information that they have in complying with the FOIA, and I

4  can't tell you as far as the decision about where to put the

5  redaction software how that decision was made, but I'm

6  confident that the CIA makes the decisions in the best way that

7  they can as far as allocation of resources are concerned.

8          THE COURT:  What's not clear from the declaration of

9  Ms. Viscuso and although you're clearly cognizant as is she of

10  the CIA backlogs in FOIA processing about any appreciation for

11  review of this process to make it more expeditious and less

12  cumbersome at least when it comes to requests for unclassified

13  records, is any kind of review in that respect underway or

14  given any thought to by the CIA?

15          MR. PARKER:  Your Honor, to be candid, I can't answer

16  that question at this time but I will be happy to take Your

17  Honor's suggestion back to the agency.

18          As you noted that's not in the CIA's declaration.  They

19  are (sic) planning to review that process, but I can certainly

20  suggest that to the agency following this hearing.

21          THE COURT:  If you could and I'd like to know the

22  response to that.

23          In addition and perhaps a predicate to that is how many

24  of the FOIA requests that the CIA gets involve just unclass,

25  requests for unclassified information?  The response may be all

USCA Case #23-5004      Document #2003801          Filed: 06/16/2023      Page 154 of 341

1  of the FOIA requests that we get implicate classified

2  information and classified records so therefore, this process

3  is the most effective one that we can come up with to protect

4  as the CIA must classified information.  But they know what the

5  requests are and how many are for classified, necessarily

6  involve classified and versus unclassified information.

7          If I could just pause for a second.  Mr. McClanahan,

8  when you, you all asked for the tables of contents, did you

9  expect that they would be classified or unclassified?

10             MR. MCCLANAHAN:  Both, Your Honor.

11             THE COURT:  So you were not surprised that the tables

12  of contents contained some classified information?

13             MR. MCCLANAHAN:  No, Your Honor, we expected some of

14  them to.  Actually, we expected many of them to be classified

15  because Studies in Intelligence was classified up until the

16  early '90s.

17          However, there were unclassified editions that were

18  nonetheless not made publicly available.  We got some of those.

19  In fact, we got 14 documents released in their entirety that

20  were not redacted at all.  And we got two that were printouts

21  from their website that are available on the website and we

22  didn't get those in electronic form even though they're on

23  their website.  Now it was a moot point because it's on their

24  website.

25          But it is sort of this proposition and our main argument

1   with this, had they come back and shown that they have a

2   process that they evaluate these documents and see if they're

3   readily reproducible and then in another request they evaluate

4   those documents and decide if they're readily reproducible and

5   that was an individualized thing and sometimes they were and

6   sometimes they weren't, we actually would not have a problem

7   with it.  But they have released to us a copy of a printout

8   from the CFR that they said they could not release in

9   electronic form.

10      I have a very good feeling that was not on the

11  classified system.  That is actually in one of your other cases

12  with, one of the related cases.  This is a blanket across the

13  board policy where they say we evaluated these records and

14  found that they were not readily reproducible because no

15  records are readily reproducible.

16      And it is maybe not in these, although I would point to

17  two that we know were not classified, the two that were

18  available on their website.  The others may have been

19  classified and were declassified that were released in their

20  entirety.  We would actually concede that actually originated

21  on the classified system, that's fine.

22      However, when documents come from an unclassified system

23  and they stick it on a classified system and then say they

24  can't take it off of the classified system because it's unduly

25  burdensome, that doesn't play and they do that for classified

1 records, they do it for unclassified records.

2      The annual FOI -- I have countless FOIA requests,

3 responses from them that do not implicate classified records

4 and they'd never give electronic records.  The National

5 Security Archive files thousands of these.  They have not once

6 received electronic records even when they file requests for

7 random stuff.

8      A guy named Jason Smathers got a release of comment

9 cards from the cafeteria that could not be released in

10 electronic form.

11           THE COURT:  All right.

12           MR. PARKER:  Could I respond, Your Honor?

13           THE COURT:  Yes, please.

14           MR. PARKER:  First as Mr. McClanahan said the

15 documents at issue in this case in the FOIA request that is

16 before the Court as he noted originated as classified

17 documents.  Some of them are now unclassified because of

18 declassification review.

19      But in this case this is not a situation in which

20 unclassified documents have had to be uploaded to the

21 classified system.  I would also say that the declaration and

22 counsel's communication with Mr. McClanahan we have been very

23 clear and if Your Honor looks at the declaration that this is a

24 case by case determination that this CIA makes.

25           Now the CIA's IT systems are the same for each request.

1   But the nature of the request differs and in the last paragraph

2   of the declaration the CIA explains that in certain situations

3   it receives requests repeatedly for the same information and

4   the CIA on occasion has made the decision that it is worth the

5   investment of time and labor up front to convert those to an

6   electronic format so that as those repeated requests come in

7   they can be provided in that format.

8        THE COURT:  So it's only documents, it's only

9   requests for records that are in those collections that ever

10  prompt an electronic response by the CIA?

11       MR. PARKER:  That's correct, Your Honor.

12       In fact, in the declaration I think it explains that the

13  CIA receives quite often requests for information regarding

14  World War II or Nazi War Crimes, and so they have a collection.

15       THE COURT:  Let me just say I have no issue with the

16  systems that the CIA uses to review FOIA, to review records for

17  response to FOIA requests that implicate classified

18  information.  That's a cumbersome process, they have to be very

19  careful, I appreciate that.

20       But when I read that they take unclassified electronic

21  and/or paper records and apparently although that's not

22  detailed in this otherwise fairly detailed document, they take

23  unclassified electronic records they must print them out and

24  then scan them into electronic form into the classified

25  computer system for review and use of the redaction software

1  only on the classified system for them and then to be printed

2  out, I have to tell you I don't see how that is reasonable and

3  compliance with the obligations under the 1996 mind you,

4  electronic FOIA amendments.

5      So I was going to give you before ruling on this another

6  opportunity to talk to Ms. Viscuso and the CIA about precisely

7  how they process records that are unclassified in response to

8  FOIA requests.

9      How much time do you need?

10      MR. PARKER:  Given the holidays, Your Honor, and the

11  fact that I think some of my colleagues in the CIA might be out

12  of town next week, could we have until I would say the 13th of

13  January for example?  I know from the last case that that's a

14  Friday, I think the first week of January that does not have a

15  holiday, if that would work.

16      THE COURT:  That's fine.

17      MR. PARKER:  And you would like me to just submit

18  that as an affidavit as additional authority?

19      THE COURT:  Yes and additional explanation about why

20  requests for unclassified records have to be treated in the way

21  that it's described in Ms. Viscuso's declaration.

22      For example, why CFR pages and pages from the CIA's

23  website have to be produced in paper form probably because

24  they've been scanned and uploaded into the classified computer

25  system.

1          MR. PARKER:  That would be based on just a

2   hypothetical situation.  Obviously, the documents in this case

3   were from the classified system but just based on a

4   hypothetical request that did not include any classified

5   information.

6          THE COURT:  Correct.

7          MR. PARKER:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9       Is there anything further?

10          MR. MCCLANAHAN:  If I could ask one quick thing.

11       We have actually proposed to them, and admittedly it

12   happened this morning so he didn't have a chance to check in

13   with them, Studies and Intelligence is part of something called

14   the Historical Review Program.  And the CIA for many years --

15          THE COURT:  What is the Studies and Intelligence?

16          MR. MCCLANAHAN:  That's the journal, sorry.

17          THE COURT:  That's the in-house journal.

18          MR. MCCLANAHAN:  That's the name of the journal,

19   yeah.

20          THE COURT:  Oh, I see.

21          MR. MCCLANAHAN:  And for several years the CIA has

22   been engaged in this massive project to declassify and make

23   publicly available as much of this journal as possible and so

24   if you look into the electronic reading room, there's hundreds

25   of articles.

USCA Case #23-5004     Document #2003001          Filed: 06/16/2023     Page 160 of 341

1    If you look in their what's called the CREST data base

2   which they gave to NARA, there's volumes of articles.  In fact,

3   on the CIA website there is an index of all of the articles

4   that have been released, all of which are available

5   electronically.

6    And so we have actually proposed that rather than give

7   us a CD, if we cut out the CD process, that's a lot of their

8   security concerns in the Viscuso declaration.  We proposed if

9   you are making the articles available on the website we would

10  be happy if you make the tables of contents available on the

11  website in the reading room.

12   So if it would be possible to see if that would be a

13  feasible alternative, we would be okay with that.

14    THE COURT:  Mr. Parker, I think I would take it that

15  probably what's made available in the electronic reading room

16  is probably even a more extensive bureaucratic process that

17  might create more delay, but if you could also provide

18  information about what that process is that would be helpful.

19    MR. PARKER:  Just so that I understand, Your Honor,

20  that's the process of taking documents and posting them into

21  the CIA's electronic reading room?

22    THE COURT:  Correct.  I would take it that that

23  probably goes through multiple levels of review, you know, like

24  might perhaps people even outside of the FOIA unit to the

25  public relations unit so, so that I understand this proposal

USCA Case #23-5004      Document #2003001            Filed: 06/16/2023      Page 161 of 341

1  and what the issues are with that proposal, if you could

2  address that in your papers so that I understand that process,

3  it would be helpful to the Court as well.  As you're

4  considering the proposal in any event.

5          MR. PARKER:  Right.  So Your Honor, just so that I'm

6  clear on January 13th we will file with the Court both an

7  affidavit and a supplemental memoranda explaining first the

8  process that takes place when someone, a hypothetical requestor

9  requests information that is only unclassified.  And --

10          THE COURT:  Or but in addition to that, when a

11  request that may encompass both classified and unclassified

12  information how does the CIA handle the portion of the requests

13  that it deals with unclassified information.  And why it is so

14  necessary to take the portion of the request that deals with

15  unclassified information and stick it on a classified computer

16  system with all of the limitations and production formats that

17  entails.

18          MR. PARKER:  Okay, Your Honor.  I don't want to

19  belabor this.

20          THE COURT:  And how that fulfills the agency's

21  obligations to maintain its records in forms or formats that

22  are reproducible for purposes of this section, and I read that

23  agency obligation in conjunction with its obligation to produce

24  documents to the extent that the documents are readily

25  reproducible in the format requested by requestors and

USCA Case #23-5004      Document #2003001            Filed: 06/16/2023      Page 162 of 341

1  particularly with requests for voluminous records, you know,

2  getting them in paper format rather than electronic format is,

3  can be problematic also for further dissemination of the

4  records.

5        MR. PARKER:  Thank you, Your Honor.  I think I

6  understand.  I don't want to belabor this point anymore but I

7  do want to, because we've talked about these things for some

8  time now, make sure that I understand.

9        I believe there are two points you would like addressed

10  both in the memo and in the declaration.  The first is how the

11  CIA handles request for unclassified information or requests

12  that include both classified and unclassified information.  And

13  how the CIA's system conforms with the obligation under FOIA to

14  keep records in a format that in which they could be readily

15  producible.

16        And then the second is the process the CIA goes to

17  upload documents to their FOIA reading room.

18        Are those the two points, Your Honor?

19            THE COURT:  Yes.

20            MR. PARKER:  We will have that for the Court on the

21  13th.

22            THE COURT:  Thank you very much.

23        Is there anything further?

24            MR. MCCLANAHAN:  May I clarify one small point, Your

25  Honor?

1                THE COURT:  Yes.

2                MR. MCCLANAHAN:  Mr. Parker keeps talking about how

3     in this request all the documents were classified and I would

4     like to point out that no, they weren't.

5                The two that were on the website were not classified.

6     And so this is not a hypothetical situation.  This is your

7     second fact pattern of when it has both classified and

8     unclassified records.  This is not an advisory policy idea.

9     This is actually in play in this request for at least two of

10    the documents.

11               THE COURT:  With that clarification, is there

12    anything further?

13               MR. PARKER:  Well, as Your Honor stated, all of these

14    requests were at one time from the classified system so but I

15    understand the request and we'll certainly --

16               THE COURT:  They were all generated by the classified

17    system whether or not the underlying records were originally

18    classified.

19               MR. PARKER:  Right.

20               THE COURT:  As I understand the declaration.

21               MR. PARKER:  That's correct.

22               THE COURT:  Okay.

23          All right, is there anything further?

24               MR. MCCLANAHAN:  No, Your Honor.

25               THE COURT:  Okay, thank you.

1          You're excused.

2          (Proceedings concluded @ 11:45 a.m.)

3                              -oOo-

```
 1                              CERTIFICATE

 2          I certify that the foregoing is a true and correct

 3   transcript, to the best of my ability, of the above pages, of

 4   the stenographic notes provided to me by the United States

 5   District Court, of the proceedings taken on the date and time

 6   previously stated in the above matter.

 7          I further certify that I am neither counsel for, related

 8   to, nor employed by any of the parties to the action in which

 9   this hearing was taken, and further that I am not financially

10   nor otherwise interested in the outcome of the action.

11

12   _____          _____

13   /S/Crystal M. Pilgrim, RPR               Date: January 11, 2012

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | * | |
| RESEARCH CENTER, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-01868 (TNM) |
| | * | |
| DEPARTMENT OF JUSTICE, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**PLAINTIFF'S MOTION TO COMPEL**
**DEFENDANT TO SEEK AN *OPEN AMERICA* STAY**

Plaintiff Assassination Archives and Research Center, Inc. ("AARC") commenced this litigation against Defendant Federal Bureau of Investigation ("FBI")[1] in 2018 in part to obtain copies of historical indices of electronic surveillance activities—the majority of which are over sixty years old—that AARC had requested in 2012. (Compl., Dkt. #1, ¶¶ 17-19 (filed Aug. 8, 2018).) After AARC commenced this litigation, FBI began processing responsive records and began releasing records at a rate of approximately 500 pages/month, which it released by mailing a CD containing responsive records to AARC each month. (J. Stat. Rep., Def.'s Mot. Modify Sched. for Stat. Reps., & Pl.'s Mot. Set Briefing Sched., Dkt. #17, at 3 (filed June 5, 2019).) As of 31 July 2021, FBI claimed that approximately 22,500 pages remained to be processed (J. Stat. Rep., Dkt. #37, at 3 (filed July 31, 2021)), which means that, if FBI continues at its current rate of production, FBI will complete its processing of responsive records in approximately forty-one

---

[1] FBI is treated herein as the "Defendant" to avoid confusion because the case is limited to questions about FBI's processing of AARC's Freedom of Information Act ("FOIA") request, even though the Department of Justice is the proper party Defendant as a matter of law.

160

months—in April 2025. In the parties' 5 June 2019 Joint Status Report, and again in the 6

August 2019 Status Conference, AARC asserted that if FBI intended to continue to process

records at the current pace and delay the resolution of this case for six more years, the Court

must require it to satisfy the strict requirements established by the D.C. Circuit in *Open America*

*v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976). (J. Stat. Rep., Dkt. #17,

at 3-4 (filed June 5, 2019).) The Court then directed AARC to file a motion to compel FBI to

seek an *Open America* stay.

Due to various intervening factors, including the coronavirus pandemic, AARC opted to

delay the filing of this Motion indefinitely. (Pl.'s Not. to Court, Dkt. #24, at 2 (filed Mar. 31,

2020).) However, due to the coronavirus pandemic lasting significantly longer than AARC

anticipated, AARC is now formally seeking the relief it originally requested in June 2019. As

explained in the following memorandum, which has been included in this Motion due to its short

length, the Court should grant AARC's Motion.

Defendant opposes this Motion. A proposed Order is attached to this Motion.

### Memorandum of Points and Authorities

In cases where an agency seeks to postpone briefing by a significant period, it is well-

established that the agency must seek an *Open America* stay justifying the delay (and,

accordingly, justifying the processing speed causing the delay). In such a motion, an agency

must show "exceptional circumstances" to meet the "substantial burden [placed] on the

government to justify to the courts any noncompliance with FOIA time limits." *Open Am.*, 547

F.2d at 617 (Leventhal, J., concurring). An *Open America* stay may be granted "(1) when an

agency is burdened with an unanticipated number of FOIA requests; *and* (2) when agency

resources are inadequate to process the requests within the time limits set forth in the statute; *and*

(3) when the agency shows that it is exercising 'due diligence' in processing the requests; *and* (4) the agency shows 'reasonable progress' in reducing its backlog of requests." *Elec. Frontier Found. v. DOJ*, 517 F. Supp. 2d 111, 120 (D.D.C. 2007) (emphasis in original) (quoting *Wilderness Soc'y v. DOJ*, No. 04-650, 2005 U.S. Dist. LEXIS 20042, at *31-32 (D.D.C. Sept. 12, 2005)).

Over the course of this litigation—and in other cases in which the undersigned has been involved—the Government has taken the unusual position that an *Open America* stay is not required when the agency in question is processing records, and that it is only necessary when the agency seeks to delay its *commencement* of the process. In other words, according to the Government, if FBI seeks to wait until June 2022 to begin processing records, which it will complete processing in September 2022, it must meet the strict requirements for an *Open America* stay, but if it seeks to slowly process records until April 2025, it may simply cite its "policy" and rely on the Court's inherent authority to enter scheduling orders as an exercise of discretion. There is no defensible reason for such a dichotomy, and such an extreme delay in the resolution of a FOIA case is beyond the scope of the Court's inherent authority to manage its docket and is the *raison d'être* for the *Open America* line of jurisprudence. It is well-established that an agency has complied with FOIA when it *completes* its processing of responsive records, not when it *begins* it. If the purpose of the heightened burden for an *Open America* stay is "to justify to the courts any noncompliance with FOIA time limits." *Open Am.*, 547 F.2d at 617 (Leventhal, J., concurring), then it must apply to "*any* noncompliance with FOIA time limits," *id.* (emphasis added), regardless of whether the noncompliance is due to a delay in the commencement or the completion of the process.

3

*Open America* itself dealt with a district court which directed the agency to immediately process the plaintiff's request. That order was reversed and the stay was granted after "exceptional circumstances" were found, but the *Open America* stay was created as, and remains, an exception to the default rule that agencies must comply with all of FOIA, including the statutorily imposed deadlines. An agency's "good faith and due diligence" remain the "touchstones underlying FOIA's statutory scheme." *Judicial Watch, Inc. v. DHS*, 895 F.3d 770 (D.C. Cir. 2018) (quoting *Open Am.*, 547 F.2d at 616). A district court is obligated to determine that an agency "has organized its records management systems to enable prompt determinations to produce records or to invoke an exemption, and to monitor when necessary an agency's progress in adjusting its records management systems to enable it to comply with FOIA." *Id*. at 784. When an agency has not yet processed all records, it has not "responded" to the entire request, because it may still decide to assert exemptions for as-yet-unprocessed records. The point of an *Open America* stay is to allow more time to respond to the request in its entirety, not just part of it. Otherwise, an agency could simply produce one responsive document up front and then delay the release of other records for years.

Once in court, an agency "may further extend its response time [to a request] *if it demonstrates 'exceptional circumstances' to the court.*" *Citizens for Resp. & Ethics in Wash. v. FEC*, 711 F.3d 180 (D.C. Cir. 2013) (emphasis added). The language of *Open America* jurisprudence broadly makes clear that agencies must either promptly comply with FOIA's requirements or *actively* seek a stay for "exceptional circumstances" to allow more response and/or processing time, which may only be granted as long as the agency is "exercising due diligence in responding to the request." 5 U.S.C. 552 § (a)(6)(C)(i). "Exceptional circumstances" specifically *excludes* "a delay that results from a predictable agency workload of requests . . .

4

163

unless the agency demonstrates reasonable progress in reducing its backlog of pending requests."
*Id.* § 552((a)(6)(C)(ii).  This change was specifically made in 1996 to narrow the circumstances
under which agencies could rely on *Open America* stays—and such a change is hardly consistent
with the notion that an agency does not have to actively justify its delay in response or
processing if it is doing anything more than not responding *at all*.

Possible reasons for such a stay include that the agency is "deluged" with requests "vastly
in excess of that anticipated by Congress," *Open Am.* at 616, or that the agency is making efforts
to, *e.g.*, reduce the number of pending requests or the size or complexity of other requests. *See,
e.g.*, *Elec. Privacy Info Ctr. v. FBI*, 933 F. Supp. 2d 42, 46 (D.D.C. 2013). But the agency has to
affirmatively meet this burden in order to be given more time. *See, e.g., Clemente v. FBI*, 71 F.
Supp. 3d 262, 266 (D.D.C. 2014) ("The FBI must make two showings before the court may grant
a stay of proceedings: (1) that exceptional circumstances exist, and (2) that the agency is
'exercising due diligence' in processing [the] request."). All of these cases take for granted that
an *Open America* stay is a conditional grant of more time contingent on the agency's affirmative
showings. Otherwise, the plaintiff may be entitled to a judgment on the pleadings. *See, e.g.*, *Nat'l
Sec. Archive v. SEC*, 770 F. Supp. 2d 6, 8-9 (D.D.C. 2011) (finding that plaintiff's allegation that
defendants violated FOIA by failing to disclose responsive records within the statutory period
was countered by the SEC's affirmative detailing of its exceptional circumstances and due
diligence warranting an *Open America* stay).

A further, practical reason the burden is on the agency to move for and demonstrate
eligibility for an *Open America* stay is that the plaintiff is in no position to know of, let alone
demonstrate to the Court, whether the agency is actually exercising due diligence or is truly
facing exceptional circumstances. For both judicial economy and basic fairness purposes, it is

only logical that the agency must either produce the requested records quickly or explain why it

cannot. This is effectively the same logic behind *Vaughn* indices, as *Vaughn v. Rosen*, 484 F.2d

820 (D.C. Cir. 1973), found that the Government could not simply assert broad and conclusive

exemptions, but instead had to defend the asserted exemptions in more detail because it was the

only party that could do so absent a special master. Indeed, the *Vaughn* court noted that "[t]he

procedural requirements we have spelled out herein may impose a substantial burden on an

agency seeking to avoid disclosure. Yet the current approach places the burden on the party

seeking disclosure, in clear contravention of the statutory mandate." *Id.* at 828. In FOIA

litigation, many burdens are on the Government for a reason. Here, it is consistent with the entire

FOIA framework to require that an agency either actively justify its delays or be vulnerable to

judgment on the pleadings.

For the foregoing reasons, AARC respectfully requests that the Court grant its Motion. If

FBI is unwilling to meet the burden of requesting an *Open America* stay, the Court should

presume that it cannot justify its implicit request for a 41-month stay of briefing and order FBI to

process all responsive records within twelve months. In order to meet this requirement, FBI

would need to process approximately 1700 pages/month, which is significantly less than the

2850 pages it has been ordered to process in *Seavey v. DOJ*, which Judge Kessler described as

"well within the range of what other courts have ordered," 266 F. Supp. 3d 241, 248 (D.D.C.

2017), after observing that "FBI has acknowledged that it has established a policy goal that 'no

requestor should have to wait more than three years before the FBI provides a complete

response' to a request." *Id.* Even allowing for the fact that FBI claims not to have received the

2012 request, FBI admits that it received notice of it in 2013 (Def.'s Ans. Pl.'s Compl., Dkt. #8-

1, ¶ 22 (filed Oct. 4, 2018)) and that it did not begin processing records until AARC filed this

case in 2018, which means that FBI has failed to complete its processing of this request for between three and eight years, and yet it maintains that it should not have to justify a further delay of over three *more* years simply because it has a "standard processing rate."

On the contrary, a survey of cases from this Circuit reveals that it is not in fact unusual for FBI to be required to process several thousand pages per month in cases involving a large volume of records. For example, in *Lardner v. FBI*, FBI processed approximately 5000 pages per month. J. Stat. Rep., Dkt. #111, at 1 n.1 (filed Aug. 1, 2012), No. 03-874 (D.D.C.). In *Electronic Privacy Information Center ("EPIC") v. FBI,* FBI complained that it was facing such exceptional circumstances that it could only review 1500 pages per month. 933 F. Supp. 2d at 48. Judge Kollar-Kotelly, relying on *Lardner*, nevertheless ordered FBI to process 25,000 potentially responsive pages in 5 months, finding "the fact that the FBI indicated on August 1, 2012, that it anticipated being able to process approximately 5,000 pages per month in another case demonstrates that the FBI is not facing such exceptional circumstances that it can only review 1,500 pages per month in response to EPIC's request."). *Id.* Again in *Clemente*, Judge Hogan ordered FBI to process 5000 pages per month after denying FBI's request for a stay. 71 F. Supp. 3d at 269. In *ACLU v. FBI*, FBI was ordered to process responsive records at the relatively sedate rate of 2500 pages per month. J. Stip. Re. Doc. Prod. Sched., Dkt. #55, at 1 (filed Apr. 13, 2011), *ACLU v. FBI*, No. 10-3759 (N.D. Cal.). Notably, all of these cases significantly post-dated FBI's 500 pages/month policy, which was implemented in 2010. These cases are but examples of court-ordered deviations from FBI's "standard processing rate," and they are provided here simply to illustrate that the Court need not assign any particular weight to FBI's claims that it

does not need to meet any particular burden beyond citing to its policy; these cases in fact show

why heightened standards are required, and why FBI is so desperate to avoid them.[2]

Date:   November 23, 2021

Respectfully submitted,

   /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

---

[2] Because the purpose of this Motion is simply to compel FBI to seek an *Open America* stay, AARC will not spend any more time attacking the processing rate in this context; that would defeat the purpose of the Motion. The fact that AARC can provide these examples—as well as many more—should be reason enough to require FBI to request a stay, and AARC is prepared in such a circumstance to vigorously refute any claims that the status quo is appropriate. Simply put, this Motion is not the proper vehicle for such a detailed argument; a motion for an *Open America* stay, in which FBI provides evidence justifying its entitlement to such a stay, is.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER, *Plaintiff*, v. DEPARTMENT OF JUSTICE, *Defendant*. | Civil Action No. 18-1868 (TNM) |

**DEFENDANT'S MOTION FOR AN EXTENSION TO FILE DEFENDANT'S OPPOSITION AND MODIFY BRIEFING SCHEDULE**

Pursuant to Rule 6(b)(1)(A) of the Federal Rules of Civil Procedure, Defendant Department of Justice ("Defendant" or "DOJ"), by and through undersigned counsel, respectfully moves for an extension of time, to and through January 28, 2022, to file its opposition to Plaintiff's motions and modify the briefing schedule. This motion is being filed three days prior to the December 23, 2021 deadline; however, as explained below, there is good cause to grant this motion. The grounds for this motion are set forth below:

1. Plaintiff brings this action under the Freedom of Information ("FOIA"), 5 U.S.C. § 552, seeking records relating to pre-1960 electronic surveillance activities. *See generally* Compl., ECF No. 1. As a result of a status conference, the Court issued an oral ruling requiring Plaintiff to file its motion disputing the DOJ's processing fees by November 11, 2021. *See* October 13, 2021 Minute Order. Plaintiff moved for an extension and filed two motions on November 23, 2021. *See* ECF Nos. 40, 41. Defendant's opposition to Plaintiff's motions is currently due on December 23, 2021. *See* November 12, 2021 Minute Order. Defendant now respectfully requests an extension of time, to and through January 28, 2022, to file its opposition to Plaintiff's motions. This is Defendant's first request.

2.       There is good cause for granting this motion.  *See, e.g, Mann v. Castiel*, 681 F.3d 368, 375 (D.C. Cir. 2012) (explaining that good cause simply "means a valid reason for delay"). Defendant requests an extension for the following reasons: (1) undersigned and agency counsel need additional time to research the issue and allegations in Plaintiff's motions and confer with the supervising attorneys about potential defenses; (2) the designated declarant needs additional time to prepare and complete the supporting declaration; (3) Defendant needs additional time to request, receive, and review the transcript of the Court's oral ruling on August 6, 2019, in which the Court heard and denied Plaintiff's oral motion to compel the Government to move for an Open America stay; and (4) Defendant requests additional time to prepare an appropriate response to Plaintiff's motions.

3.       The requested extension will impact the remainder of the briefing schedule.  Thus, in accordance with Local Civil Rule 7(m), undersigned counsel conferred with Plaintiff's counsel about extending Defendant's deadline to January 28, 2022 and modifying the remainder of the briefing schedule.  Plaintiff, through counsel, does not consent to the requested relief.  Specifically, on December 16, 2021, undersigned counsel reached out to Plaintiff's counsel for Plaintiff's position.  Plaintiff's counsel responded, "[n]o opposition as long as the processing of the records continues on the current schedule."  Undersigned counsel explained that the FBI has returned to processing, but Plaintiff's account has an outstanding balance in the amount of $22.50 and that the balance would need to be paid if processing is to continue beyond December.  Plaintiff's counsel stated his position is as follows: "Plaintiff opposes any delay in Defendant's response insofar as it will require Plaintiff to continue to pay for monthly releases in the intervening period, which Defendant has indicated would be the case if this motion is granted."

4.       Although, Plaintiff opposes this motion, Defendant does not believe that the

2

requested extension would unfairly prejudice Plaintiff because Plaintiff is indeed the one who has delayed the monthly releases in this matter and choose not to file the motion challenging the fees until approximately two years later after the initial deadline.  Also, Plaintiff recently requested an extension in November 2021 and Defendant graciously consented to the extension. Under the circumstances, and reasons provided above, allowing the Defendant additional time to respond to Plaintiff's motions and plan an appropriate defense is just.  Therefore, Defendant respectfully requests an extension and proposes the following modifications to the briefing schedule:

- Defendant will file its oppositions on or before January 28, 2022; and

- Plaintiff will file its replies on or before February 18, 2022.[1]

WHEREFORE, Defendant respectfully requests an extension of time, to and through January 28, 2022, to file it motion for summary judgment and modify the remainder of the briefing schedule to the dates specified above.  A proposed order is attached.

Dated: December 20, 2021     Respectfully submitted,

           MATTHEW M. GRAVES, D.C. Bar # 481052
           United States Attorney

           BRIAN P. HUDAK
           Acting Chief, Civil Division

           */s/ Stephanie R. Johnson*
           STEPHANIE R. JOHNSON
           D.C. Bar # 1632338
           Assistant United States Attorney
           Civil Division
           555 4th Street, N.W.
           Washington, D.C. 20530
           (202) 252-7874
           Stephanie.Johnson5@usdoj.gov
           *Attorneys for Defendant*

---

[1]  If Defendant's motion is granted, Plaintiff requested to file its response three weeks after the Defendant's January 28, 2022 deadline.

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER,

*Plaintiff*,

v.

DEPARTMENT OF JUSTICE,

*Defendant*.

Civil Action No. 18-1868 (TNM)

**DEFENDANT'S AMENDED MOTION FOR EXTENSION TO FILE DEFENDANT'S
OPPOSITION AND MODIFY BRIEFING SCHEDULE**

Pursuant to Rule 6(b)(1)(A) of the Federal Rules of Civil Procedure, Defendant Department

of Justice ("Defendant" or "DOJ"), by and through undersigned counsel, respectfully moves for

an extension of time, to and through January 21, 2022, to file its opposition to Plaintiff's motions

and modify the briefing schedule.   Defendant file this amended motion to revise Plaintiff's

position.   Pursuant to Local Civil Rule 7(m), undersigned counsel for Defendant conferred with

Plaintiff and Plaintiff, though counsel, stated "Plaintiff takes no position regarding the FBI's

request but defers to the Court's discretion in maintaining its calendar."   Also, Defendant

unfortunately, was unable to file this motion four days prior to the deadline; however, as explained

in further detail below, there is good cause to grant this motion.   The grounds for this motion are

set forth below:

1.       Plaintiff brings this action under the Freedom of Information ("FOIA"), 5 U.S.C. §

552, seeking records relating to pre-1960 electronic surveillance activities.   *See generally* Compl.,

ECF No. 1.   As a result of a status conference, the Court issued an oral ruling requiring Plaintiff

to file its motion disputing the DOJ's processing fees by November 11, 2021.   *See* October 13,

2021 Minute Order.   Plaintiff moved for an extension and filed two motions on November 23,

2021.  *See* ECF Nos. 40, 41.  Defendant's opposition to Plaintiff's motions is currently due today, January 14, 2022.  *See* December 21, 2021 Minute Order.  Defendant respectfully requests a week extension of time, to and through January 21, 2022, to file its opposition to Plaintiff's motions. This is Defendant's second request.

     2.     There is good cause for granting this motion.  *See, e.g, Mann v. Castiel*, 681 F.3d 368, 375 (D.C. Cir. 2012) (explaining that good cause simply "means a valid reason for delay"). Defendant needs additional time to secure the appropriate declaration to support its opposition to Plaintiff's motions.  Unfortunately, this morning undersigned counsel was informed by agency counsel that her supervisor needs additional time to review the proposed declaration.  Since the FBI's revised its current process for the 500-page review, the language in the proposed declaration needs to be carefully reviewed.  Agency counsel has reassured undersigned that this review can be done within a week.  Further, agency counsel stated that the recent snowstorms interfered with their schedules and ability to finalize the declaration.  Thus, Defendant graciously requests an extension of 7 days, to and through January 21, 2022, to file its opposition to Plaintiff's motions.

     3.     The requested extension will impact the remainder of the briefing schedule.  Thus, in accordance with Local Civil Rule 7(m), undersigned counsel conferred with Plaintiff's counsel about extending Defendant's deadline to January 21, 2022 and modifying the remainder of the briefing schedule.  Plaintiff, through counsel, stated "Plaintiff takes no position regarding the FBI's request but defers to the Court's discretion in maintaining its calendar."  Since, Plaintiff has no position, Defendant does not believe that the requested extension would unfairly prejudice Plaintiff.  Under the circumstances, and reasons provided above, Defendant requests an extension of 7 days and proposes the following modifications to the briefing schedule:

- Defendant will file its oppositions on or before January 21, 2022; and

- Plaintiff will file its replies on or before February 25, 2022.

WHEREFORE, Defendant respectfully requests an extension of time, to and through January 21, 2022, to file its opposition to Plaintiff's motion and modify the remainder of the briefing schedule to the dates specified above.  A proposed order is attached.

Dated: January 14, 2022                    Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar # 481052
United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

*/s/ Stephanie R. Johnson*
STEPHANIE R. JOHNSON
D.C. Bar # 1632338
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7874
Stephanie.Johnson5@usdoj.gov
*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER,

*Plaintiff,*

v.

DEPARTMENT OF JUSTICE,

*Defendant.*

Civ. A. No. 18-1868 (TNM)

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56(b) and Local Civil Rule 7(h), Defendants respectfully submit this statement of undisputed material facts.  The information herein is largely repeated from the declaration of Michael G. Seidel, who describes, for Plaintiff and the Court, the administrative history of Plaintiff's FOIA requests, describe the reasonable costs associated with processing Plaintiff's requests, and provide the Federal Bureau of Investigation ("FBI") justification for processing FOIA requests at a rate of 500 pages per month.  The declaration of Seidel, and accompanying attachments support the following statement:

1.      Beginning on February 4, 2019 and continuing through December 30, 2021, the FBI made twenty-two interim productions in response to Plaintiff's request, FOIA 1139342-001. Declaration of Michael G. Seidel ("Seidel Decl.") ¶ 17.  The FBI advised Plaintiff in each response the exemptions claimed, and of the duplication costs associated with each release.  *Id.*  The FBI further informed Plaintiff in each response to refer to letter dated November 9, 2018, *see* Ex. K, for information on the actions to be taken by the FBI in regard to Plaintiff's FOIA requests 1386188-000 and 1386440-000.  Seidel Decl. ¶ 17.

2.      As of January 1, 2022, there are approximately 22,211 pages remaining to be processed. *Id.* ¶ 18.  It should be noted that this is a rough estimate of pages, an exact number of pages remaining is difficult to determine due to the voluminous nature of the documents as well as the age and type of the documents. *Id.*  The FBI does not have a record of Plaintiff submitting the duplication fees for the twentieth, twenty-first, or twenty-second interim releases totaling $37.50. *Id.*

**I.    FBI's FOIPA PROCESSING RESOURCES, WORKLOAD, QUEUE STRUCTURE, AND INTERIM RELEASE POLICY**

3.      The FBI currently employs 237 Government Information Specialists ("GISs"), with support from 89 contractors, to process requests for FBI information under the FOIA and Privacy Acts and conduct classification and declassification reviews, inter alia. *Id.* ¶ 19.

4.      Operationally, the FBI has one of the largest and most complex FOIPA programs in the federal government receiving upwards of 40,200 pieces of annual correspondence[4] per Fiscal Year (FY) while reviewing an average of approximately one million pages for annual dissemination to the public. *Id.* ¶ 22.

5.      The FBI FOIPA Program has experienced sustained growth in the volume of incoming receipts and cases in litigation from FY 2015 to present. *Id.* ¶ 2.[3]  Notably, in FY 2018, the Program received an all-time high of 32,577 requests for records from the public, representative of a 47% increase in requests from FY 2016.  This historic incoming volume trend of above 30,000 requests per annum continued in FY 2019 and into the pandemic phase. *Id.*  Combined with the rise in FOIPA litigation case growth of 114%[5] from FY 2015 (181 pending litigations) to FY 2021

---

4       Includes the average for total of incoming receipts, appeals, other agency referrals and consultations, and additional requester correspondence from FY 2018 to FY 2021.

5       In FY2021, the FBI received 136 new FOIPA lawsuits (or approximately two new cases

(388 pending litigations), RIDS's finite resources are continually challenged with this elevated request volume and complexity of requests.  *Id.*

## II.     THE DUPLICATION FEES CHARGED BY FBI ARE REASONABLE AND THE DIRECT COSTS ARE IN EXCESS OF $15.00 PER CD.

A. Department of Justice ("Department") FOIA Fee Regulations

6.      The Department of Justice ("Department") has promulgated regulations providing for the assessment of fees with regard to the Freedom of Information Act.  *See* 28 C.F.R. §16.10, et seq.  These regulations provide for charging fees for the direct costs an agency incurs in responding to FOIA requests, including the direct costs associated with the salary of an employee performing the work.  *Id.* at §16.10 (b)(2).  Further, the regulations provide for charging for duplication costs in reproducing copies of records.  *Id.* at §16.10 (b)(3).

7.      Under these regulations, the FBI determined that Plaintiff is a general (all other) requester subject to duplication fees and the direct costs associated with the duplication of records responsive to his FOIA request.  Seidel Decl. ¶ 29.

8.      Further, the regulations provide for charging for duplication costs in reproducing copies of records.  *Id.* at §16.10 (b)(3).  Under these regulations, the FBI determined that Plaintiff is a general (all other) requester as described above, subject to duplication fees and the direct costs associated with the duplication of records responsive to his FOIA request.  Per the DOJ regulations, for copies produced on tapes, disks, or other media, an agency "...shall charge the direct costs of producing the copy, including operator time.  Where paper documents must be scanned in order to comply with a requester's preference to receive the records in electronic format, the requester shall pay the direct costs associated with scanning those materials."  *Id.* at §16.10 (c)(2).

───────────────

every week).

9.      The FBI advised Plaintiff that in accordance with his request for records to be re-produced on CD, the fee would be $15.00 per CD.  Seidel Decl. ¶ 30; *see also* Ex. L.

B.  The FBI's FOIA Document Processing System

10.      With its dual law enforcement and national security missions, the vast majority of the FBI's work is performed on classified systems.  Seidel Decl. ¶ 32.

11.      The primary records system the FBI searches in response to most FOIPA requests – the Central Records System – is accessed by the FBI's SENTINEL case management system, which is located on the FBI's SECRET-level classified enclave.  *Id.*

12.      Accordingly, the FBI's FOIA Document Processing System (FDPS), where responsive records are processed under FOIPA, is located on the classified enclave.  *Id.* Given the significant volume of classified and sensitive information in FBI records, operating in a classified space is both necessary, efficient, and comports with security protocols.  There is no unclassified system for processing of FBI FOIPA requests.  *Id.*

13.      Additionally, the complex and often classified nature of FBI records requires information equity coordination between RIDS and internal FBI subject matter experts as well as by external agency stakeholders via classified networks.  *Id.*

14.      Considering these facts, it is reasonable to process FBI records responsive to FOIPA requests on the secret enclave where FBI investigative and national security records are located because it promotes efficiency, consistency, reduces the risk of compromise, is security compliant, and is a better use of the FBI's limited resources.  Seidel Decl. ¶ 33.

4

C. The FBI's FOIPA Security Process & Direct Cost Assessment

15.     The FBI constantly seeks ways to improve efficiency, especially given the sharp rise in FOIPA requests and FOIPA litigation, without a commensurate increase in resources.[6] *Id.* ¶ 34.

16.     The FBI has made enhancements to FDPS to improve efficiency; however, this has not resulted in a reduction of direct cost below $15.00. *Id.* As before, the direct costs involved in preparing a CD for release, remain in excess of the $15.00 minimal charge. *Id.*

17.     The "Integrity" program is no longer in use. *Id.* ¶ 35. As a result of FDPS technical enhancements, in its place but performing the same function, the FBI leverages Optical Character Recognition ("OCR") capability. *Id.* This OCR capability performs required pre-release security scans based on designated lists of "exempted terms." *Id.* These scans are referred to as "Exempt Term Searches" or "ETS." *Id.* The FOIA Analyst no longer must export or convert the documents prior to running ETS, resulting in greater business process efficiency. *Id.*

18.     Despite this improvement and reduction of the number of steps required outside of FDPS, the FOIA Analyst must still perform certain necessary tasks before releasing a CD to the public. *Id.* ¶ 36. While the FBI no longer utilizes "Integrity" as the security application for FOIPA processing, the remaining steps require human analysis and review time. *Id.* Those manual review steps are still applicable albeit slightly modified using the ETS function. *Id.*

19.     The analysts responsible for conducting pre-release ETS scans and reviews range in grade from GS-11 to GS-13. *Id.* ¶ 37. Based on the 2021 Salary Table issued by the Office of

---

[6]     The FBI is currently inundated with an extraordinary number of FOIPA requests. In recent years the FBI has experienced a spike in request submitted to the agency. In Fiscal Year ("FY") 2021, the FBI received 29,828 FOIPA requests (a 34% increase over intake from five years ago), when in FY 2016, intake was 22,220 requests. In FY 2021, the FBI resolved 29,429 FOIPA requests and reviewed over 868,000 pages of records in response to FOIPA requests.

Personnel Management for the Washington D.C. locality (in which RIDS is located), the minimum hourly salary for an analyst running ETS is $36.03 per hour (GS-11, Step 1) and the maximum hourly salary for an analyst running ETS is $66.76 per hour (GS-13/Step 10).[7]   *See* *https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/#url=2021*.   *Id.* ¶ 37.   It generally takes approximately 46 minutes to set up and run the required ETS scan for a release of 500 pages.   *Id.*   Therefore, with about 46 minutes to set up and run ETS, the direct cost of duplication is

- The minimum operator cost for the ETS process alone is $26.81.

- The maximum operator cost for the ETS process alone is $49.69.

- The average operator cost for the ETS process alone is $38.25.

*Id.*   While the amount of time it takes to set up and run ETS can vary with the complexity and amount of pages, the associated impact on operator time and costs are marginal.   *Id.* Systematically, operator time would only increase with over 500 pages and decrease with less than.   *Id.* Moreover, the costs listed above do not include the added time and costs associated with re-running the scan where corrections are required as a result of an initial scan identifying the need for further review. *Id.*

20.      Prior to running ETS, work items proposed for release are "sealed" by an Expert or Supervisor who has reviewed and approved the Analyst's work.   *Id.* ¶ 38.   This changes the translucent redaction blocks on each page to solid blocks for the release of segregable information. *Id.*

---

7 FY22 salary adjustments are now available at https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/#url=2022, and result in a slightly increased cost over FY21.

21.     As part of the ETS process, an analyst must run multiple ETS searches against each "sealed" work item in the interim release using designated programmatic exempt terms and one or more case-specific exempt terms.  *Id.*  The analyst creates the case specific exempt term list as the case is processed, but the exempt nature of a term often depends on the context in which it appears. ETS assists by flagging designated terms for pre-release review so that information can be exported from the classified FDPS enclave to a CD suitable for public dissemination; however, human analysis is required to manually review any flagged "hits" to determine if the information was proposed for release in error, or in context the information should be released under FOIPA. *Id.*

22.      If the analyst determines the term and associated information to be exempt and proposed for release in error, the analyst must have an Expert or Supervisory employee "unseal" the work item so corrections can be made in advance of public release.  *Id.*  Once corrected by the analyst and verified by the Expert or Supervisor, the Expert or Supervisor must reseal the work item before the analyst runs the scan again.  *Id.*

23.     As a quality control measure, FOIPA analysts do not have the ability in FDPS to seal and unseal their own work.  *Id.* This process is repeated until no exempt information is released.  *Id.* This is a time consuming and labor-intensive process, but absolutely necessary to insure that no classified or exempt information is inadvertently released and that all segregable non-exempt information is released under FOIPA.  *Id.*

24.     The direct costs of running ETS and preparing CDs for public dissemination by the FBI still exceed $15.00.  *Id.* ¶ 39.  While the improvements discussed above which eliminated some process steps, when pay rates and average operator time to perform the current steps are calculated, the direct cost still remains above $15.00 and is therefore reasonable. *Id.*

25.     The factors outlined above work together to form the basis of the FBI's interim

release policy and the FBI's $15.00 per CD fee, both designed to equitably provide the largest

number of requesters the most amount of information possible on a rolling monthly basis at a

reasonable cost.  *Id.* ¶ 40.


Dated: January 21, 2022                        Respectfully submitted,

                                               MATTHEW M. GRAVES, D.C. Bar # 481052
                                               United States Attorney

                                               BRIAN P. HUDAK
                                               Acting Chief, Civil Division

                                               */s/ Stephanie R. Johnson*
                                               STEPHANIE R. JOHNSON
                                               D.C. Bar # 1632338
                                               Assistant United States Attorney
                                               Civil Division
                                               555 4th Street, N.W.
                                               Washington, D.C. 20530
                                               (202) 252-7874
                                               Stephanie.Johnson5@usdoj.gov

                                               *Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER,

*Plaintiff,*

v.

DEPARTMENT OF JUSTICE,

*Defendant.*

Civ. A. No. 18-1868 (TNM)

### DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 7(h), Defendant, the Department of Justice ("Department") submits this response to Plaintiff's Statement of Undisputed Material Facts.

1.      On 7 September 2012, AARC submitted to the Federal Bureau of Investigation ("FBI") a Freedom of Information Act ("FOIA") request for copies of historical indices of electronic surveillance activities.  (Compl., Dkt. #1, ¶¶ 17-19 (filed Aug. 8, 2018).)

**DEFENDANT'S RESPONSE:** Undisputed.

2.      After AARC commenced this litigation, FBI began processing responsive records and began releasing records at a rate of approximately 500 pages/month, which it releases by mailing a CD containing responsive records to AARC each month.  (J. Stat. Rep., Def.'s Mot. Modify Sched. for Stat. Reps., & Pl.'s Mot. Set Briefing Sched., Dkt. #17, at 3 (filed June 5, 2019).)

**DEFENDANT'S RESPONSE:** Undisputed.

3.      FBI insisted that AARC was required to pay $15 per CD for these releases and that it would stop processing records if AARC ceased payment.  (*Id.* at 2.).

**DEFENDANT'S RESPONSE:** Undisputed.

4.      On 9 June 2017, David Hardy authored and signed a sworn declaration describing the Integrity system used by FBI.  3d Hardy Decl., Dkt. #34-2, ¶ 13 (filed June 9, 2017), *Nat'l Sec. Counselors v. Dep't of Just.*, No. 13-556 (D.D.C.).

**DEFENDANT'S RESPONSE:** Undisputed.

5.      All records responsive to a request must be placed in the FOIA Document Processing System ("FDPS"), which is on a classified network, regardless of whether or not the records are classified.  *Id.*

**DEFENDANT'S RESPONSE:** Undisputed.

6.      Then, once a record has been processed for release in the FDPS, an employee must export each section of a document as a multi-page TIF file to his local computer drive.  *Id.*

**DEFENDANT'S RESPONSE:** Disputed as this step is no longer performed.

7.      Then the employee must manually rename each TIF file and save it to a common shared drive.  *Id.*

**DEFENDANT'S RESPONSE:** Disputed as this step is no longer performed.

8.      Then the employee must convert each multi-page TIF file into a series of single page text files because Integrity cannot read TIF files.  *Id.*

**DEFENDANT'S RESPONSE:** Disputed as this step is no longer performed.

9.      The employee cannot convert TIF files to text files on his computer and must walk to a separate computer to do the conversion.  *Id.*

**DEFENDANT'S RESPONSE:** Disputed as this step is no longer performed.

10.      The employee must then copy the newly created text files from the shared drive to his local computer drive.  *Id.*

**DEFENDANT'S RESPONSE:** Disputed as this step is no longer performed.

11.     Then the employee must "reflect[] upon the processed records" and create keywords for the Integrity system to search for.  *Id.* ¶ 8.

**DEFENDANT'S RESPONSE:** Disputed. The Integrity system is no longer in use.

12.     Then the employee runs the Integrity scan using the custom keywords he created against each single-page text document.  *Id.* ¶ 9.

**DEFENDANT'S RESPONSE:** Disputed. The Integrity system is no longer in use.

13.     Then the employee must manually review the automated scan results.  *Id.*

**DEFENDANT'S RESPONSE:** Undisputed to the extent that the employees still perform manual reviews.

14.     Then the employee must run a second Integrity scan using general keywords against each single-page text document.  *Id.*

**DEFENDANT'S RESPONSE:** Disputed. The Integrity system is no longer in use.

15.     Then the employee must determine if each keyword located by an Integrity scan is actually an entire word (e.g. "DEA" and not "death") and decide if it should be redacted.  *Id.* ¶ 10.

**DEFENDANT'S RESPONSE:** Disputed. The Integrity system is no longer in use.

16.     Then, if the employee determines that a word must be redacted, he restarts the Integrity scan from the beginning again.  *Id.*

**DEFENDANT'S RESPONSE:** Disputed. The Integrity system is no longer in use.

17.     Then the employee returns to the FDPS and exports the sections directly to an unclassified computer as PDF files, which are then burned to a CD.  *Id.* ¶ 11.

**DEFENDANT'S RESPONSE:** Undisputed.

18.    Only GS-11 through GS-13 employees can perform any of the above-described work.  *Id.* ¶ 14.

**DEFENDANT'S RESPONSE:** Undisputed.

19.    Each employee must personally be actively involved with the above-described process for 50 minutes per 500 pages.  *Id.* ¶ 13.

**DEFENDANT'S RESPONSE:** Disputed. It generally takes approximately 46 minutes to set up and run the ETS scan for 500 pages.

Dated: January 21, 2022                 Respectfully submitted,

                                        MATTHEW M. GRAVES, D.C. Bar # 481052
                                        United States Attorney

                                        BRIAN P. HUDAK
                                        Acting Chief, Civil Division

                                        */s/ Stephanie R. Johnson*
                                        STEPHANIE R. JOHNSON
                                        D.C. Bar # 1632338
                                        Assistant United States Attorney
                                        Civil Division
                                        555 4th Street, N.W.
                                        Washington, D.C. 20530
                                        (202) 252-7874
                                        Stephanie.Johnson5@usdoj.gov

                                        *Attorneys for Defendant*

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

*Plaintiff*,

v.

Civil Action No. 18-1868 (TNM)

DEPARTMENT OF JUSTICE,

*Defendant*.

## DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1)   I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), Federal Bureau of Investigation ("FBI"), Winchester, Virginia.  I joined the FBI in September 2011, and prior to my current position, I was the Assistant Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS Litigation Support Unit from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of the General Counsel, Freedom of Information Act ("FOIA") Litigation Unit, from September 2011 to November 2012.  In those capacities, I had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act ("FOIPA") litigation cases nationwide.  Prior to my joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration ("DEA") from September 2006 to September 2011, where among myriad legal responsibilities, I advised on FOIPA matters and served as agency counsel representing the DEA in FOIPA suits nationwide.  I also served as a U.S. Army Judge Advocate General's Corps Officer in various assignments from 1994 to September 2006 culminating in my assignment as

1

186

Chief, General Litigation Branch, U.S. Army Litigation Division where I oversaw FOIPA litigation for the U.S. Army. I am an attorney licensed in the State of Ohio and the District of Columbia.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 237 FBI employees, supported by approximately 89 contractors, who staff a total of ten (10) Federal Bureau of Investigation Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based on my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552 and the Privacy Act of 1974, 5 U.S.C. § 552a ("PA"). Specifically, I am familiar with the FBI's handling of Plaintiff's FOIA requests.

(4)    The FBI submits this declaration in response to Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion"), Plaintiff's Motion to Compel Defendant to Seek an Open America Stay ("Plaintiff's Motion to Compel"), and Plaintiff's Memorandum of Points and Authorities in Support of Its Motion for Partial Summary Judgment ("Memorandum") in which Plaintiff alleges the FBI is charging unreasonable fees to process the requests at issue. (ECF No.

2

187

40.) This declaration is filed in support of Defendant's Opposition and to provide Plaintiff and the Court with a description of the administrative history of Plaintiff's requests, to describe the FBI's justification for processing FOIA requests at a rate of 500 pages per month, and the reasonable costs associated with processing Plaintiff's requests.

## I. ADMINISTRATIVE HISTORY OF PLAINTIFF'S FOIA REQUESTS

FOIPA REQUEST NUMBER 1139342-001(PLAINTIFF'S FIRST CAUSE OF ACTION)

(5)   Plaintiff filed the instant Complaint on August 8, 2018 advising it submitted a follow-up FOIA request on September 7, 2012 relating to subject matter previously sought in response to its prior FOIPA Request No. 1139342-000, from 2009.[1]   On August 23, 2018, in an effort to locate the alleged September 7, 2012 request, the FBI conducted a search of its FOIA Document Processing System ("FDPS").   The FBI located Plaintiff's prior FOIA request dated

---

[1]   By letter dated October 7, 2009, Plaintiff submitted a FOIA request to the FBI seeking copies of the "seven boxes of ELSUR indices of pre-1960 electronic surveillances" as identified in *Lardner v. FBI, et al.*   Plaintiff requested to be categorized as a representative of the news media for fee purposes and also sought a public interest fee waiver.   The FBI assigned the October 7, 2009 request FOIA Request No. 1139342-000 on November 4, 2009 and conducted a search for the requested information.   On November 5, 2009, the FBI advised Plaintiff that its request for a public interest fee waiver was denied, and that with regard to its request for media status, Plaintiff did not provide sufficient information to qualify.   The FBI advised Plaintiff of its right to appeal the FBI's determination to the Director, Department of Justice ("DOJ"), Office of Information Policy ("OIP") within sixty days of the letter.   As acknowledged in the instant Complaint, Plaintiff failed to appeal the FBI's denials.   By letter dated November 13, 2009, the FBI advised Plaintiff it located approximately 18,000 pages of potentially responsive documents and requested that Plaintiff advise in writing within sixty days of his willingness to pay $15.00 per CD for the voluminous records.   The FBI informed Plaintiff that if a response was not received in sixty days, the request would be closed.   By letter dated February 9, 2011, the FBI again contacted the Plaintiff, advising that if all 18,000 pages were processed, Plaintiff would owe $540.00 (36 CD's at $15.00 each).   The FBI advised Plaintiff that if it did not receive written confirmation of Plaintiff's willingness to pay, or if Plaintiff did not contact the FBI to reduce the scope of the request, it would close the request within thirty days.   No response was received and the FBI closed the request on March 22, 2011.   Plaintiff did not file an appeal with regard to the FBI's determinations and therefore failed to exhaust the administrative remedies available to him for FOIA 1139342-000. (ECF No. 1, ¶¶ 13-14.)

3

October 7, 2009, which was closed on March 22, 2011 due to Plaintiff's failure to respond with a commitment to pay estimated fees. The FBI reviewed the actions taken and correspondence located in FDPS for FOIPA 1139342-000, and located Plaintiff's April 10, 2013, which attached a copy of Plaintiff's September 7, 2012 request. The 2013 letter and enclosure were inadvertently scanned into closed 2009 FOIPA Request Number 1139342-000 instead of opened as a new request, and the FBI took no further action at the time it was received.

(6)     In Plaintiff's April 10, 2013, FOIA submission, Plaintiff advised it was resubmitting its September 7, 2012, FOIA request due to FBI's refusal to accept delivery of its earlier request. Plaintiff requested the identities of all members of Mr. Hardy's staff who were aware of the denial of Plaintiff's rights, and request Mr. Hardy take disciplinary action against them. Plaintiff advised its current request should be entered into the processing queue in accordance with the priority it would have received had the FBI accepted delivery of it in September 2012. The enclosed September 7, 2012 FOIA request sought copies of the ELSUR indices of pre-1960 electronic surveillance identified in *Lardner v FBI, et al*, 03-0874 (DDC 2003). Plaintiff stated it was recently advised by the FBI some of the material in the seven boxes of ELSUR indices concerned post-1960 surveillance. In addition to both pre-1960 and post-1960 ELSUR indices, Plaintiff requested all tapes, transcripts, logs and other materials related to said surveillance, including surveillance applications, affidavits, testimony, authorizations, and warrants. Plaintiff requested a waiver of all search and copying fees as the requested records are of public interest. Additionally, Plaintiff requested news media fee category status. Pending the FBI's determination on whether to grant or deny a fee waiver, Plaintiff committed to the payment of up to $200 in copying fees. Finally, Plaintiff requested that he receive copies of records to be provided to him in a word searchable .pdf format. **(Ex. A.)**

4

(7)    By letter dated September 13, 2018, the FBI responded to Plaintiff's Complaint.  The FBI advised it had no record of receiving the September 7, 2012 FOIA prior to its attachment to the April 10, 2013 letter, nor did it have any record of any denial of acceptance of United States Postal Service Certified Mail from Plaintiff.  The FBI informed Plaintiff that based on the information provided in the Complaint, it had conducted a search of FDPS and located the April 10, 2013 letter that included an attached copy of the alleged September 2012 request, which had been placed into the closed records for FOIPA Request Number 1139342-000 without any further action.  As a result, the FBI advised it would now open FOIPA Request Number 1139342-001 to handle the processing of Plaintiff's request for the ELSUR indices.  Further, the FBI advised Plaintiff the request for a public interest fee waiver was reviewed and denied because Plaintiff failed to demonstrate the requested information was in the public interest and likely to contribute "significantly" to public understanding of the operations and archives of the government.  *See* 28 C.F.R. § 16.10(k)(i).  The FBI determined disclosure of the requested records would not provide meaningful information about government operations or activities likely to contribute to an increased public understanding of those operations or activities.  *See* 28 C.F.R. § 16.10(k)(2)(ii).  The FBI advised that the public's understanding of the subject of Plaintiff's FOIA request would not be enhanced by the disclosure to a significant extent.  *See* 28 C.F.R. § 16-10(k)(2)(iv).  As a result of Plaintiff's public interest fee waiver being denied, the FBI determined that Plaintiff would be charged applicable duplication fees as a general (all other) requester.  The FBI informed Plaintiff that based on Plaintiff's agreement to pay up to $200 in fees, it would begin processing responsive records up to that amount.  The FBI advised it had determined the portion of Plaintiff's request seeking: "all tapes, transcripts, logs, and other materials related to said surveillance, including surveillance applications, affidavits, testimony,

authorizations and warrants," was not a proper FOIA request as it was too vague and would require an unduly burdensome search demanding extensive FBI resources. The FOIA provides for access to Government records where the records sought are "reasonably described" (*See* Title 5, United States Code, Section 552(a)(3)(A)). Furthermore, the FBI advised the FOIA does not require federal agencies to answer inquires, create records, conduct research, or draw conclusions concerning queried data. Rather, the FOIA requires agencies to provide access to reasonably described, nonexempt records. The broad range of these additional requested records would require the FBI to conduct expansive, burdensome, multi-level research concerning approximately 18,000 pages of records to locate records responsive to this portion of Plaintiff's request and was thus not reasonably described. The FBI advised this portion of Plaintiff's request also was not a proper FOIA request as it would not allow the FBI to conduct a search for responsive records with a reasonable amount of effort. *See* 28 C.F.R. § 16.3(b). In addition, Plaintiff was advised although in litigation, Plaintiff could appeal the FBI determinations by writing to OIP within ninety (90) days of the date of the letter. Finally, the FBI advised Plaintiff could seek dispute resolution services by contacting the Office of Government Information Services ("OGIS"). **(Ex. B.)**

FOIPA REQUEST NUMBERS 1386188-000 & 1386440-000
(PLAINTIFF'S SECOND & THIRD CAUSE OF ACTION)

(8)     By electronic FOIA ("eFOIA") dated October 2, 2017, Plaintiff submitted a FOIA request to the FBI, this time seeking records pertaining to "all information about the processing of their previous FOIPA Request No. 1139342-000." **(Ex. C.)**

(9)     By letter dated October 12, 2017, the FBI acknowledged receipt of Plaintiff's FOIA request, and notified Plaintiff it had assigned his request FBI FOIPA Request Number 1386188-000. The FBI also informed Plaintiff of the following: Plaintiff submitted his request via the FBI's

6

eFOIPA system, the FBI determined it was compliant with the eFOIPA terms of service, and future correspondence about the request would be provided electronically; and for the purpose of assessing any fees, the FBI determined as a general (all other) requester, Plaintiff would be charged applicable search and duplication fees. Additionally, the FBI informed Plaintiff he could check the status of his request and/or contact the FBI with any questions at www.fbi.gov/foia. Furthermore, Plaintiff could appeal the FBI's response to the DOJ, OIP within ninety (90) days of its letter, contact the FBI's public liaison, and or seek dispute resolution services by contacting the OGIS. **(Ex. D.)**

(10)    By eFOIA dated October 2, 2017, Plaintiff submitted a FOIA request to the FBI seeking records pertaining to "all information about the aforementioned sequence of events and all information about any actions FBI took in response to Mr. Lesar's 10 April 2013 letter." **(Ex. E.)**

(11)    By letter dated October 10, 2017, the FBI informed Plaintiff it conducted a search of the places reasonably expected to have records; however, it was unable to identify law enforcement and/or administrative records responsive to Plaintiff's request. The FBI also supplied an FBI FOIPA Addendum with additional explanations as to its standard responses to FOIPA requests and informed Plaintiff he could seek additional information regarding the FBI's determinations by visiting www.fbi.gov/foia. Lastly, the FBI stated Plaintiff could appeal the FBI's response to the DOJ, OIP within ninety (90) days of its letter, contact the FBI's public liaison, and or seek dispute resolution services by contacting the OGIS. **(Ex. F.)**

(12)    By letter dated October 13, 2017, the FBI informed Plaintiff it had sent the letter dated October 10, 2017, in error. The FBI acknowledged receipt of Plaintiff's FOIA request, and notified Plaintiff it had assigned his request FBI FOIPA Request Number 1386440-000. The FBI

also informed Plaintiff of the following: Plaintiff submitted his request via the FBI's eFOIPA system, the FBI determined it was compliant with the eFOIPA terms of service, and future correspondence about the request would be provided electronically; and for the purpose of assessing any fees, the FBI determined as a general (all other) requester, Plaintiff would be charged applicable search and duplication fees. Additionally, the FBI informed Plaintiff he could check the status of his request and/or contact the FBI with any questions at www.fbi.gov/foia. Furthermore, Plaintiff could appeal the FBI's response to the DOJ, OIP within ninety (90) days of its letter, contact the FBI's public liaison, and or seek dispute resolution services by contacting the OGIS. **(Ex. G.)**

(13)   By letter dated November 8, 2017, Plaintiff submitted an appeal to DOJ, OIP challenging the FBI's adequacy of search. **(Ex. H.)**

(14)   By letter dated October 11, 2017, OIP acknowledged receipt of Plaintiff's appeal and informed Plaintiff OIP assigned appeal number DOJ-AP02018-000176 to his appeal. **(Ex. I.)**

(15)   By letter dated November 15, 2017, OIP informed Plaintiff that the FBI's no records response letter dated October 14, 2017 was sent in error and the FBI was still currently processing Plaintiff's request and there existed no adverse determination for OIP to consider on appeal, and OIP was closing the appeal. **(Ex. J.)**

(16)   By letter dated November 9, 2018, the FBI made its final release of records responsive to Plaintiff's FOIPA request Numbers 1386188-000 & 1386440-000. The FBI advised Plaintiff it reviewed 32 pages of responsive material and was releasing 32 pages with certain information withheld in part pursuant to FOIA Exemptions (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E). The FBI advised the processed records included Bates number range 18-cv-01868-CN-1 through 18-cv-01868-CN-32. The FBI further advised that this release was being provided at no charge.

8

Plaintiff was advised that as to the "Second Cause for Action" the FBI has completed processing of FOIPA request number 1386188-000, which sought: "all information about the processing of their FOIA Request No. 1139342-000." The records processed included processed copies of FDPS case notes and correspondence concerning FOIPA 1139342-000, and FOIPA 1149636-000. As to the "Third Cause of Action" the FBI advised it had completed processing of FOIPA Request Number 1386440-000, seeking: "all information about the aforementioned sequence of events and all information about any actions FBI took in response to Mr. Lesar's April 10, 2013 letter." The FBI explained that because it originally uploaded the April 10, 2013 FOIA request into FOIPA Request Number 1139342-000 with no further action, the only responsive records in the FBI's possession were already released to Plaintiff in response to FOIA 1386188-000 as detailed above. **(Ex. K.)**

THE FBI'S INTERIM RELEASES IN RESPONSE TO FOIPA 1139342-001

(17)    Beginning on February 4, 2019 and continuing through December 30, 2021, the FBI made twenty-two interim productions in response to Plaintiff's request, FOIA 1139342-001. The FBI advised Plaintiff in each response the exemptions claimed, and of the duplication costs associated with each release. The FBI further informed Plaintiff in each response to refer to letter dated November, 9, 2018,[2] for information on the actions to be taken by the FBI in regard to Plaintiff's FOIA requests 1386188-000 and 1386440-000. **(Ex. L. through Ex. AL.)**

---

[2] **(Ex. K)**

| Interim No. & Date of Production | Pages Reviewed | Pages Released | Bates Page Range | Associated Fees | |
|---|---|---|---|---|---|
| | | | | Fees Charged for Interim Production | Fees Paid |
| First Interim 02/04/2019 | 540 | 540 | 1-540 | $10.00[3] | |
| Second Interim 02/28/2019 | 513 | 513 | 541-1053 | $15.00 | |
| Third Interim 04/01/2019 | 513 | 513 | 1054-1566 | $15.00 | $40.00 (submitted on 04/18/2019) |
| Fourth Interim 05/01/2019 | 508 | 508 | 1567-2074 | $15.00 | $15.00 (submitted on 05/29/2019) |
| Fifth Interim 06/03/2019 | 509 | 509 | 2075-2583 | $15.00 | $15.00 (submitted on 06/11/2019) |
| Sixth Interim 07/01/2019 | 509 | 509 | 2584-3092 | $15.00 | |
| Seventh Interim 08/01/2019 | 502 | 502 | 3093-3594 | $15.00 | |
| Eight Interim 09/03/2019 | 510 | 510 | 3595-4104 | $15.00 | $45.00 (submitted on 03/09/2020)[4] |
| Ninth Interim 05/19/2020 | 505 | 505 | 4105-4609 | $15.00 | $15.00 (submitted on 04/28/2020) |
| Tenth Interim 06/30/2020 | 304[5] | 304 | 4610-4913 | $15.00 | $15.00 (submitted on 06/29/2020) |
| Eleventh Interim 07/30/2020 | 521 | 521 | 4914-5434 | $15.00 | $15.00 (submitted on 07/28/2020) |
| Twelfth Interim 08/31/2020 | 506 | 506 | 5435-5940 | $15.00 | $15.00 (submitted on 08/28/2020) |
| Thirteenth Interim 09/30/2020 | 524 | 524 | 5941-6464 | $15.00 | $15.00 (submitted on 09/28/2020) |

---

[3]     The FBI informed Plaintiff that pursuant to new FOIA regulations effective on May 4, 2015, the duplication cost for paper releases was reduced from $0.10 to $0.05 per page. The duplication cost of CDs remains at $15.00 per CD. Lastly, the FBI further informed Plaintiff that he was entitled to the first 100 pages free of charge, which he would receive the cost equivalent ($5.00) as a credit. As a result, Plaintiff was only charged $10.00 for his first interim release.

[4]     On September 9, 2019, Plaintiff filed an unopposed motion for an extension of time. On September 10, 2019, it was ordered that the case would be stayed through March 9, 2020. (ECF No. 21)

[5]     Whereas the FBI reviewed less than 500 pages as part of their standard interim release policy, the FBI advised Plaintiff that RIDS was operating at reduced staffing levels amidst the ongoing COVID-19 national emergency and this release represented available work product that could be released to the Plaintiff under the unprecedented circumstances.

| | | | | | |
|---|---|---|---|---|---|
| Fourteenth Interim 10/30/2020[6] | 510 | 510 | 6465-6974 | $15.00 | $15.00 (submitted on 10/28/2020) |
| Fifteenth Interim 11/24/2020 | 507 | 507 | 6975-7481 | $15.00 | $15.00 (submitted on 11/27/2020) |
| Sixteenth Interim 12/31/2020 | 518 | 518 | 7772-8289 | $15.00 | $15.00 (submitted on 12/24/2020) |
| Seventeenth Interim 01/29/2021 | 256 | 256 | 8290-8545 | $15.00 | $15.00 (submitted on 01/28/2021) |
| Eighteenth Interim 02/26/2021 | 254 | 254 | 8546-8799 | $15.00 | |
| Nineteenth Interim 03/30/2021[7] | 252 | 252 | 8800-9051 | $15.00 | |
| Twentieth Interim 10/05/2021 | 250 | 250 | 9052-9301 | $7.50[8] | |
| Twenty-first Interim 11/30/2021 | 542 | 542 | 9302-9843 | $15.00 | |
| Twenty-second Interim 12/30/2021 | 508 | 508 | 9844-10476 | $15.00 | |

---

[6]     By email dated October 28, 2020, the FBI provide to Plaintiff, in an attempt to narrow, the estimated total number of responsive pages remaining, listed the thirty different remaining Field Offices, as well as the approximate pages for each Field Office. On October 30, 2020, the Plaintiff responded via email with a prioritized list of Field Offices the Plaintiff would like to receive first. The FBI has agreed to this prioritization in an attempt to cooperatively work with Plaintiff. However, this does not lessen the burden of the amount records that remain to be processed.

[7]     On April 14, 2021, FBI halted production in response to Plaintiff informing the Defendant that Plaintiff had not paid the FBI the processing fee since February 24, 2021 and would not remit payment if the FBI continued to process at a 50% percent rate. (ECF No. 37.) By email dated September 7, 2021, the FBI, while not conceding the applicability of the assessed fees and only in this litigation, sent Plaintiff's counsel a modified fee adjustment, in an attempt to cooperatively work with Plaintiff and ensure production in this case could proceed. (ECF No. 38.)

[8]     The adjusted fees were clarified as following:
Releases      Pages      Fees
6/30/20       304 pp     Remitted $15.00
1/29/21       265 pp     Remitted $15.00
2/26/21       254 pp     *applied partial credit from June release payment
3/30/21       252 pp     *applied partial credit from January release payment
10/05/21      250 pp     Owe $7.50 but under threshold to bill, therefore, carryover with next release

11

CURRENT STATUS OF PROCESSING FOR FOIPA 1139342-001

(18)   As of January 1, 2022, there are approximately 22,211 pages remaining to be processed.  This is a rough estimate, an exact number of pages remaining is difficult to determine due to the voluminous nature of the documents as well as the age and type of the documents.   The FBI does not have a record of Plaintiff submitting the duplication fees for the twentieth, twenty-first, or twenty-second interim releases totaling $37.50.

## II.   FBI's FOIPA PROCESSING RESOURCES, WORKLOAD, QUEUE STRUCTURE, AND INTERIM RELEASE POLICY

RIDS ORGANIZATIONAL STRUCTURE AND OPERATING ENVIRONMENT

(19)   To best put in context the time and effort dedicated to completing the processing of an FBI FOIPA request, an overview of the organization and operating environment of the FBI's FOIPA program follows.

(20)   The FBI currently employs 237 Government Information Specialists ("GISs"), with support from 89 contractors, to process requests for FBI information under the FOIA and Privacy Acts and conduct classification and declassification reviews, inter alia.

(21)   Perfected FOIPA requests are typically worked by at least two units and require action by multiple employees during their lifecycle.  Requests generally start in IPOU; those that include classified information move to CU and may also undergo review by the NSU; once CU and NSU have completed their reviews, the requests move to a FOIPA Operations Unit for processing; and if a request is in litigation, LSU is involved throughout the process.[9]

---

[9]   This only addresses RIDS's internal process.  As part of the FBI's FOIA process, subject matter experts and other stakeholders within the FBI are consulted prior to release of records, and if other agencies' records or equities are implicated, the FBI consults with those agencies and/or refers records to them for processing prior to any final decisions about release or withholding under the FOIA.

12

FBI'S FOIPA WORKLOAD INCREASE

(22)   Operationally, the FBI has one of the largest and most complex FOIPA programs in the federal government receiving upwards of 40,200 pieces of annual correspondence[10] per Fiscal Year (FY) while reviewing an average of approximately one million pages for annual dissemination to the public.[11]

(23)   The FBI FOIPA Program has experienced sustained growth in the volume of incoming receipts and cases in litigation from FY 2015 to present.  Notably, in FY 2018, the Program received an all-time high of 32,577 requests for records from the public, representative of a 47% increase in requests from FY 2016.  This historic incoming volume trend of above 30,000 requests per annum continued in FY 2019 and into the pandemic phase.  Combined with the rise in FOIPA litigation case growth of 114%[12] from FY 2015 (181 pending litigations) to FY 2021 (388 pending litigations), RIDS's finite resources are continually challenged with this elevated request volume and complexity of requests.

FBI'S INTERIM RELEASE POLICY

(24)   To better serve the requesting public and prevent the monopolization of the FBI's FOIA program by a few large-queue requesters, RIDS must carefully balance multiple competing demands to ensure the best use of its finite resources. To that end, on or about January 2010, RIDS instituted a policy of reviewing and processing records in 500-page increments per month per

---

[10]    Includes the average for total of incoming receipts, appeals, other agency referrals and consultations, and additional requester correspondence from FY 2018 to FY 2021.

[11]    Includes the average for total of incoming receipts, appeals, other agency referrals and consultations, and additional requester correspondence from FY 2018 to FY 2021.

[12]    In FY2021, the FBI received 136 new FOIPA lawsuits (or approximately two new cases every week).

13

request or per litigation (hereinafter referred to as the "policy").[13]  This long-standing policy has

been judicially recognized by courts across the U.S. including the U.S. Court Appeals for the the

District of Columbia and Seventh Circuits.  *See Nat'l Sec. Counselors v. Dep't of Justice*, 848 F.3d

---

[13]      The FBI's interim release policy derives from and is the FBI's effort to comply with DOJ
FOIA regulations at 28 C.F.R. § 16.5(b) (regarding prompt disclosure of responsive material
upon payment of any applicable fees).  The rationale for processing in 500 page monthly
increments is three-fold.

First, the policy is based on sound FOIA business practice.  FOIA encourages agencies to
develop multi-track processing with the goal of responding to more requests.  Accordingly, the
FBI established four processing queues – small queue (1-50 pages), medium queue (51-950
pages), large queue (951-8,000 pages), and extra-large queue (more than 8,000 pages).  Within
each queue, requests are processed in "first in, first out" ("FIFO") order.  By making interim
releases in 500-reviewed page increments for requests in medium (as applicable), large, and
extra large queues, RIDS regularly provides more pages to more requesters across the four
queues, thus avoiding a system where a few, large queue requests monopolize finite processing
resources resulting in less pages provided to fewer requesters on a more infrequent basis.

Second, the policy promotes both RIDS and requester efficiencies.  RIDS processes responsive
records in 500-reviewed page increments, meaning 500 pages are reviewed for release and once
all security protocols are run, a CD containing the segregable releasable portions of these 500
pages reviewed is prepared; then, the next 500 pages are reviewed and prepared for release; and
so on until all responsive pages are reviewed and released.  By working in 500-page increments,
RIDS has found that more pages get processed, reviewed, and released to more requesters each
month.  In terms of managing workflow, the interim releases can be assigned to multiple
processors and the 500-page size has proven to be ideal for reviewing officials, and other
components or agencies that must be consulted before release.  Moreover, maintaining a steady
interim release posture is key in meeting the demands posed by the growing number, size, and
complexity of FOIPA requests received by the FBI.

Third, part of the process in finalizing material for release involves information security.  Many
FBI records contain classified information requiring the FBI FOIPA requests to be processed on
a classified computer network.  Thus, when a CD is prepared for release after review and
consultation, it must also undergo a multi-step information security review.  Specifically, the FBI
employs security software that must be utilized every time information is taken from the
classified network and released to a requester in an unclassified format.  This entails running a
general security protocol, whereby the software conducts optical recognition scans for prescribed
code words; and an individualized protocol, whereby the software scans for words that RIDS
determines are unique to the particular request and may include searches for specific exempt
words, names, confidential sources, or classified techniques.  Due to the security requirements,
the 500-reviewed pages size has proven ideal in maintaining a steady release flow.  The running
of these security protocols, and resolving any issues that may arise, can require a significant
amount of effort and time which increases as more pages are added.

14

467 (D.C. Cir. 2017) and *White v. FBI*, Civ. A. No. 20-1798, 2021 WL 1118087 (7th Cir. Mar. 24, 2021).

<div align="center">THE FBI'S QUEUE STRUCTURE</div>

(25)   Under the FBI's current queue structure, those requests seeking large numbers of pages (assigned to the large and extra-large queues) comprise a disproportionate percentage of the total pages pending review by RIDS at the end of fiscal year 2021 ("FY-21") -- approximately 87.2 % of the total 10.77 million pages pending.   Conversely, 12.8 % of the total 10.77 million pages pending reside in the small and medium queues.   Relative to the number of requesters, large and extra-large queue requests only account for 10.9 % of all pending request within RIDS at the end of FY-21 while the clear majority of requests pending with RIDS at 89.1 % reside in the small and medium queues.

(26)   As such, without equitable resource management focused on serving the most requesters on a consistent basis, a distinct minority of requesters seeking a disproportionate amount of pending pages (large and extra-large queue requests) can dominate RIDS' finite resources.   To prevent such an inverted system, RIDS must be allowed to be a good steward of its finite resources to serve the entire public via its active queue management procedures and strict adherence to its recognized and successful interim release policy. In RIDS's experience, the 500 pages reviewed per month workflow size has proven ideal as it allows for a steady flow of information to the public at large.   The 500-page incremental size enables a manageable monthly production rate because it allows for the processing of the material by an analyst, review time, and the application of FBI information security protocols that must be followed before FBI information can be made public.

(27)   The FBI's interim release policy, designed to most equitably provide the largest number of requesters the largest amount of information possible.   Altering the FBI's interim

<div align="center">15</div>

<div align="center">200</div>

release policy to provide more information faster than FIFO or at a higher rate for requesters who

litigate over those that do not, creates an imbalance of RIDS' finite FOIPA processing resources.

Processing at a higher rate exclusively for litigants would unwarrantedly pull FOIPA resources

away from other FOIPA requesters.  This includes requests submitted prior to Plaintiff's and

requests not subject to litigation awaiting processing in FIFO.  The same personnel who work to

comply with numerous litigation deadlines are the same individuals working on the administrative

FOIA requests, referrals, and appeals.  Thus, increasing the production schedule rate for Plaintiff's

request would absolutely result in a less equitable distribution of RIDS's finite processing

resources relative to all requesters. Simply put, departing from RIDS's current interim policy in

favor of producing more pages for Plaintiff would result in fewer requesters receiving records each

month.

## III.    THE DUPLICATION FEES CHARGED BY FBI ARE REASONABLE AND THE DIRECT COSTS ARE IN EXCESS OF $15.00 PER CD

(28)    Plaintiff relies on FBI testimony from 2017 in a different case, to challenge the

FBI's justification for charging $15.00 per CD for interim releases, claiming that this fee does not

reflect "reasonable standard charges," or "direct costs" reflected in  § 552(a)(4)(A)(ii)(III).

(Plaintiff's Motion, p. 3.)  Plaintiff claims that the FBI's "unnecessarily complex and redundant

'security review process,'" ignores the statutory restrictions placed on its ability to charge fees

under FOIA.  (Plaintiff's Motion, p. 5.)  These claims lack merit.

DEPARTMENT OF JUSTICE ("DOJ") FOIA FEE REGULATIONS

(29)    The Department of Justice ("DOJ") has promulgated regulations providing for the

assessment of fees with regard to the Freedom of Information Act.  *See* 28 C.F.R. §16.10, et seq.

These regulations provide for charging fees for the direct costs an agency incurs in responding to

FOIA requests, including the direct costs associated with the salary of an employee performing

the work.  *Id.* at §16.10 (b)(2).  Further, the regulations provide for charging for duplication costs

in reproducing copies of records.  *Id.* at §16.10 (b)(3).  Under these regulations, the FBI determined

that Plaintiff is a general (all other) requester as described above, subject to duplication fees and

the direct costs associated with the duplication of records responsive to his FOIA request.  Per the

DOJ regulations, for copies produced on tapes, disks, or other media, an agency "...shall charge

the direct costs of producing the copy, including operator time.  Where paper documents must be

scanned in order to comply with a requester's preference to receive the records in electronic format,

the requester shall pay the direct costs associated with scanning those materials."  *Id.* at §16.10

(c)(2).

(30)    As explained above, the FBI advised Plaintiff that in accordance with his request

for records to be re-produced on CD, the fee would be $15.00 per CD.  (**Ex. L.**)

THE FBI'S FOIA DOCUMENT PROCESSING SYSTEM

(31)    Plaintiff claims the FBI's placement of FDPS on a secret enclave "serves very little

actual purpose beyond allowing the FBI to claim that it is protecting classified information even

though the bulk of records put through it were unclassified from the outset and were only placed

on the classified system in the first place because the agency decided to locate the FDPS system

there."  Plaintiff's claim ignores the FBI's mission, the nature and function of FBI records and

established information systems, and many practical concerns.

(32)    With its dual law enforcement and national security missions, the vast majority of

the FBI's work is performed on classified systems.  The primary records system the FBI searches

in response to most FOIPA requests – the Central Records System – is accessed by the FBI's

SENTINEL case management system, which is located on the FBI's SECRET-level classified

enclave.  Accordingly, the FBI's FOIA Document Processing System (FDPS), where responsive

records are processed under FOIPA, is located on the classified enclave.  Given the significant volume of classified and sensitive information in FBI records, operating in a classified space is both necessary, efficient, and comports with security protocols.  There is no unclassified system for processing of FBI FOIPA requests.  Additionally, the complex and often classified nature of FBI records requires information equity coordination between RIDS and internal FBI subject matter experts as well as by external agency stakeholders via classified networks.

(33)    Considering these facts, it is clearly reasonable to process FBI records responsive to FOIPA requests on the secret enclave where FBI investigative and national security records are located because it promotes efficiency, consistency, reduces the risk of compromise, is security compliant, and is a better use of the FBI's limited resources.

THE FBI'S FOIPA SECURITY PROCESS & DIRECT COST ASSESSMENT

(34)    The FBI constantly seeks ways to improve efficiency, especially given the sharp rise in FOIPA requests and FOIPA litigation, with finite processing resources.[14]  While the detailed description provided by Plaintiff in his Memorandum at pp. 6-8 (steps 1-16) reflects the FBI process at the time of the referenced litigation (2017), it is not an accurate reflection of the steps employed today.  The FBI has made enhancements to FDPS to improve efficiency; however, this has not resulted in a reduction of direct cost below $15.00.  In fact, the direct costs involved in preparing a CD for release remains in excess of the $15.00 minimal charge.

(35)    Plaintiff describes the use of the former security program "Integrity" in steps 4 and 8, at p. 7 of its Memorandum.  This application is no longer in use.  As a result of FDPS technical

---

[14]    The FBI is currently inundated with an extraordinary number of FOIPA requests.  In recent years the FBI has experienced a spike in request submitted to the agency.  In Fiscal Year ("FY") 2021, the FBI received 29,828 FOIPA requests (a 34% increase over intake from five years ago), when in FY 2016, intake was 22,220 requests.  In FY 2021, the FBI resolved 29,429 FOIPA requests and reviewed over 868,000 pages of records in response to FOIPA requests.

enhancements, in its place but performing the same function, the FBI leverages Optical Character Recognition ("OCR") capability.   This OCR capability performs required pre-release security scans based on designated lists of "exempted terms."  These scans are referred to as "Exempt Term Searches" or "ETS."  The benefit of this technical enhancement to FDPS is that it eliminates steps 2 through 6 discussed in Plaintiff's Memorandum.  The FOIA Analyst no longer must export or convert the documents prior to running ETS, resulting in greater business process efficiency.

(36)   Despite this improvement and reduction of the number of steps required outside of FDPS, the FOIA Analyst must still perform certain necessary tasks before releasing a CD to the public.  While the FBI no longer utilizes "Integrity" as the security application for FOIPA processing, the remaining steps require human analysis and review time.  Those manual review steps, discussed in Plaintiff's Memorandum at p. 8, are still applicable albeit slightly modified using the ETS function.

(37)   The analysts responsible for conducting pre-release ETS scans and reviews range in grade from GS-11 to GS-13.  Based on the 2021 Salary Table issued by the Office of Personnel Management for the Washington D.C. locality (in which RIDS is located), the minimum hourly salary for an analyst running ETS is $34.98 per hour (GS-11, Step 1) and the maximum hourly salary for an analyst running ETS is $64.81 per hour (GS-13/Step 10).[15]   *See https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/#url=2021*.   It generally takes approximately 46 minutes to set up and run the required ETS scan for a release of 500 pages.  Therefore, with about 46 minutes to set up and run ETS, the direct cost of duplication is:

- The minimum operator cost for the ETS process alone is $26.81.
- The maximum operator cost for the ETS process alone is $49.69.
- The average operator cost for the ETS process alone is $38.25.

---

[15]   FY22 salary adjustments are now available at https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/#url=2022, and result in a slightly increased cost over FY21.

While the amount of time it takes to set up and run ETS can vary with the complexity and amount

of pages, the associated impact on operator time and costs are marginal. The costs listed above do

not include the added time and costs associated with re-running the scan where corrections are

required as a result of an initial scan identifying the need for further review.

(38)    Prior to running ETS, work items proposed for release are "sealed" by an Expert or

Supervisor who has reviewed and approved the Analyst's work. This changes the translucent

redaction blocks on each page to solid blocks for the release of segregable information. As part of

the ETS process, an analyst must run multiple ETS searches against each "sealed" work item in

the interim release using designated programmatic exempt terms and one or more case-specific

exempt terms. The analyst creates the case specific exempt term list as the case is processed, but

the exempt nature of a term often depends on the context in which it appears. ETS assists by

flagging designated terms for pre-release review so that information can be exported from the

classified FDPS enclave to a CD suitable for public dissemination; however, human analysis is

required to manually review any flagged "hits" to determine if the information was proposed for

release in error, or in context the information should be released under FOIPA. If the analyst

determines the term and associated information to be exempt and proposed for release in error, the

analyst must have an Expert or Supervisory employee "unseal" the work item so corrections can

be made in advance of public release. Once corrected by the analyst and verified by the Expert or

Supervisor, the Expert or Supervisor must reseal the work item before the analyst runs the scan

again. As a quality control measure, FOIPA analysts do not have the ability in FDPS to seal and

unseal their own work. This process is repeated until no exempt information is released. This is

a time consuming and labor intensive process, but absolutely necessary to insure that no classified

or exempt information is inadvertently released and that all segregable non-exempt information is released under FOIPA.

(39)    The direct costs of running ETS and preparing CDs for public dissemination by the FBI still exceed $15.00.  While the improvements discussed above have eliminated some process steps, when pay rates and average operator time to perform the current steps are calculated, the direct cost still remains above $15.00 and is therefore reasonable.

(40)    The factors outlined above work together to form the basis of the FBI's interim release policy and the FBI's $15.00 per CD fee, both designed to equitably provide the largest number of requesters the most amount of information possible on a rolling monthly basis at a reasonable cost.

## CONCLUSION

(41)    As described above the FBI has continued to diligently review and process the records responsive to Plaintiff's FOIA requests, making monthly interim releases on or about the last day of the month in accordance with its 500 ppm standard interim processing practice and at a reasonable direct cost rate of $15.00 per CD.

(42)    The FBI has carefully balanced the volume of responsive records along with Plaintiff's interests, while also recognizing and preserving the rights of other litigants and requesters in accessing information they seek.  The FBI has explained how processing records on the classified enclave is efficient, security-compliant, reduces risk of compromise, promotes consistency, and is a better use of FBI's limited resources given its myriad investigative and national security missions.  The FBI has outlined the necessary steps employed to prepare a CD for public dissemination and determined that the FBI's policy of charging $15.00 per CD is an

appropriate and reasonable assessment of duplication fees, consistent with the FOIA, 5 U.S.C. §

552(a)(4)(A)(ii) and DOJ's FOIA fee regulation at 28 C.F.R. § 16.10.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that Exhibits A through AL attached hereto are true and correct copies.

Executed this 21st day of January 2022.


MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

    Plaintiff,

    v.                                          Civil Action No. 18-CV-1868-TNM

UNITED STATES DEPARTMENT OF
JUSTICE

    Defendant.

# EXHIBIT A

# JAMES H. LESAR
## Attorney at Law

## FREEDOM OF INFORMATION/JFK ACT REQUESTS

October 7, 2009

Mr. David M. Hardy
Section Chief
Records Information Dissemination System
Federal Bureau of Investigation
Washington, D.C. 20535

Re:  Pre-1960 ELSUR Inices

Dear Mr. Hardy:

I represent the Assassination Archives and Research Center ("AARC"). The AARC provides information on the assassination of President John F. Kennedy and other subjects, including other political assassinations, to the news media and the public, as well as to its members.

As president of the AARC, I have been interviewed by many television news programs and documentaries concerning the assassinations of President Kennedy and Dr. Martin Luther King, Jr., the President John F. Kennedy Assassination Records Collection Act of 1992 ("JFK Records Act"), and related topics. I have also appeared on radio programs, including the Voice of America and The Larry King Show. I have appeared on a number of television programs, including CNN, Fox News, and Good Morning America (CBS). The Washington Post ran an op-ed piece by me on the need to release the records of the House Select Committee on Assassinations. This article was widely reprinted in other papers, as was an article on the AARC which was disseminated by the Associated Press. On June 8, 1997, the Washington Post published an op-ed piece on the assassination of Dr. Martin Luther King, Jr. I have been quoted by Reuters, the Associated Press, the New York Times, the Washington Post and numerous other representatives of the news media on matters pertaining to the assassinations of President Kennedy and Dr. King.

I testified to both houses of Congress regarding the pending legislation to require disclosure of records pertaining to the assassination of President Kennedy. In November 1993, I testified before the House Subcommittee on Legislation and National Security regarding the implementation of the JFK Act. On several occasions I testified at hearings held by the Assassination Records Review Board, a five-citizen panel appointed to enforce the JFK Records Act.

930 Wayne Avenue, Unit IIII • Silver Spring, MD 20910
Phone: (301) 328-5920 • (202) 393-1921
E-mail: jlesan@mindspring.com

209

2

I am also an attorney specializing in Freedom of Information Act litigation.   I am planning to write a book on my nearly four decades of experience litigating FOIA cases.

The FBI has recently discovered that it has seven boxes of ELSUR indices of pre-1960 electronic surveillances.  This is specified in the July 2, 2009 declaration of Dennis J. Argall filed in Lardner v. FBI, et al., Civil Action No. 03-0874.   Pursuant  to the Freedom of Information Act. 5 7.S.C. § 552, I hereby request copies of all these indices.

I request that copies of these records be provided to me in .pdf format.

In light of the facts recited above, the AARC and I are each entitled to representative of the news media status and cannot be charged search fees.   We are also entitled to a public interest fee waiver.  The records will show what the FBI was up to and when, with respect to the FBI's operations regarding organized crime activities and other activities.  The public interest in such matters is obvious and profound.  Our capability to disseminate the information has  been amply demonstrated.

Sincerely yours,

*James H. Lesar*

James H. Lesar

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GEORGE LARDNER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action Number |
| | ) | 03-0874 (HHK) |
| FEDERAL BUREAU OF INVESTIGATION, | ) | |
| Defendant. | ) | |

## <u>STATUS DECLARATION OF DENNIS J. ARGALL</u>

I, Dennis J. Argall, declare as follows:

(1)     I currently serve as the Assistant Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation Headquarters ("FBIHQ") in Winchester, Virginia and, in the absence of RIDS Section Chief, David M. Hardy, I serve as Acting Section Chief for RIDS. I became the Assistant Section Chief on November 1, 2008. From August 18, 2008 until October 31, 2008, I was the Unit Chief of the Litigation Support Unit. I have been employed by the FBI since August 18, 2008. Prior to my joining the FBI, from July 11, 2005 until July 10, 2008, I was on active duty in the United States Navy and assigned to United States Fleet Forces Command, located in Norfolk, Virginia, as the Fleet Judge Advocate. In that capacity I was responsible for reviewing all information being released under the Freedom of Information Act (FOIA). From August 17, 1983 to July 11, 2005, I served as an active duty Navy Judge Advocate at various

commands and routinely dealt with FOIA matters, including a tour from January 1987 to

September 1988 with the Department of the Navy Litigation Office where I was a litigation

counsel for FOIA matters.  I am also an attorney who has been licensed to practice law in the

State of Wisconsin since 1983.

    (2)    In my official capacity as Acting Section Chief of RIDS, I supervise approximately

225 employees who staff a total of ten (10) FBIHQ units and two field operational service center

units whose collective mission is to effectively plan, develop, direct, and manage responses to

requests for access to FBI records and information pursuant to the FOIA; Privacy Act; Executive

Order 12958, as amended; Presidential, Attorney General, and FBI policies and procedures;

judicial decisions; and other Presidential and Congressional directives.  My responsibilities also

include the review of FBI information for classification purposes as mandated by Executive

Order 12958, as amended,[1] and the preparation of affidavits/declarations in support of Exemption

1 claims asserted under the FOIA.[2]  I have been designated by the Attorney General of the United

States as an original classification authority and a declassification authority pursuant to Executive

Order 12958, as amended, §§ 1.3 and 3.1.  The statements contained in this declaration are based

upon my personal knowledge, upon information provided to me in my official capacity, and upon

conclusions and determinations reached and made in accordance therewith.

    (3)    Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to requests for information from its files pursuant to the provisions of

---

    [1] Classified National Security Information, 60 Fed. Reg. 19,825 (April 17, 1995) and
Further Amendment to Executive Order 12958, as Amended, 68 Fed. Reg. 15,315 (March 25,
2003).

    [2] 5 U.S.C. § 552(b)(1).

<div align="center">2</div>

the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974 ("PA"), 5 U.S.C. § 552a.  Specifically, I

am aware of the treatment which has been afforded the three FOIA requests of plaintiff, George

Lardner, which sought access to FBI records concerning Aniello Dellacroce and the FBI's Top

Hoodlum Program, both prior to 1960, and from 1960 to the present day.

(4)       This declaration supplements the information previously provided in the

Declaration of David M. Hardy dated December 5, 2006 ("First Hardy Declaration"), Declaration

of David M. Hardy dated May 25, 2007 ("Second Hardy Declaration"),[3] Supplemental

Declaration of David M. Hardy dated November 21, 2008, and the Status Declaration of David

M. Hardy, dated May 15, 2009.

(5)       This declaration will respond to issues presented by plaintiff in his Motion for

Summary Judgment, filed with the Court on November 26, 2008 ("Plaintiff's Motion for

Summary Judgment"), namely the current status of the FBI's search for electronic surveillance

("ELSUR")[4] material and the documents that the FBI has accessioned to the National Archives

and Records Administration ("NARA").  Finally, this declaration will advise the Court and

plaintiff that the FBI anticipates filing an additional <u>Vaughn</u> declaration and renewing its Motion

for Summary Judgment.

## ELSUR SEARCH

(6)       The electronic ELSUR index was created in October, 1966 at the suggestion of

the Department of Justice to ensure the FBI developed a more efficient manner of tracking

---

[3]  Second Hardy Declaration dated July 13, 2007 was provided to plaintiff, but not filed
with the Court.

[4]  See explanation of ELSUR indices in First Hardy Declaration ¶¶ 71-74.

3

213

ELSUR material.  At that time, Director Hoover instructed all FBI field offices to forward

specific information to FBIHQ for entry into an electronic surveillance indexing system.  This

information included the names of all individuals whose voices were monitored through

electronic surveillance dating back to 1/1/1960, as well as the initial start date of the monitoring

and the identity of the subject against whom the installation was directed.  Consequently, the

ELSUR documents discussed below found to be responsive to plaintiff's request were only

discovered because the initial start date of the electronic surveillance occurred prior to 1960.

      (7)     As a result of the ELSUR searches defined in the Status Declaration of David M.

Hardy dated May 15, 2009, the FBI's Chicago and Newark Field Offices located a total of

approximately 500 pages of responsive material.  RIDS personnel are currently scanning the

material into the FBI's FOIA Document Processing System ("FDPS").  Once the files are

scanned, FOIA analysts will begin reviewing and processing the material under the provisions of

FOIA.  The FBI estimates that it will take approximately four weeks to complete the processing.

Additionally, the FBI's Philadelphia, New York and Kansas City Field Offices conducted manual

ELSUR searches for responsive material to plaintiff's request.  The FBI has determined that the

material maintained in the respective field offices did not contain any ELSUR material collected

prior to 1960 for the subjects listed in Exhibit A to the Status Declaration of David M. Hardy

("Exhibit A") and therefore are not responsive to plaintiff's request.

      (8)     The FBI's initial pre-1960 ELSUR research indicated that there was no pre-1960

index system; however, further search efforts, recently revealed that there are in fact pre-1960

ELSUR index cards available.  As a result of this discovery, RMD has requested and received

seven boxes of ELSUR cards.  RIDS personnel will review each box of cards for responsiveness

to the search terms provided in Exhibit A. Plaintiff's search terms are specific to 21 field offices

and contains the names of over 500 individuals, organizations, events, or the like. The FBI will

complete the review of the index cards and submit the results to the Court in the next status

report. Once the responsive material is identified, retrieving the material may take a substantial

amount of time as each respective field office will need to physically locate and forward the

responsive files to Winchester, Virginia for scanning and processing. In the event the card

contains minimal information, the respective field offices may have to research the information

to retrieve any potentially responsive material. The FBI will submit an additional status report on

or before August 17, 2009, informing the Court of its progress in collecting and processing this

material.

### DOCUMENTS ACCESSIONED TO NARA

(9)    In the FBI's Response to Plaintiff's Motion to Compel dated April 11, 2009, the

FBI stated that is will process 600 pages a month with rolling releases each month to the Plaintiff

(approximately 600 pages beginning in July, 600 pages in August, and 600 pages in September).

Under this schedule , the FBI will have all of these records processed and sent to plaintiff by the

end of September.

### FUTURE FILINGS

(10)    In addition to the First Hardy Declaration and the Supplemental Declaration of

David M. Hardy, dated November 21, 2008, the FBI anticipates filing another Vaughn

declaration and renewing its Motion for Summary Judgment.

### CONCLUSION

(11)    As discussed above, the FBI will require four weeks to review and process the

5

215

ELSUR material that has already been located.  Before the next status report, the FBI will also review the newly discovered ELSUR index cards containing pre-1960 information for the subjects listed in Exhibit A.  Additionally, the FBI will have all NARA material reviewed, processed and released on or before September 30, 2009.  Moreover, the FBI will submit an additional status report on or before August 17, 2009, informing the Court of its progress.  Finally, the FBI anticipates filing an additional Vaughn declaration and renewing its Motion for Summary Judgment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of July, 2009.

DENNIS J. ARGALL
Acting Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, VA

6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

     Plaintiff,

   v.                    Civil Action No. 18-CV-1868-TNM

UNITED STATES DEPARTMENT OF
JUSTICE

     Defendant.

# EXHIBIT D

MR. JAMES H. LESAR
UNIT 1111
930 WAYNE AVENUE
SILVER SPRING, MD 20910

FOIA Request No.: 1139342- 000
Subject: ELSUR INDICES/CARDS
PRE-1960

Dear Mr. Lesar:

This is in response to your Freedom of Information Act (FOIA) request.

We have located approximately 18,000 pages of documents potentially responsive to your request. You have indicated that you would like to receive your releases on CD in PDF format, and the cost for receiving documents on CD is $15. Due to the voluminous nature of your request, we will make releases to you on CD as they become available. Although no payment needs to be made at this time, you must notify us in writing within 60 days from the date of this letter of your willingness to pay. Please remember that this is only an estimate, and if some pages are withheld in full pursuant to FOIA/Privacy Act exemption(s) or are determined to not be responsive to your request, the actual charges could be less.

You may want to consider reducing the scope of your request. This would allow you to lower your search and duplication costs, and hasten the receipt of your information. The FBI uses a three-queue system as a way to fairly assign and process new requests. The placement of a request in one of the three queues depends on the total number of pages responsive to that request – 500 pages or less (small queue), 501 pages to 2500 pages (medium queue), or more than 2500 pages (large queue). The small queue has the fastest rate of processing. Please let us know in writing if you are interested in discussing the possibility of reducing the scope of your request so that it will fall within one of the smaller queues, as well as your willingness to pay the estimated duplication costs indicated in the above paragraph. Your written response should provide a telephone number where you can be reached between the hours of 8:00 a.m. and 5:00 p.m., EST, if one is available. Please send this response to:

Work Process Unit
Record Information/Dissemination Section
Records Management Division
Federal Bureau of Investigation
170 Marcel Drive
Winchester, VA 22602

You may also fax your response to the following number: (540) 868-4996, Attention: Work Process Unit. If you fail to notify us of your willingness to pay and we do not hear from you regarding your willingness to reduce the scope of your request within 60 days from the date of this letter, your request will be closed. You must include the FOIA Request Number in any communication regarding this matter.

Enclosed for your information is a copy of the FBI File Fact Sheet.

Very truly yours,

David M. Hardy
Section Chief,
Record/Information
  Dissemination Section
Records Management Division

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

       Plaintiff,

    v.                                              Civil Action No. 18-CV-1868-TNM

UNITED STATES DEPARTMENT OF
JUSTICE

       Defendant.

# EXHIBIT E



**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

February 9, 2011

JAMES H. LESAR, ESQ.
UNIT 1111
930 WAYNE AVENUE
SILVER SPRING, MD 20910

Request No.: 1139342-000
Subject: ELSUR INDICES/CARDS
PRE-1960

Dear Mr. Lesar:

This is in reference to your Freedom of Information-Privacy Acts (FOIPA) request.

As you were previously advised by letter, dated November 13, 2009, we have located approximately **18,000** pages which are potentially responsive to your request. While being reviewed by an analyst, it was determined that the boxes of ELSUR indices that you described in your original request contain both pre-1960 and post-1960 ELSUR Indices/Cards. We would like some clarification on your request. Please indicate if you are interested in receiving **only** the pre-1960 ELSUR Indices/Cards (a reduction in pages by approximately 5,000 or $150.00).

Pursuant to the U.S. Department of Justice (DOJ) regulations, 28 C.F.R. §§ 16.11 and 16.49, there is a fee for these pages. Each CD contains approximately 500 pages per release. The 500 page estimate is based on our business practice of processing medium and large track cases through interim releases that generally equal approximately 500 pages. In accordance with the DOJ regulations, the FBI notifies requesters when anticipated fees exceed $25.00. If all of the pages that are potentially responsive to your request are released, you will owe **$540.00** (36 CD's at $15.00 each). Please remember this is only an estimate, and if some of the pages are withheld in full pursuant to FOIA / Privacy Act exemptions or are determined to not be responsive to your request, the actual charges could be less.

Please let us know in writing if you are interested in discussing the possibility of reducing the scope of your request, as well as your willingness to pay the estimated costs indicated in the above paragraph and your preference for pre-1960 or post-1960 material or both. Your written response should provide a telephone number where you can be reached between the hours of 8:00 a.m. and 5:00 p.m., EST, if one is available. Please send this response to: Work Process Unit, Record Information/ Dissemination Section, Records Management Division, Federal Bureau of Investigation, 170 Marcel Drive, Winchester, VA 22602. You may also fax your response to the following number: 540-868-4997, Attention: Work Processing Unit.

**No payment is required at this time. However, you must notify us in writing within thirty (30) days from the date of this letter of your request preferences and your commitment to pay the estimated fee.** If we do not receive your commitment to pay within thirty (30) days of the date of this notification, your request **will be closed.** Please include the FOIPA Request Number listed above in any communication regarding this matter.

Sincerely yours,

David M. Hardy
Section Chief,
Record/Information
  Dissemination Section
Records Management Division

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

       Plaintiff,

   v.                        Civil Action No. 18-CV-1868-TNM

UNITED STATES DEPARTMENT OF
JUSTICE

       Defendant.

# EXHIBIT F

# JAMES H. LESAR
### Attorney at Law

April 10, 2013

Mr. David M. Hardy
c/o Work Processing Station
Records Information /Dissemination Section
Records Management Division
170 Marcel Drive
Winchester, VA 22602

CERTIFIED MAIL NO.
<u>7011 0470 0002 7418 1368</u>

Re:  <u>Pre-1960 and Later ELSUR Inices</u>

Dear Mr. Hardy:

Attached is a Freedom of Information Act request which I submitted on behalf of the Assassination Archives and Research Center by letter dated September 7, 2013.  The United States Postal Service has indicated that because your office refused to accept delivery, it was sent to the Dead Mail Office and disposed of.

This is a flagrant violation of my client's rights to request information under the Freedom of Information Act.  I would like to know the identities of all members of your staff who were aware of or participated in this denial of rights, and I ask that you take disciplinary action against them.

Please place th is request in a processing queue in accordance with the priority it would have received had you accepted delivery of it in September 2012.

Sincerely yours,

James H. Lesar

930 Wayne Avenue, Unit 1111 • Silver Spring, MD 20910
Phone: (301) 328-5920 • (202) 393-1921
E-mail: jlesar@mindspring.com

# JAMES H. LESAR
## Attorney at Law

### **FREEDOM OF INFORMATION ACT REQUEST**

September 7, 2012

Mr. David M. Hardy
c/o Work Processing Station
Record Information/Dissemination Section
Records Management Division
Federal Bureau of Investigatin
170 Marcel Drive
Winchester, VA 22602

DELIVERY CONFIRMATION
NO. 7011 !570 0000 4518 3979

Re: Pre-1960 and Later ELSUR iNDICES

Dear Mr. Hardy:

I represent the Assassination Archives and Research Center ("AARC"). The AARC provides information on the assassination of President John F. Kennedy and other subjects, including other political assassinations, to the news media and the public, as well as to its members.

As president of the AARC, I have been interviewed by many television news programs and documentaries concerning the assassinations of President Kennedy and Dr. Martin Luther King, Jr., the President John F. Kennedy Assassination Records Collection Act of 1992 ("JFK Records Act"), and related topics. I have also appeared on radio programs, including the Voice of America and The Larry King Show. I have appeared on a number of television programs, including CNN, Fox News, and Good Morning America (CBS). The Washington Post ran an op-ed piece by me on the need to release the records of the House Select Committee on Assassinations. This article was widely reprinted in other papers, as was an article on the AARC which was disseminated by the Associated Press. On June 8, 1997, the Washington Post published an Outlook Section article I wrote on the assassination of Dr. Martin Luther King, Jr. and the case of his alleged assassin, James Earl Ray. I have been quoted by Reuters, the Associated Press, the New York Times, the Washington Post and numerous other representatives of the news media on matters pertaining to the assassinations of President Kennedy and Dr. King.

I testified to both houses of Congress regarding the pending legislation to require disclosure of records pertaining to the assassination of President Kennedy. In November 1993, I testified before the House Subcommittee on Legislation and National Security regarding the implementation of the JFK Act. On several occasions I testified at hearings held by the Assassination Records Review Board, a five-citizen panel appointed to enforce the JFK Records Act.

930 Wayne Avenue. Unit lIII • Silver Spring. MD 20910
Phone: (301) 328-5920 • (202) 393-1921
E-mail: jlesan@mindspring.com

2

I am also an attorney specializing in Freedom of Information Act litigation.  I am planning to write a book on my nearly four decades of experience litigating FOIA cases.

Three years ago the FBI revealed that it has seven boxes of ELSUR ("electronic surveillance") indices, the existence of which had not previously been publicly acknowledged. This is specified in the July 2, 2009 declaration of Dennis J. Argall filed in Lardner v. FBI, et al., Civil Action No. 03-0874.  Subsequently, the FBI has advised me that some of the materials in these seven boxes concern post-1960 surveillances, rather than pre-1960 surveillances.

Pursuant  to the Freedom of Information Act. 5 7.S.C. § 552, I hereby request copies of all these indices, whether they relate to  pre- or post-1960 surveillances.  I also requestt all tapes, transcripts, logs and other materials related to said surveillance, including surveillance applications, affidavits, testimony, authorizations and warrants.

I request that copies of these records be provided to me in word searchable .pdf format.  I also request

I further rerquest a waiver of all search and copying fees.  As noted above, the purposes of the AARC is to gather, preserve and disseminate information to the public regarding political assassinations.  The AARC maintains both extensive hard copy files and digital copies of government records which comprise approximately one million pages.  Because possible connections of organized crime figures to the assassinations of President John F. Kennedy, Dr. Martin Luther King, and Senator Robert F. Kennedy figure prominently in the investigations of these murders, the holdings of the AARC, both hard copy and digital, reflect this.  The public interest in such records is undeniable.  There is also a profound public interest in such materials even if they do not pertain to the above-cited political assassinations, particularly where such surveillances were unlawful or related to investigations which were not done for law enforcement purposes.

In light of the facts recited above, the AARC and I are each entitled to representative of the news media status and cannot be charged search fees.  We are also entitled to a public interest fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii).  The records will show what the FBI was up to and when, with respect to the FBI's operations regarding organized crime activities and other activities.  The public interest in such matters is obvious and profound.  Our capability to disseminate the information has  been amply demonstrated above.

Pending your determination whether to grant or deny a fee waiver, I commit to paying up to $200 in copying fees.  Indices are to be processed before the other materials requested.

Sincerely yours,

James H. Lesar

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

       Plaintiff,

   v.

UNITED STATES DEPARTMENT OF
JUSTICE

       Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT G





U.S. Department of Justice

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

September 13, 2018

MR. KEL MCCLANAHAN
NATIONAL SECURITY COUNSELORS
4702 LEVADA TERRACE
ROCKVILLE, MD 20853

Civil Action: 18-cv-01868
Request No.:1139342-001
Subject: Pre-1960 & Post-1960 ELSUR
INDICES

Dear Mr. McClanahan:

This is in response to your client's April 10, 2013, Freedom of Information/Privacy Acts (FOIPA) request regarding the processing of both Pre-1960 and Post-1960 ELSUR Indices records.

Upon receipt of your client's Complaint (18-cv-01868) filed in the United States District Court for the District of Columbia, the FBI reviewed records within its FOIA Disclosure Processing System ("FDPS") to address the Causes of Action in the Complaint.   The FBI determined it has no record of receiving a FOIA request from your client dated September 7, 2012, seeking: "copies of all pre- or post-1960 surveillance...[and] all tapes, transcripts, logs and other materials related to said surveillance, including surveillance applications, affidavits, testimony, authorizations and warrants" as outlined in Plaintiff's Complaint.   The FBI also has no record of any denial of acceptance of United States Postal Service Certified Mail from your client around the time outlined in the Complaint.   A search of FDPS confirmed the FBI did receive your client's letter dated April 10, 2013, a re-submission of its original request.   In error, the FBI placed this April 10, 2013 request into the closed records for FOIA request number 1139342-000 without any further action.   Based upon this further review, the FBI has opened FOIA request number 1139342-**001** to handle the portion of your client's April 10, 2013, FOIA request concerning both Pre-1960 and Post-1960 ELSUR Indices records.

The copy of your client's September 7, 2012 FOIA letter, enclosed in your April 10, 2013 re-submission, commits to paying up to $200 in duplications fees if your client's public interest fee waiver request is denied.   Public interest fee waivers are determined on a case by case basis.   See 5 U.S.C. § 552 (a)(4)(A)(iii) and 28 C.F.R. § 16.10(k)(i)-(ii).   Your request for a public interest fee waiver was reviewed, and denied for the reasons below.

You failed to demonstrate the requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations and activities of the government.   See 28 C.F.R. § 16.10(k)(i).   Disclosure of the requested records would not be meaningfully informative about government operations or activities in order to be likely to contribute to an increased public understanding of those operations or activities.   See 28 C.F.R. § 16.10(k)(2)(ii).   Additionally, the public's understanding of the subject in question would not be enhanced by the disclosure to a significant extent.   See 28 C.F.R. § 16.10(k)(2)(iv).

As your request for a fee waiver request has been denied, the FBI will begin processing responsive records based on your commitment to pay duplication fees up to $200.

As to the portion of your client's April 10, 2013, FOIA request seeking: "all tapes, transcripts, logs and other materials related to said surveillance, including surveillance applications, affidavits, testimony, authorizations and warrants," the FBI has determined this portion of your request is not a proper FOIA request as it is too vague and would require an unduly burdensome search demanding extensive FBI resources.

The FOIA/FOIPA provides for access to Government records where the records sought are "reasonably described" [Title 5, United States Code, Section 552(a)(3)(A)].   Furthermore, the FOIA does not require federal agencies to answer inquiries, create records, conduct research, or draw conclusions

concerning queried data.   Rather, the FOIA requires agencies to provide access to reasonably described nonexempt records.   This portion of your request would require the FBI to conduct expansive, burdensome, multi-level research concerning approximately 18,000 pages of records to locate records responsive to this portion of your request, and is thus not reasonably described.   Therefore, this portion of your request is not a proper FOIA request as it does not allow the FBI to conduct a search for responsive records with a reasonable amount of effort.   See 28 CFR § 16.3(b).

Although your request is in litigation, we are required by law to provide you the following information:

You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's FOIA online portal by creating an account on the following web site:   https://foiaonline.regulations.gov/foia/action/public/home.   Your appeal must be postmarked or electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so that it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS) at 877-684-6448, or by emailing ogis@nara.gov.   Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov.   If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Enclosed for your information is a copy of the FBI Fact Sheet.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
   Dissemination Section
Information Management Division

Enclosure

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

        Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE

        Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT H



**U.S. Department of Justice**



**Federal Bureau of Investigation**

*Washington, D.C. 20535*

November 9, 2018

MR. JAMES H. LESAR
UNIT 1111
930 WAYNE AVENUE
SILVER SPRING, MD 20910

*Assassination Archives v. DOJ*
Civil Action No. 18-cv-01868
FOIPA Request No.: 1386188-000 and 1386440-000
Subject: ELSUR INDICES/CARDS PRE-1960,

Dear Mr. Lesar:

The enclosed documents were reviewed under the Freedom of Information (FOIA), Title 5, United States Code, Section 552. Below you will find checked boxes under applicable statutes for the exemptions asserted to protect information exempt from disclosure. The appropriate exemptions are noted on the processed pages next to redacted information. An Explanation of Exemptions is enclosed to further explain justification for withheld information.

|  | **Section 552** |  | **Section 552a** |
|---|---|---|---|
| ☐ (b)(1) | ☐ (b)(7)(A) | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | ☐ (j)(2) |
| ☐ (b)(3) | ☑ (b)(7)(C) | ☐ (k)(1) |
| _____ | ☐ (b)(7)(D) | ☐ (k)(2) |
| _____ | ☑ (b)(7)(E) | ☐ (k)(3) |
| _____ | ☐ (b)(7)(F) | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | ☐ (k)(5) |
| ☑ (b)(5) | ☐ (b)(9) | ☐ (k)(6) |
| ☑ (b)(6) |  | ☐ (k)(7) |

32 pages were reviewed and 32 pages are being released.

Below you will also find additional informational paragraphs about your request. Where applicable, checked boxes are used to provide you with more information about the processing of your request. Please read each item carefully.

☐ Document(s) were located which originated with, or contained information concerning, other Government Agency (ies) [OGA].

☐ This information has been referred to the OGA(s) for review and direct response to you.
☐ We are consulting with another agency. The FBI will correspond with you regarding this information when the consultation is completed.

☐ In accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E) and Privacy Act exemption (j)(2) [5 U.S.C. § 552/552a (b)(7)(E)/(j)(2)], this response neither confirms nor denies the existence of your subject's name on any watch lists.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the Freedom of Information Act (FOIA).   See 5 U.S.C. § 552(c) (2006 & Supp. IV (2010).   This response is limited to those records subject to the requirements of the FOIA.   This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist. Enclosed for your information is a copy of the Explanation of Exemptions.

Please direct any further inquiries about this case to the Attorney representing the Government in this matter. Please use the FOIPA Request Number and/or Civil Action Number in all correspondence or inquiries concerning your request.

☐   The enclosed material is from the main investigative file(s) in which the subject(s) of your request was the focus of the investigation.   Our search located additional references, in files relating to other individuals, or matters, which may or may not be about your subject(s).   Our experience has shown such additional references, if identified to the same subject of the main investigative file, usually contain information similar to the information processed in the main file(s).   As such, we have given priority to processing only the main investigative file(s) given our significant backlog.   If you would like to receive any references to the subject(s) of your request, please submit a separate request for the reference material in writing.   The references will be reviewed at a later date, as time and resources permit.

☑   See additional information which follows.

Sincerely,

David M. Hardy
Section Chief
Record/Information
  Dissemination Section
Information Management Division

Enclosures

The enclosed documents (Bates numbered 18-cv-01868-CN-1 through 18-cv-01868-CN-32) represent the final release of information responsive to your Freedom of Information Acts (FOIA) request 1386188-000 and 1386440-000, and are provided at no charge.

Upon receipt of your Complaint (18-cv-01868), the FBI conducted a review on or about August 23, 2018, of the issues involved in your three "Causes of Action" outlined in your Complaint.   Below is a summary of actions to be taken by the FBI.

As to your "First Cause of Action" the FBI re-opened your FOIA request number 1139342-001 to process the ELSUR index cards previously known as the "Pre-1960's ELSUR cards", subject to the payment of duplication fees.

At the time of your original October 7, 2009 FOIA request, it was determined approximately 18,000 pages of responsive records were located within the above described ELSUR index card collection.   Due to the large amount of records, RIDS originally split your administrative request into two requests.   FOIPA Request Number 1139342-000 was opened to handle the processing of the first half of the records, while the second half of the responsive records were to be processed in FOIPA Request Number 1149636-000.   After not receiving response to its November 13, 2009 and February 9, 2011 cost estimate letters requesting a commitment to pay potential fees, the FBI administratively closed FOIPA Request Numbers 1139342-000 and 1149636-000 on March 22, 2011.

In reviewing its FOIA Disclosure Processing System ("FDPS") for the FOIA issues raised in your complaint, the

FBI has determined it has no record of receiving a FOIA request from you dated September 7, 2012, seeking "copies of all pre- or post-1960 surveillance…[and] all tapes, transcripts, logs and other materials related to said surveillance, including surveillance applications, affidavits, testimony, authorizations and warrants."   The FBI also has no record of any denial of acceptance of a United States Postal Service Certified Mail from you around the time outlined in the Complaint.   A search of FDPS has confirmed the FBI did receive your letter dated April 10, 2013 (contained a copy of the September 7, 2012 request), requesting this request to be considered a "re-submission" and placed into the priority status as if it was received by the FBI in September of 2012.   Inadvertently, the FBI uploaded this letter into the records associated with FOIA request number 1139342-000 in FDPS, but did not take any further action.   The FBI has now opened FOIA request number 1139342-001 to handle your April 10, 2013 resubmission.   The FBI will begin reviewing 500 pages per month and make its first release of this material on January 31, 2019.   It will provide subsequent releases at the end of each month thereafter until complete, as long as you continue to pay assessed duplication fees.

As to your "Second Cause for Action" the FBI has completed   processing of FOIA request number 1386188-000, through which you sought: "all information about the processing of their FOIA Request No. 1139342-000."   Enclosed are processed copies of FDPS case notes and correspondence concerning FOIA 1139342-000, and FOIA 1149636-000 (both opened to handle the processing of your request).

As to your "Third Cause of Action" the FBI has completed processing of FOIPA Request Number 1386440-000, through which you sought: "all information about the aforementioned sequence of events and all information about any actions FBI took in response to Mr. Lesar's April 10, 2013 letter."   RIDS uploaded your April 10, 2013 FOIA request into FOIPA Request Number 1139342-000 with no further action, so the only responsive records in the FBI's possession were released in response to FOIA 1386188-000 detailed above.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

        Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE

        Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT I

**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

February 4, 2019

MR. JAMES H. LESAR
UNIT 1111
930 WAYNE AVENUE
SILVER SPRING, MD 20910

*Assassination Archives v. DOJ*
Civil Action No. 18-cv-01868
FOIPA Request No.: 1139342-001
Subject: ELSUR INDICES/CARDS PRE-1960

Dear Mr. Lesar:

The enclosed documents were reviewed under the Freedom of Information (FOIA), Title 5, United States Code, Section 552. Below you will find checked boxes under applicable statutes for the exemptions asserted to protect information exempt from disclosure. The appropriate exemptions are noted on the processed pages next to redacted information. An Explanation of Exemptions is enclosed to further explain justification for withheld information.

|          Section 552          |          |          | Section 552a |          |
|-------------------------------|----------|----------|--------------|----------|
| ☑ (b)(1)                      | ☐ (b)(7)(A) |       | ☐ (d)(5)     |          |
| ☐ (b)(2)                      | ☐ (b)(7)(B) |       | ☐ (j)(2)     |          |
| ☑ (b)(3)                      | ☑ (b)(7)(C) |       | ☐ (k)(1)     |          |
| 50 USC Section 3024(i)(1)     | ☑ (b)(7)(D) |       | ☐ (k)(2)     |          |
|                               | ☑ (b)(7)(E) |       | ☐ (k)(3)     |          |
|                               | ☐ (b)(7)(F) |       | ☐ (k)(4)     |          |
| ☐ (b)(4)                      | ☐ (b)(8) |          | ☐ (k)(5)     |          |
| ☐ (b)(5)                      | ☐ (b)(9) |          | ☐ (k)(6)     |          |
| ☑ (b)(6)                      |          |          | ☐ (k)(7)     |          |

540 pages were reviewed and 540 pages are being released.

Below you will also find additional informational paragraphs about your request. Where applicable, checked boxes are used to provide you with more information about the processing of your request. Please read each item carefully.

☐ Document(s) were located which originated with, or contained information concerning, other Government Agency (ies) [OGA].

☐ This information has been referred to the OGA(s) for review and direct response to you.
☐ We are consulting with another agency. The FBI will correspond with you regarding this information when the consultation is completed.

☐ In accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E) and Privacy Act exemption (j)(2) [5 U.S.C. § 552/552a (b)(7)(E)/(j)(2)], this response neither confirms nor denies the existence of your subject's name on any watch lists.

233

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the Freedom of Information Act (FOIA).   See 5 U.S. C. § 552(c) (2006 & Supp. IV (2010).   This response is limited to those records subject to the requirements of the FOIA.   This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist. Enclosed for your information is a copy of the Explanation of Exemptions.

Please direct any further inquiries about this case to the Attorney representing the Government in this matter. Please use the FOIPA Request Number and/or Civil Action Number in all correspondence or inquiries concerning your request.

☐   The enclosed material is from the main investigative file(s) in which the subject(s) of your requestwas the focus of the investigation.   Our search located additional references, in files relating toother individuals, or matters, which may or may not be about your subject(s).   Our experience has shown such additional references, if identified to the same subject of the main investigative file, usually contain information similar to the information processed in the main file(s).   As such, we have given priority to processing only the main investigative file(s) given our significant backlog.   If you would like to receive any references to the subject(s) of your request, please submit a separate request for the reference material in writing.   The references will be reviewed at a later date, as time and resources permit.

☑   See additional information which follows.

Sincerely,

David M. Hardy
Section Chief
Record/Information
  Dissemination Section
Information Management Division

Enclosures

The enclosed documents represent the first interim release of information responsive to your Freedom of Information Acts (FOIA) request 1139342-001 and current Bates stamp range (18-cv-01868-1 through 18-cv-01868-540).   Pursuant to new Freedom of Information Act (FOIA) regulations effective on May 4, 2015, the duplication cost for paper releases was reduced from $0.10 to $0.05 per page.   The duplication cost for a Compact Disc (CD) remains at $15.00 per CD.   You are entitled to 100 free pages which you will receive as a $5.00 credit towards your first interim CD release.   As a result, we must notify you there will be a $25.00 charge when the second interim release is made in this case.   At that time you will be billed for the $10.00 remaining from the $15.00 fee of the first release, as well as the $15.00 duplication fee for the second release, for a total of $25.00.

For further information on the actions to be taken by the FBI in regards to your FOIA requests, please see FOIA 1386188-000/1386440-000 release letter dated November 9, 2018.

234

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

       Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE

       Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT J

**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

February 28, 2019

MR. KEL McCLANAHAN
NATIONAL SECURITIES COUNSELORS
4702 LEVADA TERRACE
ROCKVILLE, MD 20853

> *Assassination Archives v. DOJ*
> Civil Action No. 18-cv-01868
> FOIPA Request No.:  1139342-001
> Subject:  ELSUR INDICES/CARDS PRE-1960

Dear Mr. McClanahan:

The enclosed documents were reviewed under the Freedom of Information (FOIA), Title 5, United States Code, Section 552.  Below you will find checked boxes under applicable statutes for the exemptions asserted to protect information exempt from disclosure.  The appropriate exemptions are noted on the processed pages next to redacted information.  An Explanation of Exemptions is enclosed to further explain justification for withheld information.

|  | **Section 552** |  |  | **Section 552a** |
|---|---|---|---|---|
| ☑ (b)(1) | ☐ (b)(7)(A) |  | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) |  | ☐ (j)(2) |
| ☑ (b)(3) | ☑ (b)(7)(C) |  | ☐ (k)(1) |
| 50 USC Section 3024(i)(1) | ☑ (b)(7)(D) |  | ☐ (k)(2) |
|  | ☑ (b)(7)(E) |  | ☐ (k)(3) |
|  | ☐ (b)(7)(F) |  | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) |  | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) |  | ☐ (k)(6) |
| ☑ (b)(6) |  |  | ☐ (k)(7) |

513 pages were reviewed and 513 pages are being released.

Below you will also find additional informational paragraphs about your request.  Where applicable, checked boxes are used to provide you with more information about the processing of your request.  Please read each item carefully.

☐ Document(s) were located which originated with, or contained information concerning, other Government Agency (ies) [OGA].

☐ This information has been referred to the OGA(s) for review and direct response to you.
☐ We are consulting with another agency.  The FBI will correspond with you regarding this information when the consultation is completed.

☐ In accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E) and Privacy Act exemption (j)(2) [5 U.S.C. § 552/552a (b)(7)(E)/(j)(2)], this response neither confirms nor denies the existence of your subject's name on any watch lists.

236

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the Freedom of Information Act (FOIA).   See 5 U.S. C. § 552(c) (2006 & Supp. IV (2010).   This response is limited to those records subject to the requirements of the FOIA.   This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist. Enclosed for your information is a copy of the Explanation of Exemptions.

Please direct any further inquiries about this case to the Attorney representing the Government in this matter. Please use the FOIPA Request Number and/or Civil Action Number in all correspondence or inquiries concerning your request.

☐   The enclosed material is from the main investigative file(s) in which the subject(s) of your request was the focus of the investigation.   Our search located additional references, in files relating to other individuals, or matters, which may or may not be about your subject(s).   Our experience has shown such additional references, if identified to the same subject of the main investigative file, usually contain information similar to the information processed in the main file(s).   As such, we have given priority to processing only the main investigative file(s) given our significant backlog.   If you would like to receive any references to the subject(s) of your request, please submit a separate request for the reference material in writing.   The references will be reviewed at a later date, as time and resources permit.

☑   See additional information which follows.

Sincerely,

David M. Hardy
Section Chief
Record/Information
   Dissemination Section
Information Management Division

Enclosures

The enclosed documents represent the second interim release of information responsive to your Freedom of Information Acts (FOIA) request 1139342-001 and current Bates stamp range (18-cv-01868-541 through 18-cv-01868-1053).

**By letter dated February 4, 2019, we sent you a Compact Disc (CD) containing the first interim release for this case.   At that time, we explained the $10.00 balance associated with that release would be billed with this release.   Accordingly, upon receipt of the enclosed CD please go to www.pay.gov to make an electronic payment\* in the amount of $25.00, or make a check or money order payable to the Federal Bureau of Investigation and remit it to the Work Process Unit, Record Information/Dissemination Section, Records Management Division, Federal Bureau of Investigation, 170 Marcel Drive, Winchester, VA 22602.   Please include the FOIPA Request Number with your payment.   Failure to pay for this release within thirty (30) days from the date of this letter will close any pending FBI FOIPA requests from you.   Nonpayment will also cause an automatic denial of any future FOIPA requests.**

*\*Pay.gov is a secure web-based application that accepts credit card and ACH payments online, and is hosted by the United States Department of Treasury, Financial Management Service.   For frequent FOIPA requesters, it is recommended to create a Pay.gov account to retain an online history of payments made through Pay.gov and to retain specific information for future payments.   To make an electronic payment, complete the FBI Freedom of Information Act and Privacy Act Form located on Pay.gov.   Please note:   if a refund is necessary, there is less processing time to refund a credit card payment than an ACH payment.*

*For further information on the actions to be taken by the FBI in regards to your FOIA requests, please see FOIA 1386188-000/1386440-000 release letter dated November 9, 2018.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

       Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE

       Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT AB



**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

October 5, 2021

MR. KEL McCLANAHAN
NATIONAL SECURITIES COUNSELORS
4702 LEVADA TERRACE
ROCKVILLE, MD 20853

*Assassination Archive v. DOJ*
Civil Action No. 18-cv-01868
FOIPA Request No.:   1149636-000
Subject:   ELSUR INDICES/CARDS PRE-1960

Dear Mr. McClanahan:

The enclosed documents were reviewed under the Freedom of Information Act (FOIA), Title 5, United States Code, Section 552.   Below you will find checked boxes under applicable statutes for the exemptions asserted to protect information exempt from disclosure.   The appropriate exemptions are noted on the processed pages next to redacted information.   In addition, a deleted page information sheet was inserted to indicate where pages were withheld entirely pursuant to applicable exemptions.   An Explanation of Exemptions is enclosed to further explain justification for withheld information.

|  Section 552 | | Section 552a |
|---|---|---|
| ☑ (b)(1) | ☐ (b)(7)(A) | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | ☐ (j)(2) |
| ☑ (b)(3) | ☑ (b)(7)(C) | ☐ (k)(1) |
| ___50 USC Section 3024(i)(1)___ | ☐ (b)(7)(D) | ☐ (k)(2) |
| _____ | ☑ (b)(7)(E) | ☐ (k)(3) |
| _____ | ☐ (b)(7)(F) | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | ☐ (k)(6) |
| ☑ (b)(6) | | ☐ (k)(7) |

250 pages were reviewed and 250 pages are being released.

Please see the paragraphs below for relevant information specific to your request and the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

☐ Document(s) were located which originated with, or contained information concerning, other
 Government Agency (ies) [OGA].

  ☐ This information has been referred to the OGA(s) for review and direct response to you.
  ☐ We are consulting with another agency.   The FBI will correspond with you regarding this information
   when the consultation is completed.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request.   **"Part 1"** of the Addendum includes standard responses that apply to all requests.   **"Part 2"** includes additional standard responses that apply to all requests for records about yourself or any third party individuals. **"Part 3"** includes general information about FBI records that you may find useful.   Also enclosed is our Explanation of Exemptions.

Although your request is in litigation, we are required by law to provide you the following information:

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal.   Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

Please direct any further inquiries about this case to the Attorney representing the Government in this matter.   Please use the FOIPA Request Number and/or Civil Action Number in all correspondence or inquiries concerning your request.

☑   See additional information which follows.


Sincerely,

*[signature]*

Michael G. Seidel
Section Chief
Record/Information
   Dissemination Section
Information Management Division




Enclosures


The enclosed documents represent the 20th interim release of information responsive to your Freedom of Information Act (FOIA) request 1149636-000 with current Bates stamp range (18-cv-01868-9052 through 18-cv-01868-9301).   This release includes responsive records from portions of the New York field office.

The FBI has adjusted the duplication fee due with regard to this release and the prior releases consisting of less than 500 pages of processed records.   The adjusted fee is as follows:

| Releases | Pages | Fees |
|---|---|---|
| 6/30/20 | 304 pp | remitted $15 |
| 1/29/21 | 256 pp | remitted $15 |
| 2/26/21 | 254 pp | *applied partial credit from June release payment |
| 3/30/21 | 252 pp | *applied partial credit from January release payment |
| 4/30/21 | 250 pp | Owe $7.50 but under threshold to bill, therefore, carryover with next release |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

      Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE

      Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT AD

**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

December 30, 2021

MR. KEL McCLANAHAN
NATIONAL SECURITIES COUNSELORS
4702 LEVADA TERRACE
ROCKVILLE, MD 20853

*Assassination Archives v. DOJ*
Civil Action No. 18-cv-01868
FOIPA Request No.:  1149636-000
Subject:  ELSUR INDICES/CARDS PRE-1960

Dear Mr. McClanahan:

The enclosed documents were reviewed under the Freedom of Information Act (FOIA), Title 5, United States Code, Section 552.   Below you will find checked boxes under applicable statutes for the exemptions asserted to protect information exempt from disclosure.   The appropriate exemptions are noted on the processed pages next to redacted information.   In addition, a deleted page information sheet was inserted to indicate where pages were withheld entirely pursuant to applicable exemptions.   An Explanation of Exemptions is enclosed to further explain justification for withheld information.

|  | **Section 552** |  | | **Section 552a** |
|---|---|---|---|---|
| ☑ (b)(1) | ☐ (b)(7)(A) | | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | | ☐ (j)(2) |
| ☑ (b)(3) | ☑ (b)(7)(C) | | ☐ (k)(1) |
| 50 USC Section 3024(i)(1) | ☑ (b)(7)(D) | | ☐ (k)(2) |
| | ☑ (b)(7)(E) | | ☐ (k)(3) |
| | ☐ (b)(7)(F) | | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | | ☐ (k)(6) |
| ☑ (b)(6) | | | ☐ (k)(7) |

508 pages were reviewed and 508 pages are being released.

Please see the paragraphs below for relevant information specific to your request and the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

☐ Document(s) were located which originated with, or contained information concerning, other Government Agency (ies) [OGA].

☐ This information has been referred to the OGA(s) for review and direct response to you.
☐ We are consulting with another agency.   The FBI will correspond with you regarding this information when the consultation is completed.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request.   **"Part 1"** of the Addendum includes standard responses that apply to all requests.   **"Part 2"** includes additional standard responses that apply to all requests for records about yourself or any third party individuals. **"Part 3"** includes general information about FBI records that you may find useful.   Also enclosed is our Explanation of Exemptions.

Although your request is in litigation, we are required by law to provide you the following information:

    If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal.   Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

    Please direct any further inquiries about this case to the Attorney representing the Government in this matter.   Please use the FOIPA Request Number and/or Civil Action Number in all correspondence or inquiries concerning your request.

☑   See additional information which follows.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information
   Dissemination Section
Information Management Division

Enclosures

    The enclosed documents represent the 22nd interim release of information responsive to your Freedom of Information Act (FOIA) request 1149636-000 with current Bates stamp range (18-cv-01868-9844 through 18-cv-01868-10476).   This release includes responsive records from the New York field office.

    **Upon receipt of the enclosed Compact Disc (CD), please go to www.pay.gov to make an electronic payment\* in the amount of $37.50.   This amount includes the balance due of $22.50, as explained in our November 30, 2021 letter, in addition to $15.00 for this release.   Please make check or money order payable to the Federal Bureau of Investigation and mail it to the Work Process Unit, Records/Information Dissemination Section, Records Management Division, Federal Bureau of Investigation, 170 Marcel Drive, Winchester, VA 22602.   Please include the FOIPA request Number with your payment.   Failure to pay for this release within thirty (30) days from the date of this letter will close any pending FBI FOIPA requests from you.   Nonpayment will also cause an automatic denial of any future FOIPA requests.**

    *Pay.gov is a secure web-based application that accepts credit card and ACH Payments online, and is hosted by the United States Department of Treasury, Financial Management Service.   For frequent FOIPA requests, it is recommended to create a Pay.gov account to retain an online history of payments made through Pay.gov and to retain specific information for future payments.   To make an electronic payment, complete the FBI Freedom of Information ACT and Privacy Act Form located on Pay.gov.   Please note:   if a refund is necessary, there is less processing time to refund a credit card payment than an ACH payment.*

    For further information on the actions to be taken by the FBI in regards to your FOIA requests, please see FOIA 1386188-000/1386440-000 release letter dated November 9, 2018.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

       Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE

       Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT AE

1/6/22, 8:49 AM EMailCorrespondence.html

Case 1:18-cv-01868-TNM   Document 45-1   Filed 01/31/22   Page 164 of 190
USCA Case #23-5004   Document #2003881   Filed: 06/16/2023   Page 251 of 341

----START MESSAGE---- Subject: eFOIA Request Received Sent: 2017-10-02T02:19:30.419954+00:00 Status: pending Message:

## Organization Representative Information

| | |
|---|---|
| **Organization Name** | National Security Counselors |
| **Prefix** | |
| **First Name** | Kel |
| **Middle Name** | |
| **Last Name** | McClanahan |
| **Suffix** | |
| **Email** | kel@nationalsecuritylaw.org |
| **Phone** | 301-728-5908 |
| **Location** | United States |

## Domestic Address

| | |
|---|---|
| **Address Line 1** | 4702 Levada Terrace |
| **Address Line 2** | |
| **City** | Rockville |
| **State** | Maryland |
| **Postal** | 20853 |

## Agreement to Pay

245

1/6/22, 8:49 AM                                    EMailCorrespondence.html

Case 1:18-cv-01868-TNM   Document 45-1   Filed 01/31/22   Page 165 of 190
USCA Case #23-5004      Document #2003881      Filed: 06/16/2023      Page 252 of 341

**How you will pay** | I am willing to pay additional fees and will enter the maximum amount I am willing to pay in the box below.

**Allow up to $** | 1

# Non-Individual FOIA Request

**Request Information**

```
On behalf of my client, the Assassination Archives and Research Center, I
request all information about the processing of their previous FOIA Request
No. 1139342. This includes all information in the FDPS as well as all emails
or records not in that system discussing this request. However, you may
exclude records which are responsive to that request itself; this is a
request for records ABOUT that request, not for records RESPONSIVE TO that
request. Please provide all records in electronic format through this
portal.

Because these records should be easy to locate and should not be voluminous,
we do not anticipate the assessment of any fees, but should you conclude
that fees are appropriate, please inform me and we will address that issue
at that time.
```

----END MESSAGE----

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

      Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE

      Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT AF



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

October 12, 2017

MR. KEL MCCLANAHAN ESQUIRE
NATIONAL SECURITY COUNSELORS
4702 LEVADA TERRACE
ROCKVILLE, MD 20853

FOIPA Request No.: 1386188-000
Subject: PROCESSING INFORMATION
FOR FOIA 1139342

Dear Mr. McClanahan:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to the FBI.   Below you will find check boxes and informational paragraphs about your request, as well as specific determinations required by these statutes.   Please read each one carefully.

☑   Your request has been received at FBI Headquarters for processing.

☐   Your request has been received at the _____ Resident Agency / _____ Field Office and forwarded to FBI Headquarters for processing.

☑   You submitted your request via the FBI's eFOIPA system.

  ☑   We have reviewed your request. Consistent with the FBI eFOIPA terms of service, future correspondence about your FOIA request will be provided in an email link.

  ☐   We have reviewed your request. Consistent with the FBI eFOIPA terms of service, future correspondence about your FOIPA request will be sent through standard mail.

☐   The subject of your request is currently being processed and documents will be released to you upon completion.

☐   Release of responsive records will be posted to the FBI's electronic FOIA Library (The Vault), http:/vault.fbi.gov, and you will be contacted when the release is posted.

☐   Your request for a public interest fee waiver is under consideration, and you will be advised of the decision at a later date.   If your fee waiver is not granted, you will be responsible for applicable fees per your designated requester fee category below.

☑   For the purpose of assessing any fees, we have determined:

  ☐   As a commercial use requester, you will be charged applicable search, review, and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(I).

  ☐   As an educational institution, noncommercial scientific institution or representative of the news media requester, you will be charged applicable duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(II).

  ☑   As a general (all others) requester, you will be charged applicable search and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(III).

Please check the status of your FOIPA request at www.fbi.gov/foia by clicking on **FOIPA Status** and entering your FOIPA Request Number.   Status updates are adjusted weekly.   The status of newly assigned requests may not be available until the next weekly update.   If the FOIPA has been closed the notice will indicate that appropriate correspondence has been mailed to the address on file.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request number listed above has been assigned to your request.   Please use this number in all correspondence concerning your request.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's FOIA online portal by creating an account on the following web site:  https://foiaonline.regulations.gov/foia/action/public/home.   Your appeal must be postmarked or electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS) at 877-684-6448, or by emailing ogis@nara.gov.   Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov.   If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
   Dissemination Section
Records Management Division

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

      Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE

      Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT AG

----START MESSAGE---- Subject: eFOIA Request Received Sent: 2017-10-02T02:43:01.565128+00:00 Status: pending Message:

## Organization Representative Information

| | |
|---|---|
| Organization Name | National Security Counselors |
| Prefix | |
| First Name | Kel |
| Middle Name | |
| Last Name | McClanahan |
| Suffix | |
| Email | kel@nationalsecuritylaw.org |
| Phone | 301-728-5908 |
| Location | United States |

## Domestic Address

| | |
|---|---|
| Address Line 1 | 4702 Levada Terrace |
| Address Line 2 | |
| City | Rockville |
| State | Maryland |
| Postal | 20853 |

## Agreement to Pay

251

| **How you will pay** | I am willing to pay additional fees and will enter the maximum amount I am willing to pay in the box below. |

| **Allow up to $** | 1 |

## Non-Individual FOIA Request

**Request Information**

On 7 September 2012, James Lesar submitted a FOIA request on behalf of his client, the Assassination Archives and Research Center ("AARC"), by Certified Mail to FBI (copy attached). On 10 September 2012, FBI refused to accept delivery of the envelope containing the request. See attached USPS tracking information. On 10 April 2013, Mr. Lesar sent a followup letter to FBI (copy attached) complaining about this refusal, stating, in pertinent part, "I would like to know the identities of all members of your staff who were aware of or participated in this denial of rights, and I ask that you take disciplinary action against them. Please place this request in a processing queue in accordance with the priority it would have received had you accepted delivery of it in September 2012."

On behalf of my client, the AARC, I request all information about the aforementioned sequence of events and all information about any actions FBI took in response to Mr. Lesar's 10 April 2013 letter. This includes all information in the FDPS about the request itself, all emails or records not in that system discussing the request, and all records, regardless of location, discussing any disciplinary actions considered or taken by FBI regarding this sequence of events, as well as any similar records discussing this matter (such as, for example, an email or memo inquiring into the reasons for the refusal, or an email or memo stating that no response will be issued). However, you may exclude records which are responsive to that request itself; this is a request for records ABOUT that request, not for records RESPONSIVE TO that request. Please provide all records in electronic format through this portal.

Because these records should be easy to locate and should not be voluminous, we do not anticipate the assessment of any fees, but should you conclude that fees are appropriate, please inform me and we will address that issue at that time.

----END MESSAGE----

# JAMES H. LESAR
Attorney at Law

## FREEDOM OF INFORMATION ACT REQUEST

September 7, 2012

Mr. David M. Hardy
c/o Work Processing Station
Record Information/Dissemination Section
Records Management Division
Federal Bureau of Investigatin
170 Marcel Drive                    DELIVERY CONFIRMATION
Winchester, VA 22602                NO. 7011 1570 0000 4518 3979

Re: Pre-1960 and Later ELSUR iNDICES

Dear Mr. Hardy:

I represent the Assassination Archives and Research Center ("AARC"). The AARC provides information on the assassination of President John F. Kennedy and other subjects, including other political assassinations, to the news media and the public, as well as to its members.

As president of the AARC, I have been interviewed by many television news programs and documentaries concerning the assassinations of President Kennedy and Dr. Martin Luther King, Jr., the President John F. Kennedy Assassination Records Collection Act of 1992 ("JFK Records Act"), and related topics. I have also appeared on radio programs, including the Voice of America and The Larry King Show. I have appeared on a number of television programs, including CNN, Fox News, and Good Morning America (CBS). The Washington Post ran an op-ed piece by me on the need to release the records of the House Select Committee on Assassinations. This article was widely reprinted in other papers, as was an article on the AARC which was disseminated by the Associated Press. On June 8, 1997, the Washington Post published an Outlook Section article I wrote on the assassination of Dr. Martin Luther King, Jr. and the case of his alleged assassin, James Earl Ray. I have been quoted by Reuters, the Associated Press, the New York Times, the Washington Post and numerous other representatives of the news media on matters pertaining to the assassinations of President Kennedy and Dr. King.

I testified to both houses of Congress regarding the pending legislation to require disclosure of records pertaining to the assassination of President Kennedy. In November 1993, I testified before the House Subcommittee on Legislation and National Security regarding the implementation of the JFK Act. On several occasions I testified at hearings held by the Assassination Records Review Board, a five-citizen panel appointed to enforce the JFK Records Act.

930 Wayne Avenue, Unit 1111 • Silver Spring, MD 20910
Phone: (301) 328-5920 • (202) 393-1921
E-mail: jlesan@mindspring.com

2

I am also an attorney specializing in Freedom of Information Act litigation.  I am planning to write a book on my nearly four decades of experience litigating FOIA cases.

Three years ago the FBI revealed that it has seven boxes of ELSUR ("electronic surveillance") indices, the existence of which had not previously been publicly acknowledged. This is specified in the July 2, 2009 declaration of Dennis J. Argall filed in Lardner v. FBI, et al., Civil Action No. 03-0874.  Subsequently, the FBI has advised me that some of the materials in these seven boxes concern post-1960 surveillances, rather than pre-1960 surveillances.

Pursuant to the Freedom of Information Act. 5 7.S.C. § 552, I hereby request copies of all these indices, whether they relate to pre- or post-1960 surveillances.  I also requestt all tapes, transcripts, logs and other materials related to said surveillance, including surveillance applications, affidavits, testimony, authorizations and warrants.

I request that copies of these records be provided to me in word searchable .pdf format.  I also request

I further rerquest a waiver of all search and copying fees.  As noted above, the purposes of the AARC is to gather, preserve and disseminate information to the public regarding political assassinations.  The AARC maintains both extensive hard copy files and digital copies of government records which comprise approximately one million pages.  Because possible connections of organized crime figures to the assassinations of President John F. Kennedy, Dr. Martin Luther King, and Senator Robert F. Kennedy figure prominently in the investigations of these murders, the holdings of the AARC, both hard copy and digital, reflect this.  The public interest in such records is undeniable.  There is also a profound public interest in such materials even if they do not pertain to the above-cited political assassinations, particularly where such surveillances were unlawful or related to investigations which were not done for law enforcement purposes.

In light of the facts recited above, the AARC and I are each entitled to representative of the news media status and cannot be charged search fees.  We are also entitled to a public interest fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii).  The records will show what the FBI was up to and when, with respect to the FBI's operations regarding organized crime activities and other activities.  The public interest in such matters is obvious and profound.  Our capability to disseminate the information has  been amply demonstrated above.

Pending your determination whether to grant or deny a fee waiver, I commit to paying up to $200 in copying fees.  Indices are to be processed before the other materials requested.

Sincerely yours,

*James H. Lesar*
James H. Lesar

| | Your Label Number | Service | Status of Your Item | Date & Time | Location | Features |
|---|---|---|---|---|---|---|
| Result 1 | 70111570000045183979 | First-Class Mail® | Processed through USPS Sort Facility | September 15, 2012, 11:21 pm | WASHINGTON, DC 20066 | **Expected Delivery By:** September 10, 2012 Certified Mail™ Return Receipt |
| | | | Processed through USPS Sort Facility | September 14, 2012, 10:21 am | MERRIFIELD, VA 22081 | |
| | | | Depart USPS Sort Facility | September 13, 2012 | MERRIFIELD, VA 22081 | |
| | | | Processed through USPS Sort Facility | September 12, 2012, 9:22 am | MERRIFIELD, VA 22081 | |
| | | | Refused | September 10, 2012, 5:53 pm | WINCHESTER, VA 22601 | |
| | | | Refused | September 10, 2012, 5:29 pm | WINCHESTER, VA 22602 | |
| | | | Arrival at Unit | September 10, 2012, 6:51 am | WINCHESTER, VA 22601 | |
| | | | Depart USPS Sort Facility | September 10, 2012 | DULLES, VA 20101 | |
| | | | Processed through USPS Sort Facility | September 09, 2012, 11:22 pm | DULLES, VA 20101 | |
| | | | Depart USPS Sort Facility | September 09, 2012 | GAITHERSBURG, MD 20898 | |
| | | | Processed at USPS Origin Sort | September 08, 2012, 9:23 pm | GAITHERSBURG, MD 20898 | |

255

| Your Label Number | Service | Status of Your Item | Date & Time | Location | Features |
|---|---|---|---|---|---|
| | | Facility | | | |
| | | Dispatched to Sort Facility | September 08, 2012, 7:01 pm | SILVER SPRING, MD 20910 | |
| | | Acceptance | September 08, 2012, 12:27 pm | SILVER SPRING, M | |

April 10, 2013

Mr. David M. Hardy
c/o Work Processing Station
Records Information /Dissemination Section
Records Management Division
170 Marcel Drive                                    CERTIFIED MAIL NO.
Winchester, VA 22602                                7011 0470 0002 7418 1368

       Re:  Pre-1960 and Later ELSUR Inices

Dear Mr. Hardy:

       Attached is a Freedom of Information Act request which I submitted on behalf of the
Assassination Archives and Research Center by letter dated September 7, 2013.  The United
States Postal Service has indicated that because your office refused to accept delivery, it was sent
to the Dead Mail Office and disposed of.

       This is a flagrant violation of my client's rights to request information under the Freedom
of Information Act.  I would like to know the identities of all members of your staff who were
aware of or participated in this denial of rights, and I ask that you take disciplinary action against
them.

       Please place th is request in a processing queue in accordance with the priority it would
have received had you accepted delivery of it in September 2012.

               Sincerely yours,

               James H. Lesar

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

      Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE

      Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT AH



**U.S. Department of Justice**

---

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

October 10, 2017

MR. KEL MCCLANAHAN
NATIONAL SECURITY COUNSELORS
4702 LEVADA TERRACE
ROCKVILLE, MD 20853

FOIPA Request No.: 1386440-000
Subject: Refusal of James Lesar request sent via
Certified Mail

Dear Mr. McClanahan:

This is in response to your Freedom of Information Act (FOIA) request. The FBI has completed its search for records responsive to your request.   Below you will also find informational paragraphs relevant to your request. Please read each item carefully.

Based on the information you provided, we conducted a search of the Central Records System.   We were unable to identify any main file records responsive to your request.   If you have additional information pertaining to the subject of your request, please provide us with such details, and we will conduct an additional search.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the Freedom of Information Act (FOIA).   See 5 U.S. C. § 552(c) (2006 & Supp. IV (2010).   This response is limited to those records subject to the requirements of the FOIA.   This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request Number listed above has been assigned to your request.   Please use this number in all correspondence concerning your request.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's FOIA online portal by creating an account on the following web site:  https://foiaonline.regulations.gov/foia/action/public/home.   Your appeal must be postmarked or electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS) at 877-684-6448, or by emailing ogis@nara.gov.   Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov.   If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Enclosed for your information is a copy of the FBI Fact Sheet and Explanation of Exemptions.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
   Dissemination Section
Records Management Division

Enclosure

259

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

      Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE

      Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT AI



**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

October 13, 2017

MR. KEL MCCLANAHAN
NATIONAL SECURITY COUNSELORS
4702 LEVADA TERRACE
ROCKVILLE, MD 20853

FOIPA Request No.: 1386440-000
Subject: Refusal of James Lesar request
sent via Certified Mail

Dear Mr. Mcclanahan:

     The No Record Letter previously sent to you was in error. This acknowledges receipt of your Freedom of Information Act (FOIA) request to the FBI.   Below you will find check boxes and informational paragraphs about your request, as well as specific determinations required by these statutes.   Please read each one carefully.

☑     Your request has been received at FBI Headquarters for processing.

☐     Your request has been received at the _____ Resident Agency / _____ Field Office and forwarded to FBI Headquarters for processing.

☑     You submitted your request via the FBI's eFOIPA system.

        ☑     We have reviewed your request. Consistent with the FBI eFOIPA terms of service, future correspondence about your FOIA request will be provided in an email link.

        ☐     We have reviewed your request. Consistent with the FBI eFOIPA terms of service, future correspondence about your FOIPA request will be sent through standard mail.

☐     The subject of your request is currently being processed and documents will be released to you upon completion.

☐     Release of responsive records will be posted to the FBI's electronic FOIA Library (The Vault), http:/vault.fbi.gov, and you will be contacted when the release is posted.

☐     Your request for a public interest fee waiver is under consideration, and you will be advised of the decision at a later date.   If your fee waiver is not granted, you will be responsible for applicable fees per your designated requester fee category below.

☑     For the purpose of assessing any fees, we have determined:

        ☐     As a commercial use requester, you will be charged applicable search, review, and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(I).

        ☐     As an educational institution, noncommercial scientific institution or representative of the news media requester, you will be charged applicable duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(II).

☑   As a general (all others) requester, you will be charged applicable search and
duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(III).

Please check the status of your FOIPA request at www.fbi.gov/foia by clicking on **FOIPA Status**
and entering your FOIPA Request Number.   Status updates are adjusted weekly.   The status of newly
assigned requests may not be available until the next weekly update.   If the FOIPA has been closed the
notice will indicate that appropriate correspondence has been mailed to the address on file.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us."
The FOIPA Request number listed above has been assigned to your request.   Please use this number in all
correspondence concerning your request.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States
Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you
may submit an appeal through OIP's FOIA online portal by creating an account on the following web
site:   https://foiaonline.regulations.gov/foia/action/public/home.   Your appeal must be postmarked or
electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely.
If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of
Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so it may be
easily identified.

You may seek dispute resolution services by contacting the Office of Government Information
Services (OGIS) at 877-684-6448, or by emailing ogis@nara.gov.   Alternatively, you may contact the FBI's
FOIA Public Liaison by emailing foipaquestions@fbi.gov.   If you submit your dispute resolution
correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please
also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
   Dissemination Section
Records Management Division

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

       Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE

       Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT AJ

**Appeal Details**

**Request Type :** *FOIA*



Submitted ─── Evaluation ─── Assignment ─── Processing ─── Closed

## Appeal Details

| | |
|---|---|
| Tracking Number : DOJ-AP-2018-000176 | Submitted Date : 10/11/2017 |
| Requester : Mr. Kel McClanahan | Received Date : 10/11/2017 |
| Organization : National Security Counselors | Last Assigned Date : 10/11/2017 |
| | Appeal Track : TBD |
| Requester Has Account : Yes | Due Date : 11/08/2017 |
| Created on behalf of : N/A | Assigned To : Appeals |
| Email Address : kel@nationalsecuritylaw.org | Last Assigned By : N/A |
| Phone Number : 301-728-5908 | |
| Fax Number : 240-681-2189 | |
| Address : 4702 Levada Terrace | |
| City : Rockville | |
| State/Province : MD | |
| Zip Code/Postal Code : 20853 | |

## Request Details

| | |
|---|---|
| Tracking Number : 1386440-000 | Request Phase : Submitted |
| Requester : Assassination Archives and Research Center | Request Track : Simple |
| | Final Disposition : |
| Date Submitted : 10/11/2017 | |

Request Description :

---

| Submission Details | Case File | Admin Cost | Assigned Tasks | Comments (0) | Review |

## Appeal Handling

| | |
|---|---|
| Requester Info Available to the Public : No | Appeal Received : Yes |
| Appeal Track : Select Track | Received Date : 10/11/2017 |
| Fee Category : N/A | Acknowledgement Sent Date : |
| Based on Fee Waiver : ☐ | 5 Day Notifications : ☐ |
| Based on Expedited Processing : ☐ | Litigation : No |
| Expedited Processing Requested : No | |
| Expedited Processing Status : N/A | |

## Basis for Appeal

Short Description :

We appeal the adequacy of FBI's search. It is no surprise that the responsive records about what the FBI Mail Room did about a FOIA request is not in the Central Records System, and it is ludicrous for FBI to only search that system.

Basis Available to the Public : [No ▼]          Has Basis Been Modified? ☐

## Additional Information

Source Request Tracking   [1386440-000]
Number :
Expedited Type :   [Select Expedited Type ▼]
Sub-Office :   [Federal Bureau of Investigation ▼]

## Attached Supporting Files

No supporting files have been added.

## Upload Supporting Files

No attachments have been added.

265

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

   Plaintiff,

  v.          Civil Action No. 18-CV-1868-TNM

UNITED STATES DEPARTMENT OF
JUSTICE

   Defendant.

# EXHIBIT AK

1425 New York Avenue N.W.
Suite 11050
Washington, DC 20005

Kel McClanahan
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853

October 11, 2017

Dear Mr. Kel McClanahan,

This is to advise you that your administrative appeal from the action of the FBI regarding Request No. 1386440-000 was received by this Office on 10/11/2017.

The Office of Information Policy has the responsibility of adjudicating such appeals.  In an attempt to afford each appellant equal and impartial treatment, we have adopted a general practice of assigning appeals in the approximate order of receipt.  Your appeal has been assigned number DOJ-AP-2018-000176.  Please mention this number in any future correspondence to this Office regarding this matter. Please note that if you provide an e-mail address or another electronic means of communication with your request or appeal, this Office may respond to your appeal electronically even if you submitted your appeal to this Office via regular U.S. Mail.

We will notify you of the decision on your appeal as soon as we can.  If you have any questions about the status of your appeal, you may contact me at (202) 514-3642.  If you have submitted your appeal through FOIAonline, you may also obtain an update on the status of your appeal by logging into your account.

Sincerely,

Priscilla Jones

Supervisory Administrative Specialist

267

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

       Plaintiff,

   v.

UNITED STATES DEPARTMENT OF
JUSTICE

       Defendant.

Civil Action No. 18-CV-1868-TNM

# EXHIBIT AL

**U.S. Department of Justice**

Office of Information Policy

*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

Kel McClanahan, Esq.
National Security Counselors
4702 Levada Terrace                    Re:     Appeal No. DOJ-AP-2018-000176
Rockville, MD  20853                           Request No. 1386440
kel@nationalsecuritylaw.org                    MWH:JNW

**VIA:  FOIAonline**

Dear Mr. McClanahan:

        You appealed from the action of the Federal Bureau of Investigation on your Freedom of
Information Act request for access to records concerning James Lesar's September 7, 2012 and
April 10, 2013 letters to the FBI.

        Please be advised that the FBI sent you a letter dated October 13, 2017 indicating that the
no records response it sent you was in error (copy enclosed).  The FBI is still currently
processing your client's request.  Accordingly, there is no adverse determination for this Office
to consider on appeal, and I am closing your appeal file in this Office.

        If you have any questions regarding the action this Office has taken on your appeal, you
may contact this Office's FOIA Public Liaison for your appeal.  Specifically, you may speak with
the undersigned agency official by calling (202) 514-3642.

                                        Sincerely,

                                                                11/15/2017

                                        X _____

                                        Matthew Hurd, Associate Chief, for
                                        Sean O'Neill, Chief, Administrative Appeals ...
                                        Signed by: MATTHEW HURD

Enclosure

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | * | |
| RESEARCH CENTER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-01868 (TNM) |
| | * | |
| DEPARTMENT OF JUSTICE, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| *    *    *    *    *    *    * | * | *    *    *    *    *    * |

**PLAINTIFF'S CONSENT MOTION FOR ENLARGEMENT OF TIME**
**WITHIN WHICH TO FILE ITS REPLIES IN SUPPORT OF ITS MOTION**
**FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO COMPEL**

NOW COMES Plaintiff to respectfully request a five-day enlargement of time until 16

February 2022, pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, within which to

file its Replies in support of its motion for partial summary judgment (Dkt. #40) and motion to

compel Defendant to seek an *Open America* stay (Dkt. #41). These briefs are due 11 February

2022.

Plaintiff has good cause to request this extension. Since the Court established the current

briefing schedule, another court in this district has ordered the undersigned to be ready for a

seven-day jury trial beginning 28 February, and further ordered the parties to file the necessary

joint pretrial statement today, 11 February. Despite the undersigned's best efforts to complete the

pretrial statement earlier in the week, the Government did not return the marked-up draft until

this evening, necessitating that most of the remaining time in the day be spent addressing the

proposed changes. While the undersigned only anticipates needing less than a day to complete

these briefs—leading him to not request this extension earlier because he did not know if he

would need it—his schedule this weekend and early next week is prohibitively full, and so he

accordingly requests an extension until next Wednesday for these briefs.

Defendant consents to this Motion. A proposed Order accompanies this Motion.

Date:   February 11, 2022

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

2

271

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **ASSASSINATION ARCHIVES AND RESEARCH CENTER**, <br><br> Plaintiff, <br><br> v. <br><br> **DEPARTMENT OF JUSTICE**, <br><br> Defendant. | Case No. 1:18-cv-01868 (TNM) |

## ORDER

Before the Court in this Freedom of Information Act (FOIA) case are Assassination Archives and Research Center's (the Center) Motion for Partial Summary Judgment and Motion to Compel Defendant to Seek an Open America Stay.  *See* Mot. for Partial Summ. J., ECF No. 40; Mot. to Compel, ECF No. 41.  The Government filed its opposition to both motions pursuant to the Court's scheduling order, and the Center now moves for an extension of time to file its reply.  *See* 1/14/2022 Min. Order; Mem. in Opp'n, ECF No. 45; Consent Mot. for Extension of Time (Mot. for Ext.), ECF No. 46.  Because the Center has repeatedly disregarded the Court's standing order and scheduling orders, the Court will summarily deny its motions.

The Center filed its Complaint in this case in 2018.  *See* Compl., ECF No. 1.  The Court then entered its standing order, which states that "[m]otions for extensions of time . . . are strongly discouraged" and will be "granted only in truly exceptional or compelling circumstances."  Standing Order ¶ 9, ECF No. 3.  The Court's standing order also requires a party seeking an extension of time to file its motion for an extension "at least four business days prior to the first affected deadline" (the "four-day rule").  *Id.* ¶ 9(A).  A party's motion must also

include "[t]he number of previous extensions or continuances, if any, granted to each party." *Id.* ¶ 9(B)(iv).

The Center has requested an extension six times since filing its Complaint. It first filed a motion for an extension to file a joint status report. *See* ECF No. 10. The Center acknowledged it had failed to abide by the Court's four-day rule. *See id.* at 2; Standing Order ¶ 9(A). The Court granted the Center's motion but warned it to comply with the standing order. *See* 12/10/2018 Min. Order.

The Center next requested a six-month extension to file a motion for partial summary judgment. *See* ECF No. 21. The Court granted the motion. *See* 9/10/2019 Min. Order.

One day prior to the end of the six-month extension, the Center sought an additional fifteen-week extension to file its motion for partial summary judgment. *See* ECF No. 22. The Center acknowledged it was not in compliance with the Court's four-day rule, *see id.* at 2, but it did not state how many times it had previously requested an extension. *See* Standing Order ¶ 9(B)(iv). The Court granted the extension in part with a warning that "[f]urther requests for extension shall be disfavored." 3/11/2020 Min. Order.

Several days later, the Center renewed its request for an extension. *See* ECF No. 23. The Court denied the motion, stating that "the Plaintiff has not shown good cause why its briefing deadline should be extended yet again." *See* 3/16/2020 Min. Order. The Center then filed a notice stating it would be unable to meet the Court's briefing deadline, and it asked the briefing schedule to be vacated. *See* ECF No. 24. The Court granted the request. *See* 4/1/2020 Min. Order.

Over a year later, the Center again indicated its desire to move forward with partial summary judgment briefing. The Court set a briefing schedule. *See* 10/13/2021 Min. Entry.

The day before the Center's partial summary judgment motion and motion to compel were due, it requested an extension. *See* ECF No. 39. The Center apologized for the lateness of its motion, *see id.* at 2, but it did not acknowledge it had violated the Court's four-day rule. *See* Standing Order ¶ 9(A). Nor did the Center state the number of requests for an extension it had previously made. *See* Standing Order ¶ 9(B)(iv). Still, the Court granted the extension request with a warning that future extension requests would be disfavored. *See* 11/12/2021 Min. Order.

The Center finally filed its motions on time. *See* ECF Nos. 40, 41. But after the Government filed its opposition to the Center's motions, the Center again requested an extension. *See* Mot. for Ext. The motion, filed the day the Center's reply was due, does not acknowledge it has—yet again—violated the Court's four-day rule. Nor does the motion state how many times the Center has requested an extension.

Enough is enough. A plaintiff must prosecute its case. And it must abide by the Court's instructions. The Center has done neither.

"District courts enjoy broad discretion when deciding case management and scheduling matters." *McGehee v. U.S. Dep't of Just.*, 362 F. Supp. 3d 14, 18 (D.D.C. 2019); *see also In re Vitamins Antitrust Class Actions*, 327 F.3d 1207, 1210 (D.C. Cir. 2003) (stating that a district court's discretion is "at its greatest" in "a case-management decision"). Because the Center has repeatedly violated the Court's standing order and its warnings that future requests for an extension would be disfavored, the Court will deny the Center's motions. The Center shall either pay the Government within 30 days, or the Government may suggest a briefing schedule on the issue of whether production is complete given that the Center is refusing to pay processing fees.

For these reasons, it is hereby

**ORDERED** that the Center's [46] Consent Motion for Extension of Time is DENIED; it is also

**ORDERED** that the Center's [40] Motion for Partial Summary Judgment and [41] Motion to Compel are DENIED; and it is also

**ORDERED** that on or before March 14, 2022, the Center shall pay the processing fee to the Government, or the Government shall file by March 18, 2022, a proposed schedule for further proceedings consistent with this Order.

**SO ORDERED**.

2022.02.14
16:05:36 -05'00'

Dated: February 14, 2022

TREVOR N. McFADDEN
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER, <br><br> *Plaintiff,* <br><br> v. <br><br> DEPARTMENT OF JUSTICE, <br><br> *Defendant.* | Civil Action No. 18-1868 (TNM) |

## DEFENDANT'S STATUS REPORT

Pursuant to the Court's February 14, 2022 Order, Defendant Department of Justice ("Defendant"), by and through undersigned counsel, respectfully submits this Status Report. Defendant reports as follows:

1. Plaintiff brings this action under the Freedom of Information, 5 U.S.C. § 552, seeking records relating to pre-1960 electronic surveillance activities. *See* ECF No. 1, Pl.'s Compl.

2. This Court ordered, *inter alia*, that Plaintiff pay Defendant within 30 days or Defendant may suggest a briefing schedule on the issue of whether production is complete given that the Center is refusing to pay processing fees. *See* February 14, 2022 Minute Order.

3. As of this filing, and as ordered, Plaintiff has not paid Defendant and therefore Defendant proposes the following briefing schedule:

- Defendant shall file it motion on or before April 18, 2022;

- Plaintiff will file its opposition on or before May 18, 2022; and,

- Defendant will file its reply on or before June 17, 2022.

4.    In light of the above, Defendant requests that the Court order the briefing schedule proposed above.


Dated: March 18, 2022                    Respectfully submitted,

                                         MATTHEW M. GRAVES, D.C. Bar # 481052
                                         United States Attorney

                                         BRIAN P. HUDAK
                                         Acting Chief, Civil Division

                                         */s/ Stephanie R. Johnson*
                                         STEPHANIE R. JOHNSON
                                         D.C. Bar # 1632338
                                         Assistant United States Attorney
                                         United States Attorney's Office
                                         Civil Division
                                         555 4th Street, N.W.
                                         Washington, D.C. 20530
                                         Stephanie.Johnson5@usdoj.gov

                                         *Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER, | |
| *Plaintiff*, | |
| v. | Civil Action No. 18-1868 (TNM) |
| DEPARTMENT OF JUSTICE, | |
| *Defendant*. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Contents ............................................................................................................ i

Table of Authorities ........................................................................................................ ii

Factual and Procedural Background ............................................................................ 1

Standard of Review ......................................................................................................... 3

Argument .......................................................................................................................... 4

      I.     Plaintiff Has Failed To Pay The Fees Required By FOIA, Permitting The
           Department To Cease Its Releases ................................................................. 4

      II.    The Duplication Fee Charged By The FBI Is Reasonable ..................................... 7

Conclusion ...................................................................................................................... 10

# TABLE OF AUTHORITIES

## Cases

Page

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................................3

*Antonelli v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
555 F. Supp. 2d 16 (D.D.C. 2008).............................................................................6

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................................................3

*Chaplin v. Stewart*,
96 F. Supp. 2d 209 (D.D.C. 2011).............................................................................4

*DeBrew v. Atwood*,
792 F.3d 118 (D.C. Cir. 2015)..................................................................................9

*Hicks v. Hardy*,
No. 04-769, 2006 WL 949918 (D.D.C. Apr. 12, 2006)............................................6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)..................................................................................................3

*McLaughlin v. Dep't of Just.*,
598 F. Supp. 2d 62 (D.D.C. 2009).............................................................................6

*Nat'l Sec. Couns. v. Dep't of Just.*,
305 F. Supp. 3d 176 (D.D.C. 2018) *summ. aff'd*, No. 18-5171, 2018 WL 6167377 (D.C. Cir.
Nov. 1, 2018)............................................................................................................7

*Otero v. United States Dep't of Just.*,
No. 18-5080, 2019 WL 4565497 (D.C. Cir. Sept. 4, 2019).......................................6

*Pollack v. Dep't of Just.*,
49 F.3d 115 (4th Cir. 1995).......................................................................................6

*Sieverding v. Dep't of Just.*,
910 F. Supp. 2d 149 (D.D.C. 2012)...........................................................................4

*Tao v. Freeh*,
27 F.3d 635 (D.C. Cir. 1994).....................................................................................3

*Trueblood v. United States Dep't of Treasury*,
943 F. Supp. 64 (D.D.C. 1996).................................................................................4

*United States v. L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952)....................................................................................................9

**Statutes, Regulations, Rules, and Other Authorities**

5 U.S.C. § 552 ................................................................................................4, 9

28 C.F.R. § 16.10 ........................................................................................ 4-5, 9

Fed. R. Civ. P. 41 ...........................................................................................4

Fed. R. Civ. P. 56 ........................................................................................1, 3

Defendant United States Department of Justice (the "Department" or "Defendant") respectfully moves pursuant to Federal Rule of Civil Procedure 56(c) for partial summary judgment on the issue of the completeness of its releases in response to certain Freedom of Information Act ("FOIA") requests in light of Plaintiff Assassination Archives and Research Center's ("Plaintiff") failure to timely pay FOIA fees as ordered by the Court.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff commenced this action on August 8, 2018, pursuant to FOIA. *See generally* ECF No.1, Compl.  Under FOIA, Plaintiff sought records relating to pre-1960 electronic surveillance activities from the Federal Bureau of Investigation ("FBI").[2] *See id.*

The FBI has been processing and producing these records in accordance with a priority list provided by Plaintiff on October 30, 2020.  *See* ECF No. 45-1, Declaration of Michael G. Seidel ("Seidel Decl.") at 11, n. 6.  Plaintiff requested that the records released be placed on a CD, so Plaintiff was required to pay a monthly $15 duplication fee and would receive the 500 pages on a CD.  Plaintiff paid the assessed fees for the first nineteen interim productions beginning on February 4, 2019, continuing through March 30, 2021.  *See id.* ¶ 17; *see also* Second Declaration of Michael G. Seidel ("2d Seidel Decl.") ¶ 7.  The FBI made twenty-two interim productions in response to Plaintiff's request, FOIA 1139342-001, beginning on February 4, 2019, and continuing

---

[1]   Defendant also incorporates the Statement of Undisputed Material Facts that are filed contemporaneously with this Memorandum.

[2]   Plaintiff submitted three FOIA requests to the FBI.  The FBI assigned the three FOIA requests with FOIPA Request Numbers 1139342-001 (Plaintiff's First Cause of Action), 1386188-000 (Plaintiff's Second Cause of Action), and 1386440-000 (Plaintiff's Third Cause of Action). Until Plaintiff stopped paying the associated fees, the FBI was processing and producing records for FOIA Request Number 1139342-001.  *See* Seidel Decl. ¶¶ 5-7, 17-18.  By letter dated November 9, 2018, the FBI made its final release of records responsive to Plaintiff's FOIA Request Numbers 1386188-000 and 1386440-000.  *Id.* ¶ 16.  The FBI made the release at no cost.  *Id.*

through December 30, 2021.  *See* Seidel Decl. ¶ 17; *see also* 2d Seidel Decl. ¶ 7.  The FBI noted

in its January 31, 2022, letter that there was an outstanding balance due of $52.50 for the

duplication fees associated with the twentieth, twenty-first, twenty-second, and twenty-third

release and that failure to pay the outstanding fees within 30 days would result in the closure of

Plaintiff's requests.  *See* 2d Seidel Decl. ¶ 7.  Due to the volume of records involved, the FBI does

not have a precise figure but estimates that, as of January 1, 2022, it has approximately 22,211

pages left to process in this case.[3]  *See* Seidel Decl. ¶ 18.

On November 23, 2021, Plaintiff moved for partial summary judgment and argued that the

$15 is unreasonable and, based on the FBI's current processing rate, requested that the Court

compel Defendant to move for an *Open America* stay.  *See generally* ECF Nos. 40, 41, Pl.'s Mot.

for Partial Summ. J., Mot. to Compel.  The Department opposed Plaintiff's motions and argued

that the cost associated with processing Plaintiff's requests is reasonable and the rate of 500 pages

per month is justified and therefore an *Open America* stay is unnecessary in this matter.  *See*

*generally* ECF No. 45, Def.'s Opp.

The Court denied Plaintiff's motions and ordered, in relevant part, that Plaintiff to pay

Defendant by March 14, 2022.  The Court's order also noted that if Plaintiff failed to make that

payment, Defendant may suggest a briefing schedule on the issue of whether production is

complete given that Plaintiff is refusing to pay processing fees.  *See* ECF No. 47, Feb. 14, 2022,

Order.  As of the date of this filing, Plaintiff has not submitted payment for the outstanding

duplication fee.  *See also* 2d Seidel Decl. ¶¶ 9-11.  Accordingly, this matter should be dismissed,

and judgment should be entered in Defendant's favor.

---

[3]      The FBI welcomed further guidance from Plaintiff on narrowing criteria that can be applied
to the search results to reduce the volume of records that need to be processed.  To date, Plaintiff
has provided no suggestions.

## STANDARD OF REVIEW

Summary judgment on an issue is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). A genuine issue of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

The party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 248. Once the moving party has met its burden, the nonmoving part may not rest upon the mere allegations or denials of his pleading but must instead establish more than "the mere existence of a scintilla of evidence" in support of his position. *Anderson*, 477 U.S. at 252. Thus, summary judgment is due if the non-moving party fails to offer "evidence on which the jury could reasonably find for the [nonmovant]." *Id.* When determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Summary judgment on parts of claims or defenses is expressly contemplated by Rule 56. *See* Fe. R. Civ. P. 56(a). At this time, Defendant moves for summary judgment on the issue of the completeness of its releases to date with respect to FOIA Request Number 1139342-001 based on Plaintiff's non-payment of fees since February 2021 for releasing records on CDs as plaintiff requested. Plaintiff's failure to pay fees relieves the FBI from further processing records

responsive to Plaintiff's FOIA request and runs contrary to the Court's February 14, 2022, Order to pay the fees.[4]

## ARGUMENT

### I.    PLAINTIFF HAS FAILED TO PAY THE FEES REQUIRED BY FOIA, PERMITTING THE DEPARTMENT TO CEASE ITS RELEASES.

A FOIA requester must pay required fees to obtain responsive records under FOIA. 5 U.S.C. § 552(a)(4)(A).  In other words, "[f]or FOIA requests, an agency can assess fees for the search and duplication of documents, and can require advance payment from the requester before processed records are released."  *Sieverding v. Dep't of Just.*, 910 F. Supp. 2d 149, 156 (D.D.C. 2012) (citing 5 U.S.C. § 552(a)(4)(A)).  Importantly here, the "commencement of a civil action pursuant to the FOIA does not relieve a requester of his obligation to pay any assessed fees." *Sieverding*, 910 F. Supp. 2d at 156 (quoting, among others, *Chaplin v. Stewart*, 796 F. Supp. 2d 209, 211 (D.D.C. 2011) (granting summary judgment in agency's favor when requester failed to pay FOIA fees), *vacated on other grounds*, No. 11-5252, 2015 WL 9309592 (D.C. Cir. Dec. 9, 2015)); *see also Trueblood v. Dep't of Treasury*, 943 F. Supp. 64, 68 (D.D.C. 1996) ("Regardless of whether the plaintiff 'filed' suit before or after receiving a request for payment, the plaintiff has an obligation to pay for the reasonable copying and search fees assessed by the defendant.").

The Department has promulgated regulations providing for the assessment of fees with regards to FOIA.  *See* 28 C.F.R. § 16.10, et seq.  These regulations provide for charging fees for the direct costs an agency incurs in responding to FOIA requests, including the direct costs

---

[4]    Plaintiff's violation of the Court's February 14, 2022, Order to pay and disregard of the Court's standing order may serve as a predicate for an involuntary dismissal of this entire case pursuant to Rule 41(b), but Defendant is not seeking involuntary dismissal at this time.  If the Court grants this motion or finds the fees reasonable, Defendant asks that the Court order the unpaid balance of $52.50 for the duplication fees associated with the twentieth, twenty-first, twenty-second, and twenty-third release to be paid within two weeks of the Court's Order upon penalty of dismissal of the action.

associated with the salary of an employee performing the work. *Id.* §16.10(b)(2). Further, the regulations provide for charging for duplication costs in reproducing copies of records. *Id.* §16.10(b)(3). Per the Department's regulations, for copies produced on tapes, disks, or other media, an agency "shall charge the direct costs of producing the copy, including operator time." *Id.* at §16.10 (b)(2). The Department's regulations provide that when a requester has "failed to pay a properly charged FOIA fee to any component or agency within 30 calendar days of the billing date, a component may require that the requester pay the full amount due . . . before the component . . . continues to process a pending request[.]" 28 C.F.R. § 16.10(i)(3).

Here, on November 13, 2009, and September 13, 2018, by letter, the FBI denied the Plaintiff's request for a fee waiver and Plaintiff was advised that it would be charged applicable duplication fees as a general (all other) requester. *See* Seidel Decl. at 3, n. 1, ¶ 7, Exs. D, G; 2d Seidel Decl. ¶ 7. The FBI advised Plaintiff that it could appeal the FBI determinations by writing to Office of Information Policy within ninety days of the date of the letter and could also seek dispute resolution services by contacting the Office of Government Information Services. *See* Seidel Decl. at 3, n. 1, ¶ 7, Exs. D, G. Plaintiff did not appeal the FBI's determination and paid the assessed fees for the first nineteen interim productions beginning on February 4, 2019, continuing through March 30, 2021. *See* Seidel Decl. at 3, n. 1, ¶¶ 7, 17; *see also* 2d Seidel Decl. ¶ 7. Subsequently, the FBI noted in its letter, dated January 31, 2022, that there was an outstanding balance due of $52.50 for the duplication fees associated with the twentieth, twenty-first, twenty-second, and twenty-third release and that failure to pay the outstanding fees within 30 days would result in the closure of Plaintiff's requests. *See* 2d Seidel Decl. ¶ 7.

On April 15, 2022, the Record/Information Dissemination Section Public Information Officer checked the payment log and determined there was no record of Plaintiff's payment for

$52.50.  *Id.* ¶ 9.  RIDS further conducted a search of the records in the FOIA Document Processing System and found no record of Plaintiff's payment.  *Id.*  On March 31, 2022, RIDS stopped processing the remaining pages that have been deemed potentially responsive to the requests because Plaintiff failed to submit the required fees associated with processing its FOIA requests. *Id.* ¶ 10.  Despite being ordered to pay the outstanding fee, afforded numerous chances to contest the reasonableness of fee, and several opportunities to pay the outstanding fee, as of the filing of this motion, Plaintiff has not paid the required fee.

Plaintiff's failure to pay required fees relieves the Department from further searches and processing on Plaintiff's request.  *See, e.g., Otero v. Dep't of Just.*, No. 18-5080, 2019 WL 4565497, at *1 (D.C. Cir. Sept. 4, 2019) ("As the district court concluded, the FBI properly refused to finish processing [the FOIA request] unless [the requester] paid a $25 fee for the search conducted so far."); *Pollack v. Dep't of Just.*, 49 F.3d 115, 120 (4th Cir. 1995) (affirming summary judgment; "the Department continued processing [plaintiff's] request and successfully petitioned the district court for an order directing [plaintiff] to pay the required fees. When the Department had completed its efforts and [plaintiff] still refused to pay, the Department filed a motion for summary judgment based in part on [plaintiff's] failure to pay the required fees, and the court granted the motion"); *McLaughlin v. Dep't of Just.*, 598 F. Supp. 2d 62, 66 (D.D.C. 2009) (granting summary judgment where plaintiff failed to pay required FOIA fees); *Antonelli v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 555 F. Supp. 2d 16, 23 (D.D.C. 2008) (finding summary judgment is appropriate when the plaintiff has failed to comply with agency fee regulations); *Hicks v. Hardy*, Civ. A. No. 04-0769, 2006 WL 949918, at *2 (D.D.C. Apr. 12, 2006) (holding that "plaintiff cannot maintain his claim without paying the assessed fee," and explaining that this holds true "[r]egardless of whether . . . plaintiff 'filed' suit before or after receiving a

request for payment"). Thus, the Court should grant summary judgment to the Department as to the completeness of its searches.

## II.     THE DUPLICATION FEE CHARGED BY THE FBI IS REASONABLE.

Plaintiff cannot avoid the dispositive nature of its failure to pay fees by claiming the fees charged were unreasonable. Indeed, the $15 fee changed by the FBI is a reasonable duplication fee and actually less than the direct cost of running the search and reproducing the records on the CD. The D.C. Circuit has agreed and recently summarily affirmed the reasonableness and appropriateness of the FBI's $15 per CD charge for FOIA releases. *See Nat'l Sec. Couns. v. Dep't of Just.*, 305 F. Supp. 3d 176, 181 (D.D.C. 2018) (granting summary judgment on remand, finding there existed no genuine issue of material fact that the FBI's $15 per CD charge is lawful), *summ. aff'd*, No.18-5171, 2018 WL 6167377, at *1 (D.C. Cir. Nov. 1, 2018) ("The district court did not err . . . by concluding that the undisputed evidence showed that the fee was not excessive.").

The FBI constantly seeks ways to improve efficiency, especially given the sharp rise in FOIA and Privacy Act requests and related litigation, without a commensurate increase in resources.[5] The FBI has made enhancements to the FOIA Document Processing System ("FOIA System") to improve efficiency; however, this has not resulted in a reduction of direct costs below $15.00. *See* Seidel Decl. ¶ 34. The direct costs involved in preparing a CD for release, however, remains in excess of the $15.00 minimal charge. *Id.*

---

[5]     The FBI is currently inundated with an extraordinary number of FOIPA requests. In recent years the FBI has experienced a spike in request submitted to the agency. In Fiscal Year ("FY") 2021, the FBI received 29,828 FOIPA requests (a 34% increase over intake from five years ago), when in FY 2016, intake was 22,220 requests. In FY 2021, the FBI resolved 29,429 FOIPA requests and reviewed over 868,000 pages of records in response to FOIPA requests. *See* Seidel Decl. at 18, n. 14.

The FBI leverages Optical Character Recognition capability, which has been a result of enhancements to the FOIA System, to perform security scans based on lists of "exempted terms." *Id.* ¶ 35.  These scans are referred to internally as "Exempt Term Searches" or "ETS".  *Id.*  The benefit of this improvement to the FOIA System is that an analyst no longer must export or convert the documents prior to running Exempt Term Searches, resulting in greater efficiency.  *Id.*  Despite this improvement, an analyst must still perform certain necessary tasks before releasing a CD to the public.  *Id.* ¶ 36.

In most cases, the RIDS employees who are responsible for setting up and running the Exempt Term Searches range in grade from GS-11 to GS-13.  *See id.*  ¶ 37.  Based on the 2021 Salary Table issued by the Office of Personnel Management for the Washington D.C. locality (in which RIDS is located), the minimum hourly salary for a RIDS employee running ETS is $34.98 per hour (GS-11, Step 1) and the maximum hourly salary for a RIDS employee running ETS is $64.81 per hour (GS-13/Step 10).  *See* http://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2021/DCB.  In RIDS's experience, it generally takes approximately 46 minutes to set up and run the Exempt Term Searches for 500 pages.  *See* Seidel Decl. ¶ 37.  Therefore, assuming that it takes 46 minutes to set up and run Exempt Term Searches:

- The minimum operator cost for the Exempt Term Searches alone is $26.81.

- The maximum operator cost for the Exempt Term Searches alone is $49.69.

- The average operator cost for the Exempt Term Searches alone is $38.25.

The amount of time it takes to set up and run Exempt Term Searches increases as more pages are added that need to be scanned and/or as more search terms are added to the Exempt Term Searches protocol.  *Id.*  Moreover, the costs listed above do not include the costs associated with re-running the scan after any corrections that need to be made.  *Id.*  The Seidel Declaration provides

additional details regarding Exempt Term Searches and the processes used by the FBI in reproducing responsive records for release under FOIA. *Id.* ¶¶ 38-42.

Despite the improvements discussed above, when pay rates and average time to perform the current steps are calculated, the direct cost still remains above $15.00 and is therefore reasonable. *See* Seidel Decl. ¶ 41. As explained, the necessary steps employed to prepare a CD for public dissemination and the FBI determined that its policy of charging $15.00 per CD is an appropriate and reasonable assessment of duplication fees, consistent with the FOIA, 5 U.S.C. § 552(a)(4)(A)(ii) and the Department's FOIA fee regulation at 28 C.F.R. § 16.10. *Id.* ¶ 42. Therefore, $15 for each CD with 500 pages per month is reasonable.

Additionally, summary judgment is appropriate because plaintiff failed to challenge the amount of the fees being assessed at the administrative phase. *See* Def.'s St. of Material Facts ¶¶ 11-14; *DeBrew v. Atwood*, 792 F.3d 118, 123 (D.C. Cir. 2015) (allowing judicial review without an administrative appeal undercuts the purpose of exhaustion). Thus, plaintiff may not be heard in this Court on any issue outside the scope of his administrative appeal, and it has waived any challenge to the reasonableness of the fees because the denial of a fee waiver is distinct from a challenge to a challenge to the amount of the fees assessed. *See United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (courts need not consider arguments or issues not raised administratively).

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant Defendant's

motion and declare that Defendant's releases in response to the FOIA requests at issue in this case

are complete.   Additionally, Defendant respectfully requests that the Court (1) order Plaintiff to

pay the balance of the fees accrued to date, fifty-dollar and fifty cents ($52.50), within fourteen

days, and (2) warn plaintiff that failure to pay in full will result in dismissal of this case.


Dated: April 18, 2022                          Respectfully submitted,

                                               MATTHEW M. GRAVES, D.C. Bar # 481052
                                               United States Attorney

                                               BRIAN P. HUDAK
                                               Acting Chief, Civil Division

                                               */s/ Stephanie R. Johnson*
                                               STEPHANIE R. JOHNSON
                                               D.C. Bar # 1632338
                                               Assistant United States Attorney
                                               Civil Division
                                               555 4th Street, N.W.
                                               Washington, D.C. 20530
                                               (202) 252-7874
                                               Stephanie.Johnson5@usdoj.gov

                                               *Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER, <br><br> *Plaintiff,* <br><br> v. <br><br> DEPARTMENT OF JUSTICE, <br><br> *Defendant.* | Civil Action No. 18-1868 (TNM) |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56(b) and Local Civil Rule 7(h), Defendant respectfully submits this statement of undisputed material facts. The information herein is largely repeated from the first and second declaration of Michael G. Seidel. The declarations of Seidel, and accompanying attachments support the following statement:

1.       Michael G. Seidel is the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division, Federal Bureau of Investigation ("FBI"), Winchester, Virginia. *See* Second Declaration of Michael G. Seidel ("2d Seidel Decl.") ¶ 1.

2.       Because of Seidel's official duties, he is familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552 and the Privacy Act, 5 U.S.C. § 552a. *Id.* ¶ 3.

3.       Seidel is aware of the FBI's handling of the FOIA requests at issue in the above-captioned. *Id.*

4.       By letter dated October 7, 2009, Plaintiff submitted a FOIA request to the FBI seeking copies of the "seven boxes of ELSUR indices of pre-1960 electronic surveillances" as

identified in *Lardner v. FBI, et al.  See* ECF No. 45-1, Declaration of Michael G. Seidel ("Seidel Decl.") at 3, n. 1.

5.      Plaintiff sought a public interest fee waiver.  *Id.*

6.      On November 5, 2009, the FBI advised Plaintiff that its request for a public interest fee waiver was denied, and that with regard to its request for media status, Plaintiff did not provide sufficient information to qualify.  *Id.*

7.      The FBI advised Plaintiff of its right to appeal the FBI's determination to the Director, Department of Justice ("DOJ"), OIP within sixty days of the letter. *Id.*

8.      Plaintiff did not appeal the FBI's denials.  *Id.*

9.      By letter dated November 13, 2009, the FBI advised Plaintiff it located approximately 18,000 pages of potentially responsive documents and requested that Plaintiff advise in writing within sixty days of his willingness to pay $ 15.00 per CD for the voluminous records.  *Id.*

10.      The FBI informed Plaintiff that if a response was not received in sixty days, the request would be closed.  *Id.*

11.      By letter dated February 9, 2011, the FBI again contacted the Plaintiff, advising that if all 18,000 pages were processed, Plaintiff would owe $ 540.00 (36 CDs at $ 15.00 each). *Id.*

12.      The FBI advised Plaintiff that if it did not receive written confirmation of Plaintiff's willingness to pay, or if Plaintiff did not contact the FBI to reduce the scope of the request, it would close the request within thirty days.  *Id.*

13.      No response was received, and the FBI closed the request on March 22, 2011.  *Id.*

14.      Plaintiff did not file an appeal with regard to the FBI's determinations.  *Id.*

15.     By letter dated September 13, 2018, the FBI advised Plaintiff that the request for a public interest fee waiver was reviewed and denied, and Plaintiff would be charged applicable duplication fees as a general (all other) requester.  *Id.* ¶ 7; *see also* 2d Seidel Decl. ¶ 7.

16.     Plaintiff was also advised, although in litigation, Plaintiff could appeal the FBI determinations by writing to OIP within ninety (90) days of the date of the letter and seek dispute resolution services by contacting the Office of Government Information Services.  *See* 2d Seidel Decl. ¶ 7.

17.     The FBI also advised the Plaintiff of assessed duplication fees incurred for each interim release and of any outstanding cumulative balance owed.  *See id.*

18.     Plaintiff paid the assessed fees for the first nineteen interim productions beginning on February 4, 2019, continuing through March 30, 2021.  *Id.*; *see also* Seidel Decl. ¶ 17.

19.     The FBI made twenty-two interim productions in response to Plaintiff's request, FOIA 1139342-001, beginning on February 4, 2019, continuing through December 30, 2021.  *See* 2d Seidel Decl. ¶ 7; *see also* Seidel Decl. ¶ 17.

20.     The FBI noted in its letter, dated January 31, 2022, there was an outstanding balance due of $52.50 for the duplication fees associated with the twentieth, twenty-first, twenty-second, and twenty-third release and that failure to pay the outstanding fees within 30 days would result in the closure of Plaintiff's requests.  *See* 2d Seidel Decl. ¶ 7.

21.     On April 15, 2022, the RIDS Public Information Officer checked the payment log, the location where paid fees are recorded, and determined there was no record of Plaintiff's payment for $52.50.  *Id.* ¶ 9.

22.     RIDS further conducted a search of the records in the FOIA Document Processing System and found no record of Plaintiff's payment.  *Id.*

23.     Plaintiff failed to submit the required fees associated with processing its FOIA requests, so on March 31, 2022, RIDS stopped processing the remaining pages that have been deemed potentially responsive to the requests.  *Id.* ¶ 10.

24.     Due to the volume of records involved, the FBI does not have a precise figure but estimates that**,** as of January 1, 2022, it has approximately 22,211 pages left to process in this case. *See* Seidel Decl. ¶ 18.

25.     DOJ has promulgated regulations providing for the assessment of fees with regard to the Freedom of Information Act.  *See* 28 C.F.R. §16.10, et seq.

26.     These regulations provide for charging fees for the direct costs an agency incurs in responding to FOIA requests, including the direct costs associated with the salary of an employee performing the work.  *Id.* at §16.10 (b)(2).

27.     Further, the regulations provide for charging for duplication costs in reproducing copies of records.  *Id.* at §16.10 (b)(3).

28.     Under these regulations, the FBI determined that Plaintiff is a general (all other) requester as described above, subject to duplication fees and the direct costs associated with the duplication of records responsive to its FOIA request.  *See* 2d Seidel Decl. ¶ 6.

29.     Per the DOJ regulations, for copies produced on tapes, disks, or other media, an agency "...shall charge the direct costs of producing the copy, including operator time."  28 C.F.R. §16.10 (b)(2).

30.     As of April 15, 2022, the FBI has no record of Plaintiff submitting payment for the outstanding duplication fee of $52.50, owed to the FBI for the duplication costs associated with the twentieth through twenty-third productions in response to Plaintiff's FOIA requests.  *See* 2d Seidel Decl. ¶ 11.

\*     \*     \*

Dated: April 18, 2022            Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar # 481052
United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

*/s/ Stephanie R. Johnson*
STEPHANIE R. JOHNSON
D.C. Bar # 1632338
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7874
Stephanie.Johnson5@usdoj.gov

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

     *Plaintiff,*

       v.

DEPARTMENT OF JUSTICE,

     *Defendant.*

---

Civil Action No. 18-1868 (TNM)

## SECOND DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1)    I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division, Federal Bureau of Investigation ("FBI"), Winchester, Virginia. I joined the FBI in September 2011, and prior to my current position, I was the Assistant Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS Litigation Support Unit from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of the General Counsel, Freedom of Information Act ("FOIA") Litigation Unit, from September 2011 to November 2012. In those capacities, I had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act ("FOIPA") litigation cases nationwide. Prior to my joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration ("DEA") from September 2006 to September 2011, where among myriad legal responsibilities, I advised on FOIPA matters and served as agency counsel representing the DEA in FOIPA suits nationwide. I also served as a U.S. Army Judge Advocate General's Corps Officer in various assignments from 1994 to September 2006 culminating in my assignment as Chief, General Litigation Branch, U.S.

Army Litigation Division where I oversaw FOIPA litigation for the U.S. Army. I am an attorney licensed in the State of Ohio and the District of Columbia.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 240 FBI employees, supported by approximately 86 contractors, who staff a total of ten (10) Federal Bureau of Investigation Headquarters units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based on my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552 and the Privacy Act, 5 U.S.C. § 552a. Specifically, I am aware of the FBI's handling of Plaintiff's FOIA requests.

(4)     This declaration incorporates and supplements the information provided in my first declaration submitted in this case. (ECF 45-1, "First Seidel Decl.") The FBI submits this declaration in support of Defendant's motion for partial summary judgment based on Plaintiff's failure to exhaust administrative remedies by failing to pay the duplication fees assessed for receipt of records responsive to the FOIA requests.

2

**298**

## PLAINTIFF'S FAILURE TO PAY DUPLICATION FEES

(5)     The administrative history related to the handling of Plaintiff's FOIA requests was provided in the First Seidel Declaration.  (¶¶ 5-17.)

(6)     As discussed in my prior declaration at ¶ 29, the Department of Justice ("DOJ") has promulgated regulations providing for the assessment of fees with regard to the Freedom of Information Act.  *See* 28 C.F.R. §16.10, et seq.  These regulations provide for charging fees for the direct costs an agency incurs in responding to FOIA requests, including the direct costs associated with the salary of an employee performing the work.  *Id.* at §16.10 (b)(2).  Further, the regulations provide for charging for duplication costs in reproducing copies of records.  *Id.* at §16.10 (b)(3).  Under these regulations, the FBI determined that Plaintiff is a general (all other) requester as described above, subject to duplication fees and the direct costs associated with the duplication of records responsive to his FOIA request.  Per the DOJ regulations, for copies produced on tapes, disks, or other media, an agency "...shall charge the direct costs of producing the copy, including operator time." *Id.* at §16.10 (b)(2).

(7)     As explained in my earlier declaration, the FBI denied the Plaintiff's request for a fee waiver, by letter dated September 13, 2018.[1]  (¶ 7.)  The FBI advised the Plaintiff of assessed duplication fees incurred for each interim release and of any outstanding cumulative balance owed. Plaintiff paid the assessed fees for the first nineteen interim productions beginning on February 4, 2019 and continuing through March 30, 2021.  (¶ 17.)  Subsequently, the FBI noted in its January 31, 2022 letter there was an outstanding balance due of $52.50 for the duplication fees associated with the twentieth, twenty-first, twenty-second, and twenty-third release and that failure to pay the

---

[1]  Plaintiff was also notified by letter, dated November 13, 2009, that its request for a fee waiver was denied by the FBI. (First Seidel Decl. at 3, n. 1).

3

outstanding fees within 30 days would result in the closure of Plaintiff's requests. **(Ex. A.)**

(8)     On February 14, 2022, this court ordered Plaintiff "shall either pay the Government within 30 days, or the Government may suggest a briefing schedule on the issue of whether production is complete given that the Center is refusing to pay processing fees." (ECF No. 47.)

(9)     On April 15, 2022, the RIDS Public Information Officer ("PIO") checked the payment log, the location where paid fees are recorded, and determined there was no record of Plaintiff's payment for $52.50.  RIDS further conducted a search of the records in the FOIPA Document Processing System and found no record of Plaintiff's payment.

(10)     As Plaintiff failed to submit the required fees associated with processing its FOIA requests, on March 31, 2022, RIDS halted processing the remaining pages deemed potentially responsive to the requests. RIDS estimates that if Plaintiff remits the required fees, processing will continue for approximately fourteen more months.

## CONCLUSION

(11)     As of April 15, 2022, the FBI has no record of Plaintiff submitting payment for the outstanding duplication fee of $52.50 for the duplication costs associated with the twentieth through twenty-third productions in response to Plaintiff's FOIA requests.    Thus, Plaintiff has failed to exhaust administrative remedies by failing to submit the required duplication fees per DOJ regulation.

4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this _____15th_____ day of April 2022.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

  *Plaintiff*,

            v.                          Civil Action No. 18-1868 (TNM)

DEPARTMENT OF JUSTICE,

  *Defendant*.

# Exhibit A



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

January 31, 2022

MR. KEL McCLANAHAN
NATIONAL SECURITIES COUNSELORS
4702 LEVADA TERRACE
ROCKVILLE, MD 20853

*Assassination Archives v. DOJ*
Civil Action No. 18-cv-01868
FOIPA Request No.: 1149636-000
Subject: ELSUR INDICES/CARDS PRE-1960

Dear Mr. McClanahan:

        The enclosed documents were reviewed under the Freedom of Information/Privacy Acts (FOIPA), Title 5, United States Code, Section 552/552a.   Below you will find check boxes under the appropriate statute headings which indicate the types of exemptions asserted to protect information which is exempt from disclosure.   The appropriate exemptions are noted on the enclosed pages next to redacted information.   In addition, a deleted page information sheet was inserted to indicate where pages were withheld entirely and identify which exemptions were applied.   The checked exemption boxes used to withhold information are further explained in the enclosed Explanation of Exemptions.

|  **Section 552** | | **Section 552a** |
|---|---|---|
| ☑ (b)(1) | ☐ (b)(7)(A) | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | ☐ (j)(2) |
| ☑ (b)(3) | ☑ (b)(7)(C) | ☐ (k)(1) |
| | ☑ (b)(7)(D) | ☐ (k)(2) |
| 50 USC Section 3024(i)(1) | | |
| | ☑ (b)(7)(E) | ☐ (k)(3) |
| | ☐ (b)(7)(F) | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | ☐ (k)(6) |
| ☑ (b)(6) | | ☐ (k)(7) |

        509 pages were reviewed and 509 pages are being released.

        Please see the paragraphs below for relevant information specific to your request as well as the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

☐  Document(s) were located which originated with, or contained information concerning, other Government Agency (ies) [OGA].

   ☐ This information has been referred to the OGA(s) for review and direct response to you.
   ☐ We are consulting with another agency.   The FBI will correspond with you regarding this information when the consultation is completed.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request.   **"Part 1"** of the Addendum includes standard responses that apply to all requests.   **"Part 2"** includes additional standard responses that apply to all requests for records about yourself or any third party individuals. **"Part 3"** includes general information about FBI records that you may find useful.   Also enclosed is our Explanation of Exemptions.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request Number listed above has been assigned to your request.   Please use this number in all correspondence concerning your request.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal.   Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS).   The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.   Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov.   If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

☑   See additional information which follows.

Sincerely,

*M. A. L. O*

Michael G. Seidel
Section Chief
Record/Information
   Dissemination Section
Information Management Division

Enclosure(s)

The enclosed documents represent the 23rd interim release of information responsive to your Freedom of Information Act (FOIA) request 1149636-000 with current Bates stamp range (18-cv-01868-10477 through 18-cv-01868-10860). This release includes responsive records from the New York field office.

Upon receipt of the enclosed Compact Disc (CD), please go to **www.pay.gov to make an electronic payment\* in the amount of $52.50. This amount includes the balance due of $37.50, as explained in our December 30, 2021 letter, in addition to $15.00 for this release. Please make check or money order payable to the Federal Bureau of Investigation and mail it to the Work Process Unit, Records/Information Dissemination Section, Records Management Division, Federal Bureau of Investigation, 170 Marcel Drive, Winchester, VA 22602. Please include the FOIPA request Number with your payment. Failure to pay for this release within thirty (30) days from the date of this letter will close any pending FBI FOIPA requests from you. Nonpayment will also cause an automatic denial of any future FOIPA requests.**

*Pay.gov is a secure web-based application that accepts credit card and ACH Payments online, and is hosted by the United States Department of Treasury, Financial Management Service. For frequent FOIPA requests, it is recommended to create a Pay.gov account to retain an online history of payments made through Pay.gov and to retain specific information for future payments. To make an electronic payment, complete the FBI Freedom of Information ACT and Privacy Act Form located on Pay.gov. Please note: if a refund is necessary, there is less processing time to refund a credit card payment than an ACH payment.*

For further information on the actions to be taken by the FBI in regards to your FOIA requests, please see FOIA 1386188-000/1386440-000 release letter dated November 9, 2018.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | * | |
| RESEARCH CENTER, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-01868 (TNM) |
| | * | |
| DEPARTMENT OF JUSTICE, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Assassination Archives and Research Center, Inc. ("AARC") commenced this

litigation against Defendant Federal Bureau of Investigation ("FBI")[1] in 2018 in part to obtain

copies of historical indices of electronic surveillance activities—the majority of which are over

sixty years old—that AARC had requested in 2012. (Compl., Dkt. #1, ¶¶ 17-19 (filed Aug. 8,

2018).) After AARC commenced this litigation, FBI began processing responsive records and

began releasing records at a rate of approximately 500 pages/month, which it released by mailing

a CD containing responsive records to AARC each month. (J. Stat. Rep., Def.'s Mot. Modify

Sched. for Stat. Reps., & Pl.'s Mot. Set Briefing Sched., Dkt. #17, at 3 (filed June 5, 2019).) FBI

insisted that AARC was required to pay $15 per CD for these releases and that it would stop

processing records if AARC ceased payment. (*Id.* at 2.) At a 6 August 2019 Status Conference,

---

[1] FBI is treated herein as the "Defendant" to avoid confusion because the case is limited to
questions about FBI's processing of AARC's Freedom of Information Act ("FOIA") request,
even though the Department of Justice is the proper party Defendant as a matter of law.

the Court directed AARC—over AARC's objection[2]—to file a motion for partial summary judgment alleging that FBI was charging unreasonable fees to process this request. After several delays due in large part to the coronavirus pandemic, AARC filed its motion on 23 November 2021 (Pl.'s Mot. Part. Summ. J., Dkt. #40, *passim* (filed Nov. 23, 2021) [hereinafter AARC's 1st Mem.]), and FBI filed its Opposition on 21 January 2022 (Def.'s Opp'n Pl.'s Part. Mot. Summ. J. & Mot. Compel. Def. to Seek *Open Am.* Stay, Dkt. #45, at 1-9 (filed Jan. 21, 2022)).

When AARC requested an extension the day its Reply was due, the Court denied AARC's entire motion for partial summary judgment, even though both a briefed motion and an opposition were on the record. (Order, Dkt. #47, at 4 (filed Feb. 14, 2022).) The Court directed that AARC should pay the fees it allegedly owed to FBI within thirty days, and that if it did not, FBI should file a motion arguing that "production is complete given that [AARC] is refusing to pay processing fees." (*Id.* at 3.) After AARC did not pay the fees that it maintains have not been properly assessed, FBI finally filed the Motion on 18 April 2022 that AARC had asked the Court to direct it to file almost three years earlier. (Def.'s Mem. P. & A. Supp. Def.'s Mot. Part. Summ. J., Dkt. #49, *passim* (filed Apr. 18, 2022) [hereinafter FBI's Mem.].) For the reasons stated herein, the Court should find that FBI improperly denied AARC's request for a public interest fee waiver and that, even if the fee waiver denial was proper, the duplication fees charged by FBI have not been "limited to reasonable standard charges for document . . . duplication,"[3] 5 U.S.C. §

---

[2] AARC maintained that because FBI legally bears the burden of proving that its fees are reasonable, it should be required to file a dispositive motion supported by admissible evidence on that issue first, which AARC could then oppose.

[3] The two issues are separate and distinct. *Accord Stein v. DOJ*, 197 F. Supp. 3d 115, 123 (D.D.C. 2016) ("The question of whether [a separate statutory fee provision] prohibits Defendant from charging Plaintiff any duplication fees is, as Plaintiff correctly told Defendant in October 2015, 'a separate issue from the public interest fee waiver issue.'"). AARC's entitlement to a fee waiver—or lack thereof—has no bearing on FBI's duty to only assess reasonable fees in the first place.

2

552(a)(4)(A)(ii)(III),  and accordingly order FBI to return all fees paid to it by AARC thus far
with interest, and enjoin FBI from charging any more fees to AARC for the processing of this
request.

## I.    FBI IMPROPERLY DENIED AARC A PUBLIC INTEREST FEE WAIVER

Before the Court can consider whether FBI charged reasonable fees, it must first
determine if FBI has adequately proven that its decision to deny AARC's request for a public
interest fee waiver was proper under FOIA. If the Court finds that FBI has not so proven, it must
deny this Motion and find that FBI is not entitled to assess any fees for this request.

Despite being warned several times that it must demonstrate the legality of its fee waiver
denial (*see*, *e.g.*, AARC's 1st Mem. at 2 n.4), FBI has not even *mentioned* its fee waiver decision
except to imply that AARC somehow failed to exhaust its administrative remedies on the issue,
which is quite simply not an issue in this case. (*See* FBI's Mem. at 11 (arguing that AARC did
not appeal FBI's fee waiver denial dated 13 September 2018).)[4] Simply put, FBI did not issue its
fee waiver denial until 13 September 2018, and AARC commenced this litigation on 8 August
2018. It is well established that no administrative appeal is required of an agency determination
issued during litigation. Therefore, this argument is frivolous, and the Court should reject it
outright.

Therefore, it is entirely improper for FBI to seek summary judgment on the question of
whether it assessed reasonable fees before it even attempts to prove that its fee waiver
determination was justified under FOIA. The uncontroverted facts show that AARC submitted a
request in which it requested a public interest fee waiver. It stated:

---

[4] FBI confusingly argues later that AARC "may not be heard in this Court on any issue outside
the scope of his [sic] administrative appeal, and it has waived any challenge to the
reasonableness of the fees because the denial of a fee waiver is distinct from a challenge to . . .

As president of the AARC, I have been interviewed by many television news programs and documentaries concerning the assassinations of President Kennedy and Dr. Martin Luther King, Jr., the President John F. Kennedy Assassination Records Collection Act of 1992 ("JFK Records Act"), and related topics. I have also appeared on radio programs, including the Voice of America and The Larry King Show. I have appeared on a number of television programs, including CNN, Fox News, and Good Morning America (CBS). The Washington Post ran an op-ed piece by me on the need to release the records of the House Select Committee on Assassinations. This article was widely reprinted in other papers, as was an article on the AARC which was disseminated by the Associated Press. On June 8, 1997, the Washington Post published an Outlook Section article I wrote on the assassination of Dr. Martin Luther King, Jr. and the case of his alleged assassin, James Earl Ray. I have been quoted by Reuters, the Associated Press, the New York Times, the Washington Post and numerous other representatives of the news media on matters pertaining to the assassinations of President Kennedy and Dr. King.

I testified to both houses of Congress regarding the pending legislation to require disclosure of records pertaining to the assassination of President Kennedy. In November 1993, I testified before the House Subcommittee on Legislation and National Security regarding the implementation of the JFK Act. On several occasions I testified at hearings held by the Assassination Records Review Board, a five-citizen panel appointed to enforce the JFK Records Act.

*****

As noted above, the purposes [sic] of the AARC is to gather, preserve and disseminate information to the public regarding political assassinations. The AARC maintains both extensive hard copy files and digital copies of government records which comprise approximately one million pages. Because possible connections of organized crime figures to the assassinations of President John F. Kennedy, Dr. Martin Luther King. and Senator Robert F. Kennedy figure prominently in the investigations of these murders, the holdings of the AARC, both bard copy and digital, reflect this. The public interest in such records is undeniable. There is also a profound public interest in such materials even if they do not pertain to the above-cited political assassinations, particularly where such surveillances were unlawful or related to investigations which were not done for law enforcement purposes.

In light of the facts recited above, the AARC [is] . . . entitled to a public interest fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). The records will show what the FBI was up to and when, with respect to the FBI's operations regarding organized crime activities and other activities. The public interest in such matters

---

the amount of fees assessed" (*id.* at 9), which implies that AARC filed an appeal of the fee waiver denial, which, as noted above, it did not.

4

is obvious and profound. Our capability to disseminate the information has been amply demonstrated above.

(Letter from Lesar to Hardy of Sept. 7, 2012, Dkt. #45-1, at 45-46 (filed Jan. 21, 2022).) This description amply satisfies the statutory criteria which states that requested information is "in the public interest [if] it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requestor." 5 U.S.C. § 552(a)(4)(A)(iii). Because FBI has not even attempted to argue that its determination was proper, it should be found to have forfeited that argument, which renders the remainder of this Motion moot.[5]

## II.    FBI'S FEES WERE NOT REASONABLE AT THE TIME THEY WERE ASSESSED

As FBI admits, the process described below was in place at the time FBI assessed the fees. (*See* 1st Seidel Decl., Dkt. #45-1, ¶ 34 (filed Jan. 22, 2022) ("[T]he detailed description provided by Plaintiff . . . reflects the FBI process at the time of the referenced litigation (2017).").) The general standard for judicial review of agency FOIA determinations is whether or not the decision was proper at the time it was made. *See Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1284 (D.C. Cir. 1983) (indicating that to invoke Exemption (b)(3), an agency must be able to demonstrate that the statute being invoked in conjunction with Exemption (b)(3) "was in effect at the time of the FOIA request"); *see also King v. DOJ*, 830 F.2d 210, 216 (D.C. Cir. 1987) (indicating that for purposes of Exemption (b)(1), a classification decision should be considered in regard to the terms of the Executive Order under which the decision was made). Accordingly, even accepting as true FBI's claims regarding its current system of

---

[5] This conclusion is additionally justified since at least one district court has previously held that AARC was entitled to a public interest fee waiver. *See AARC v. CIA*, 334 F.3d 55, 56 (D.C. Cir. 2003) (noting that the district court ordered the agency to waive duplication fees over its objection).

processing FOIA requests, this was not the system in place when FBI *began* processing AARC's request, which was when it made the fee assessment. Therefore, the Court must decide if the fees assessed *in 2018* were reasonable, which it should find was not the case.

The referenced declaration asserted that $15/CD was a reasonable fee because it did not exceed the "direct labor costs" incurred by forcing a GS-11 to GS-13 employee to be "active through a majority of the process." (3d Hardy Decl., Dkt. #34-2, ¶ 13 (filed June 9, 2017), *Nat'l Sec. Counselors v. DOJ*, No. 13-556 (D.D.C.) [hereinafter *NSC* Hardy Decl.], Dkt. #40-1 (filed Nov. 23, 2021).)[6] Simply put, even though FBI offered evidence which demonstrates that the direct costs of releasing a CD containing 500 pages exceed $15, that is not the end of the matter. The "reasonable standard charges" restriction, *id.* § 552(a)(4)(A)(ii)(III), and the "direct costs" restriction, *id.* § 5 U.S.C. § 552(a)(4)(A)(iv), on an agency's ability to assess duplication fees are not two distinct provisions which can be treated independently of one another. FOIA itself originally treated these two requirements *together* stating that "fees shall be limited to reasonable standard charges for document search and duplication and provide for recovery of only the direct costs of such search and duplication." 5 U.S.C. § 552(a)(4)(A) (1974). This understanding was implicit in the relevant court decisions of the time, which always treated the two provisions together and which remain controlling precedent. *See*, *e.g.*, *Better Gov't Ass'n v. Dep't of State*,

---

[6] Judge Chutkan granted summary judgment to FBI in that case over the plaintiffs' objection because she interpreted the remand order from the D.C. Circuit to be limited to the question of whether the $15/CD charge exceeded FBI's direct costs, not whether those direct costs were reasonable. *Nat'l Sec. Counselors v. DOJ*, 305 F. Supp. 3d 176, 180 (D.D.C. 2018), *aff'd* No. 18-5171, 2018 U.S. App. LEXIS 31112 (D.C. Cir. Nov. 1, 2018). Accordingly, the instant case is the first time that any court has had the opportunity to fully adjudicate the reasonableness of FBI's $15/CD duplication fee in light of the *NSC* Hardy Declaration; the D.C. Circuit's previous consideration of this fee rate predated—and was responsible for—the public disclosure of this information, and Judge Chutkan's brief observations regarding the fee rate, *id.*, are simply *dicta* which this Court should respectfully decline to follow because they impermissibly shifted the burden to the plaintiffs to prove that the fees were unreasonable instead of forcing FBI to prove that they were reasonable.

780 F.2d 86, 88-89 (D.C. Cir. 1986) ("FOIA permits agencies to impose 'reasonable standard charges for document search and duplication' to recover the direct costs of such services.").

When Congress replaced this quoted language with the current multi-paragraph version of 5 U.S.C. § 552(a)(4)(A) as part of the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1803, it gave absolutely no indication in the legislative history that it intended to separate these two considerations. The FOIA amendments were absent from the congressional reports on this large omnibus act, and the only mentions of the fee amendments in floor statements focused on how the intent was to give greater guidance to agencies and make it easier for agencies to make fee determinations and for certain types of requesters to obtain preferential fee treatment, *not* to separate the "direct costs" requirement from the "reasonable standard charges" requirement. *See*, *e.g.*, 132 Cong. Rec. S14297-14299 (Sept. 30, 1986) (statement of Sen. Leahy). This understanding has been adopted by courts since that amendment as well, undermining any argument that decisions like *Better Government Association* are no longer good law. *See Pollack v. DOJ*, 49 F.3d 115, 119 (4th Cir. 1995) ("[T]he Act specifically requires the government to publish a uniform schedule of fees, authorizing each agency to charge a 'reasonable' amount for the direct costs of document search, duplication, and review."); *Goulding v. IRS*, No. 97-5628, 1998 U.S. Dist. LEXIS 9143, at *26 (N.D. Ill. June 2, 1998) ("[FOIA authorizes] each agency to charge a 'reasonable' amount for the direct costs of document search, duplication, and review.").

As the *Pollock* opinion shows, it is clearly appropriate for a court to consider whether the direct costs are reasonable, and a contrary holding would run counter to the general rule of FOIA that agencies must only assess "reasonable standard charges" for duplication. If an agency could simply utilize a patently unreasonable duplication method and then hide behind the fact that it is only charging the "direct costs" it incurred using that patently unreasonable duplication method,

the "reasonable standard charges" limitation would be effectively *subordinate* to the "direct costs" limitation, instead of being the co-equal factor intended by Congress.[7]

The next legal question is whether or not an agency can ignore the statutory restrictions placed on it by FOIA by implementing an unnecessarily complex and redundant "security review process," but this question has already been addressed by another court in this Circuit. In the case *National Security Counselors v. CIA*, Judge Howell addressed an analogous controversy, in which the Central Intelligence Agency and Department of State were accused of using overcomplicated processes for duplicating records in electronic format as a justification for categorically determining that no records were readily reproducible in electronic format. 960 F. Supp. 2d 101, 202-07 (D.D.C. 2013). In that case, as in this case, the underlying explanation for the agencies' processes was that the FOIA processing system was on each agency's classified network, and so extra steps were required to move records from the classified network to the unclassified network. Judge Howell stated that she was "somewhat skeptical regarding the State Department's explanation of the labyrinthine steps that are necessary to move a document from the classified system to an unclassified piece of electronic media," *id.* at 205, and separately opined, "I can't imagine a more cumbersome process to have been created to do FOIA processing, I really can't. It boggles the mind that the CIA takes unclassified documents, puts them on a classified computer system, which can only print for obvious reasons in order to process what might otherwise be a fairly simple FOIA request for unclassified documents." (Tr. of 12/16/11 Status Conf. at 7:18-23, *Nat'l Sec. Counselors v. CIA*, No. 11-443 (D.D.C.), Dkt.

---

[7] A similar legal question would arise if an agency deliberately searched for records using the most time-consuming process when it was able to conduct a much shorter search, such as reviewing every entry in a database one at a time for 100 hours instead of using the database's search function for 10 minutes, and then insisted that every requester must pay for the direct costs of the longer process.

#40-2 (filed Nov. 23, 2011).) Despite these judicial warnings in 2013 and 2011, respectively, involving two separate agencies, FBI implemented the next evolution of these processes. In light of the fact that at least one court has held that an agency cannot refuse to provide CDs *at all* based solely on its insistence on using "labyrinthine steps" to create a CD, FBI instead decided to argue that it may use the *cost* of that process to justify charging more fees to requesters than it otherwise would be able to. This Court should solidly decline this invitation to allow an agency to use a process that is deliberately and unnecessarily complicated and redundant to justify higher fees than FOIA would allow if it used a reasonable process.

With this in mind, it is appropriate to demonstrate the unreasonableness of the process FBI has described in the *NSC* Hardy Declaration by removing all the conclusory editorial text about security and focusing solely on the actual script a FOIA employee must follow to produce a single CD containing 500 pages of unclassified records:

1.  First, all records responsive to a request must be placed in the FOIA Document Processing System ("FDPS"), which is on a classified network, regardless of whether or not the records are classified. *NSC* Hardy Decl. ¶ 6.

2.  Then, once a record has been processed for release in the FDPS, an employee must export each section of a document[8] as a multi-page TIF file to his local computer drive. *Id.*

3.  Then the employee must manually rename each TIF file and save it to a common shared drive. *Id.*

---

[8] Hardy did not define what constitutes a "section" other than to say, "A release can include multiple sections." *Id.* ¶ 7.

4.      Then the employee must convert each multi-page TIF file into a series of single-page text files because Integrity—the FBI security system being described—cannot read TIF files. *Id.*

5.      The employee cannot convert TIF files to text files on his computer and must walk to a separate computer to do the conversion. *Id.*

6.      The employee must then copy the newly created text files from the shared drive to his local computer drive. *Id.*

7.      Then the employee must "reflect[] upon the processed records" and create keywords for the Integrity system to search for. *Id.* ¶ 8.

8.      Then the employee runs the Integrity scan using the custom keywords he created against each single-page text document. This scan takes an unspecified amount of time. *Id.* ¶ 9.

9.      Then the employee must manually review the automated scan results. *Id.*

10.     Then the employee must run a second Integrity scan using general keywords against each single-page text document because Integrity apparently cannot search for these general keywords at the same time as the custom keywords he inputted previously. *Id.*

11.     Then the employee must determine if each keyword located by an Integrity scan is actually an entire word (e.g. "DEA" and not "death") and decide if it should be redacted because the Integrity system lacks the common search option of limiting results to whole words. *Id.* ¶ 10.

12.   Then, if the employee determines that a word must be redacted, he restarts the Integrity scan from the beginning again, even though it would already have identified any other unredacted keywords located in the document. *Id.*

13.   Then the employee returns to the FDPS and exports the sections directly to an unclassified computer as PDF files, which are then burned to a CD. *Id.* ¶ 11.

14.   Only GS-11 through GS-13 employees can perform *any* of the above-described work. *Id.* ¶ 14.

15.   Each employee must personally be actively involved with the above-described process for 50 minutes per 500 pages. *Id.* ¶ 13.

16.   As a result, for every 4800 pages released to *anyone*, a GS-11 or higher-level employee must spend an *entire 8-hour work day* doing nothing but going back and forth between computers, reviewing records which have already been through a line-by-line FOIA review, and re-running redundant automated scans, instead of searching for or reviewing records in response to FOIA requests.

From the above description, which is drawn *directly* from Hardy's testimony, it is clear that this process served very little actual purpose beyond allowing FBI to claim that it is protecting classified information even though the bulk of records put through it were unclassified from the outset and were only placed on the classified system in the first place because the agency decided to locate the FDPS system there. Moreover, even the assertion that the FDPS system has to be located on the classified system is undermined by Hardy's testimony that after all the Integrity scans have been run, the employee *returned to the FDPS system*, which is presumably still located on the classified network, and *directly "export[ed] all sections from FDPS into an unclassified PDF format outside FDPS." Id.* ¶ 11. This "external FDPS location"

appears not to be located on the classified network, begging the question of why it was not used the entire time instead of putting unclassified records on a classified network. However, even setting that odd inconsistency aside, there is no rational reason for the unnecessarily labyrinthine processes described by Hardy, such as converting files from one format to another format, then to a third format, then back to the first format, all on different computers unable to read the other formats, or re-running an entire scan because a single word was redacted, as though that will change whether or not other prohibited words are located, after which a simple export process can be run from the first system to the CD-creation program without any complications.

With all this in mind, however, whether or not FBI was allowed to use this process is beyond the scope of this case, especially since it claims to have changed at least some of the process. This case is about whether or not FBI can *charge requesters* for the time spent using this bizarre process, and the answer to that question is decidedly in the negative because the direct costs incurred as a result of this process are not "a 'reasonable' amount for the direct costs of document . . . duplication." *Pollack*, 49 F.3d at 119. Accordingly, if the agency would not be allowed under FOIA to charge the direct costs of using this process, then it cannot use the direct costs of using this process as a metric against which other arbitrary fees are measured. As a result, the simple fact that $15/CD was less than the direct costs of using this process does not demonstrate that $15/CD was a reasonable fee. For this reason, the Court should find that FBI has been assessing unreasonable duplication costs to AARC and accordingly deny FBI's Motion. If the Court still finds that FBI was correct to assess fees to AARC, it should accordingly direct AARC to commit to paying all fees or certify the issue for interlocutory appeal, since there remain numerous additional issues regarding this case which require judicial review, including searches and withholdings.

Date:   May 18, 2022

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ASSASSINATION ARCHIVES AND | * | |
| RESEARCH CENTER, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-01868 (TNM) |
| | * | |
| DEPARTMENT OF JUSTICE, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**PLAINTIFF'S  RESPONSE TO DEFENDANT'S**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 7(h), Plaintiff Assassination Archives and Research Center, Inc.

("AARC") submits this response to Defendant's Statement of Undisputed Material Facts.

1.  Plaintiff has no direct knowledge of this allegation and cannot admit or deny it.

2.  Plaintiff has no direct knowledge of this allegation and cannot admit or deny it.

3.  Plaintiff has no direct knowledge of this allegation and cannot admit or deny it.

4.  Admit.

5.  Admit.

6.  Admit.

7.  Admit.

8.  Admit.

9.  Admit.

10.  Admit.

11.  Admit.

12.  Admit.

13.    Admit.

14.    Admit.

15.    Admit.

16.    Admit, but deny the implication that an appeal was required.

17.    Admit.

18.    Admit, but deny the implication that Plaintiff waived any objection to the fees.

19.    Admit.

20.    Admit.

21.    Plaintiff has no direct knowledge of this allegation and cannot admit or deny it.
Plaintiff admits that it has not paid $52.50.

22.    Plaintiff has no direct knowledge of this allegation and cannot admit or deny it.
Plaintiff admits that it has not paid $52.50.

23.    Admit that Plaintiff failed to submit fees and that FBI stopped processing the
remaining pages. Deny that the fees were required.

24.    Plaintiff has no direct knowledge of this allegation and cannot admit or deny it.

25.    Admit.

26.    No response is required to this legal conclusion.

27.    No response is required to this legal conclusion.

28.    Admit that FBI made the determination. Deny that the determination was in
accordance with the regulations.

29.    No response is required to this legal conclusion.

30.    Plaintiff has no direct knowledge of this allegation and cannot admit or deny it.
Plaintiff admits that it has not paid $52.50.

Date:   May 18, 2022

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ASSASSINATION ARCHIVES AND**
**RESEARCH CENTER**,

         Plaintiff,

         v.

**DEPARTMENT OF JUSTICE**,

         Defendant.

Case No. 1:18-cv-01868 (TNM)

---

**ORDER**

Before the Court in this FOIA case is the government's Motion for Partial Summary Judgment. *See* Mot. for Partial Summ. J. (Def.'s Mot.), ECF No. 49. The government submits that Plaintiff Assassination Archives and Research Center (the Center) failed to timely pay FOIA fees as ordered by this Court. *See id.* at 1. The Court will grant the government's motion and order the Center to pay the outstanding balance it owes—$52.50—within 14 days of this Order upon penalty of dismissal of the action.

The Center filed a Complaint seeking records related to pre-1960 electronic surveillance activities from the FBI under FOIA. *See* Compl., ECF No. 1. The Center submitted three FOIA requests, and the FBI made its final release for two of the requests in November 2018. *See* Def.'s Mot. at 1. As for its third FOIA request, the Center requested that the FBI release records on CDs. *See id.* The government informed the Center that it would need to pay a monthly $15 duplication fee to receive the records on CDs. *See id.* The Center paid this monthly fee for the first nineteen productions. *See id.; see also* Second Declaration of Michael G. Seidel (2d Seidel Decl.) ¶ 7. But then the Center stopped paying. *See id.* at 2. By that point, the government had released four more productions. *See id.* The FBI sent a letter to the Center informing it that it

322

had an outstanding balance for these productions, and that failure to pay the outstanding fees

within 30 days would lead to the closure of the Center's FOIA request.  *See id.*

      After requesting multiple extensions of time and repeatedly flouting Court orders, the

Center moved for partial summary judgment, arguing that the government's assessed fees were

unreasonable.  *See* Pl.'s Mot. for Partial Summ. J., ECF No. 40.  This Court summarily dismissed

that motion because the Center had repeatedly violated the instructions in its Standing Order.

*See* Order, ECF 47.  And the Court ordered the Center to pay the government within 30 days.

*See id.*  The Center has not done so.  *See* Def.'s Mot. at 1.

      FOIA authorizes agencies to "promulgate regulations . . . specifying the schedule of fees

applicable to the processing of requests."  5 U.S.C. 552(a)(4)(A)(i).  As relevant here, the

Department of Justice has issued regulations governing FOIA fees which imposes "[d]uplication

fees" for most requesters.  28 C.F.R. § 16.10(c)(2).  The regulations define duplication as

"reproducing a copy of a record, or of the information contained in it."  *Id.* § 16.10(b)(3).  And

the regulations specify that when "a requester has previously failed to pay a properly charged

FOIA fee" the agency "may require that the requester pay the full amount due, plus any

applicable interest . . . before [the agency] begins to process a new request or continues to

process a pending request."  *Id.* § 16.10(i)(3); *see also* 5 U.S.C. § 552(a)(3)(A) (providing that an

agency's FOIA disclosure obligations are triggered under FOIA if a request is "made in

accordance with published rules stating the . . . fees [] and procedures to be followed").

      Summary judgment is proper if "there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The government argues that partial summary

judgment on the issue of fee nonpayment is warranted because the Center has not paid the

duplication fees for the last four productions.  *See* Def.'s Mot. at 2; *see also* 2d Seidel Decl. ¶¶ 9–11.  And the Center does not dispute that it has not paid the $52 and change it owes.  *See generally* Pl.'s Opp'n, ECF No. 50; Def.'s Reply, ECF No. 51 at 1.[1]  The D.C. Circuit and other courts in this district have held that an agency is entitled to summary judgment if a requester has failed to pay FOIA fees.  *See, e.g.*, *Pollack v. DOJ*, 49 F.3d 115, 120 (D.C. Cir. 1995); *Rosenberg v. USCIS*, 954 F. Supp. 2d 1, 13 (D.D.C. 2013).  This Court will do the same.

For these reasons, it is hereby

**ORDERED** that the Center's [49] Motion for Partial Summary Judgment is GRANTED; it is also

**ORDERED** that on or before October 12, 2022, the Center shall pay the government the outstanding balance it owes of $52.50; it is also

**ORDERED** that the government shall promptly inform this Court if the Center does not pay within the time specified, so that the Court may dismiss this action.

**SO ORDERED**.

2022.09.30
16:09:55 -04'00'

Dated: September 30, 2022

TREVOR N. McFADDEN
United States District Judge

---

[1] The Center defends by arguing that the government improperly denied its public interest fee waiver and that the government's duplication fees are not reasonable.  *See* Pl.'s Opp'n at 3–12. Neither argument raises a genuine issue of material fact that the Center has not paid the required duplication fees for the four productions it already received.  This Court allowed the Center to argue such issues in its Partial Motion for Summary Judgment, but the Center lost that opportunity by failing to abide by this Court's Orders despite frequent reminders (and regardless it only brought claims about the reasonableness of fees in its Motion for Partial Summary Judgment, *see* Mot. for Partial Summ. J., ECF No. 40 at 2 n.4).  In any event, neither argument raises a genuine issue that would preclude summary judgment as to the fee nonpayment issue.

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSASSINATION ARCHIVES AND RESEARCH CENTER, | |
| *Plaintiff*, | |
| v. | Civil Action No. 18-1868 (TNM) |
| DEPARTMENT OF JUSTICE, | |
| *Defendant*. | |

**DEFENDANT'S MOTION TO DISMISS AND
MEMORANDUM IN SUPPORT THEREOF**

## TABLE OF CONTENTS

Table of Contents ............................................................................................................ i

Table of Authorities ........................................................................................................ ii

Background ...................................................................................................................... 1

Argument ......................................................................................................................... 2

Conclusion ...................................................................................................................... 3

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

**<u>Page</u>**

*Ciralsky v. CIA*, 355 F.3d 661
355 F.3d 661 (D.C. Cir. 2004) ..........................................................................................2

*Link v. Wabash R.R. Co.*,
370 U.S. 626 (1962) ...........................................................................................................2

*Newby v. Bush*, ,
Civ. A. No. 08-983 (RMC), 2008 WL 11432194 (D.D.C. June 17, 2008) .......................2

*Peterson v. Archstone Cmtys. LLC*, 637 F.3d 416, 418 (D.C. Cir. 2011,
637 F.3d 416 (D.C. Cir. 2011) ...........................................................................................2

**<u>Statutes, Regulations, Rules, and Other Authorities</u>**

5 U.S.C. § 552 .....................................................................................................................2

Fed. R. Civ. P. 41 ............................................................................................................1, 2

Defendant United States Department of Justice ("Defendant"), by and through undersigned counsel, hereby moves to dismiss this matter pursuant to the Court's September 30, 2020, Order and Federal Rule of Civil Procedure ("Rule") 41(b) in light of Plaintiff Assassination Archives and Research Center's ("Plaintiff") failure to pay the duplication fees as ordered by the Court.

## BACKGROUND

Plaintiff commenced this action on August 8, 2018, pursuant to FOIA.  *See generally* ECF No.1, Compl.  Under FOIA, Plaintiff sought records relating to pre-1960 electronic surveillance activities from the Federal Bureau of Investigation ("FBI").  *See id.*

On November 23, 2021, Plaintiff moved for partial summary judgment and argued that the $15 is an unreasonable duplication fee and, based on the FBI's current processing rate, requested that the Court compel Defendant to move for an *Open America* stay.  *See generally* ECF Nos. 40, 41, Pl.'s Mot. for Partial Summ. J., Mot. to Compel.  Defendant opposed Plaintiff's motions.  *See generally* ECF No. 45, Def.'s Opp.  The Court denied Plaintiff's motions and ordered, in relevant part, Plaintiff to pay Defendant the outstanding balance by March 14, 2022.  The Court's order also noted that if Plaintiff failed to make that payment, Defendant may suggest a briefing schedule on the issue of whether production is complete given that Plaintiff is refusing to pay processing fees.  *See* ECF No. 47, Feb. 14, 2022, Order.  Plaintiff failed to pay the outstanding duplication fee (*see* ECF No. 49-1, 2d Seidel Decl. ¶¶ 9-11), and Defendant requested that the Court order a briefing schedule (ECF No. 48, Def.'s Status Report).  The Court granted the request.  *See* Mar. 23, 2022, Min. Order.

Defendant moved for partial summary judgment due to Plaintiff's failure to pay the FOIA fees as ordered by this Court.  *See* ECF No. 49, Def.'s Mot.  This Court granted Defendant's motion and ordered, *inter alia*, Plaintiff to pay Defendant the outstanding balance of $52.50 by no

later than October 12, 2022.  *See* ECF No. 52, Sept. 30, 2022, Order.  The Court also ordered Defendant to promptly inform the Court if Plaintiff failed to pay the fee within the time specified, so that the Court may dismiss this action.  *Id.*  Plaintiff has not paid the outstanding balance as ordered by the Court.  *See* Third Declaration of Michael G. Seidel at 2.  Accordingly, this matter should be dismissed with prejudice.

## <u>ARGUMENT</u>

Since Plaintiff failed to pay the outstanding balance as ordered by the Court, and required by FOIA, this matter should be dismissed.  Rule 41(b) permits the Court to dismiss either a claim or an action because of the plaintiff's failure to comply with the Rules "or any order of [the] court." Fed. R. Civ. P. 41(b); *Newby v. Bush*, Civ. A. No. 08-983 (RMC), 2008 WL 11432194, at *1 (D.D.C. June 17, 2008); *Ciralsky v. CIA*, 355 F.3d 661, 669 (D.C. Cir. 2004).  The court may dismiss for failure to prosecute *sua sponte* or on a defendant's motion.  *See Peterson v. Archstone Cmtys. LLC*, 637 F.3d 416, 418 (D.C. Cir. 2011) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629 (1962)); *see also* Fed. R. Civ. P. 41(b).  The authority to dismiss suits has long been recognized as "necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion" in the courts.  *Link*, 370 U.S. at 629-30.

Here, Plaintiff failed to pay the required fee pursuant to 5 U.S.C. § 552(a)(4)(A) and, even after several warnings, Plaintiff violated the Court's February 14, 2022, and September 30, 2022, orders which ordered Plaintiff to pay the outstanding balance of $52.50 for the duplication fees. Accordingly, the Court should dismiss this matter with prejudice due to Plaintiff's failure to pay the outstanding balance of $52.50 as required by FOIA and ordered by the Court.

**<u>CONCLUSION</u>**

For the foregoing reasons, Defendant respectfully requests that the Court grant Defendant's

motion and dismiss this matter with prejudice.

Dated: October 24, 2022                Respectfully submitted,

                                       MATTHEW M. GRAVES, D.C. Bar # 481052
                                       United States Attorney

                                       BRIAN P. HUDAK
                                       Chief, Civil Division

                                       */s/ Stephanie R. Johnson*
                                       STEPHANIE R. JOHNSON
                                       D.C. Bar # 1632338
                                       Assistant United States Attorney
                                       United States Attorney's Office
                                       Civil Division
                                       601 D Street, N.W.
                                       Washington, D.C. 20530
                                       Stephanie.Johnson5@usdoj.gov

                                       *Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASSASSINATION ARCHIVES AND
RESEARCH CENTER, INC.,

     *Plaintiff,*

         v.

U.S. DEPARTMENT OF JUSTICE,

     *Defendant.*

Civil Action No. 18-1868 (TNM)

## THIRD DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

1.     I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), Federal Bureau of Investigation ("FBI"), Winchester, Virginia. Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. §552a. Specifically, I am aware of the FBI's handling of Plaintiff's FOIA requests.

2.     The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3.     This declaration also incorporates and supplements the information provided in my first and second declaration submitted in this case. (ECF 45-1, "First Seidel Decl." and ECF 49-1, "Second Seidel Decl."). The FBI submits this declaration in support of Defendant's motion

to dismiss based on Plaintiff's failure to exhaust administrative remedies by failing to pay the

duplication fees assessed for receipt of records responsive to the FOIA requests.

### PLAINTIFF'S FAILURE TO PAY DUPLICATION FEES

4.　　The administrative history related to handling of Plaintiff's FOIA request was

provided in the First Seidel Declaration (¶¶ 5-17) and the Second Seidel Declaration (¶¶ 5-10).

5.　　On September 30, 2022, this court ordered Plaintiff "that on or before October 12,

2022, the Center shall pay the government the outstanding balance it owes of $52.50." (ECF No.

52.)

6.　　On October 17, 2022, the RIDS Public Information Officer checked the payment

log, the location where paid fees are recorded, and determined there was no record of Plaintiff's

payment for the outstanding duplication fee of $52.50 associated with the twentieth through

twenty-third productions provided in response to Plaintiff's FOIA requests. RIDS further

conducted a search of the records in the FOIPA Document Processing System and found no

record of Plaintiff's payment.

7.　　Accordingly, Plaintiff has failed to pay the required duplication fees per DOJ

regulation and as ordered by this Court on September 30, 2022.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this _____19th_____ day of October 2022.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **ASSASSINATION ARCHIVES AND RESEARCH CENTER**, |
| Plaintiff, |
| v. |
| **DEPARTMENT OF JUSTICE**, |
| Defendant. |

Case No. 1:18-cv-01868 (TNM)

**ORDER**

Before the Court in this FOIA case is the Government's Motion to Dismiss.  *See* Mot. to Dismiss (Def.'s Mot.), ECF No. 53.  This Court recounted the history of this case in its prior Order granting the Government's motion for partial summary judgment on the issue of unpaid FOIA processing fees.  *See* ECF No. 52.  In that Order, the Court instructed Plaintiff Assassination Archives and Research Center (the Center) to pay the Government the FOIA processing fees it owed ($52.50) within fourteen days upon penalty of dismissing the action.  *See* Def.'s Mot. at 2.  The Government submits that the Center has not paid.  *See id.* at 1; *see also* 3d Seidel Decl. ¶ 6.  Accordingly, the Court will dismiss this case under Rule 41(b) because the Center has failed to comply with this Court's Order.  *See Ciralsky v. CIA*, 355 F.3d 661, 669 (D.C. Cir. 2004) (affirming dismissal of an action for failure to comply with a Court order).

For these reasons, it is hereby

**ORDERED** that the Government's [53] Motion to Dismiss is GRANTED.

**SO ORDERED**.

The Clerk of Court shall close this case.

333

This is a final, appealable Order.

2022.11.08
10:55:43 -05'00'

Dated: November 8, 2022

TREVOR N. McFADDEN
United States District Judge

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

**333 Constitution Avenue, NW**
**Washington, DC 20001-2866**
**Phone: 202-216-7000 | Facsimile: 202-219-8530**


Plaintiff:            **AARC**
_____

           vs.                        Civil Action No. **18-1868 (TNM)**
_____

Defendant:         **DOJ**
_____

## CIVIL NOTICE OF APPEAL


Notice is hereby given this <u>7</u> day of <u>January</u> 20<u>23</u>, that

<u>Assassination Archives and Research Center, Inc.</u>

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from the

judgement of this court entered on the <u>8</u> day of <u>November</u>, 20<u>22</u>, in

favor of <u>Defendant</u>

against said <u>Plaintiff</u>


                              Kelly B. McClanahan
                              _____
                                Attorney or Pro Se Litigant


(Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure a notice of appeal in a civil action must be filed within 30 days after the date of entry of judgment or 60 days if the United States or officer or agency is a party)

USCA Form 13
August 2009 (REVISED)

335