No. 23-5004

[ORAL ARGUMENT NOT YET SCHEDULED]

**UNITED STATES COURT OF APPEALS**
**DISTRICT OF COLUMBIA CIRCUIT**

_____

ASSASSINATION ARCHIVES AND RESEARCH CENTER, INC.,

*Plaintiff-Appellant*,

v.

DEPARTMENT OF JUSTICE,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:18-cv-01868 (Trevor N. McFadden, J.)

_____

**BRIEF FOR PLAINTIFF-APPELLANT**
_____

Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff-Appellant*

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .....i

CORPORATE DISCLOSURE STATEMENT ...............................................ii

TABLE OF AUTHORITIES ..........................................................................iii

GLOSSARY ...................................................................................................vi

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF ISSUES..............................................................................1

STATEMENT OF THE CASE .........................................................................2

FACTUAL BACKGROUND ...........................................................................3

    *Initial Processing* ................................................................................3

    *AARC's First Attempts to Resolve the Fee and Processing Rate Issues* .5

    *Briefing Delays and the COVID-19 Pandemic* ....................................7

    *Renewed Briefing and Summary Dismissal* ..........................................10

    *Final Briefing and Final Dismissal* ......................................................14

SUMMARY OF ARGUMENT ......................................................................16

ARGUMENT ..................................................................................................17

    I.      STANDARD OF REVIEW ........................................................17

    II.     ISSUES REGARDING FUNDAMENTAL LITIGATION
          CONCEPTS................................................................................18

          A.     AGENCIES MUST SEEK SUMMARY JUDGMENT
                FIRST IN FOIA FEE ASSESSMENT CASES .................18

B.    AGENCIES MUST SEEK SUMMARY JUDGMENT
FIRST IN FOIA FEE WAIVER CASES ..........................20

C.    THE DISTRICT COURT ABUSED ITS DISCRETION
IN DENYING AARC'S 16 MARCH 2020 EXTENSION
REQUEST ......................................................................23

D.    SUMMARY JUDGMENT MOTIONS MUST BE
DECIDED ON THE MERITS AND SANCTIONS MUST
BE PROPORTIONATE....................................................26

III.    IMPLIED DECISIONS ON THE MERITS ................................32

A.    AARC IS ENTITLED TO A FEE WAIVER ...................32

1.    Information pertains to government operations or
activities .................................................................36

2.    Disclosure is likely to contribute to an
understanding of the operations or activities of
government ...............................................................36

3.    Disclosure will contribute to an understanding of
the subject by a reasonably broad audience of
interested persons...................................................37

4.    Disclosure will contribute significantly to public
understanding .........................................................37

5.    AARC has no cognizable commercial interest in
the requested records .............................................38

B.    FBI'S FEES WERE NOT REASONABLE AT THE
TIME THEY WERE ASSESSED....................................39

C.    FBI NEEDED TO SEEK AN *OPEN AMERICA* STAY....49

CONCLUSION .............................................................................54

CERTIFICATE OF SERVICE........................................................55

CERTIFICATE OF COMPLIANCE ...........................................................56

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Appellant Assassination Archives and Research Center, Inc. ("AARC"), by and through undersigned counsel, certifies the following:

### I.    Parties and Amici

The parties to this case are the Appellant AARC and the Appellee Department of Justice.  There are no *amici curiae* so far.

### II.    Rulings Under Review

Appellant seeks review of the orders issued by the District Court (McFadden, J.) on 6 August 2019, 16 March 2020, 14 February 2022, and 30 September 2022, and the Judgment issued by the District Court on 8 November 2022.

### III.    Related Cases

This case was not previously before this Circuit or any other court. There are currently no pending related cases.

Date: June 16, 2023

Respectfully submitted,


 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Circuit Rule 26.1, Appellant Assassination Archives and Research Center, Inc. hereby informs the Court that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Date: June 16, 2023

<u>  /s/ Kelly B. McClanahan  </u>
Kelly B. McClanahan, Esq.

# **GLOSSARY**

| | |
|---|---|
| AARC | Appellant Assassination Archives and Research Center, Inc. |
| ELSUR | Electronic Surveillance |
| FBI | Federal Bureau of Investigation |
| FOIA | Freedom of Information Act |
| FDPS | FOIA Document Processing System |
| JA | Joint Appendix |

## <u>TABLE OF AUTHORITIES</u>

**Cases:**                                                                                      **Pages**

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242 (1986) ...................................27

*AARC v. CIA*, 177 F. Supp. 2d 1 (D.D.C. 2001)...............................................35

*Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86 (D.C. Cir. 1986) ................41

*Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521 (D.C. Cir. 2011) ........18

*Brown v. U.S. Patent & Trademark Ofc.*, 445 F. Supp. 2d 1347 (M.D.
   Fla. 2006)..............................................................................................21

*Campbell v. DOJ*, 164 F.3d 20 (D.C. Cir. 1998) ..............................................38

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)................................................30

*Citizens for Resp. & Ethics in Wash. v. FEC*, 711 F.3d 180 (D.C. Cir. 2013)..52

*Clemente v. FBI*, 71 F. Supp. 3d 262 (D.D.C. 2014) .......................................53

*DOJ v. Tax Analysts*, 492 U.S. 136 (1989)............................................…18, 19

*Elec. Frontier Found. v. DOJ*, 517 F. Supp. 2d 111 (D.D.C. 2007) ...............50

*Elec. Privacy Info Ctr. v. FBI*, 933 F. Supp. 2d 42 (D.D.C. 2013)...................52

*EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406 (D.C. Cir. 1996) ..............28

*Foman v. Davis*, 371 U.S. 178 (1962)..............................................................27

*Founding Church of Scientology v. Webster*, 802 F.2d 1448 (D.C. Cir.
   1986) ....................................................................................................17

*Friends of the Coast Fork v. Dep't of the Interior*, 110 F.3d 53 (9th Cir.
   1997) ....................................................................................................39

*Goulding v. IRS*, No. 97-5628, 1998 U.S. Dist. LEXIS 9143 (N.D. Ill. June 2, 1998)...................................................................................................42

*Grimes v. Dist. of Cola.*, 794 F.3d 83 (D.C. Cir. 2015))...................................26

*Jackson v. Wash. Monthly Co.*, 569 F.2d 119 (D.C. Cir. 1977) .......................31

*\*Judicial Watch, Inc. v. GSA*, No. 98-2223, 2000 U.S. Dist. LEXIS 22872 (D.D.C. Sept. 25, 2000) .........................................................................33

*Judicial Watch, Inc. v. DHS*, 895 F.3d 770 (D.C. Cir. 2018)...........................51

*Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108 (D.C. Cir. 2004) ........................36

*Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003)............36, 38

*King v. DOJ*, 830 F.2d 210 (D.C. Cir. 1987)....................................................40

*Larson v. CIA*, 843 F.2d 1481 (D.C. Cir. 1988)................................................21

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009) ................................17

*Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962) ...............................................30

*\*McCready v. Nicholson*, 465 F.3d 1 (D.C. Cir. 2006)....................................28

*Nat'l Sec. Archive v. SEC*, 770 F. Supp. 2d 6 (D.D.C. 2011)...........................53

*Nat'l Security Counselors v. CIA*, 960 F. Supp. 2d 101 (D.D.C. 2013) ..........44

*\*Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976)................................................................5, 6, 49, 50, 51, 52

*Pollack v. DOJ*, 49 F.3d 115 (4th Cir. 1995)..........................................42, 48

*Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280 (D.C. Cir. 1983) .......................................................................................................40

*Ripalda v. American Ops. Corp.*, 977 F.2d 1464 (D.C. Cir. 1992) .................31

*Rizzo v. Tyler*, 438 F. Supp. 895 (S.D.N.Y. 1977)............................................33

*Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980).....................................30

*Shepherd v. American Broadcasting Cos., Inc.*, 62 F.3d 1469 (D.C. Cir. 1995) .......................................................................................30, 31

*Stein v. DOJ,* 197 F. Supp. 3d 115 (D.D.C. 2016)............................................20

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ....................................53, 54

*Wilderness Soc'y v. DOJ*, No. 04-650, 2005 U.S. Dist. LEXIS 20042 (D.D.C. Sept. 12, 2005) .........................................................................50

*Winston & Strawn, LLC v. McLean*, 843 F.3d 503 (D.C. Cir. 2016) ............26

**Statutes and Rules:**

5 U.S.C. § 552 ......................................................…...1, 17, 21, 39, 41, 42, 52

28 C.F.R. § 16.10................................................................................36

28 U.S.C. § 1331.................................................................................1

29 U.S.C. § 2601 note........................................................................8

Fed. R. Civ. P. 41...............................................................................16

**Legislative History:**

132 Cong. Rec. S14297 (Sept. 30, 1986) ..........................................42

H.R. Rep. No. 1497, 89th Cong., 2d Sess. (1966) ...........................19

S. Rep. No. 813, 89th Cong., 1st Sess. (1965)..................................19

## JURISDICTIONAL STATEMENT

Appellant Assassination Archives and Research Center, Inc. ("AARC") invoked the District Court's jurisdiction against the Federal Bureau of Investigation ("FBI")[1] under FOIA, 5 U.S.C. § 552, and 28 U.S.C. § 1331. Joint App'x at 12 [hereinafter "JA"].

On 8 November 2022, the Honorable Trevor N. McFadden ("the District Court") issued a Final Order dismissing the case. *Id.* at 242. AARC noticed an appeal against FBI on 7 January 2023. *Id.* at 335.

## STATEMENT OF ISSUES

1.      Whether the District Court erred as a matter of law in ordering AARC to seek partial summary judgment on fee issues?

2.      Whether the District Court erred as a matter of law in concluding that FBI was not required to seek an *Open America* stay?

3.      Whether the District Court erred as a matter of fact and law in denying AARC's extension motion based on the coronavirus emergency?

4.      Whether the District Court erred as a matter of law in denying AARC's partial summary judgment motion and motion to compel?

---

[1] FBI is treated herein as the "Appellee" because the case is about FBI Freedom of Information Act ("FOIA") requests.

5.      Whether the District Court erred as a matter of fact and law in ordering AARC to pay FBI's assessed fees?

6.      Whether the District Court erred as a matter of law in dismissing the entire case solely because AARC did not pay all of FBI's assessed fees?

## **STATEMENT OF THE CASE**

AARC sued FBI in response to the agency's failure to properly process its FOIA requests. This appeal addresses the following five decisions:

- Minute Order, 6 August 2019 – This order required AARC to seek partial summary judgment on two fee issues and file a motion to compel FBI to seek an *Open America* stay. It also denied AARC's oral motion to compel FBI to seek a stay. JA at 5.

- Minute Order, 16 March 2020 – This order denied AARC's extension motion. *Id.* at 6.

- Order, 14 February 2022 – This order denied AARC's motion for partial summary judgment on one fee issue and motion to compel. *Id.* at 272-75.

- Order, 30 September 2022 – This order awarded partial summary judgment to FBI. *Id.* at 322-24.

- Order, 8 November 2022 – This order dismissed the case as a sanction for not paying fees assessed by FBI. *Id.* at 333-34.

## FACTUAL BACKGROUND

*Initial Processing:*

1.    In July 2009, FBI revealed in litigation the existence of seven boxes of index cards pertaining to pre-1960 electronic surveillance activities ("ELSUR indices"). *Id.* at 214.

2.    In October 2009, AARC submitted to FBI a FOIA request for the ELSUR indices ("the 1st Request"). *Id.* at 209-10.

3.    In February 2011, FBI clarified that approximately 5,000 pages of the 18,000 identified pages were dated after 1960. *Id.* at 220. Due to a dispute over fees, FBI closed the 1st Request on 22 March 2011. *Id.* at 188.

4.    On 8 September 2012, AARC submitted another FOIA request to FBI. *Id.* at 255-56. This request asked for the ELSUR indices, regardless of whether they related to pre- or post-1960 surveillance, as well as "all tapes, transcripts, logs and other materials related to said surveillance, including surveillance applications, affidavits, testimony, authorizations and warrants" ("the 2d Request"). *Id.* at 223-24. AARC requested a public interest fee waiver. *Id.* at 224.

5.    On 10 September 2012, FBI refused delivery of the 2d Request. *Id.* at 255.

6.    In April 2013, AARC wrote to FBI to complain about the refusal. *Id.* at 222. FBI failed to respond to this correspondence as well until after the instant case was filed in 2018. *Id.* at 226.

7.    In September 2018, FBI denied AARC's fee waiver request, agreed to start processing the ELSUR indices, and claimed that the second part of the 2d Request "is not a proper request as it is too vague and would require an unduly burdensome search demanding extensive FBI resources." *Id.* at 226-27.

8.    On 4 February 2019, FBI issued its first release of ELSUR indices and informed AARC that it would be charged $25 for the first two CDs and $15 for each additional CD. *Id.* at 233-34.

9.    On 8 February 2019, AARC published a summary of this case on its website with the title "CURRENT: New Release of FBI ELSUR Records." https://aarclibrary.org/current-new-release-of-fbi-elsur-records/ (last accessed June 16, 2023).

10.    Later in February 2019, FBI informed AARC that it would be responsible for paying $15 within thirty days of each release or else FBI "will close any pending FBI FOIPA requests from you" and "cause an automatic denial of any future FOIPA requests." JA at 237.

4

11.     In October 2017, AARC also submitted two FOIA requests to FBI requesting information about the processing of the 1ˢᵗ Request and the refusal to accept the 2d Request. *Id.* at 246, 252.

12.     In November 2018, FBI released some redacted pages and claimed that its response to these requests was complete. *Id.* at 229-31.

*AARC's First Attempts to Resolve the Fee and Processing Rate Issues:*

13.     In June 2019, AARC first asked the District Court to intercede to resolve three preliminary issues. AARC argued that FBI should have to file a partial summary judgment motion justifying the reasonableness of its fee assessment and its denial of AARC's fee waiver request. *Id.* at 33-35. AARC argued that the District Court could not properly require AARC to seek partial summary judgment on these matters first when FBI had not yet provided any declarations or other evidence supporting its position. *Id.* at 33-34. FBI argued that the Court should not require it to justify its determinations first and should allow it to continue charging fees until AARC filed a partial summary judgment motion. *Id.* at 36.

14.     AARC also argued that the fact that FBI's 500-pages-per-CD processing rate delayed the resolution of the case by several years meant that FBI should be required to file a formal motion for a stay which satisfied the requirements established by this Court in *Open America v. Watergate Special*

5

*Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976). *Id.* at 34-35. FBI simply argued that it was "prepared to defend this processing rate." JA at 36.

15.    In August 2019, the District Court held a status conference. In that conference, FBI confirmed that its "only contention when we were discussing [the two fee issues] . . . is who would actually initiate briefing." *Id.* at 44. The District Court "direct[ed] the plaintiffs to file first and on both issues," referencing FBI's denial of AARC's fee waiver request and AARC's contention that FBI was not charging reasonable fees. *Id.* at 45-46.

16.    AARC also proposed suspending the monthly charges until FBI had completed its production, at which time FBI could seek summary judgment and AARC could pay any assessed fees if the District Court awarded it. *Id.* at 46. FBI declared that AARC "ha[s] to pay every month in order for FBI to produce." *Id.* at 47. The District Court declined to issue such an order without a formal partial summary judgment motion. *Id.*

17.    The District Court also stated that, in its opinion, a formal motion for an *Open America* stay was not necessary "given that there is an ongoing production." *Id.* at 52. It stated that AARC could file a motion to compel FBI to seek an *Open America* stay at the same time, but that it currently favored "setting production schedules based on various factors, not so much kind of a clear legal

6

standard, as more just trying to supervise the docket and the needs for certain production amount change over time." *Id*. at 53 (cleaned up).

*Briefing Delays and the COVID-19 Pandemic:*

18.    In this conference, the District Court instructed AARC to file its motions by 13 September 2019. *Id.* at 47.

19.    On 9 September 2019, AARC filed an unopposed motion requesting a six-month extension of this filing deadline, until 13 March 2020, advising the District Court that AARC's President had recently undergone heart surgery and was under medical orders not to work for an indefinite period of time. *Id.* at 56-57.

20.    On 10 September 2019, the District Court extended AARC's deadline until 10 March 2020. *Id.* at 6.

21.    On 9 March 2020, AARC filed an unopposed motion requesting an extension until 24 June 2020, stating that in the intervening time the undersigned had learned that he was expecting a baby on 17 April 2020, which would make adhering to the briefing schedule impossible. *Id.* at 58. AARC explained that the undersigned had not been able to comply with the District Court's standing order requiring that scheduling motions must be filed at least four business days in advance, *id.* at 21, because of a catastrophic computer failure. *Id.* at 59.

22.     On 11 March 2020, the District Court ordered that AARC's motions must be filed by 31 March 2020. The Minute Order stated that "[f]urther requests for extension shall be disfavored." *Id.* at 6.

23.     On 13 March 2020, President Donald Trump issued a proclamation declaring that the COVID-19 outbreak constituted a national emergency. White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, Mar. 13, 2020, *available at* https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last accessed June 8, 2023). This and similar measures resulted in the immediate closure of most businesses and agencies in the Washington, DC metropolitan area, including the childcare facility attended by the undersigned's older child. JA at 61.

24.     On 14 March 2020, the U.S. House of Representatives passed the Families First Coronavirus Response Act. This soon-to-be-passed law required, *inter alia*, that employers must provide two weeks of paid sick leave to any employee if "[t]he employee is caring for a son or daughter of such employee if the school or place of care of the son or daughter has been closed, or the child care provider of such son or daughter is unavailable, due to COVID-19 precautions." 29 U.S.C. § 2601 note.

8

25.    On 16 March 2020, AARC filed an unopposed renewed motion again requesting an extension until 24 June 2020. AARC cited the coronavirus outbreak as extraordinary circumstances and specifically cited H.R. 6201's requirement. JA at 61-62.

26.    Also on 16 March 2020, then-Chief Judge Beryl Howell issued Standing Order No. 20-9, which restricted District Court operations, citing among many factors the President's proclamation and "the closing of all area school districts for at least two weeks, which impinges on the availability of courthouse staff, jurors, and counsel." Standing Order No. 20-9 at 1-2, *available at* https://www.dcd.uscourts.gov/sites/dcd/files/Court%20Operations%20Standing%20Order%2020-9.pdf (last accessed June 8, 2023).

27.    On 16 March 2020, the District Court denied AARC's motion, stating, "The Plaintiff has known of its summary judgment briefing deadline since August 6, 2019. Notwithstanding the national emergency surrounding the coronavirus, the Plaintiff has not shown good cause why its briefing deadline should be extended yet again." JA at 6.

28.    On 31 March 2020, AARC notified the District Court that it would not be filing the planned motions because doing so would require the undersigned's law firm to violate the law. *Id.* at 63. AARC advised the District Court that it would wait until FBI sought summary judgment on the fee issues at

9

the end of its processing of the request at issue in Count 1 and then oppose that motion. *Id.* at 64. AARC also advised that it would indefinitely delay briefing matters related to FBI's processing rate because "the unexpected and extreme nature of the coronavirus emergency calls for at least a temporary cease-fire in this particular battle." *Id.* at 65. AARC advised that "[o]nce the coronavirus emergency has passed and FBI has taken steps to cope with the surge in its backlog, Plaintiff will reassess the situation and, if necessary, move at that time to accelerate FBI's processing of responsive records." *Id.*

*Renewed Briefing and Summary Dismissal:*

29.    At a status conference in October 2021, AARC informed the District Court that the unexpected duration of the coronavirus emergency and the slow rate of FBI's processing necessitated the filing of the previously planned motions, with the exception that the forthcoming fee motion would focus entirely on the reasonableness of FBI's fees and would not address AARC's fee waiver request. *Id.* at 108. The District Court instructed AARC to file its motions on 12 November 2021. *Id* at 110.

30.    In October 2021, AARC ceased making monthly payments to FBI.

31.    On 11 November 2021, AARC filed a consent motion requesting that its filing deadline be extended until 23 November 2021, advising the District Court that the undersigned's schedule had been disrupted by the accelerated briefing

10

schedule ordered by Judge Chutkan in another case in which he represented a group of legal scholars. AARC apologized for not filing this motion more than four days in advance, explaining that the undersigned "was attempting to meet the Court's original deadline and only just determined that it would not be possible to do so." *Id.* at 113-14.

32.    On 12 November 2021, the District Court granted AARC's motion and stated that "[f]uture extension requests will be disfavored." *Id.* at 9.

33.    On 23 November 2021, AARC sought partial summary judgment on the reasonableness of FBI's fees, accompanied by a ten-page memorandum of law. *Id.* at 115-24. AARC specifically stated:

> To be clear, this Motion is *not* about AARC's request for a public interest fee waiver; it is *just* about whether FBI has charged reasonable fees *assuming that AARC was not entitled to a fee waiver*. . . . FBI must justify through admissible evidence that it properly determined that AARC was not entitled to a public interest fee waiver when it seeks summary judgment *on its own* at some future point in the case . . . .

*Id.* at 116-17.

34.    AARC also filed a contemporaneous eight-page motion to compel FBI to seek an *Open America* stay. *Id.* at 160-67.

35.    On 20 December 2021, FBI requested that its 23 December 2021 deadline be extended until 28 January 2022. FBI argued that "good cause simply means a valid reason for delay" and gave the following four reasons for its extension: "(1) undersigned and agency counsel need additional time to research

11

the issue and allegations in Plaintiff's motions and confer with the supervising

attorneys about potential defenses; (2) the designated declarant needs additional

time to prepare and complete the supporting declaration; (3) Defendant needs

additional time to request, receive, and review the transcript of the Court's oral

ruling on August 6, 2019, in which the Court heard and denied Plaintiff's oral

motion to compel the Government to move for an Open America stay; and (4)

Defendant requests additional time to prepare an appropriate response to Plaintiff's

motions." *Id.* at 169-70.

36.    On 21 December 2021, the District Court ordered that FBI's

opposition briefs must be filed by 14 January 2022. The Minute Order stated that

"[f]uture extension requests will be disfavored." *Id.* at 9.

37.    In December 2021, FBI stopped making monthly releases.

38.    On 14 January 2022, FBI requested a further seven-day extension,

advising the District Court that "this morning undersigned counsel was informed

by agency counsel that her supervisor needs additional time to review the proposed

declaration." *Id.* at 172. After conferring with the undersigned, FBI also requested

that AARC's reply be due on 25 February 2022. *Id.* at 173.

39.    On 14 January 2022, the District Court granted FBI's request for

seven additional days for its brief but ordered that AARC's reply briefs must be

12

filed by 11 February 2022. The Minute Order did not state anything about future extension requests. *Id.* at 9.

40.    On 11 February 2022, AARC filed a consent motion requesting that its deadline be extended by five days, advising the District Court that the undersigned had been ordered by another district judge to be ready for a jury trial at the end of February and had been similarly ordered to file a joint pretrial statement that day, and that the Government did not return the marked-up draft until that evening. *Id.* at 270. The undersigned further explained that he did not request the extension earlier because he did not know if he would need it, because he only anticipated needing less than a day to complete the briefs. *Id.* at 270-71.

41.    On 14 February 2022, the District Court denied AARC's extension motion. After reciting a history of AARC's—but not FBI's—extension requests, the District Court stated, "Enough is enough. A plaintiff must prosecute its case. And it must abide by the Court's instructions. The Center has done neither." *Id.* at 273-74.

42.    In addition to denying AARC's extension motion, the District Court also denied AARC's partial summary judgment motion and its motion to compel, stating that "the Center has repeatedly violated the Court's standing order and its warnings that future requests for an extension would be disfavored." *Id.* at 274. The District Court further ordered, "The Center shall either pay the Government

13

within 30 days, or the Government may suggest a briefing schedule on the issue of whether production is complete given that the Center is refusing to pay processing fees." *Id.*

43.    The District Court's 14 February 2022 Order did not include a discussion of *any* of the arguments made in either of AARC's motions.

*Final Briefing and Final Dismissal:*

44.    On 18 March 2022, FBI advised the District Court that AARC had not paid the fees that it was contesting. *Id.* at 276. It accordingly proposed a briefing schedule for a motion for summary judgment. *Id.*

45.    On 18 April 2022, FBI sought partial summary judgment, arguing that its responses to the FOIA requests at issue in this case were complete because AARC had stopped paying the monthly fees associated with the 2d Request. *Id.* at 287. FBI also argued in this motion that its fees were reasonable, *id.* at 288-90, but it did not argue that it had properly denied AARC's fee waiver request.

46.    FBI also did not argue that any of its searches were adequate, that any of its withholdings were proper, or that the second part of the 2d Request was an improper FOIA request. The only mention of any topics besides the non-payment of fees and the reasonableness of fees was in the context of "*further* searches and processing." *Id.* at 287 (emphasis added).

14

47.     On 18 May 2022, AARC filed its opposition to FBI's motion. AARC argued extensively that FBI had failed to demonstrate that the fees it assessed were reasonable, *id.* at 310-17, and that, even if they were, FBI had improperly denied AARC a public interest fee waiver, *id.* at 308-10.

48.     On 30 September 2022, the District Court granted FBI's motion on the sole grounds that AARC had not paid the assessed fees. *Id.* at 324.

49.     The District Court's 30 September 2022 Order did not include a discussion of *any* of the arguments made in AARC's opposition except for a footnote acknowledging that they were made and the following statement:

> Neither argument raises a genuine issue of material fact that the Center has not paid the required duplication fees for the four productions is already received. This Court allowed the Center to argue such issues in its Partial Motion for Summary Judgment, but the Center lost that opportunity by failing to abide by this Court's Orders despite frequent reminders (and regardless it only brought claims about the reasonableness of fees in its Motion for Partial Summary Judgment . . . ). In any event, neither argument raises a genuine issue that would preclude summary judgment as to the fee nonpayment issue.

*Id.*

50.     The District Court further ordered AARC to pay FBI the outstanding $52.50 balance within two weeks of the decision and stated that failure to do so would lead to "the Court . . . dismiss[ing] the action." *Id.*

51.     On 24 October 2022, FBI advised the District Court that AARC had not paid the fees that it was contesting. *Id.* at 329. It accordingly asked the District

Court to dismiss the case in its entirety pursuant to Federal Rule of Civil Procedure 41(b). *Id*. FBI argued that dismissing the entire case, including all of the search and withholding issues in controversy related to the releases already made, because AARC had not paid $52.50 in monthly payments was "necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the courts." *Id.* (cleaned up). FBI made this argument without ever explaining why its own lethargic processing rate, its stubborn refusal to file a motion justifying its fee determinations, or its complete halting of all processing did not cause "undue delays in the disposition of pending cases and . . . congestion in the courts." FBI also made this argument without ever, in the entire history of the case, filing a single piece of evidence to support its processing of AARC's requests which did not pertain to either its $15-per-CD fee or its 500-pages-per-month processing rate.

52.     On 8 November 2022, the District Court granted FBI's motion, citing Rule 41(b) and AARC's failure to pay the fees it continued to contest. *Id.* at 333.

53.     On 7 January 2023, AARC appealed the District Court's orders. *Id.* at 335.

## **SUMMARY OF ARGUMENT**

The District Court erred when it ordered AARC to file the first partial summary judgment motion regarding fee issues, and it erred when it denied AARC's March 2020 extension motion. Reversing either of these decisions would

have a hydraulic effect on the rest of the case, leading to all subsequent decisions being reversed and remanded.

The District Court also erred by denying AARC's partial summary judgment motion on the reasonableness of FBI's fee assessment and AARC's motion to compel FBI to seek an *Open America* stay as a sanction.

The District Court also erred by finding that AARC was required to pay FBI's assessed fees and that FBI was not required to seek an *Open America* stay, to the extent that the District Court made any findings regarding those issues.

## ARGUMENT

AARC seeks a reversal of the District Court's orders of 6 August 2019, 16 March 2020, 14 February 2022, 30 September 2022, and 8 November 2022.

## I.    STANDARD OF REVIEW

The Court reviews substantive FOIA decisions and questions of law *de novo*. *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009). The Court's review of fee waiver decisions is limited to the record before the agency. 5 U.S.C. § 552(a)(4)(A)(vii). The Court reviews scheduling orders and orders imposed as sanctions for abuse of discretion. *Founding Church of Scientology v. Webster*, 802 F.2d 1448, 1457 (D.C. Cir. 1986).

17

## II.    ISSUES REGARDING FUNDAMENTAL LITIGATION CONCEPTS

Despite the apparent complexity of the factual background recited above, many of the legal issues in play in this case are basic building blocks of civil litigation. Cases must be decided on the merits except in extraordinary circumstances. Parties which do not bear the burden of proof cannot be required to seek summary judgment. A court cannot grant a motion for summary judgment without explaining why there is no genuine issue of material fact. A court's discretion in scheduling matters is not limitless. And most critically, sanctions must be proportional to the alleged misconduct. At one point or another, the District Court failed to follow each of these core precepts, and as a result, the Court should reverse the District Court's decisions and put this case back on track.

For ease of reference, the following discussion is organized in roughly chronological order according to the decision in question.

### A.    AGENCIES MUST SEEK SUMMARY JUDGMENT FIRST IN FOIA FEE ASSESSMENT CASES

FOIA cases are appropriately resolved on motions for summary judgment. *Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). These motions are required to be brought by the Government because "[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not agency records or have not been improperly withheld." *DOJ v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989) (quotations omitted). This has

18

been the case since FOIA was first enacted. *See* S. Rep. No. 813, 89th Cong., 1st Sess., 8 (1965) ("Placing the burden of proof upon the agency puts the task of justifying the withholding on the only party able to explain it"); H.R. Rep. No. 1497, 89th Cong., 2d Sess., 9 (1966) (same).

Despite this universal rule, the District Court decided to reverse the burden of proof and force AARC to "disprove[] that the materials sought . . . have not been improperly withheld." *Tax Analysts*, 492 U.S. at 142 n.3. Despite the fact that, as AARC pointed out, there was *no* evidence in the record that supported FBI's claim that its assessed fees were reasonable, the District Court insisted that the requester must first argue that the fees were *unreasonable,* placing AARC at the distinct disadvantage of having to guess at the FBI's justifications in its initial brief, while the FBI would be free to tailor its declaration to the arguments made by AARC and not run the risk of revealing any information that might detract from its narrative. This clearly erroneous decision set the stage for the entire course of this case and led inexorably to this appeal.

In anticipation of the fact that the Court may question the importance of this decision, vacating and reversing it would have a hydraulic effect on most of the challenged decisions in this case. Reversing this decision would mean that AARC likely would have never needed to request the extensions which troubled the District Court. It would mean that AARC's motion would never have been denied

19

due to delays because it would not have been required, which in turn would mean that when FBI *did* ultimately file a motion on the fee issue and AARC opposed it, the District Court would have been required to actually adjudicate the motion on the merits instead of relying on the fact that it had already dismissed AARC's motion and concluding that the fact that "the Center has not paid the duplication fees for the last four productions" was dispositive. JA at 323-24.

In short, if the Court finds that the District Court abused its discretion in making AARC go first, it should accordingly vacate every substantive or sanction decision which followed the 6 August 2019 status conference and remand the case to the District Court with instructions to adjudicate FBI's 18 April 2022 motion *on the merits* and explicitly consider AARC's arguments regarding the reasonableness of FBI's assessed fees and its entitlement to a fee waiver. Once the District Court fully adjudicates the question of whether AARC is legally required to pay the fees assessed by FBI, the case can then proceed on a normal track.

## B.    AGENCIES MUST SEEK SUMMARY JUDGMENT FIRST IN FOIA FEE WAIVER CASES

Similarly, the District Court erred by not requiring FBI to seek partial summary judgment presenting evidence that it had properly denied AARC's request for a public interest fee waiver, which is a separate and distinct factual and legal question from the reasonableness of the assessed fees. *Accord Stein v. DOJ,* 197 F. Supp. 3d 115, 123 (D.D.C. 2016) ("The question of whether §

20

552(a)(4)(A)(viii) prohibits Defendant from charging Plaintiff any duplication fees is . . . 'a separate issue from the public interest fee waiver issue.'"). On this issue, AARC maintains that FBI would still be required to either file the first motion or otherwise provide AARC with "the record before the agency," 5 U.S.C. § 552(a)(4)(A)(vii), but it recognizes that this position potentially lies in tension with this Court's jurisprudence that "the burden for satisfying the public interest standard remains on the requester," *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988). However, the fact that the standard of review for fee waiver cases is statutorily restricted to "the record before the agency" necessarily means that a requester cannot be required to meet his burden of proof *without that record*, as would be the case if a requester were forced to file the first motion.

In such a case, the requester never actually receives "the record before the agency"; it is only given a declaration responding to the specific arguments it raised in its motion. The FOIA statute does not restrict the court's review to "the parts of the record before the agency that the requester already knows about and the agency selectively chooses to produce"; it requires that the court consider *the entire record before the agency. See*, *e.g.*, *Brown v. U.S. Patent & Trademark Ofc.*, 445 F. Supp. 2d 1347, 1354 (M.D. Fla. 2006) (holding that administrative record— which "includes Plaintiff's e-mailed FOIA requests, letters from USPTO to Plaintiff, e-mails, memoranda, and handwritten notes made by USPTO employees

in processing Plaintiff's requests, the documents provided by the USPTO in response to Plaintiff's first FOIA request, the USPTO estimate of charges for processing Plaintiff's second FOIA request and denial of his fee waiver request, Plaintiff's letter appealing that decision with three attachments, and the USPTO denial of Plaintiff's appeal"—was sufficient because it "appears to contain documents which would be prepared or assembled in the normal course of evaluating a FOIA fee waiver request"). Accordingly, a court cannot perform an adequate *de novo* review of any fee waiver determination without the agency first presenting *all* of its evidence that it made the correct determination, at which point the requester must demonstrate that, based on all of the agency's evidence, the agency made the wrong decision.

As with the fee assessment above, a ruling in AARC's favor on this issue would have a hydraulic effect on the subsequent decisions in the case. If FBI had been required to justify its denial of AARC's request for a public interest fee waiver in 2019, the District Court would have adjudicated that question long before AARC stopped paying fees. If the District Court had ruled in AARC's favor, there would have been no fees for AARC to stop paying. FBI could not then base its entire case on AARC's non-payment of fees, and the District Court could not have dismissed the case as a sanction for not obeying a court order to pay fees. For that matter, if the District Court had ruled that AARC was *not* entitled to a

22

public interest fee waiver and FBI *had* charged reasonable fees, *AARC would not have stopped paying fees*. JA at 46 ("[W]e've committed that if we are denied the fee waiver and the Court decides that we have to pay fees, that we'll pay the fees."). This Court should accordingly vacate every decision which followed the 6 August 2019 status conference and remand the case to the District Court as described above.

### C.     THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING AARC'S 16 MARCH 2020 EXTENSION REQUEST

Simply put, the District Court abused its discretion by unreasonably minimizing the effect the coronavirus emergency and the related shutdowns had on AARC's undersigned counsel, claiming that denial of a unopposed motion was appropriate because "Plaintiff has known of its summary judgment briefing deadline since August 6, 2019" and holding that "[n]otwithstanding the national emergency surrounding the coronavirus, the Plaintiff has not shown good cause why its briefing deadline should be extended yet again." *Id.* at 6. On the first point, the fact that AARC had known about the deadline since August was irrelevant since the District Court had already concluded on 10 September 2019 that AARC's President's heart surgery was a legitimate reason for the undersigned not to work on the motions for that period of time. It would be patently unfair to allow the District Court to expressly endorse a party's reason for not working on motions for

six months and then penalize the party for not working on the motions for six months.

The District Court's second statement, however, underscores the unreasonableness of this decision. The President of the United States declared a state of emergency which led to virtually the entire Executive Branch shutting down and most private businesses closing until further notice. The U.S. House of Representatives passed a bill legally requiring all employers to provide paid sick leave to employees—like the undersigned—who now had to care for children at home, and the bill was on track to be signed into law within days. The Chief Judge of the District Court expressly acknowledged all of these factors and restricted court operations to a small fraction of the normal workload. And all of this happened as the undersigned was preparing to go on paternity leave after the birth of his second child. There is no scenario in which a denial of this motion is reasonable.

Viewed with the benefit of hindsight, the District Court's abuse of its discretion is even more apparent when one considers that, while all of these factors could arguably have been held to not constitute good cause, the District Court held that FBI's counsel demonstrated good cause by simply claiming that she "need[ed] additional time to research the issue and allegations in Plaintiff's motions and confer with the supervising attorneys about potential defenses," that the agency

24

declarant "need[ed] additional time to prepare and complete the supporting declaration," that FBI "need[ed] additional time to request, receive, and review the transcript of the Court's" 6 August 2019 ruling (which it had known would be relevant since 6 August 2019), that FBI "request[ed] additional time to prepare an appropriate response to Plaintiff's motions," and that a senior agency official decided at the last minute to review a declaration. *See id.* at 160, 163. If these statements—which basically boil down to "writing briefs takes time"—constituted good cause, it cannot be argued that AARC's stated reasons, based in a once-in-a-lifetime public health crisis, official government responses to it, and the fast-approaching birth of an attorney's child during a pandemic—did not.

As with the previous decision, this decision is worth reversing primarily because of the critical role it played in the development of this case. Without it, AARC would not have been required to forgo filing its motions in March 2020, and twenty months would not have passed between the District Court's deadline and their ultimate filing. In short, reversing this decision would have the same general effect as reversing the previous decision, resulting in the District Court's adjudication of the parties' respective motions—likely including AARC's motion to compel, although AARC may have declined to pursue it in June 2020 for the same reason it stated in March 2020—on the merits, which would effectively negate all of the District Court's subsequent decisions.

25

**D.    SUMMARY JUDGMENT MOTIONS MUST BE DECIDED ON THE MERITS AND SANCTIONS MUST BE PROPORTIONATE**

All three of the District Court's 2022 decisions were clearly erroneous for variations of the same two basic reasons: (1) the District Court failed to follow this Court's clear precedent requiring summary judgment motions to be decided on the merits; and (2) the sanctions selected by the District Court for violations of its Standing Order were grossly disproportionate to the alleged misconduct.

On the first point, this Court has clearly spoken in controlling precedent, and it should summarily reverse these decisions on this basis alone. In 2016, this Court held that a Local Rule which allowed a judge to dismiss an unopposed motion for summary judgment as conceded was fundamentally incompatible with Federal Rules of Civil Procedure 56(a) and 56(e), holding that "a court must always determine for itself whether the record and any undisputed material facts justify granting summary judgment," *Winston & Strawn, LLC v. McLean*, 843 F.3d 503, 507 (D.C. Cir. 2016) (quoting *Grimes v. Dist. of Cola.*, 794 F.3d 83, 95 (D.C. Cir. 2015)), and that "judgment is granted only after the District Court satisfies itself that the record and any undisputed material facts justify granting summary judgment." *Id.* A necessary corollary to this rule is that a District Court also cannot *deny* a motion for summary judgment without "determin[ing] for itself whether the record and any undisputed material facts justify granting summary judgment," *id.*

26

All of this is in service of the basic precept that "our judicial system[] [has a] strong presumption in favor of adjudications on the merits." *Foman v. Davis*, 371 U.S. 178, 181-82 (1962).

When the District Court summarily denied AARC's motion for partial summary judgment solely on the basis of the violations of the Standing Order and AARC's alleged failure to "prosecute its case," JA at 274, it did so without ever determining for itself whether the record and any undisputed material facts justified granting summary judgment. When the District Court relied on that decision[2] and granted FBI's partial summary judgment motion solely on the basis of the fact that AARC had not paid FBI the fees the District Court had never fully held to be properly assessed, it did so without ever satisfying itself that the record and any undisputed material facts justified granting summary judgment.[3] When the

---

[2] The District Court's reliance on the previous denial to grant summary judgment to FBI on the fee waiver issue is undeniably erroneous, since AARC "only brought claims about the reasonableness of fees in its Motion for Partial Summary Judgment." *Id.* at 324. In other words, even assuming *arguendo* that the District Court properly denied AARC's partial summary judgment motion, it would have no bearing on whether AARC later demonstrated the existence of a genuine issue of material fact regarding its entitlement to a public interest fee waiver.

[3] This decision is especially problematic because the District Court declined to believe the evidence of the nonmovant and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 255 (1986). AARC provided significant evidence, and yet the District Court's order relegated it to a passing conclusory remark in a footnote that "neither argument raises a genuine issue that would preclude summary judgment as to the fee nonpayment issue." JA at 324.

District Court finally dismissed the case in its entirety solely because AARC had not paid FBI the fees in question, it did so without ever even *reading* the record regarding the adequacy of the searches already performed by FBI, the appropriateness of FBI's determination that part of the 2d Request was not a proper FOIA request, or the validity of FBI's withholdings of information from thousands of pages it had already processed and released, since FBI had filed *no evidence* about any of these issues. Every one of these decisions is directly precluded by controlling precedent.

Moreover, these decisions ignored the District Court's duty to articulate the reasons for its decisions. "When [this Court] review[s] a district court's decision . . . for an abuse of discretion, it is imperative that a district court articulate its reasons." *McCready v. Nicholson*, 465 F.3d 1, 15 (D.C. Cir. 2006) (cleaned up) (quoting *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1410 (D.C. Cir. 1996)). When a District Court fails to address any of the arguments made by a party except to say that it was not convinced, it is not "articulat[ing] its reasons." This is true for most of the decisions under appeal, including the decision to require AARC to file first, the decision to deny AARC's 16 March 2020 extension motion, the decision to deny AARC's partial summary judgment motion, the decision to deny AARC's motions to compel (both the oral and written ones), and the decision to grant FBI's final motion. The consistent factor in all of these

28

decisions is the District Court's failure to justify its determinations in non-conclusory terms.[4]

It is abundantly clear that the District Court made every decision after August 2019 to punish AARC, whether the District Court explicitly styled the order as a sanction or not. Over time, the District Court's sanctions became more extreme even though the cited misconduct remained comparatively minor, leading to the ultimate sanction of dismissal. The best example of this trend is the denial of AARC's 23 November 2021 motions based solely on its extension request regarding reply briefs. The District Court would arguably have been operating within its discretion to deny this motion and simply disallow the late filing of AARC's reply briefs, at which point it would have still had four briefs to review. It is well established that a motion and an opposition provide a court with an adequate basis for adjudicating a motion. Instead, the District Court took the extreme step of not only denying AARC's extension motion, but denying the substantive motions as well without evaluating them on their merits. And it did so *solely as a sanction*. The District Court took a similar punitive action against

---

[4] Both parties violated the primary rule the District Court cited, JA at 272-73, but only AARC was sanctioned. *See id.* at 168-70 (violating four-day rule), 171-73 (same). Moreover, almost 40% (51 out of 130 pages) of the exhibits included in Dkt. #45-1—FBI's largest filing—were not text-searchable despite Local Civil Rule 5.4(a), which apparently did not warrant mention—let alone sanction—by the District Court.

AARC—this time for no stated reason whatsoever—when it granted FBI's requested extension but reduced AARC's requested subsequent extension by fourteen days in the same order. *Id.* at 9.

Generally, the appropriate sanction is governed by the rule violated. However, "[w]hen rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of judicial process, the inherent power [of the court] fills the gap." *Shepherd v. American Broadcasting Cos., Inc.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)). "Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Id.* at 1475 (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980)). Thus, utilization of inherent powers must be restrained "[b]ecause of their very potency." *Id.* at 1475 (quoting *Chambers*, 501 U.S. at 44). For this reason, "the overriding purpose of the inherent power is 'to achieve the orderly and expeditious disposition of cases.'" *Id.* at 1475 (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-631 (1962)).

Such exercise requires clear and convincing proof the court's order has been violated in bad faith. *Id.* at 1476-1477. Naturally flowing through this examination "is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 1478 (quoting *Chambers*, 50 U.S. at 44-45). "[D]ismissal is a 'drastic step, normally to be taken only after unfruitful resort to lesser

sanctions.'" *Ripalda v. American Ops. Corp.*, 977 F.2d 1464, 1466 (D.C. Cir. 1992) (quoting *Jackson v. Wash. Monthly Co.*, 569 F.2d 119, 123 (D.C. Cir. 1977)). This act of properly and methodically calibrating the scales ensures all lesser sanctions have been thoroughly addressed so as to impose the most effective penalty while still balancing the policy favoring adjudication on the merits. *Shepherd*, 62 F.3d at 1478-1479.

Simply put, the District Court did not do that. Its first sanction for requesting too many extensions and not including specific language in those requests was to dismiss two meritorious motions which had already been substantially briefed. Its second sanction was ordering AARC to pay fees that it had not yet clearly found to be legally assessed, effectively granting summary judgment to FBI on all fee-related issues without the matter even being briefed. Its third sanction was to effectively dismiss the entire case in a two-step process because AARC refused to pay fees that the Court had *still* not properly found to be legally assessed. While the District Court had the undeniable discretion to impose *some* sanctions if it so chose, none of these are remotely proportional responses to the cited misconduct, and they all demonstrate that most of the decisions made in this case were the product of a district judge who simply blamed the requester for the slow progress of a FOIA case caused by the agency's intransigence.

## III.    IMPLIED DECISIONS ON THE MERITS

The District Court claimed that its two fee-based findings were alternatively reached by an evaluation of the merits of the parties' respective positions, JA at 324, but since it failed to articulate any reasons for this conclusion, it falls to this Court to perform an independent review.[5] Additionally, while the District Court never claimed to have considered the merits of AARC's motion to compel, *id.* at 274, AARC will briefly address that motion as well to demonstrate that, as a matter of law, is position was correct and that either its oral motion or its written motion should have been granted.

### A.    AARC IS ENTITLED TO A FEE WAIVER

Rather than argue that no genuine issue of material fact existed regarding its denial of AARC's fee waiver request, FBI instead elected to argue simply that it was entitled to summary judgment because AARC had not paid the fees FBI had assessed after denying that request. The District Court then claimed that AARC's argument that it was entitled to a fee waiver—against which FBI offered no evidence to the contrary—did not "raise[] a genuine issue of material fact that the Center has not paid the required duplication fees for the four productions it already

---

[5] While the District Court treated this as a single question of whether AARC paid the fees FBI had assessed, AARC argued that it was not *required* to pay the assessed fees because it was entitled to a public interest fee waiver and the fees were not reasonable. *Id.* Accordingly, they will be treated separately herein.

received." *Id.* at 324. This statement makes no sense. If AARC is entitled to a fee waiver, then FBI could not "require[] duplication fees" in the first place, and the District Court could not penalize AARC for not paying fees that were not properly imposed. *See Judicial Watch, Inc. v. GSA*, No. 98-2223, 2000 U.S. Dist. LEXIS 22872 at *39 (D.D.C. Sept. 25, 2000) ("An attempt to condition disclosure upon the payment of fees improperly imposed is the sort of improper withholding that this court may enjoin.") (quoting *Rizzo v. Tyler*, 438 F. Supp. 895, 898 (S.D.N.Y. 1977)). Therefore, this Court should find that AARC has clearly satisfied the fee waiver standard and reverse and remand this case accordingly.

As an initial matter, FBI raised an inexplicable argument below that AARC was required to appeal the denial of its fee waiver request, and AARC will address it briefly first, since this argument ignores the record in this case. As FBI's declarant unambiguously testified, the request in which AARC did not appeal the fee waiver denial was Request No. 1139342-000, submitted on 7 October 2009 and herein described as the "1st Request," "which was closed on March 22, 2011 due to Plaintiff's failure to respond with a commitment to pay estimated fees." *Id.* at 188-89. Then, according to FBI's declarant, AARC submitted *another* request in either 2012 or 2013[6] which was broader than the 1st Request, which was opened as

---

[6] The parties' disagreement over when this request was submitted is immaterial to this case.

Request No. 1139342-001 on 13 September 2018 and is herein described as the

"2d Request." *Id.* at 190. FBI did not issue its fee waiver denial for the 2d Request

until 13 September 2018, *id.*, a month after AARC commenced this litigation. It is

well established that no administrative appeal is required of an agency

determination issued during litigation. Therefore, this argument is frivolous.

The uncontroverted facts show that AARC submitted the following

information in support of its fee waiver request:

> As president of the AARC, I have been interviewed by many television
> news programs and documentaries concerning the assassinations of
> President Kennedy and Dr. Martin Luther King, Jr., the President John
> F. Kennedy Assassination Records Collection Act of 1992 ("JFK
> Records Act"), and related topics. I have also appeared on radio
> programs, including the Voice of America and The Larry King Show.
> I have appeared on a number of television programs, including CNN,
> Fox News, and Good Morning America (CBS). The Washington Post
> ran an op-ed piece by me on the need to release the records of the House
> Select Committee on Assassinations. This article was widely reprinted
> in other papers, as was an article on the AARC which was disseminated
> by the Associated Press. On June 8, 1997, the Washington Post
> published an Outlook Section article I wrote on the assassination of Dr.
> Martin Luther King, Jr. and the case of his alleged assassin, James Earl
> Ray. I have been quoted by Reuters, the Associated Press, the New
> York Times, the Washington Post and numerous other representatives
> of the news media on matters pertaining to the assassinations of
> President Kennedy and Dr. King.
>
> I testified to both houses of Congress regarding the pending legislation
> to require disclosure of records pertaining to the assassination of
> President Kennedy. In November 1993, I testified before the House
> Subcommittee on Legislation and National Security regarding the
> implementation of the JFK Act. On several occasions I testified at
> hearings held by the Assassination Records Review Board, a five-
> citizen panel appointed to enforce the JFK Records Act.

\*\*\*\*\*

As noted above, the purposes of the AARC is [sic] to gather, preserve and disseminate information to the public regarding political assassinations. The AARC maintains both extensive hard copy files and digital copies of government records which comprise approximately one million pages. Because possible connections of organized crime figures to the assassinations of President John F. Kennedy, Dr. Martin Luther King. and Senator Robert F. Kennedy figure prominently in the investigations of these murders, the holdings of the AARC, both hard copy and digital, reflect this. The public interest in such records is undeniable. There is also a profound public interest in such materials even if they do not pertain to the above-cited political assassinations, particularly where such surveillances were unlawful or related to investigations which were not done for law enforcement purposes.

. . . The records will show what the FBI was up to and when, with respect to the FBI's operations regarding organized crime activities and other activities. The public interest in such matters is obvious and profound. Our capability to disseminate the information has been amply demonstrated above.

*Id.* at 223-24. This description amply satisfies the statutory criteria. This conclusion is additionally justified since at least one district court has previously held that AARC was entitled to a public interest fee waiver. *See AARC v. CIA*, 177 F. Supp. 2d 1, 3 (D.D.C. 2001).

Four requirements must be met in order to find that release of the requested information is in the public interest. First, a requester must demonstrate that the information it seeks concerns the *operations or activities of government.* Second, it must demonstrate that the disclosure is *likely to contribute* to an understanding of the operations or activities of government. Third, it must show that the disclosure

35

will contribute to an understanding of the subject by a *reasonably broad* audience of interested persons. Fourth, it must demonstrate that the information will contribute *significantly* to such understanding. 28 C.F.R. § 16.10(k); *see also Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1126 (D.C. Cir. 2004); *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003).

### 1.    Information pertains to government operations or activities

There is no meaningful dispute that this request pertains to government operations or activities. The information is about FBI surveillance activities.

### 2.    Disclosure is likely to contribute to an understanding of the operations or activities of government

Similarly, there is no principled reason to question that the disclosure of this information would contribute to an understanding of FBI operations and activities. The only potential issue would arise if AARC had not established an ability to disseminate the released information, but it clearly did so. In fact, AARC posted a summary of this case and the first release on its website only a few days after receiving the first tranche of records, and all the records received thus far are available on AARC's website. *ELSUR: Electronic Surveillance*, *at* https://aarclibrary.org/fbi-elsur/ (last accessed June 16, 2023). AARC is in the business of storing and disseminating information, and its officers are recognized as experts in their fields. Accordingly, the Court should find that AARC clearly demonstrated that it satisfied this criterion.

36

### 3.    Disclosure will contribute to an understanding of the subject by a reasonably broad audience of interested persons

This criterion is easily met in this case by virtue of the same facts which met the previous criterion. Simply put, people with their own well-trafficked website who are cited in as many places as AARC's officers can be presumed to reach a reasonably broad audience of interested persons, especially when the subject matter involves controversial law enforcement surveillance techniques of historically significant people and organizations. The Court can reach this conclusion without even considering the dispute over FBI's refusal to classify AARC as a representative of the news media: a determination which neither FBI nor the District Court have attempted to justify, despite AARC pointing out the need to do so early in the litigation. JA at 116 ("FBI will eventually have to prove through admissible evidence that it properly denied AARC's fee category request."). Therefore, AARC will not further belabor this point.

### 4.    Disclosure will contribute significantly to public understanding

For the same reasons presented above, the significance of the contribution to public understanding cannot reasonably be questioned. None of these *18,000 pages* of records—not to mention all of the "tapes, transcripts, logs and other materials" that FBI has so far refused to process—about *decades* of FBI's electronic surveillance activities had been previously released, and their mere existence was

only revealed in 2009. *Id.* at 224. *Any* contribution to public understanding of these matters is by definition significant given the previous secrecy of the information.

This is why the "significance" criterion is consistently evaluated in terms of whether or not the information already exists in the public domain to a substantial degree. *See*, *e.g.*, *Campbell v. DOJ*, 164 F.3d 20, 36 (D.C. Cir. 1998) (holding that defendant agency did not explain how the requested material was in the public domain and thus did not justify its fee waiver denial and stating the rule that the "mere fact that material is in the public domain does not justify denying a fee waiver; only material that has met the threshold level of public dissemination will not further public understanding"). It is self-evident that records which had never been previously publicly disseminated documenting controversial and potentially unlawful agency activities of potentially great historical significance will contribute significantly to public understanding.

In light of Congress' clear mandate that FOIA must be "liberally construed" in favor of waivers for non-commercial requesters, *Rossotti*, 326 F.3d at 1312, the Court should find that the disclosure of the requested information is in the public interest.

### 5.    AARC has no cognizable commercial interest in the requested records

The remaining prong of the public interest fee waiver test requires that the requested information not be primarily in the requester's commercial interest. 5

U.S.C. § 552(a)(4)(A)(iii). FBI has never asserted that AARC has a commercial interest, so this issue is effectively forfeited, since "the agency must stand on whatever reasons for denial it gave in the administrative proceeding." *Friends of the Coast Fork v. Dep't of the Interior*, 110 F.3d 53, 55 (9th Cir. 1997).[7]

Accordingly, the Court should hold that AARC is entitled to a public interest fee waiver, reverse all decisions of the District Court which were premised on the absence of such entitlement, and remand this case to the District Court with instructions to proceed accordingly.

## B.     FBI'S FEES WERE NOT REASONABLE AT THE TIME THEY WERE ASSESSED

In contrast to the fee waiver dispute described above, FBI did argue that its fees were reasonable, but it based its argument on the fact that its processing routine *now* is different than its processing routine *at the time of the fee assessment*, JA at 178, which renders its evidence meaningless.

---

[7] On this point, it is worth noting that, assuming *arguendo* that the letters exchanged between AARC and FBI are the total extent of the administrative record, FBI did not actually give *any* reasons for denial. This fact alone distinguishes this case from practically every other fee waiver case decided in the Government's favor; where those denial letters provided some inkling of where the requester's request fell short, FBI chose to simply parrot the regulatory language here, possibly even using a template. This level of generality falls far short of the rule that a denial letter "must be reasonably calculated to put the requester on notice as to the deficiencies in the requester's case." *Id.*

As FBI admits, the process described below was in place at the time FBI assessed the fees. *See id.* at 203 ("[T]he detailed description provided by Plaintiff . . . reflects the FBI process at the time of the referenced litigation (2017)."). The standard for judicial review of agency FOIA determinations is whether or not the decision was proper at the time it was made. *See Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1284 (D.C. Cir. 1983) (indicating that to invoke Exemption (b)(3), an agency must be able to demonstrate that the statute being invoked in conjunction with Exemption (b)(3) "was in effect at the time of the FOIA request"); *see also King v. DOJ*, 830 F.2d 210, 216 (D.C. Cir. 1987) (indicating that for purposes of Exemption (b)(1), a classification decision should be considered in regard to the terms of the Executive Order under which the decision was made). Accordingly, even accepting as true FBI's claims regarding its current system, this was not the system in place when FBI *began* processing AARC's request, which was when it made the fee assessment. Therefore, the Court must decide if the fees assessed *in 2018* were reasonable, which they were not.

The referenced declaration of David Hardy asserted that $15/CD was a reasonable fee because it did not exceed the "direct labor costs" incurred by forcing a GS-11 to GS-13 employee to be "active through a majority of the

process." JA at 133.[8] Simply put, even though FBI offered evidence which

demonstrated that the direct costs of releasing a CD containing 500 pages exceeded

$15, that is not the end of the matter. The "reasonable standard charges"

restriction, 5 U.S.C. § 552(a)(4)(A)(ii)(III), and the "direct costs" restriction, *id.* §

5 U.S.C. § 552(a)(4)(A)(iv), on an agency's ability to assess duplication fees are

not two distinct provisions which can be treated independently of one another.

FOIA itself originally treated these two requirements *together* stating that "fees

shall be limited to reasonable standard charges for document search and

duplication and provide for recovery of only the direct costs of such search and

duplication." 5 U.S.C. § 552(a)(4)(A) (1974). This understanding was implicit in

the relevant court decisions of the time, which always treated the two provisions

together. *See*, *e.g.*, *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 88-89 (D.C.

Cir. 1986) ("FOIA permits agencies to impose 'reasonable standard charges for

document search and duplication' to recover the direct costs of such services.").

---

[8] Judge Chutkan granted summary judgment to FBI in that case because she
interpreted this Court's remand order to be limited to the question of whether the
$15/CD charge exceeded FBI's direct costs, not whether those direct costs were
reasonable. *Nat'l Sec. Counselors v. DOJ*, 305 F. Supp. 3d 176, 180 (D.D.C.
2018). Accordingly, the instant case is the first time that any court has had the
opportunity to fully adjudicate the reasonableness of FBI's $15/CD duplication fee
in light of the subsequent Hardy Declaration; this Court's previous consideration of
this fee rate predated—and was responsible for—the public disclosure of this
information.

When Congress replaced this quoted language with the current multi-paragraph version of 5 U.S.C. § 552(a)(4)(A) as part of the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1803, it gave no indication that it intended to separate these two considerations. The FOIA amendments were absent from the congressional reports on this large omnibus act, and the only mentions of the fee amendments in floor statements focused on how the intent was to give greater guidance to agencies and make it easier for agencies to make fee determinations and for certain types of requesters to obtain preferential fee treatment, *not* to separate the "direct costs" requirement from the "reasonable standard charges" requirement. *See*, *e.g.*, 132 Cong. Rec. S14297-14299 (Sept. 30, 1986) (statement of Sen. Leahy). This understanding has been adopted by courts since that amendment as well, undermining any argument that decisions like *Better Government Association* are no longer good law. *See Pollack v. DOJ*, 49 F.3d 115, 119 (4th Cir. 1995) ("[T]he Act specifically requires the government to publish a uniform schedule of fees, authorizing each agency to charge a 'reasonable' amount for the direct costs of document search, duplication, and review."); *Goulding v. IRS*, No. 97-5628, 1998 U.S. Dist. LEXIS 9143, at *26 (N.D. Ill. June 2, 1998) ("[FOIA authorizes] each agency to charge a 'reasonable' amount for the direct costs of document search, duplication, and review.").

42

As the *Pollock* opinion shows, it remains appropriate for a court to consider whether the direct costs are reasonable, and a contrary holding would run counter to the general rule of FOIA that agencies must only assess "reasonable standard charges" for duplication. If an agency could simply utilize a patently unreasonable duplication method and then hide behind the fact that it is only charging the "direct costs" it incurred using that patently unreasonable duplication method, the "reasonable standard charges" limitation would be effectively *subordinate* to the "direct costs" limitation, instead of being the co-equal factor intended by Congress.[9]

The next legal question is whether an agency can ignore FOIA's statutory restrictions by implementing an unnecessarily complex and redundant "security review process," but this question has already been addressed by another district court in this Circuit. In the case *National Security Counselors v. CIA*, Judge Howell addressed an analogous controversy, in which the Central Intelligence Agency and Department of State were accused of using overcomplicated processes for duplicating records in electronic format as a justification for categorically determining that no records were readily reproducible in electronic format. 960 F.

---

[9] A similar legal question would arise if an agency deliberately searched for records using the most time-consuming process when it was able to conduct a much simpler search and then insisted that every requester must pay for the direct costs of the longer process.

43

Supp. 2d 101, 202-07 (D.D.C. 2013). In that case, as in this case, the underlying explanation for the agencies' processes was that the FOIA processing system was on each agency's classified network, and so extra steps were required to move records from the classified network to the unclassified network. Judge Howell stated that she was "somewhat skeptical regarding the State Department's explanation of the labyrinthine steps that are necessary to move a document from the classified system to an unclassified piece of electronic media," *id.* at 205, and separately opined, "I can't imagine a more cumbersome process to have been created to do FOIA processing, I really can't. It boggles the mind that the CIA takes unclassified documents, puts them on a classified computer system, which can only print for obvious reasons in order to process what might otherwise be a fairly simple FOIA request for unclassified documents." JA at 142.

Despite these judicial warnings in 2013 and 2011, respectively, involving two separate agencies, FBI implemented the next evolution of these processes. In light of the fact that at least one court has held that an agency cannot refuse to provide CDs *at all* based solely on its insistence on using "labyrinthine steps" to create a CD, FBI instead decided to argue that it may use the *cost* of that process to justify charging more fees to requesters than it otherwise would be able to. This Court should decline this invitation to allow an agency to use a process that is

44

deliberately and unnecessarily complicated and redundant to justify higher fees than FOIA would allow if it used a reasonable process.

With this in mind, it is appropriate to demonstrate the unreasonableness of the process FBI previously described by examining the actual script a FOIA employee was required to follow to produce a single CD containing 500 pages of unclassified records:

1.    First, all records responsive to a request had to be placed in the FOIA Document Processing System ("FDPS"), which is on a classified network, regardless of the records' classification. *Id.* at 130.

2.    Then, once a record was processed for release in the FDPS, an employee had to export each section of a document as a multi-page TIF file to their local computer drive. *Id*. at 131.

3.    Then the employee had to manually rename each TIF file and save it to a common shared drive. *Id.*

4.    Then the employee had to convert each multi-page TIF file into a series of single-page text files because Integrity—the FBI security system being described—could not read TIF files. *Id.*

5.    The employee had to walk to a separate computer to do the conversion. *Id.*

6.    The employee had to then copy the newly created text files from the shared drive to their local computer drive. *Id.*

7.    Then the employee had to create keywords for the Integrity system to search for. *Id.*

8.    Then the employee had to run the Integrity scan using the custom keywords they created against each single-page document for an unspecified amount of time. *Id.* at 132.

9.    Then the employee had to manually review the automated scan results. *Id.*

10.    Then the employee had to run a second Integrity scan using general keywords against each single-page document because Integrity could not search for general and custom keywords at the same time. *Id.*

11.    Then the employee had to determine if each keyword located by an Integrity scan was actually an entire word and decide if it should be redacted because the Integrity system could not limit results to whole words. *Id.*

12.    Then, if the employee determined that a word must be redacted, they restarted the Integrity scan from the beginning again. *Id.* at 133.

13.     Then the employee returned to the FDPS and exported the sections directly to an unclassified computer as PDF files, which were then burned to a CD. *Id.*

14.     Only GS-11 through GS-13 employees could perform *any* of the above-described work. *Id.* at 134.

15.     Each employee had to personally be actively involved with the above-described process for 50 minutes per 500 pages. *Id.* at 133.

16.     As a result, for every 4800 pages released to *anyone*, a GS-11 or higher-level employee had to spend an *entire 8-hour work day* doing nothing but going back and forth between computers, reviewing records which had already been through a line-by-line FOIA review, and re-running redundant automated scans.

From Hardy's testimony, it is clear that this process served very little purpose beyond allowing FBI to claim that it is protecting classified information even though the bulk of records put through it were unclassified from the outset. Moreover, even the assertion that the FDPS system had to be located on the classified system is undermined by Hardy's testimony that after all the Integrity scans had been run, the employee *returned to the FDPS system*, which is presumably still located on the classified network, and *directly "export[ed] all sections from FDPS into an unclassified PDF format outside FDPS." Id.* at 133.

47

This "external FDPS location" appears not to have been located on the classified network, prompting the question of why it was not used the entire time instead of putting unclassified records on a classified network. However, even setting that odd inconsistency aside, there was no rational reason for the unnecessarily labyrinthine processes described by Hardy, such as converting files from one format to another format, then to a third format, then back to the first format, all on different computers unable to read the other formats, or re-running an entire scan because a single word was redacted, after which a simple export process could be run from the first system to the CD-creation program without any complications.

That being said, whether FBI was allowed to use this process is beyond the scope of this case, especially since it claims to have changed at least some of the process. This case is about whether or not FBI can *charge requesters* for the time spent using this bizarre process, and the answer to that question is no because the direct costs incurred as a result of this process are not "a 'reasonable' amount for the direct costs of document . . . duplication." *Pollack*, 49 F.3d at 119.

Accordingly, if the agency would not be allowed under FOIA to charge the direct costs of using this process, then it cannot use the direct costs of using this process as a metric against which other arbitrary fees are measured. As a result, the simple fact that $15/CD was less than the direct costs of using this process does not demonstrate that $15/CD was a reasonable fee. For this reason, the Court should

48

find that FBI assessed unreasonable duplication costs to AARC and accordingly reverse and remand this case. If the Court still finds that FBI was correct to assess fees to AARC, it should still reverse and remand this case with instructions for the District Court to give AARC an opportunity to make good on its commitment to pay all assessed fees if it lost this argument, JA at 46.

### C.    FBI NEEDED TO SEEK AN *OPEN AMERICA* STAY

This Court should hold that FBI—and any other similarly situated agency— must satisfy the strict requirements this Court established in *Open America* and conclude that the District Court erred by implicitly holding that a formal motion for a stay was not required because "there [wa]s an ongoing production," *id.* at 52.

In cases where an agency seeks to postpone briefing by a significant period, it is well established that the agency must seek an *Open America* stay justifying the delay. In such a motion, an agency must show "exceptional circumstances" to meet the "substantial burden [placed] on the government to justify to the courts any noncompliance with FOIA time limits." *Open Am.*, 547 F.2d at 617 (Leventhal, J., concurring). An *Open America* stay may be granted "(1) when an agency is burdened with an unanticipated number of FOIA requests; *and* (2) when agency resources are inadequate to process the requests within the time limits set forth in the statute; *and* (3) when the agency shows that it is exercising 'due diligence' in processing the requests; *and* (4) the agency shows 'reasonable progress' in

reducing its backlog of requests." *Elec. Frontier Found. v. DOJ*, 517 F. Supp. 2d 111, 120 (D.D.C. 2007) (quoting *Wilderness Soc'y v. DOJ*, No. 04-650, 2005 U.S. Dist. LEXIS 20042, at *31-32 (D.D.C. Sept. 12, 2005)).

In recent years, the Government has taken the unusual position that an *Open America* stay is not required when the agency in question is processing records, and that it is only necessary when the agency seeks to delay its *commencement* of the process. In other words, according to the Government, if an agency seeks to wait until June 2024 to begin processing records, which it would complete processing in September 2024, it must meet the strict requirements for an *Open America* stay, but if it seeks to slowly process records until April 2028, it may simply cite its "policy" and rely on the Court's inherent authority to enter scheduling orders as an exercise of discretion. There is no defensible reason for such a dichotomy, and such an extreme delay in the resolution of a FOIA case is beyond the scope of the Court's inherent authority to manage its docket and is the *raison d'être* for the *Open America* line of jurisprudence. It is well established that an agency has complied with FOIA when it *completes* its processing of responsive records, not when it *begins* it. If the purpose of the heightened burden for an *Open America* stay is "to justify to the courts any noncompliance with FOIA time limits." *Open Am.*, 547 F.2d at 617 (Leventhal, J., concurring), then it must apply to "*any* noncompliance with FOIA time limits," *id.* (emphasis added), regardless of

50

whether the noncompliance is due to a delay in the commencement or the
completion of the process.

*Open America* dealt with a district court's order to immediately process the
plaintiff's request. That order was reversed and the stay was granted after
"exceptional circumstances" were found, but the *Open America* stay was created
as, and remains, an exception to the default rule that agencies must comply with all
of FOIA, including the statutorily imposed deadlines. An agency's "good faith and
due diligence" remain the "touchstones underlying FOIA's statutory scheme."
*Judicial Watch, Inc. v. DHS*, 895 F.3d 770 (D.C. Cir. 2018) (quoting *Open Am.*,
547 F.2d at 616). A district court is obligated to determine that an agency "has
organized its records management systems to enable prompt determinations to
produce records or to invoke an exemption, and to monitor when necessary an
agency's progress in adjusting its records management systems to enable it to
comply with FOIA." *Id*. at 784. When an agency has not yet processed all records,
it has not "responded" to the entire request, because it may still decide to assert
exemptions for as-yet-unprocessed records. The point of an *Open America* stay is
to allow more time to respond to the request in its entirety, not just part of it.
Otherwise, an agency could simply produce one responsive document up front and
then delay the release of other records for years.

Once in court, an agency "may further extend its response time [to a request] *if it demonstrates 'exceptional circumstances' to the court.*" *Citizens for Resp. & Ethics in Wash. v. FEC*, 711 F.3d 180 (D.C. Cir. 2013) (emphasis added). The language of *Open America* jurisprudence broadly makes clear that agencies must either promptly comply with FOIA's requirements or *actively* seek a stay for "exceptional circumstances" to allow more response and/or processing time, which may only be granted as long as the agency is "exercising due diligence in responding to the request." 5 U.S.C. 552 § (a)(6)(C)(i). "Exceptional circumstances" specifically *excludes* "a delay that results from a predictable agency workload of requests . . . unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." *Id.* § 552((a)(6)(C)(ii). This change was specifically made in 1996 to narrow the circumstances under which agencies could rely on *Open America* stays—and such a change is hardly consistent with the notion that an agency does not have to actively justify its delay in response or processing if it is doing anything more than not responding *at all*.

Possible reasons for such a stay include that the agency is "deluged" with requests "vastly in excess of that anticipated by Congress," *Open Am.* at 616, or that the agency is making efforts to, *e.g.*, reduce the number of pending requests or the size or complexity of other requests. *See, e.g.*, *Elec. Privacy Info Ctr. v. FBI*, 933 F. Supp. 2d 42, 46 (D.D.C. 2013). But the agency has to affirmatively meet

this burden in order to be given more time. *See, e.g., Clemente v. FBI*, 71 F. Supp. 3d 262, 266 (D.D.C. 2014) ("The FBI must make two showings before the court may grant a stay of proceedings: (1) that exceptional circumstances exist, and (2) that the agency is 'exercising due diligence' in processing [the] request."). All of these cases take for granted that an *Open America* stay is a conditional grant of more time contingent on the agency's affirmative showings. *See, e.g.*, *Nat'l Sec. Archive v. SEC*, 770 F. Supp. 2d 6, 8-9 (D.D.C. 2011) (finding that plaintiff's allegation that defendants violated FOIA by failing to disclose responsive records within the statutory period was countered by the SEC's affirmative detailing of its exceptional circumstances and due diligence warranting an *Open America* stay).

A further, practical reason the burden is on the agency to move for and demonstrate eligibility for an *Open America* stay is that the plaintiff is in no position to know of, let alone demonstrate to the Court, whether the agency is actually exercising due diligence or is truly facing exceptional circumstances. For both judicial economy and basic fairness purposes, the agency must either produce the requested records quickly or explain why it cannot. This is effectively the same logic behind *Vaughn* indices, as *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), found that the Government could not simply assert broad and conclusive exemptions, but instead had to defend the asserted exemptions in more detail because it was the only party that could do so absent a special master. Indeed, the

53

*Vaughn* court noted that "[t]he procedural requirements we have spelled out herein may impose a substantial burden on an agency seeking to avoid disclosure. Yet the current approach places the burden on the party seeking disclosure, in clear contravention of the statutory mandate." *Id.* at 828. In FOIA litigation, many burdens are on the Government for a reason. Here, it is consistent with the entire FOIA framework to require that a district court may not significantly delay the case as a simple act of discretion based on an agency's conclusory statements.[10]

## **CONCLUSION**

For the foregoing reasons, the Court should summarily reverse the District Court's orders with respect to the issues described herein.

Date: June 16, 2023

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Appellant*

---

[10] Because the question before the Court is simply whether FBI is required to seek an *Open America* stay in the first place, any argument over its processing rate is beyond the scope of the Court's immediate review.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 16th day of June, 2023, I filed the foregoing with the Court's Electronic Case Filing system, causing a copy to be served via electronic mail to Appellee's counsel of record.

Date: June 16, 2023

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing filing contains 12,977 words, excluding portions exempted by Fed. R. App. P. 32(f), and was prepared in 14-point Times New Roman font using Microsoft Word 2016.

<u>/s/ Kelly B. McClanahan</u>
Kelly B. McClanahan, Esq.